IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TENNESSEE RIVERKEEPER, INC., )
)
             Plaintiff,     )
                            ) Case No.
        v.                  ) 3:23-cv-00878
                            )
RICKY RAY dba RR Farms      ) District Judge Crenshaw
a/k/a RR Farms Mass Grading, )
                            )
             Defendant.     )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

TRANSCRIPT OF PROCEEDINGS

May 19, 2025
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:

          For the Plaintiff:  Mr. Mark E. Martin
                              Mark E. Martin, LLC
                              1706 Reid Road
                              Oneonta, Alabama 35121

                              Mr. Andrew Holt
                              Neal & Harwell, PLC
                              1201 Demonbreun Street
                              Suite 1000
                              Nashville, Tennessee 37203

          For the Defendant:  Mr. Gregory Lee Cashion
                              Mr. William Fitts
                              Smith, Cashion & Orr
                              One American Center
                              3100 West End Avenue, Suite 800
                              Nashville, Tennessee 37203

PREPARED BY:
                  LISE S. MATTHEWS, RMR, CRR, CRC
                     Official Court Reporter
                  719 Church Street, Suite 2300
                       Nashville, TN 37203
                  lise_matthews@tnmd.uscourts.gov

I N D E X

Monday, May 19, 2025


INDEX OF WITNESSES

(None)



INDEX OF EXHIBITS

(None)

The above-styled cause came on to be heard on May 19, 2025, before the Honorable Waverly D. Crenshaw, Jr., District Judge, when the following proceedings were had, to-wit:

HE COURT:  So we're still on the record in case 23-878, *Tennessee Riverkeeper, Inc. v.* -- now, I guess we're down to one defendant, *Ricky Ray, dba RR Farms a/k/a RR Farms Mass Grading.*

If the counsel want to make their appearance on the record.

MR. MARTIN:  Mark Martin for Tennessee Riverkeeper.

MR. HOLT:  Drew Holt for Tennessee Riverkeeper.

MR. CASHION:  Greg Cashion for Ricky Ray.

MR. FITTS:  And William Fitts for Ricky Ray.

THE COURT:  All right.  So we're here for the final pretrial conference.  The case will proceed to jury trial on May the 27th at 9:00 in this room.

Let me go over certain things, and at certain points I'll stop for any questions.

The first thing will be jury selection.  The Court's going to have 30 citizens from the Middle District of Tennessee present here for voir dire.  The Court plans to select eight to be the jury.  There are no alternates in civil cases.  So all will deliberate and all will participate

in reaching a verdict.

So the way I generally do it, when they come into the courtroom, they will come in in the random selection.  So they'll gather, I think, around 7:30, fill out paperwork. They'll see a video from Chief Justice Roberts, and they will also look at another video on implicit bias and do a lot of paperwork.  So around 9:00 they should be ready to come up here.

And once we know who appears, the Clerk does the random selection, and they'll come in in that order.  When you come into the courtroom on Tuesday morning, you'll have a chart, and that's big enough so you can do your notes on that chart during voir dire.

And the first -- Juror Number 1 will be at the top row to the first chair to the right.  That will be Juror Number 1.  We'll fill up the box and then probably a little bit in the gallery.  And we'll voir dire everybody at one time.

The first eight after you exercise your for cause challenges and peremptory challenges, whoever's the first eight, that will be your jury.

So I will start the questioning with very general stuff:  Have you ever been in a lawsuit?  Have you ever been a juror? a grand juror?  If so, what kind of case did you hear?  If it's a criminal case we won't put any time in that.

If it's a civil case, I'll try to ask them a little bit about that experience.  I generally ask them when you were -- what year you were a prior juror or how long ago?  Did you -- were you the foreperson?  Did you deliberate and did you reach a verdict?  And whether it was civil or criminal, state or federal.  So that gives you all enough information that you can follow up.

And then I'll ask them all generally, is there anything about that experience that would interfere with their ability to be a fair and impartial juror in this case?

What other general questions do I ask?  I will ask them if they know, of course, any of the parties.  I'll ask them if they know any of the jurors.  I'll ask them have -- for themselves, their -- their family members and close family friends, any experience with -- in cases either as a party, as a witness, or a juror.

So those -- those questions usually will give us a pretty good idea of their prior experience.  When you come in in the morning, you'll have not only that big chart that you can write on, 1 through 30, but you'll also have two pieces of information about each juror:  Where they live, their spouse, where they -- whether they have children, and where they work.  And I think where the spouse works.  So that will all be on the information on your desk when you come in.

Also on your desk will be a copy of the proposed

draft instructions for you to have, as well as your peremptory challenge report and the for cause.

So, after I go through all of those general questions, I'm -- I shift to case-specific questions. And this is where I need your help, because I will read to them a one- or two-page joint agreed statement of the case that I need you all to prepare and submit to me by 9:00 on May the 22nd. Just one to two pages that says what kind of case this is and briefly what the parties', you know, summary of the case is. I think you might be able to do it in one page, but no more than two.

And I'll use that to transition to case-specific -- you know, have you read anything about this case? Do you know anything about this case? Do you know any -- any -- have you ever been a juror in any case like this in the past? And then what their experience, if any, has been with some of the environmental issues you all are raising here.

This is a pretty focused case in the sense it's about the Clean Water Act. So I would like you all's help for any questions you think generally I should ask the -- the venire about this case in particular.

I'll certainly, you know, tell them it's brought under the Clean Water Act, and then we have the other statute here as well, but have they ever had any dealings with this

at all -- these kind of issues before, either themselves, close family -- family members or close family friends.

On the off chance they've ever been a party to a case like this or a witness to a case like this, or if there's anything particular about this case that would give them -- that would interfere with their ability to be a fair and impartial juror. I guess that's my thinking of where we'll -- we'll need to take a little bit deeper dive to see if anyone on the panel has any strong opinions, beliefs about the environment in general that might be something we need to delve into to make sure they can be fair and impartial.

So, if there are any -- I haven't really come up with my questions yet. We've got a week off. But I don't think I'll have a lot. But I'll use whatever you all provide me as a joint statement of the case to get into the more -- more case-specific issues for discussion.

Then, after -- after I've asked my questions, then I'll turn to the plaintiff. You'll have 15 minutes to follow up. Then the defendant will have 15 minutes to follow up. And then we'll all -- whoever's doing the voir dire, only one attorney on each side will come to the bench. And we'll both have our big charts and then we'll do the for cause.

And I'll just say "Juror Number 1." And if anybody wants to object for cause, that's your time. Tell me why. I'll rule. If I grant it, then you can scratch that

one off.  If I don't, "Juror Number 2."  So we go 1 through 30, and that's the for cause hearing.

Then you'll go back to your desk and exercise your three peremptory challenges.  You'll both do that at the same time.  You'll pass it up.  I'll scratch those from the chart, and then I'll announce who are the first eight, and that will be our jury.

So it will be easy for the jury to see and look at Ricky Ray, because he'll be here.

Who is going to be Tennessee Riverkeeper's corporate representative?

MR. MARTIN:  That will be David Whiteside.

THE COURT:  Can you spell the last name?

MR. MARTIN:  W-h-i-t-e-s-i-d-e.

THE COURT:  Does he have a title or. . .  Just member?

MR. MARTIN:  He's the executive director.

THE COURT:  Okay.

MR. MARTIN:  And the Riverkeeper.

THE COURT:  And obviously I'll introduce the lawyers and the parties and Mr. Whiteside and Mr. Ray during voir dire.

Let's see.  So I've told you about jury information, for cause, peremptory challenges.

No discussion of the law during voir dire.  No

personal information about yourselves, your favorite sports team, or anything like that. Strictly questions that go to whether or not a particular juror can be an impartial judge of the facts in this case and follow the Court's instructions.

If a particular juror has a personal matter and is uncomfortable sharing it to everyone, then I'll ask that juror to approach the bench. One attorney from each side will also come to the bench. We'll still be on the record, but we can do that here at the bench and hear what their concerns are.

Would I be correct that -- I'll tell the jury I anticipate the case will go, you know, at most two to three days, something like that. In other words, if we start on Tuesday, we should be done by Friday, so they don't have to interfere with any vacation plans they've got for the 4th of July.

Everyone agree with that?

From the plaintiff?

MR. MARTIN: I agree with that.

THE COURT: All right.

And the defense?

MR. CASHION: We agree.

THE COURT: So we'll talk about the timing. I'll just tell them generally how court will run. We start at

9:00; we'll take a morning break; we'll take an hour for lunch; we'll take an afternoon break; and then we'll typically end up anywhere between 4:30, 5:00, and 5:30. Might go past 5:30 if we've got a witness on the stand and we're almost done with that witness, then stay a little bit later to do it.

Once we have the jury, I'll have a better idea where people are driving from. Some of our jurors will have an hour-and-a-half to an hour-45-minute drive. And I'm real sensitive to that, especially if they've got to pick up children, make dinner, get home. I try to take that into account.

At the same time, getting here at 9:00 in the morning can be an ordeal in Nashville traffic if you're coming that far. And we can be a little sensitive to that once we know who the jurors are.

I don't think this case will merit it, but sometimes, if it's a long case, I'll ask the jury, you know, do they want to work late or start early. But I don't think we're going to have that problem here because you all really don't have that many witnesses.

But every now and then we might get a juror who has to pick up children at a certain time. But we'll -- that will all come out in voir dire, and we can deal with that if we have to.

So that's -- that's the jury selection process. In the civil cases we usually have a jury before noon, usually able to do the openings before noon and ready to call our first witness in the afternoon.

So I'll stop there. Any questions from the plaintiff about jury selection?

MR. MARTIN: Yes, sir, I do. Can you elaborate a little bit on the 15 minutes that you'll give each party to follow up?

THE COURT: You're free to use all of it or part of it. Hopefully -- what I'm trying to do is unearth the topsoil so, if there's something about a particular juror you want to ask a little bit more about, you'll have a little bit of -- a little bit more information about them as it has to do with general things. But, you know, I leave that up to you all as you think is appropriate.

Maybe I'm not -- what do you have in mind?

MR. MARTIN: Would you see that as more individual jurors --

THE COURT: Yeah.

MR. MARTIN: -- instead of asking the whole --

THE COURT: You can do both. You can do both. You can call out a particular juror. Again, the first eight will be the jury. If you want to spend your time on 25 through 30, that's your business. But the first eight. So

that probably is where you want to focus.

But you can talk -- you can ask questions to all, have them raise their hand and then talk directly to the ones that raise their hand. Or some may have had some things to say during my questioning that I won't follow up on but leave to you to follow up on. So you can do both. You can do both.

Okay. Anything about jury selection from the defense? Okay.

All right. So that -- that will be our jury.

Exhibits. The Court needs four copies. I need an original for the courtroom deputy. I need two copies and the witness needs one. I generally like those in a three-ring binder with a table of contents. So Plaintiff's Exhibit Number 1 will be Tab 1. And it will have an exhibit label, "Plaintiff's Exhibit Number 1." So be sure you get some exhibit labels before you leave. Same for the defense.

Each document -- you can have multiple -- you can combine documents if they're related, but preferably each document should have one number. Don't use 1A, 1B; just only use numbers. And that should correspond as well with your exhibit lists.

I would encourage you all to -- I'm sort of jumping ahead -- but to meet -- you know, meet face to face and see if there's any objections to the authenticity of each

document. In other words, does the defense have some objection that a plaintiff's document is fabricated, is not real? Same for the plaintiff on the defense.

Usually by this time in a case everybody knows everything about every document, and most people will stipulate that the exhibits are authentic, they -- they are what they purport to be.

And then I would ask you to have some discussion about exhibits and see how many of those you can agree to their admissibility. I am not asking you, and you're not ordered, to waive any objection to any exhibit. If you object to that exhibit based on something in the rules of evidence, then raise it. We'll talk about it; I'll rule and we'll move on.

But juries tell me -- and I talk to them afterwards -- it's distracting when lawyers get up, "Objection, hearsay," and then we come up here and talk. Or sometimes we don't have to come up here and talk. And they kind of lose their train of thought. Things go so much easier in terms of the questioning and it helps the jury follow what is going on. Remember, they've not lived with this case as long as you all have. So they're trying to catch names, and in this case unusual things, like drainage and landfills and such, and what is that, and -- so do put yourselves in the shoes of a lay person.

So that's why I ask, you know, try to -- try to stipulate to the admissibility. And that way, when you call a witness, you can just use the exhibits; they're all in. You know, "Mr. Smith, go to Exhibit Number 5," and ask your questions and keep things moving.

So the real reason I ask you all to meet in person and stipulate to as much as you can is because it helps the jury.

Same thing with stipulations of fact. When you all meet in person about the exhibits, talk about any facts you all can stipulate to. And I can read -- you can read them or you can tell the Court to read them to the jury. We can give the jury a copy of it if it's technical stuff that you think they might need to read a couple -- or you all want them to read a couple of times. Again, that helps the jury.

The last one we did was a criminal case, and the crime had four elements. The parties were able to stipulate to Element Number 1 and Element Number 4, and when I went back in the jury room after they reached a verdict, guilty, the jury said it was so helpful that they had agreed to Elements 1 and 4 so, when they finished their lunch, they jumped into Elements 2 and 3 and got their work done.

So it just guides them, helps them follow the instructions and get their work done.

So, like I said, one will be on the witness stand

for everybody.  So we don't pass documents here.  You just say, "Turn to Exhibit 4," and if it's entered, you can start asking questions.  If not, get him or her to identify it, how do you know what it is, move for its admission, and we can go.

So you can still do it that way, or object as necessary.

I also need all the exhibits on a thumb drive, an electronic thing.  I smile because this is -- this is new territory for me and others with gray hair.  But, again, the juries say it's so helpful for them to have all the exhibits on a thumb drive.  Because when they get back there they put the thumb drive on the TV, and they all read the exhibit together and talk about it.  Which is what we want them to do.

So before the case -- before they begin their deliberations, you'll review all the exhibits with the clerk, make sure they're in order, and then she'll put them on -- you know, take out the ones that aren't in evidence, leave the ones that are with the right number, and they will have the thumb drive that they can use to read all the exhibits, which they find to be helpful.

Obviously, this doesn't include impeachment documents.  Those -- those need not be disclosed until you find it necessary to do so.

Also, when the jury -- when we get our trial jury, I'll give them a folder. And inside the folder will be a notebook for them to take notes on. I allow juries to take notes, but I do not allow juries to ask questions. I did have one jury who -- juror who didn't ask questions because I don't allow that, but he sent me the questions and said, "Ask the lawyers to ask this question." That juror was a lawyer. So keep that in mind. And that's the way we handled that.

But they'll have that folder with a notepad, a highlighter, a couple of pens. And if there's a particular exhibit that you want the jury to have its own copy of and read and reread, then you -- once it's admitted, if you want to give them a copy, I'll certainly allow you to do that.

Before you all leave, get with Ms. Seay and go over the exhibit -- technical use of the -- getting something shown up. Like I said, we don't pass documents. Obviously, you have to refresh their memory or do impeachment. But that will show up on the -- on the monitor.

And each juror, if you want to go over there and look -- well, not each juror -- two jurors will share a monitor. Plus it will be on the big TV for the witness, and then the witness has the same thing and you'll have the same thing at the podium. So familiarize yourself.

Also, you can focus down either by your laptop or at the podium, if you want to look at one paragraph and read

that out with the witness, if that's important. So do familiarize yourself with all the technical things that help. You can play with it there. If you want the witness to circle something in particular in pink, you can do that so the jury will see that, and that will show up on theirs too.

So there's all kind of new things you can do with electronic presentation. And, interesting enough, the jury takes note of that. We had one lawyer come in and was using a flip chart. And when I went back to talk to them, well, what was wrong with him? Didn't he know how to do the electronic stuff?

I said, well, he was just more comfortable. And I don't know how that went into their deliberation, but they didn't think much of that lawyer who was using a flip chart. And I kind of like flip charts. So just keep that in mind. They know what they like.

So that's the way we do exhibits.

I mentioned that jurors can take notes. I'll tell them, though, their notes is only for their use and their notes are not to be given more weight than your own recollection of the evidence. So they need to pay attention.

So I do allow demonstrative exhibits in opening statements. If you're going to use a demonstrative, share it with the other side. And then in your filing on November [sic] the 22nd at 9:00, just include in that parties have

shared their demonstratives, there are no objections, then you can use it however you wish.

If there is an objection, you need to submit that to me in your filing at 9:00 on the 22nd. I'll read it, I'll rule on it, and then you'll know what you can -- you can use for -- for opening statements.

All right. I think I've talked about the one-to-two-page joint statement of the case.

I've sort of talked about exhibit presentation.

So, one ongoing problem I have is lawyers not wanting to use those microphones at the podium. So all the witness examination takes place at the podium. Please, please, please use the microphone so the court reporter can hear you and the jury can hear you.

And some lawyers like to use the monitor there, and then they'll move over there to that monitor, but there's a microphone there. So be sure you all use that because I hate to interrupt and say, you know, "Talk into the microphone" so the jury can hear you when you're doing the examination or using the exhibits.

So I kind of talked about this. I think you've got it. You know, we'll start at 9:00, take breaks in the morning, lunch an hour, then afternoon break about 15 or 20 minutes, and then leave for the day.

Is any -- I don't see that you all are planning

any testimony by deposition.

Is that true for the plaintiff?  None?

MR. MARTIN:  That's true.

THE COURT:  And for the defense?

Okay.  That's what I thought.

Oh, before you leave, all the lawyers who are going to participate in the trial should give your cellphone numbers to Ms. Seay.  She'll create a group text so if -- if I get sick and I can't go, she'll say, "Judge sick, we'll start the following day," or something.  Or something happens that we need to quickly let you all know if there's a change. Or if we know, oh, a juror is going to be late, I'll let you know that, say, well, we're not going to get to start at 9:00 because they won't be able to get here until 10:30.  Whatever it will be.

I try to limit the bench conferences.  That's because jurors are inquisitive.  They want to know what's going on when you're up there.  I tell them, "Nothing you need to worry about," but they worry about it anyway.  But I try to limit those to limit their curiosity.

Be sure to tell the corporate representative and Mr. Ray they need to be here all day, just like you all, at 9:00, and they stay until the end of the day.

I had one party who was a doctor, and apparently he planned a surgery during the trial where he was the

plaintiff, and yet he thought it not important enough for him to be here. So now I say the parties must be at trial. They must be here all day, every day.

If you're going to have a paralegal, or you can tell the parties since they're sitting within the well, they just don't walk out. They'll take their break when we take our break.

Now, if you want to sit in the gallery, that's fine, you can go and come as you will. But, again, the reason I do that is because when you get up and start -- the jury stops looking and they watch whoever is moving to the door. It distracts them.

I try to limit -- during your opening and closing, I will tell the audience, if any, please don't leave. And I don't allow anyone to come in. Because every juror's going to look at whoever that's walking in instead of listening to what you all have prepared and worked hard to prepare. So I try to limit that. And so we limit the activity within the well and in the public as much as we can.

Objections -- typically we can do that, you stand up, "Objection, hearsay." I'll look to the other side, I'll rule, and we'll keep moving on. If it's going to require more than that, we might come to the bench, but I try to rule on those so we can keep things moving.

Oh. Tell your clients the Court does not allow

them to engage in any kind of facial expressions of -- or other conduct that shows any opinion about a witness's testimony. So the nodding of the head, that's good, good, or the shaking of the head. Or sometimes they'll move in their chair to -- so there's no expression of any testimony that's good or bad. No facial expressions, no shrugging, things like that in front of the jury. Because they're looking at you all. Because, as you know, the show is about the lawyers and the parties. But I try to keep them focused on the witness as much as possible.

After we select the jury, then you have to talk to them as a whole. You can't single out any one juror after they're selected, either during opening or closing.

For the witnesses, no familiarity.

So everybody's really Mr., Mrs., Ms., or however. But no use of first names.

And if you want to have any testimony read back, that needs to be addressed to the Court. Don't think this will be a problem in the sense that it typically is a problem in some of our cases here, but I don't allow any coarse, curse, vulgar, locker room, alley, street kind of language. I can't imagine we're going to have it in an environmental case, but if -- in some of the cases, if you really have -- if the -- you know, if it's a bad word, then we spell it into the record, s-h-i-t or the F-word, and then we just call it

"the S-word" or "the F-word" or "the B-word."  But I don't think you all are going to get into those kind of -- you're more concerned about the color of the water than the color of the language, so. . .

Do need to make sure the plaintiff has enough witnesses here so the jury's not delayed.  And I do ask the parties to share with the other side here who are our first three witnesses so when it comes your time to cross you know who the witness is, there's no surprises.  And then, when it's the defense turn to put on its witnesses, they do the same for the plaintiff.  But give them a rolling list of the next three witnesses so they can be ready to go.

So -- so I've got two things left on my list.

Since we don't have any motions in limine, I want to talk about the motion to exclude the expert, and I want to talk about jury instructions.

So, before I go into those, any questions from the plaintiff on anything we've covered so far?  Or any -- any -- anything you want to bring up about those issues?

MR. MARTIN:  Yeah, one thing.  I filed, as -- as instructed, a list of exhibits last week.

THE COURT:  Yes.

MR. MARTIN:  I want to renumber --

THE COURT:  Sure.

MR. MARTIN:  -- my exhibits and may have

additional exhibits.

What -- is that possible?

THE COURT:  Well, I imagine the defense is going to have some issues, but if you're going to do that -- yeah, you can certainly amend your exhibit list.  I would like the final, final exhibit list no later than 9:00 on the 22nd. And that will coincide with your three -- your notebook.  And whatever the numbering is on your exhibit list, that should be the same numbering in the exhibit book for the plaintiff and your exhibit number and the table of contents.

MR. MARTIN:  That was 9:00 on --

THE COURT:  On the 22nd.  Thursday.

MR. MARTIN:  Thursday?

THE COURT:  Yeah.

MR. MARTIN:  I was hearing 27th, and I didn't think that was right.

THE COURT:  No.  22nd.  Okay.  Any questions from the defense on anything we've touched on so far?

MR. CASHION:  Not so far.

MR. MARTIN:  I'm sorry.

THE COURT:  Oh, go ahead.

MR. MARTIN:  I have one more thing.

Count Three in our complaint, your order from Friday, I understand you don't like that count either.  And I don't like it either.  And I would be happy to just dismiss

that count.

THE COURT: I can't believe the defendant's going to object.

MR. CASHION: No objection.

THE COURT: All right. So done. We'll enter an order to that effect.

All right. Anything else before I turn to your motion to exclude the expert?

All right. So we've got the defendant's motion to limit or exclude the plaintiff's expert Barry Sulkin. And the Court has read the briefs and Mr. Sulkin's report, you know, the plaintiff's response and all of that. And I guess I'm ready to rule, but I'll certainly allow both parties to make any additional arguments before I do so.

So anything that -- well, it's the defense's motion. So anything more from the defense on the -- I guess I will ask, it seems like y'all have reached agreement that Sulkin's Opinion Number One -- you have agreed that that opinion is a question of law. Is that right? Seems like there's no longer any objection to Opinion Number 1 or you agreed with -- to --

MR. MARTIN: Well, I'm not sure anymore. I assumed that that was the question of law that you would decide on summary judgment, and you haven't done that. So I think we're going to have to present something to the jury on

that.

THE COURT: Well, let me go to the defense first because it's their motion to exclude. I can rule on it, but I wasn't clear if -- are you withdrawing any objection to Opinion Number 1 or not?

MR. FITTS: We are not going to withdraw objection to Number 1, especially because he includes about permit coverage, other than just the definition.

I guess Mr. -- the plaintiff's claims in response to this Opinion Number 1 are about a definition that we have discussed in another document about construction and demolition of landfills.

THE COURT: Okay.

MR. FITTS: But it seems like there's kind of confusion, I guess because they're dropping Claim Number 3, which I think was predicated on the fact that we were operating a construction/demolition landfill without a permit, which was a violation, then Opinion 1 no longer is relevant, possibly?

MR. MARTIN: That's Count Two. Count Three was the old dump.

THE COURT: Yeah. Okay. Well, I'll just include that.

So it's your motion, defense. I've read your brief. I've done my research. Anything more you all want to

add? And then I'm going to come to the plaintiff.

MR. CASHION: One thing that I would like clarity -- I don't know how you're going to rule -- is dealing with "wholly past." Because the way we look at it, that's everything before August of 2023. And most of their case is about things that have passed in this case.

So, especially in Mr. Sulkin's report, there's many things where he talks about TDEC. He'll read something in TDEC and he'll have an opinion on it. And it will be from 2020 or 2021. And there's a lot of -- all of his stuff there is wholly past.

So I don't know if you're going to rule yes, it's all wholly past or what -- if we need to object every time somebody brings up a document prior to -- or photograph -- prior to August of 2023, is that an objection that you're going to listen to, or have you a blanket ruling or -- I'm just -- "wholly past" is something I do a lot of cases with. So. . .

THE COURT: Let -- I think I can do -- I think the best way to proceed is let me do my ruling after I hear from the plaintiff --

MR. CASHION: Okay.

THE COURT: -- and I think that will bring some clarity.

MR. CASHION: Thank you.

THE COURT: Anything from the plaintiff on the defense motion to limit or exclude the proposed expert witness testimony of Barry Sulkin?

MR. MARTIN: I think we've -- we've briefed it pretty well.

THE COURT: Okay.

MR. MARTIN: Except I think that Opinion 1 and 2 are valid now because we do have the issue of whether or not that's a landfill that, you know, I believe will go to the jury.

THE COURT: All right. Well, thank you all for the briefing, and the Court found it helpful.

So Defendants have filed a motion to limit or exclude the testimony of Plaintiff's expert witness, Document Number 80 that's ripe for decision, Documents 81 and 91.

Plaintiffs proposed expert witness is Barry Sulkin, an environmental consultant with knowledge and experience in the field of environmental science and water quality and in all aspects of discharge permits under the Federal Clean Water Act's National Pollutant Discharge Elimination System and related state programs. He has a master of science in environmental engineering from Vanderbilt University. His experience -- his extensive work history with the State of Tennessee Department of Environment and Conservation as a water quality specialist includes

service as a staff member, field inspector, enforcement coordinator, assistant field office manager, and assistant manager of the enforcement section.  For several years he served as the department's special projects assistant to the director and statewide manager of the enforcement and compliance section for the Division of Water Pollution Control.

At the request of Plaintiffs, Sulkin investigated the site RR Farms a/k/a RR Farms Mass Grading, located in Davidson County, Tennessee.  He plans to offer 22 opinions regarding RR Farms based upon his multiple visits to RR Farms, discussions with neighbors, view of Sulphur Creek and its tributaries, public records and discussions with the owner and his photographs -- and his -- and Sulkin's photographs and videos.

Eighteen of his opinions, Opinions Number 1, 2, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22, purport to be legal conclusions regarding what Mr. Sulkin believes are violations of the Clean Water Act, CWA, the Resources Conservation and Recovery Act, RCRA, and/or the Tennessee General Permit for Discharges of Stormwater Associated with Construction Activities, General Permit Number TNR1 Permit.

For each of these opinions he plans to tell the jury that he believes Defendants have violated the law.  He

offers little or no analysis on why he thinks these are violations and, even if he did, it would be suspect to the Court because he's not a lawyer.

Sulkin also offers several opinions that appear to some degree to be based upon his own personal observations sometimes, but all without any analysis.

These include Opinion Number 1 that the site is a construction and demolition landfill that should have been -- I'm sorry -- that, quote, should have, but did not, obtain permit coverage, end quote, without any analysis or explanation. See Document Number 58 at 3;

Opinion Number 3, that the site is, quote, best characterized, end quote, as a landfill, rather than a construction site, based apparently on his observations and public filings of the waste piles in paragraphs 12, 13, 14, 15, and 16. See Document Number 58 at 3 through 4, but again without any analysis;

Opinion Number 6, that the violations are continuing and ongoing or are likely to recur, again without any explanation or analysis. See Document 58 at 5;

And Opinion Number 7, that the violations have, quote, adversely affected and/or diminished water quality, end quote, apparently based on his observations, discussions, and public records. See Document 58 at 5 through 7, without analysis.

Federal Rule of Evidence 702 governs the admissibility of an expert witness's testimony or opinions at trial.  See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 at 589, 1993.

Under Rule 702 a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the Court that it is more likely than not that, A, the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; B, the testimony is based on sufficient facts or data; C, the testimony is the product of reliable principles and methods; and, D, the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Based on the language of Rule 702, a proposed expert's opinion is admissible at the discretion of the trial court if the opinion satisfies three requirements.  See *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517 at 529, Sixth Circuit, 2008.

First, the witness must be qualified by knowledge, skill, experience, training, or education.  In other words, the Court should investigate the competence a particular proffered witness would bring to bear on the issues and whether it would aid the trier of fact in reaching its

decision.  See *Mannio*, M-a-n-n-i-o, *v. International Manufacturing Company*, 650 F.3d 846 at 850, Sixth Circuit, 1981.

Second, the testimony must be relevant, meaning, that it will assist the trier of fact to understand the evidence or to determine a fact in issue.  See *In re Scrap Metal Antitrust Litigation*, 527 F.3d at 529, quoting Federal Rule of Evidence 702.

*Daubert* counsels that relevance is a "fit" requirement, meaning that the expert must fit the facts of the case to the principles and methodologies used to render his or her opinions.  *Daubert* at 509 U.S. at 591.

This ensures that the expert testimony is helpful to the trier of fact and connected to the case before the jury.  When an expert's opinion offers a legal conclusion, attempts to tell the trier of fact what verdict to render, or confuses the trier of fact, it is not helpful and thus must be excluded.  See *Woods v. Lecureux*, L-e-c-u-r-e-u-x, 110 F.3d 1215 at 1220, Sixth Circuit, 1997.

Third, the testimony must be reliable.  *In re Scrap Metal Antitrust Litigation*, 527 F.3d at 529.  To determine reliability under Rule 702, the Court must determine, not whether the expert's opinion is correct, but, rather, whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.  Id. at 529 through

-30.

Four, non-exhaustive inquiries guide the reliability analysis.  Is the technique testable?  Has it been subjected to peer review?  What is the error rate?  And are there standards for lowering it?  Is the technique generally accepted in the relevant scientific community?  See *United States v. Gissantaner*, G-i-s-s-a-n-t-e-r, 990 F.3d 457 at 463, Sixth Circuit, 2021.

In considering those four factors, the key handholds of Rule 702 must be remembered.  To be admissible, any relevant scientific or technical evidence must be the product of reliable principles and methods and must have been reliably applied in the case.  *Id*.

Lastly, and of note, the party proffering the expert testimony must show by a preponderance of the evidence that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case.  See *Pride v. Bic Corp.*, 218 F.3d 566 at 578, Sixth Circuit, 2000, citing *Daubert*, 509 U.S. at 592, Note 10.  See also *Sigler v. American Honda Motor Company*, 532 F.3d 469 at 478, Sixth Circuit, 2008.

Based upon the parties' briefs and the Court's evaluation of Sulkin's expert report, Document 58, the Court concludes that the plaintiff has failed to satisfy the

requirements in Rule 702A, -B, -C and -D, each one of those by a preponderance of the evidence.

The Court will exclude Sulkin's opinions that constitute legal conclusions and that lack any reliable application of standards, principles, or methods.

However, Mr. Sulkin can testify without offering any opinions based solely on his personal knowledge.

As explained, an expert's opinion must help the trier of fact understand the evidence or determine a fact in issue. When an expert offers a legal opinion, he or she is telling the trier of fact what its verdict should be, and that invades the role of the trier of fact. See *Torres*, T-o-r-r-e-s, *v. County of Oakland*, 758 F.2d 147 at 151, Sixth Circuit, 1985. Expert opinions must stop short of embracing the legal terminology that frames the ultimate legal conclusion that the jury must decide.

Sulkin repeatedly opines that defendant has violated the CWA, RCRA, and/or the permit.

As to the CWA and the RCRA, the Court will charge the jury that they must make that decision. Sulkin's opinion on whether any laws have been violated cannot be allowed.

Additionally, exclusion would be required because Sulkin offers no analysis or explanation relying upon acceptable standards, principles, or methods in contradiction to 702C and 702D.

Accordingly, the Court excludes Opinions 1, 2, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 22.

Turning to the remaining opinions, Numbers 1 -- I'm sorry -- 3, 6, and 7, the Court excludes each because Sulkin does not articulate any standard principle or method as 702C requires, and thus he fails to provide any analysis or application of any standard, principle, or method as 702D requires. He simply states his opinion and that the jury should accept his opinion because he is the expert. His failure to deploy any reliable methodology based on efficient data -- sufficient data and information is not helpful to the jury.

Sulkin's opinion, albeit one from an eminently qualified individual, amounts to only that. His lack of methodological reasoning raises several red flags that caution against certifying him as an expert, including reliance on anecdotal evidence, improper extrapolation, and lack of testing and subjectivity. *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521 at 527, Sixth Circuit, 2012, citing *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171 at 177, Sixth Circuit, 2009.

In addition, if a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion. Because Sulkin's opinions and

testimony are unreliable and irrelevant under 702, they must be excluded. See *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333 at 1339, Seventh Circuit, 1989, (Expert that provides only a bottom-line opinion supplies nothing of value to the judicial process).

So I'm going to grant the motion of the defendant to exclude. But Mr. Sulkin could -- can testify based on his personal knowledge in the plaintiff's case.

So, with that, that takes me to the jury instructions. And, as I understand the plaintiff's theory -- and it may be helpful for you all to pull out your complaint, and Plaintiff can certainly tell me I'm misreading it. But it looks like in Count One on page 11, starting with allegation Number 70 through 129, the plaintiff identifies A through N, some 14 -- I think -- separate violations against -- against the defendant.

And, if that's correct, then the jury charge is going to have to be set up -- and the plaintiff is proceeding on all 14 of those at trial -- then I need the jury -- I need to in the jury instructions explain each one of those 14.

And that -- and I appreciate what -- what has been already filed, but the jury instructions have to be written in a way that it literally takes the citizen, the individual citizen, by the hand and walks him or her through the terminology that they have to then apply to the facts as they

find them.

And this is only for demonstrative purposes, but we put together -- you can hand it out to -- just a simple template of what you're going to have to put together. And just going with, say, Count 1A, failure to conduct and submit a site assessment.

And you'll see there what we've -- but I understand the plaintiff's allegation to be "Riverkeeper alleges that Ray failed to conduct and submit a site assessment in violation of 5535 of the permit."

And the permit states, "Site assessment shall be conducted at each outfall draining 10 or more acres. This means that Ray was required to conduct a site assessment at each outfall with a drainage area of 10 or more acres on its property."

And now I have to tell them, well, what is a site assessment? And then I've got to tell them, what is an outfall? And then, "To find Ray violated this permit condition" -- I think that's capital P there -- "you must find by preponderance of the evidence that there are at least one -- there is at least one outfall on Mr. Ray's property that receives drainage from 10 or more acres, and Mr. Ray failed to conduct a site assessment at that outfall."

And then, you know, "If you conclude that Tennessee Riverkeeper has established each one by a

preponderance, then you must decide whether Mr. Ray has a valid affirmative defense to that violation."

"If Mr. Ray bears the burden of proof of establishing an affirmative defense for each one, for each day of the violation; that is, Mr. Ray must prove by preponderance of the evidence that each and every element of the defense" -- and then I don't know what the defense is, but then I need to explain that so the jury can walk through.

And the reason we went -- this is just a template. But I think this has got to be -- something close to this has got to be done for A -- you know, for all 14, which is going to make the jury charge pretty long. But that's okay. It still won't be my longest. My longest took two days to read, and I don't think this will. But that's what I need you all to work on for me.

And that's what I really need -- I think you need to meet face to face. I think it's going to take some time and sort of Plaintiff is going to have to, okay, between A and N of those 14, if you want to go forward with all 14, that's fine. Makes -- doesn't make the Court any difference. But I've got to break each one down.

Now, some of the definitions you can incorporate, don't have to include, you know, repeating the same. We can say we've already given you the definition for -- for "drainage" or whatever. But we've got to set out for those

14 what it is Plaintiff says that Mr. Ray didn't do, and literally take it by the hand through each word so they can make a determination by preponderance if the plaintiff has carried its burden of proof.

So, that's my thinking.

Let me turn to you all. Agree? Disagree? Modify?

What says the plaintiff?

MR. MARTIN: No. I understand. I agree, and we can -- I'll have some time in the next few days. If -- if y'all do, we can get together and we'll hash something out.

THE COURT: What does the defendant think?

MR. CASHION: I agree, but I go back to my "wholly past," because I haven't checked what you've said, but I can tell you that most of all those allegations were before the complaint of 2023.

And, from my understanding of "wholly past," you can't go back that far. You've got to have something there.

And I think the bigger significance is my client did not build or complete the retention ponds until July of '23.

So you have this -- situations where those -- there could be things that were -- were wrong. Let's just say that. Could be a thing that was wrong back in '22, but when he got -- when he receives his -- and finishes his

retention basins, then that's cleared up all that stuff.

And so now the water comes in retention plains and it's 'scaped off.

So that's why I want to get to the timeline to where -- I don't want to object every time somebody mentions a date --

THE COURT: Right.

MR. CASHION: -- before August of 2023.

THE COURT: So, correct me if I'm wrong -- and you all are truly the experts, not me -- but is that not a determination, a factual issue that the jury has to determine, and maybe up to you all's discussion, that's something that has to be included on each one before they can determine violation? Because the defense contends this occurred in the past. If you find from all the facts presented here that that's correct, then what's the ramification? And the burden would be on the plaintiff to show that it's a continuing violation.

MR. MARTIN: I still think he has an incorrect statement of the law about "wholly past."

THE COURT: Okay.

MR. MARTIN: But I also agree with you that that's a jury question.

THE COURT: I think it's a jury question. But that's an essential -- that is -- that is a factual

determination the jury needs to consider and decide. And then you all need to help me tell the jury, you know, what does that mean? If the jury finds that this particular violation occurred wholly in the past, I don't know -- I can't remember -- August of 2023 or April?

MR. CASHION: August.

THE COURT: August of 2023.

If you find that -- you know, "You must find in order to" -- and we can say that in the charge. "In order to find for the plaintiff, you must find each of the following." And one of that being that the -- this violation has been continuing, the plaintiff alleges since August of 2023, and the defense says, no, that hasn't happened.

So it seems like it's still a factual question, even at -- I guess the first time we'll get to test it will be at the close of the plaintiff's proof and whether or not the plaintiff has come forth with sufficient evidence viewed in the light most favorable to the plaintiff from which the jury could conclude that violation -- one or more of these 14 violations constitute a continuing violation.

But I'm glad you all raised that. Because the other thing that I need your help on -- and I should put all the things the Court needs help on before you. I think it would be helpful if you all also gave me some -- I don't usually do this -- trial briefs, that helps the Court in

understanding the theories of the plaintiff for relief and the defense's. Because right now all I have is the complaints. And I think it will be helpful to have trial briefs that -- that -- in which the plaintiff -- sort of identifies the legal standard, the relevant permit or -- or legal standard and what your anticipated proof is for each one.

So I would just go A through N and say, "Plaintiff alleges in A the following: The plaintiff believes this is the legal standard; defendant believes this is the standard. And the plaintiff's anticipated proof on this will be the following: Testimony from Bob Jones, saying blah, blah, blah. Defense will say, well, this is the standard. In order to succeed on this, the plaintiff must show that it's a continuing violation prior to August of 2023; this is what the defense did, and since that time everything's been perfect."

So I can follow the testimony -- because this is -- this -- this is very technical. So that would be helpful.

You may have taken care of the second topic, whether a solid waste disposal site can simultaneously be both a construction and a demolition landfill and an open dump. I think maybe dismissal of Count Three may take care of that. But just clarify it if I've got that wrong.

And then whether the definition -- whether the definition of "fill material" in 33 CFR 323.2E1 and 40 CFR 2322 applies to the use of that term in the Tennessee regulations, and I'll put that in the order.

But I've got 11-01.02(1)(B)(3)(xiii).  And, if not, show how should the Court define "fill material," if that doesn't apply.

So that will -- I think that will give me a better understanding of what the plaintiff sees the proof -- plans on proving and a highlight to me what the defendant -- that's going to be very helpful -- I think it's going to be very helpful when you all present it to the jury.  But that's just my opinion.  But it's going to be very helpful when the Court looks at the defense motion at the close of the plaintiff's proof.

And I guess we all agree that the jury's not assessing any damages.  Here we have possible penalties.  But that's all for the Court.

Now, the Court does need to know the number of violations that they find.  So I see asking them that.  So that's -- that's sort of -- yeah.  Sure.

MR. CASHION:  On that, I assume there will be no proof to the jury about any financial information from the defendant?

THE COURT:  I don't see how that would be relevant

on -- because they're just looking at liability. If there's a violation found, then, yeah, there will be full briefing and, you know, we can have another hearing if you want. But that's solely for the Court to determine.

MR. CASHION: Right.

THE COURT: Okay. So I hope I'm -- well, I know I'm sharing with you the questions I have. So it's helpful in that way. I hope it's helpful to you all.

But the big issue I see is these jury instructions. And, again, if the plaintiff is going to, you know, proceed on the 14 or 10, 7, whatever, whatever the number is, I've got to literally take them by the hand and put it in language that they understand and how they go back there and apply it.

You know, there's -- I was going to share with you all one story -- not to frighten you, but it's a real -- it's a real story. It's real life. I think it was a tax case. And this case reminds me a lot of the tax case. And the parties were deep into it, tax lawyers, deep into the regulations.

And we picked the jury, and we did opening statements, and we went home. That was as far as we got that first day. They come back the next day and they gather in the jury room, and they send me a note. Not a good sign. You've heard no evidence. What could you be asking me about?

And the note said, "Your Honor, can the -- can the jury have a dictionary?  We did not understand the words they used in opening."

Just keep that in mind.  Keep that in mind.

So I'll just stop there.  What -- I'm glad to clarify.  I'll enter an order that contains most of what I've gone over here.  But any -- any observations, questions, concerns, from the plaintiff?  About anything, I guess, at this point?

MR. MARTIN:  Well, just observation I had is that we aren't going to agree on what is fill material.

THE COURT:  Okay.

MR. MARTIN:  We have polar opposite opinions of that.  We can talk about it and we can try, but we aren't going to get there.

THE COURT:  And I guess I need to -- I forgot that.  I was so -- so what I have also -- and I want you all to do, is all your filings are going to be due at 9:00 on the 22nd.  But I want you all to hold for me on the 23rd -- because I'm going get your filings on Thursday morning.  I'm going to read them all day Thursday, go over it with my law clerk.

And then I want to get back together with you all on Friday at 9:00.  And we might meet in the jury room and go through it again after I've had -- and that may be one -- you

know, if you can't agree on that, then I'm going to be interested in what's your basis and then what's the defense basis, and then we'll consider how that gets incorporated into the jury charge.

So I hope you all meet and we don't make Friday an all-day affair. But, you know, if you do, I've got some bourbon that might help everything go a lot more faster and a lot more cooperative. But I don't -- I want to have a pretty good set, almost finished set of the jury charge Friday so I can come in Monday, polish, and have it on your table Tuesday morning.

All right. Anything -- anything at all the defense wants to raise or things you shouldn't do or where I've missed it or whatever it might be?

MR. CASHION: No, Your Honor.

THE COURT: Okay. All right.

So this -- I think -- yeah. This is the second Clean Water Act case I've had to go to trial. And at least this is going to be shorter than the first one that went two weeks. So we'll get an order out on all the rulings here. And then what's needed for Thursday at 9:00. And then sounds like we're going to get together at least for a little while on Friday to try to iron everything out.

All right. Well, thank you.

MR. FITTS: Your Honor, one other thing. When do

the exhibit notebooks need to be here?

THE COURT:  Thursday at 9:00.

MR. FITTS:  Thank you.

THE COURT:  And be sure you all play with the technology.

(Court adjourned.)

REPORTER'S CERTIFICATE

I, Lise S. Matthews, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on May 19, 2025, in the matter of TENNESSEE RIVERKEEPER, INC. v. RICKY RAY dba RR Farms a/k/a RR Farms Mass Grading, Case No. 3:23-cv-00878; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (pages 1 through 46) is a true and accurate record of said proceedings.

This the 17th day of July, 2025.


/s/ Lise S. Matthews
LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter