IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TENNESSEE RIVERKEEPER,            )
INC.,                            )
                    Plaintiff,   )  Case No.
                                 )  3:23-cv-00878
        v.                       )
                                 )  District Judge Crenshaw
RICKY RAY dba RR Farms           )
a/k/a RR Farms Mass              )
Grading,                         )
                    Defendant.   )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

JURY TRIAL DAY 1

May 27, 2025

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:
        For the Plaintiff:   Mr. Mark E. Martin
                             Mark E. Martin, LLC
                             1706 Reid Road
                             Oneonta, Alabama 35121

                             Mr. Andrew Holt
                             Neal & Harwell, PLC
                             1201 Demonbreun Street
                             Suite 1000
                             Nashville, Tennessee 37203

        For the Defendant:   Mr. Gregory Lee Cashion
                             Mr. William Fitts
                             Smith, Cashion & Orr
                             One American Center
                             3100 West End Avenue, Suite 800
                             Nashville, Tennessee 37203

PREPARED BY:
                   LISE S. MATTHEWS, RMR, CRR, CRC
                      Official Court Reporter
                   719 Church Street, Suite 2300
                        Nashville, TN 37203
                   lise_matthews@tnmd.uscourts.gov

I N D E X

Tuesday, May 27, 2025

INDEX OF PROCEEDINGS

                                                      PAGE

PLAINTIFF'S OPENING STATEMENT                          55

DEFENDANTS' OPENING STATEMENT                          62

INDEX OF WITNESSES

WITNESSES:                                            PAGE

BARRY SULKIN
     DIRECT 701 EXAMINATION BY MR. MARTIN             74

JEREMY MATTINGLY
     DIRECT EXAMINATION BY MR. MARTIN                 95
     CROSS-EXAMINATION BY MR. FITTS                   97

NICHOLAS KECK
     DIRECT EXAMINATION BY MR. MARTIN                 99
     CROSS-EXAMINATION BY MR. FITTS                  108
     REDIRECT EXAMINATION BY MR. MARTIN              112

RICKY RAY
     DIRECT EXAMINATION BY MR. MARTIN                115

I N D E X

Tuesday, May 27, 2025

EXHIBITS

| PLAINTIFF'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 1 | Video from drone of Ray's site (3 minutes, 29 seconds) | 96 | 96 | |
| 2 | Video from drone of the Ray's site (1 minute, 9 seconds) | 97 | 97 | |
| 6 | Photograph taken by Nicholas Keck on April 3, 2025. It was taken from the north side of Highway 12 by the southwest corner of the RR Farms property. | 103 | 103 | |
| 7 | Photograph taken by Nicholas Keck on April 3, 2025 | 104 | 104 | |
| 8 | Photograph taken by Nicholas Keck on April 3, 2025 | 105 | 105 | |
| 9 | Photograph taken by Nicholas Keck on April 3, 2025 | 106 | 106 | |
| 10 | Photograph taken by Nicholas Keck on April 3, 2025 | 107 | 107 | |
| 52-1 | Notice of Intent for General NPDES Permit for Stormwater Discharges from Construction Activities (TNR100000)(CGP), filed by Crystal Ray for RR Farms Mass Grading. | 120 | 120 | |
| 52-2 | Storm Water Pollution Prevention Plan (SWPPP) for RR Farms, filed October 2019. | 121 | 121 | |

I N D E X

Tuesday, May 27, 2025

EXHIBITS (CONTINUED)

| PLAINTIFF'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 52-3 | Notice of Coverage for Tracking Number TNR24456 on June 9, 2020. | 121 | 121 | |
| 52-4 | A letter from TDEC to Crystal Ray on June 9, 2020. | 122 | 122 | |
| 52-5 | NPDES General Permit for Discharges of Stormwater Associated with Construction Activities (Permit Number TNR100000). | 123 | 123 | |
| 52-6 | NPDES General Permit for Discharges of Stormwater Associated with Construction Activities (Permit Number TNR100000). | 123 | 123 | |
| 52-7 | A report of an inspection by TDEC of RR Farms Mass Grading on June 28, 2023. | 125 | 125 | |

The above-styled cause came on to be heard on May 27, 2025, before the Honorable Waverly D. Crenshaw, Jr., District Judge, when the following proceedings were had, to-wit:

THE COURT: All right. Be seated. So the jury has arrived and they're ready to come upstairs.

Any preliminary matters from the plaintiff?

MR. MARTIN: None, Your Honor.

MR. CASHION: Yes, Your Honor. I have a couple.

THE COURT: Okay.

MR. CASHION: Do you want me to stand or go up to the podium?

THE COURT: Whatever you're comfortable with.

MR. CASHION: I'll go up to the podium.

First, on the document that we did, the joint statement that we had, I have one request for a change.

And it's on page 2 at the last paragraph. "Mr. Ray contends that he has" -- I want to change "fully" to "substantially."

THE COURT: Okay.

MR. CASHION: Second, would it be appropriate when I'm introducing my team to the jury to mention Mr. Ray's daughter, who is sitting in the courtroom there, or just the people at the desk?

THE COURT: Probably just the people at the desk.

Okay.

MR. CASHION:  All right.

The last thing that I have is we've been trying to figure out about the testimony of Barry Sulkin, where he's limited to his actual, and they've already told us they wanted him to talk about permit, SWPPP, and all this stuff. And it sounds to me like I'm going to be jumping like a Jack in-the-box over here.

So what I would like to have the jury understand what's going on in that testimony is I request -- that we not do it right now -- but if I need to, I'll call a jury out at that -- but that you read the order excluding Mr. Sulkin from testifying as an expert --

THE COURT:  In front of the jury?

MR. CASHION:  In front of the jury.

And then explain to him the limitation that he has --

THE COURT:  Oh.

MR. CASHION:  -- on testifying; that this is what you found in your order, and, therefore, he cannot testify -- only to personal knowledge, not to documents or anything else he has seen.  And I think that would clear up, if you're listening, to the jury, and you're seeing me do nothing but objections, it makes it sound like I'm trying to prevent something.

THE COURT: Sure.

MR. CASHION: Which I am, but I think they should know why I'm trying to prevent that.

THE COURT: Sure.

MR. CASHION: So that's what I want you to consider.

THE COURT: Well, I've given a lot of thought to that, and I've given more thought to it after I saw the plaintiff's most recent version of what Count Two is about.

So this is what I had in mind, and we won't get to it today. I suspect we'll get to it tomorrow, since we're going to stop today at 2:30 so you all can make your way to the funeral.

MR. CASHION: Thank you.

THE COURT: Before Mr. Sulkin testifies before the jury, we probably need to have a jury-out hearing so I can hear what it is that the plaintiff proposes to ask him on direct.

I think the only thing that Mr. Sulkin can testify is under 701. And that limits or excludes his ability to talk about anything that is scientific or anything of that nature. He can talk about what he saw, what he heard, maybe what he tasted -- maybe he tasted the water, I don't know -- of his personal knowledge. And he can make inferences only to the extent that an average person in everyday living can

do so.

And that's kind of the fence, Mr. Martin, I'm going on to put around Mr. Sulkin's testimony.

And I agree it's probably best for me to hear that so you'll know on your direct, you can ask him these questions; I can't ask him these other questions. Mr. Sulkin will know he can testify to X, but not to Y and Z. Because he's going to be limited to what he can do under 701.

That's my position.

MR. CASHION: Yes, sir.

THE COURT: I don't know if I need to read that. The jury's not going to understand that, nor should they. What is important is that the lawyers know, the Court knows, Mr. Sulkin knows this is the parameters of his speech.

MR. CASHION: All right. And I would ask that we have the rule. I think Mr. Sulkin is now in the courtroom.

THE COURT: Right. And I usually do that after we have the jury picked. I'll ask you to do that.

MR. CASHION: Perfect.

THE COURT: I will say, Mr. Martin, I'm still confused about Count Two. So you can see in the draft jury instructions, I'm just not sure what it is that Count Two is about. But this I do know: It's going to be limited to what is in the pretrial order, and it cannot be greater than what is in your original complaint.

And when I compare what you filed -- yesterday, was it? Seems like a week ago -- yesterday, Monday -- and I'll go on back and read the amended complaint -- I'm having a hard time figuring out what Count Two is about.

So that's why you all don't see anything in the jury charge about Count Two or in the verdict form. But I think we can cross that bridge when we get there.

Does that sound doable, Mr. Martin?

MR. MARTIN: Yes, Your Honor.

THE COURT: Does that answer your question?

MR. CASHION: Yes, Your Honor. Thank you.

THE COURT: Go ahead.

MR. CASHION: I said thank you.

THE COURT: Oh, sure.

So the jury's here. Do you all have -- do you all have the random selection of the jurors, Numbers 1 through -- I think 30? You each should have a large sheet with that.

Do you have that, Mr. Martin? Mr. Cashion?

MR. CASHION: Yes, sir.

THE COURT: So you all can use that to make your notes. Remember, Juror Number 1 will be in the upper -- that chair right there. That will be Juror Number 1, and they will fill in.

All right. So, if there's nothing else, we will -- she will bring the injury in now and we'll get

started.

All right.  Thank you.

(Respite.)

(Venire present.)

THE COURT:  Be seated.  So, ladies and gentlemen, welcome to the United States District Court for the Middle District of Tennessee.  My name is Waverly Crenshaw, and I'm presiding over the case that's currently before the Court, which is a civil case.  I have two parties here, and they have a dispute, and they need your help to resolve that dispute.  So thank you for coming.

Let me especially thank you for being here on time.  As soon as I got to the courtroom -- courthouse today, the jury clerk told me you all had arrived, you were finishing your orientation, and you were ready to go before 9:00.  And the Court really appreciates that, and thanks you for your service.

I serve as one of the four active district judges in this district.  This Court was created under Article III of the Constitution that embodies the judicial branch of government, which is one of the three coequal branches of the government.  The other two being the executive branch and the legislative branch.

As you know, the Constitution of the United States establishes a system of self-government.  We have a

government of the people, by the people, and for the people. The Constitution also guarantees the right to a jury trial in most civil cases. Jury duty is part of the process of self-government. It is one of the "by the people" parts of self-government.

So thank you again for your voluntary compliance with the Court's invitation to appear here today. Jury duty is the way that we implement the right to a jury trial. And if people refused to serve on juries, we would not have a true self-government, and it would greatly undermine our precious right to a jury trial.

So at this point I'm going to ask each member -- each person here who has appeared for jury duty to stand, raise your right hand, and the clerk will administer the oath.

(Venire sworn.)

THE COURT: All right. Be seated.

We're now going to begin the process of jury selection. Our goal is to obtain a fair and impartial jury who will decide this case based solely on the evidence you see and hear together in this courtroom. This portion of the proceedings is called voir dire. Literally translated, it means to speak the truth.

I will ask you some general questions, and then I will ask you some questions that are specific to this case.

Then I'll allow the attorneys to have an opportunity to ask you some questions.  This process helps me to decide whether any juror should be excused for cause.  And it also enables the attorneys and the parties to make their own independent judgments concerning peremptory challenges.  Peremptory challenges are challenges for which no reason has to be given.

I want you to understand that voir dire is a very important part of the process of ensuring that the parties receive a fair trial.  And fairness starts with your honesty and your candor.  The lawyers and I cannot do our jobs unless you meet your obligation to be honest and candid.

Now, each of you individually is the only person in the world that knows what's in your heart and your mind as you appear here today.  It is absolutely essential -- if a question or statement makes you think you should raise your hand that you do so.  It is absolutely necessary for you to let me and the lawyers and the parties know if there is something about this case or about you personally that might affect your ability to sit as a fair and impartial juror in this particular case.

Now, if your concerns are of a personal nature, then you can let me know that and approach the bench.  We'll still be asking you questions on the record, and there will be one lawyer from each side here at the bench.  Again, all

you have to say is "May I approach the bench," and I will allow you to do that if you believe that the matters you want to discuss are of a personal nature. So don't hesitate at all if that's what you would prefer to do.

So we're going -- I'm going to start this process, again, of asking some general questions. Now, in order to do so, I need you all to wait with the gentleman here to -- with the microphone. And the reason I need you to do that is because everything we say here in the courtroom and do here in the courtroom has to be recorded by the courtroom -- by the stenographer that you see in front of me. So the microphone ensures that she can hear you, I can hear you, the parties can hear you, the lawyers can hear you, and I won't have to ask you to repeat it again. So give him just a moment so we can get that microphone to you.

So let me begin that process now by asking you all, is everyone here comfortable reading and understanding the English language? All the testimony that's given in this case will be in English, all of the documents that I might allow into evidence will be in English. Is everyone comfortable with that?

If you are comfortable with the English language, please raise your hand.

And I see everyone's hand is up. Thank you.

Does anyone have any special personal needs? For

example, we will -- for those of you who are chosen to sit on the trial jury, we will typically work for about -- about 90 minutes or so, maybe 75 to 90 minutes, and then we'll take a break for about 15 minutes.  We'll take a lunch break for an hour.  We'll come back after lunch and continue to work, and we'll take an afternoon break, generally around 15 to 20 minutes.

So if anyone here has a special need that you would need to refresh yourself, say, every 15 to 20 minutes, that might not be something that I can accommodate and keep the trial moving.

So does anyone have any personal concerns about their ability to pay attention, listen to the evidence under the schedule I've given?

And, again, if you would like to talk to me privately, we can do it here -- do that here at the bench on the record with attorneys.

So does anyone have a special need that would need -- that I need to be aware of?  Please raise your hand.

All right.  Do you want to speak from there or would you like to come to the bench?

PROSPECTIVE JUROR:  I can speak from here.

THE COURT:  All right.  Let him bring that -- now, when you raise your hand, do me another favor, and we will need to -- I need you to identify who you are.

Is that Juror Number 20?

PROSPECTIVE JUROR:  Yes.

THE COURT:  ////////////////////.  Okay.  Go ahead.

PROSPECTIVE JUROR:  I just need to take my medicine around 1:30.

THE COURT:  Okay.  I think we can take care of that.  Thank you for sharing it.

Anyone else?

So, to help the process go a little bit smoother and quicker, I need to make sure that each of you are identified on the record.  So at this point I'm going to ask the clerk to call out your name, and you respond with "present."  And the reason for that is that will show on the record that you indeed are here and you've responded.

So, as we go through other questions, I think that will help the process go a little bit faster.

All right.

COURT DEPUTY:  ////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: ////////////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: ////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: /////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: //////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: /////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: ////////////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: //////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: //////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: /////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: ////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: ////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: //////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: ////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ////////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ////////////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  /////////////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ///////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ///////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ////////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  /////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  //////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ///////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY:  ///////////////////////.

PROSPECTIVE JUROR:  Present.

COURT DEPUTY: ////////////////.

PROSPECTIVE JUROR: Present.

THE COURT: All right. Thank you.

So at this point I'm going to ask the parties and their lawyers to introduce themselves to you.

We'll start with the plaintiff.

MR. MARTIN: I am Mark Martin. This is David Whiteside. David is the executor and riverkeeper for Tennessee Riverkeeper organization.

And this is Andrew Holt, who is co-counsel.

THE COURT: All right. Thank you.

For the defense.

MR. CASHION: Yes. My name is Greg Cashion, representing, my far right, Ricky Ray. Beside him is one of our law school clerks, Katie Lowe, and assisting me with this is my associate, Will Fitts. Thank you.

THE COURT: All right. So, ladies and gentlemen, you've now been introduced to the parties and their attorneys.

Does anyone here know any of the persons who just introduced? Prior to today, did any of you know the parties here, Tennessee Riverkeepers, which is represented by David Whiteside. And Mr. Bill Ray [sic], who is the defendant here, or their attorneys. If you do, please raise your hand.

I see no hands.

So no one here has any knowledge of any of the parties or their attorneys?

Has -- does anyone here have any knowledge of the attorneys specifically? Have you ever worked with those attorneys or, to the best of your knowledge, have your family or close family friends ever worked with the attorneys who are here before the Court today? If so, please raise your hand.

Okay. Again, I see no hands.

Do any of you know or recognize any person who has been summoned, like you, for jury duty? So look at the other persons who have appeared here today for jury duty and raise your hand if you recognize any other fellow juror here this morning.

So the schedule here -- I've given you the daily schedule. I anticipate this case will probably take two or three days to try. And it's important that those of you who are selected on the jury be here every day to hear testimony and ultimately to deliberate.

So, if we -- we're going to get started today. We won't have a full day today. Typically we'll go until about 5:00 -- between 5:00 and 6:00, ending for the day depending on the witness. But I do think we can get the case presented to you and you can start your deliberations over the next two to three, possibly -- we'll definitely be done by Friday.

So does anybody have any nonrefundable airline tickets or cruise reservations that are not refundable or anything like that that would interfere with your ability to be here every day and listen to testimony?  If so, we need to know that.

So I'll ask you to raise your hand.

All right.  All right.  We've got one.

Ms. Farris?

PROSPECTIVE JUROR:  I leave out Thursday morning for a family vacation in Iowa.

THE COURT:  And you said Thursday morning?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  And are -- do you have plane tickets?

PROSPECTIVE JUROR:  We are driving, but we have, like, hotel, Airbnb reservations.

THE COURT:  Are those nonrefundable?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Thank you.

Anyone else?  Anyone else would have a difficulty serving on the jury today, Wednesday, Thursday, and up through Friday maybe?  Maybe.  Okay.

So I'm going to read the names of persons who may or may not testify as witnesses in this case.  And obviously, if you know a particular witness, that's something we need to discuss probably here at the bench.

So I'm going to read off the persons who may or may not testify here to make sure that no one here on the jury has any prior knowledge of the witnesses.

Nicholas Keck, K-e-c-k; Jeremy Mattingly; Barry Sulkin; Frank Canale; and possibly Crystal Ray.

Any of those names familiar to anyone here today? Please raise your hand.

Does anyone want me to read that list again?

So no one has any prior knowledge of any witness who may or may not testify?

So have any of you ever been a witness in a civil or criminal case in state or federal court? If you've ever been a witness, called to testify in court prior to today, raise your hand.

All right. Let's do in the jury box here first. ////////////?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: All right. Were you in state or federal court?

PROSPECTIVE JUROR: Be state court, sir.

THE COURT: Okay. And were you a witness for the plaintiff or defendant?

PROSPECTIVE JUROR: It would be a criminal case. I'm former law enforcement, retired.

THE COURT: How long ago was that?

PROSPECTIVE JUROR:  The court appearance or --

THE COURT:  The -- your being a witness in state court?

PROSPECTIVE JUROR:  I couldn't pinpoint it.  It would be in the last seven years.

THE COURT:  Okay.  And that was a criminal case?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Thank you.

Anyone else in the jury box?

All right.  ▨▨▨▨▨▨?  Were you a witness in state or federal court?

PROSPECTIVE JUROR:  Federal court.

THE COURT:  Okay.  Was it a civil or criminal case?

PROSPECTIVE JUROR:  Civil.

THE COURT:  Okay.  Did you testify?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And what kind of case was it?

PROSPECTIVE JUROR:  It was an age discrimination case.

THE COURT:  And were you -- were you a witness for the plaintiff or defendant?

PROSPECTIVE JUROR:  The defendant.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR:  I was much younger then.

THE COURT: Say again?

PROSPECTIVE JUROR: I was much younger then.

THE COURT: All right.

Anyone else in the jury box been a witness in state or federal court prior to today?

Someone raised their hand, but I don't see it. There we are.

PROSPECTIVE JUROR: It was --

THE COURT: I'm sorry. Are you ▨▨▨▨▨▨?

PROSPECTIVE JUROR: No. ▨▨▨▨▨▨.

THE COURT: All right. State or federal court?

PROSPECTIVE JUROR: State.

THE COURT: Was it a civil or criminal case?

PROSPECTIVE JUROR: Criminal.

THE COURT: Were you a witness for the government or the defendant?

PROSPECTIVE JUROR: Government.

THE COURT: How long ago was that?

PROSPECTIVE JUROR: Thirty years.

THE COURT: Okay. Thank you.

Anyone else been a witness in a case prior to today in state or federal court where you were asked to come and testify?

Has anyone here ever been a party, plaintiff or defendant, in a criminal or civil case, in state or federal

court?  Have you ever been a party in a lawsuit in state or federal court?  If so, raise your hand.

No one's ever been a plaintiff or a defendant in a case prior to today?

Well, has anyone ever served as a juror in a case in state or federal court, civil or criminal, prior to today?  Has anyone previously served as a juror?

No one in the box.

So we have Ms. --

PROSPECTIVE JUROR:  ////////////////.

THE COURT:  Was it state or federal court?

PROSPECTIVE JUROR:  It was state court.

THE COURT:  Was it a civil or criminal case?

PROSPECTIVE JUROR:  A civil case.

THE COURT:  Were you the foreperson?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Did you deliberate?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And reached a verdict in the civil case?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And what kind of civil case was it?  If you remember.

PROSPECTIVE JUROR:  It was an injury case, personal injury.

THE COURT:  Personal injury?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Car wreck?

PROSPECTIVE JUROR:  A fall.

THE COURT:  A fall.  Okay.

And you did say you deliberated to a verdict?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  How long ago was that?

PROSPECTIVE JUROR:  Twenty-five years.

THE COURT:  Okay.  Thank you.

Anyone else been a juror in federal or state court, civil or criminal case, prior to today?

Has anyone ever served as a grand juror in a grand jury in state or federal court prior to today?

//////////////, you were a grand juror as well?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  All right.  In state or federal court?

PROSPECTIVE JUROR:  State.

THE COURT:  How long did you serve?

PROSPECTIVE JUROR:  It was six months.

THE COURT:  Were you the foreperson?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  And how long ago was that?

PROSPECTIVE JUROR:  Just last summer.

THE COURT:  Okay.  Where was that?  Here in

Nashville?

PROSPECTIVE JUROR: Yes, sir. Williamson County.

THE COURT: Williamson. All right. Thank you.

Anyone else ever served as a grand juror or as a juror prior to today?

So, I'm going to share with you a little information about this particular case. And I'm doing so only so you can have a context of my next questions, which will be more case specific.

Now, if you're selected to serve as a juror here and hear the case, you'll need -- you'll be -- I'll tell you you must make your decision based upon the evidence. And what I'm about to read to you is not evidence. It's only to give you a context about the case so that we can ask you some follow-up questions.

So this is a lawsuit brought by Tennessee Riverkeeper, Inc., against Ricky Ray, who operates a grading business known as RR Mass Farms Grading, for alleged violations of two federal laws, the Clean Water Act and the Resource Conservation and Recovery Act, at Mr. Ray's property on Ashland City Highway in Davidson County, Tennessee.

Mr. Ray obtained a permit from the State of Tennessee in 2020 for stormwater discharge related to construction activity on his property and a grading permit shortly thereafter from Metro Nashville to regrade the

property pursuant to approved plans.

Riverkeeper contends that Mr. Ray is operating a solid waste disposal landfill without having first obtained a solid waste disposal permit, in violation of the Resource Conservation and Recovery Act. Mr. Ray contends that Tennessee law exempts the property from any landfill permit requirement and disputes that actions on the property have violated any provision of the Resource Conservation and Recovery Act.

Riverkeeper also alleges that stormwater from the site has carried excessive sediment and other pollutants into Sulphur Creek and the Cumberland River and that Mr. Ray's operation has not complied with several requirements of its state stormwater permit, the general stormwater construction permit.

Since Riverkeeper filed this lawsuit, neighbors of Mr. Ray and individuals concerned about pollution in Sulphur Creek have documented multiple instances of excessive sediment being discharged from the property into the creek. Riverkeeper contends that each of these discharges are separate violations of the Clean Water Act because they occurred in part due to Mr. Ray's failure to comply with the requirements of his general stormwater construction permit.

Each day that the site has discharged water while failing to comply with a provision of its permit is a

separate violation of the Clean Water Act.

Riverkeeper contends that Mr. Ray has failed to comply with multiple provisions of his general stormwater construction permit, including, 1, the failure to inspect and perform site assessments; 2, the failure to maintain adequate erosion controls; 3, the failure to ensure discharges do not degrade state water quality; 4, the failure to perform twice-weekly inspections; and 5, the failure to update his stormwater prevention plan. For each of these violations, Tennessee Riverkeeper contends that Mr. Ray is independently liable under the Clean Water Act for discharging stormwater in violation of his permit.

Mr. Ray contends that he has substantially complied with the terms of his stormwater permit, and the control systems in place mitigate any harmful discharge. Mr. Ray contends that Riverkeeper's claims of excessive sediment and other pollutants are from -- are from prior to the completion of construction of the stormwater retention basin on the property and prior to initiation of this lawsuit, rendering them irrelevant according to law.

Riverkeeper contends that Mr. Ray is not in compliance with his permit and that, because there are documented instances of discharge after Riverkeeper brought suit in August 2023, the discharges from Mr. Ray's property are sufficiently ongoing to sustain a citizen suit for

violation of the Clean Water Act.

So, again, what I've shared with you is only the contention of the parties. It is not evidence. And if you're selected to be on the case, you must make your decision based only on the evidence.

So, based on what I've shared with you, has anyone -- have any prior knowledge of this lawsuit between Tennessee Riverkeeper and Mr. Ricky Ray? If you have any prior -- all right. I see one hand.

/////////?

PROSPECTIVE JUROR: Yes.

THE COURT: Can you approach the bench. And one lawyer, whoever's going to be doing voir dire, approach the bench.

(Bench conference outside the hearing of the venire.)

THE COURT: All right. So, /////////, what have you heard about this case prior to today?

PROSPECTIVE JUROR: I work for Metro Water Services.

THE COURT: I'm sorry?

PROSPECTIVE JUROR: I work for Metro Water Services, so there's been conversations within the leadership team about this case. I don't know a whole lot about it, but --

THE COURT: (Indiscernible).

PROSPECTIVE JUROR: -- Stormwater. I am.

THE COURT: Metro Water Services?

PROSPECTIVE JUROR: So we do water, sewer, stormwater.

THE COURT: And y'all have talked about this case?

PROSPECTIVE JUROR: Yes. I don't know a whole lot about it, but to say I don't know anything -- it's just been a discussion.

MR. MARTIN: Judge, I would like to also add --

THE COURT: I'm sorry, I couldn't hear you.

MR. MARTIN: If I may add, we at one time sent a notice of intent to sue to Metro. I'm not sure if she's aware of that. But we have had some history with Metro.

PROSPECTIVE JUROR: Yeah.

THE COURT: So you're familiar with Tennessee Riverkeeper?

PROSPECTIVE JUROR: I am.

THE COURT: Okay. And I -- well, any questions?

MR. CASHION: I don't have any questions.

THE COURT: I gather you think -- it would be difficult for you to be a fair and impartial juror here?

PROSPECTIVE JUROR: 100 percent.

THE COURT: Okay. All right. Thank you.

MR. MARTIN: Thank you for your honesty.

MR. CASHION:  Thank you.

(In open court.)

THE COURT:  All right.  So, again, do any of you know or believe you might know anything about this case prior to today?  Please raise your hand.

Have any -- has anyone here read, seen, or heard anything about this case prior to today?  If so, please raise your hand.

Have you read anything, seen anything, or heard anything about this case prior to today?  Raise your hand.

I see no hands.

Has anyone contacted you or attempted to contact you about this case prior to today?  Please raise your hand.

Has anyone talked to you or communicated in any way or any fashion, social media or cellphone or text or Twitter or whatever, any communications at all with you about this case prior to today?  Please raise your hand.

And I see no hands.

So you've heard one of the parties here, the plaintiff, is Tennessee Riverkeeper, Inc.  So my question to each of you, are you a member of any environmental organization?  If so, please raise your hand.

All right.  ///////////////?

PROSPECTIVE JUROR:  ///////////////.

THE COURT:  All right.  I'm going to have you

approach the bench.

(Bench conference outside the hearing of the venire.)

THE COURT: So I'm going to put you in the middle, and we'll put one attorney on each side.

PROSPECTIVE JUROR: That's fine.

THE COURT: So what environmental organization --

PROSPECTIVE JUROR: So I live on the Tennessee River.

THE COURT: I'm sorry?

PROSPECTIVE JUROR: I said I live on the Tennessee River.

THE COURT: Oh.

PROSPECTIVE JUROR: Yeah. It's a drive. That's okay. So I'm kind of heading our little area for -- it's kind of like a -- we go in -- and I don't know if it's the same company or not. But it's -- it may be Tennessee River. I'm not real positive. But we go in and we've got, like, a stretch of the river, and we'll go in every spring and get all the tires and all the debris and pick it all up and clean it up.

THE COURT: What's the name of your organization?

PROSPECTIVE JUROR: You would ask that. Friends of Leatherwood.

THE COURT: Friends of what?

PROSPECTIVE JUROR: Friends of Leatherwood.

THE COURT: Leatherwood?

PROSPECTIVE JUROR: Yeah. It's our little community.

THE COURT: And do you -- how long have you been a member?

PROSPECTIVE JUROR: Three years.

THE COURT: Okay.

PROSPECTIVE JUROR: Probably.

THE COURT: And this consists of property owners --

PROSPECTIVE JUROR: Community -- yeah. So -- yeah, it's just a little community that we live in. We'll get together once a year and just clean it up.

THE COURT: And the community lives or is close to the Tennessee River?

PROSPECTIVE JUROR: Well, I'm on the Tennessee River. Yeah. Yeah. So here's the river, and there's a bay called Leatherwood Bay.

THE COURT: When you're cleaning up, do you do anything else?

PROSPECTIVE JUROR: Not really. We just try to clean it up and try to, you know, report stuff that we. . .

THE COURT: Okay. Have you all taken any positions on environmental issues, anything like that?

PROSPECTIVE JUROR: Huh-uh. I used to work for UST with environment conservation, but that's been 40 years ago. I'm good.

THE COURT: U.S. Transportation?

PROSPECTIVE JUROR: Underground storage tanks.

THE COURT: So you were familiar with environmental issues there?

PROSPECTIVE JUROR: Uh-huh.

THE COURT: Any follow-up?

MR. CASHION: I don't have any follow-up questions.

MR. MARTIN: You haven't worked with Tennessee Riverkeeper?

THE COURT: I can't hear you.

MR. MARTIN: You haven't worked with Tennessee Riverkeeper?

PROSPECTIVE JUROR: See, I don't know that it -- it could be the same. But it's -- I set it up, like, three years ago. And we just go do it. And we just know we have this stretch of property that's on the Tennessee River, and we just go clean it up. We don't -- I don't really contact them or have any --

MR. MARTIN: That's not --

THE COURT: I can't hear you.

MR. MARTIN: We haven't done that. That's not --

(Indiscernible).

THE COURT: So, other than cleaning up once a year, do you all do anything else?

PROSPECTIVE JUROR: We boat a lot.

THE COURT: As a group?

PROSPECTIVE JUROR: That's it.

THE COURT: So you've heard what this case is about.

PROSPECTIVE JUROR: I have.

THE COURT: If you're selected to be on the jury, you become a judge. You become a judge of the facts.

Do you think you can be a fair and impartial judge if selected?

PROSPECTIVE JUROR: Yeah. Yes, I do.

THE COURT: Any follow-up?

MR. CASHION: No follow-up.

MR. MARTIN: No.

THE COURT: Okay. Thank you.

(In open court.)

THE COURT: All right. Anyone else been a member of any environmental organization? Please raise your hand.

Has anyone here ever been employed by an environmental organization? Please raise your hand.

All right. I think we understand, ////////////.

Anyone else?

Any family members been employed by an environmental organization?

And I'll broaden it even further. Any family members or close family friends been a member of -- been employed by an environmental organization? Please raise your hand.

Does anyone here hold a degree or certification, environmental, conservation, water quality, soil classification, or stormwater management and permitting? Anyone have a degree or certification in any of those subjects? Please raise your hand.

Does anyone have a family member who has a degree or certification in any of those subjects? Please raise your hand.

Ms. -- I'll just say ░░░░.

PROSPECTIVE JUROR: Yeah, ░░░░░░.

THE COURT: Do you have a family member who is employed by a -- I'm sorry -- has a degree or certification?

PROSPECTIVE JUROR: My daughter has a bachelor's in soil and science -- science degree in plant and soil. And she used to work for USDA. So I don't know if that counts.

THE COURT: And does -- why don't you approach the bench. Why don't you come to the bench.

(Bench conference outside the hearing of the venire.)

THE COURT: I'm going to put you in the middle there.

So did she ever talk to you about her work?

PROSPECTIVE JUROR: Well, she's finished with school. She works on a farm right now during the summer. She's going to go back and get her master's in geology.

THE COURT: Does she work in Tennessee?

PROSPECTIVE JUROR: Uh-huh.

THE COURT: I need you to verbalize.

PROSPECTIVE JUROR: In Tennessee.

THE COURT: When you say "uh-huh" or "huh-uh," we can't tell.

She's going back to school?

PROSPECTIVE JUROR: She's going back to MTSU to get her master's.

THE COURT: In what?

PROSPECTIVE JUROR: In geology.

THE COURT: So have you and her had discussions about environmental issues and the like?

PROSPECTIVE JUROR: No.

THE COURT: You just know what she does?

PROSPECTIVE JUROR: Yeah, yeah.

THE COURT: Do you understand what she does?

PROSPECTIVE JUROR: I don't think she really knows what she wants to do further. But, like I said, she finished

her bachelor of science in plant and soil.  She worked for the USDA for about five months because she couldn't get to the other side of the wall to work for the, like, Soil Department.

THE COURT:  Okay.

PROSPECTIVE JUROR:  So she's just furthering her education.

MR. CASHION:  No questions.

MR. MARTIN:  No questions.

THE COURT:  All right.  Thank you.

(In open court.)

THE COURT:  All right.  Anyone else have a family member or close family friend who has a degree or certification in environmental, conservation, water quality, soil classification, or stormwater management?

Let me get your name.

PROSPECTIVE JUROR:  //////////////////.

THE COURT:  All right.  Do you want to speak from there?

PROSPECTIVE JUROR:  My brother has a master's degree in environmental engineering.

THE COURT:  And is his work related to that as well?

PROSPECTIVE JUROR:  He builds hospitals for the Army Corps of Engineers, the Air Force now.

THE COURT:  Does he work in Tennessee?

PROSPECTIVE JUROR:  In Texas.

THE COURT:  All right.  Thank you.

Anyone else?

We have one in the jury box. ▨▨▨▨▨?

PROSPECTIVE JUROR:  ▨▨▨▨▨.  I have a degree in civil engineering.

THE COURT:  I'm sorry?

PROSPECTIVE JUROR:  Civil engineering degree, but for another country.

THE COURT:  You have a civil engineering degree from another country?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And what country is that?

PROSPECTIVE JUROR:  Venezuela.

THE COURT:  Venezuela.

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  All right.  Thank you.

Anyone else?

Has anyone in here ever been employed by a local, state, or federal government to perform any tasks or work related to environmental regulation or conservation?  If you've had such employment, please raise your hand.

Have -- I think we've discussed that.  Thanks, ▨▨▨▨▨.

////////// -- I'm sorry. ////////// is in front of you. That's it.

All right. Anyone have a family member who has been employed by any government to work in -- on matters pertaining to environmental regulation or conservation? Any family members that do that? Or close family friends who have engaged in that kind of work? I see no hands.

Now that you know a little bit about this case, do any of you feel like that you might have a problem being a fair and impartial juror? If selected to be on the trial jury here, you'll actually become judges of the facts.

And my question is, now that you know a little bit about the case, do any of you feel like you would just not be able to be fair and impartial because of opinions or beliefs that you have? If so, please raise your hand.

And we can certainly discuss that here at the bench.

So everyone feels like, if selected, you could listen to the evidence and make a decision on the law that I give you? Anyone feel like they can't do that? Please raise your hand.

All right. So I'm going to stop my questioning now and allow the -- the parties, through their counsel, to ask questions. We'll follow the same format.

Again, thank you for letting the court officer get

to you with the microphone.

And I guess, Mr. Martin, are you going to do the voir dire for the plaintiff?

MR. MARTIN:  Yes, Your Honor.

THE COURT:  All right.  Then, if you want to come to the podium, you can get started.

MR. MARTIN:  Well, thank you ladies and gentlemen, I just have one or two questions to make sure everyone's fair and impartial.

First question, is anyone here a Libertarian, a political party, a member of the Libertarian political party?

Does anyone feel that environmental laws in this country are too strict?  That people shouldn't really be subjected to limitations on, you know, what they do and put into the water, into the rivers?

Okay.  Thank you.

Does anybody feel that people really shouldn't follow the rules on acquiring a permit for activities like running a landfill or any other activity that's going to put or possibly put pollutants into the environment, into the rivers?

That's really all I have to ask.  Thank you very much.

THE COURT:  All right.  Mr. Cashion.

MR. CASHION:  It's always a good sign when the

attorney doesn't bring his pad with him.

I just have a few simple questions. And that is, is everyone able to just listen to the case and make your own decision? Is there any reason -- everything we've said here today -- that you have any prejudice for or against either Riverkeepers or my client, Ricky Ray?

So everybody's good -- sir?

PROSPECTIVE JUROR: I do have -- I own a home on Old Hickory Lake, which is part of the Cumberland River, and so does my mother and father-in-law --

MR. CASHION: Uh-huh.

PROSPECTIVE JUROR: -- and my parents. We all -- they live in Hendersonville and Gallatin. So I --

THE COURT: Put that microphone closer to you.

PROSPECTIVE JUROR: I'm sorry.

So I do cherish the river and the lake for my children to swim in it and boat and et cetera.

MR. CASHION: Right. Thank you.

THE COURT: So, Mr. Watts, if you're selected to be on the trial jury, can you listen to the evidence and follow the law I give you, even if you disagree with that?

PROSPECTIVE JUROR: Absolutely.

THE COURT: Okay. And make your decision solely on the evidence presented?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: All right. Thank you.

MR. CASHION: That's all the questions I have for the jury.

THE COURT: All right. If the lawyers can approach.

(Bench conference outside the hearing of the venire.)

THE COURT: So we'll do the for-cause challenges. I'll just call out each juror number, and if you have a for-cause challenge, just tell me.

Juror Number 1?

MR. MARTIN: Can I go get my --

THE COURT: Yeah.

MR. CASHION: I'm sorry.

THE COURT: Yeah. Get your papers.

MR. CASHION: I wasn't sure what you. . .

THE COURT: This is just the for-cause, and then you can go back and do your peremptories. This is just the for-cause.

MR. CASHION: And I don't have anything. A couple way back, but. . .

THE COURT: This is the quickest I've ever selected a jury. It's a record here.

So these are the for-cause. You can strike them off if I grant it, then you can exercise your peremptories.

All right. Juror Number 1.

Juror Number 2.

Juror Number 3 has to be an hour driving. Probably can let -- I'm going to strike her so she can get to go to Iowa.

////// -- Juror Number 4.

Juror Number 5.

Juror Number 6.

Juror Number 7.

Juror Number 8.

Juror Number 9.

Juror Number 10.

Juror Number 11.

Juror Number 12.

Juror Number 13.

Juror Number 14.

Juror Number 15.

Juror Number 16.

Juror Number 17.

Juror Number 18.

MR. MARTIN: I believe -- was she the one that worked for Metro? Daughter builds hospitals?

THE COURT: And she was on a grand jury.

MR. CASHION: For six months.

THE COURT: All right.

Juror Number 19.

Juror Number 20.

Juror Number 21.

Juror Number 22.

Juror Number 23.

Juror Number 24.

Juror Number 25.

Juror Number 26.

And Juror Number 27.

MR. MARTIN:  Yes, sir.

THE COURT:  I'll strike her.

Juror Number 28.

29.

And 30.

So you can go back now and exercise your three peremptories, pass those up.  The first eight will be the jury.

MR. CASHION:  Right.  Okay.

(In open court.)

THE COURT:  So, when you have your peremptory challenges completed, just pass it up to the Court.

All right.  So, ladies and gentlemen, we've completed the process of jury selection.  And let me end by thanking you again for your participation.  I'm going to call out the names of those who have been chosen to sit on this

case. And if I don't call out your name, you can return to the jury room downstairs on the first floor. Be sure you get your parking paid for and close out things there.

And, again, thank you for your participation. Thank you for your diligence. And we truly could not have trial by jury if citizens like yourselves didn't inconvenience yourselves. I'm sure each of you had personal, business, other matters to take care of but you stopped that and came to the Court today so that we could make sure that trial by jury occurs here in the Middle District. So I appreciate you.

So I'm going to call out the names of those who are selected. You should stay seated. And if I don't call our your name, you're free to return to the jury assembly room.

///////////////, ///////////////, ///////////////, ///////////////////////, ///////////////, //////// -- you know who you are. ///////////////, and ///////////////////. Please remain seated.

Thank you to everyone else.

All right. So, ///////////, if you could move down one chair, and /////////// follow him one chair. ///////////, if you would go down one chair, followed by ///////////, two chairs, and ///////////, join the others in that last seat.

This will be your seat for the remainder of the

trial.

So what we're going to do now, I'm going to go ahead and give them -- give you all some preliminary instructions. Then we're going to take a break.

The court security officer will take you to the jury room, where you have coffee, snacks, and other things to refresh yourself. We'll do that for about 15, 20 minutes, then we'll come back and start the case with opening -- with opening statements.

So now I'm going to ask each of you to stand, and the courtroom deputy will administer the oath.

(Jury sworn.)

THE COURT: All right. Be seated.

So, members of the jury, now that you've been sworn, I'm going to give you some preliminary instructions to guide you in your performance in the trial.

It will be your duty to find from the evidence what the facts are. You and you alone are the judges of the facts. You will then have to apply those facts to the law that I give you, and you must follow the law whether you agree with it or not.

Nothing I may say or do during the course of the trial is intended to indicate, nor should it be taken by you as indicating, what your verdict should be.

The evidence from which you will find the facts

will consist of the testimony of witnesses, documents, and other things received into the record as exhibits, and any facts the lawyers agree or stipulate to or that I may instruct you to find.

Certain things are not evidence and must not be considered by you. Among those things are statements, arguments, and questions by lawyers. These are not evidence. The objections to questions are not evidence.

Lawyers have an obligation to their client to make an objection when they believe evidence being offered is improper under the Rules of Evidence. You should not be influenced by the objection or by my ruling on it. If an objection is sustained, ignore the question. If it is overruled, treat the answer like any other answer. And if you're instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that I have excluded or told you to disregard is not evidence and must not be considered. Anything you may have seen or heard outside of this courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in this courtroom.

There are two kinds of evidence: direct and circumstantial. Direct evidence is direct proof of the facts, such as testimony of an eyewitness. Circumstantial

evidence is proof of facts from which you may infer or conclude that other facts exist. I will give you further instructions on these, as well as other matters at the end of the case, but keep in mind you may consider both kinds of evidence.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, or how much of any witness's testimony to accept or reject. I will give you some guidelines for determining credibility of witnesses at the end of the case.

I now have a few words about your conduct as jurors. These instructions are necessary for a fair trial and are very important.

First, during the trial, you are to avoid contact with any witness, the parties, any lawyer, or anyone else who may have an interest in the outcome of the case. Do not talk or have any other communication, by any means, with them. Because you may not know whether a particular person in the courthouse falls into one of these categories, during breaks you should not speak to anyone in the courthouse you do not know. And if anyone tries to talk to you about the case, please bring it to my attention promptly.

Second, during the trial, you are not to discuss the case with anyone or permit anyone to discuss it with you. This prohibition includes your family, friends, and

coworkers. It also includes any form of communication whatsoever, whether over the internet, such as email, instant messaging, tweeting, Facebook, or other social media posts, websites, and blogs; the use of cellphones for -- cellphones for text messaging or video or audio recordings; or the use of any other recording or transmitting device. People who aren't in the courtroom and haven't heard the evidence may yet and still express opinions about the case, and your verdict is not to be based on what others say about the case, only on what the evidence is.

So don't you post or email or tweet or text anything about this case, and don't read anything anyone else might post, email, tweet, or text about this case. And, of course, don't talk about the case and don't listen to anyone else talk about the case.

The prohibition even includes your fellow jurors. You should refrain from any case-related discussions with one another until all of the evidence is received, final instructions are given, and you retire to the jury room to deliberate on your verdict. One of the main reasons for this is that discussing the case can lead to forming an opinion, and that is not a good idea before you have heard all of the evidence.

Even after deliberations begin, you may talk about the case among your fellow jurors only when all are present.

Third, during the trial you are not to gather information, investigate, or do anything else to learn about the case outside of the properly admitted evidence. For example, do not attempt to investigate the case on the internet or travel to a particular location that may be of interest in the trial.

You should also avoid exposure to media coverage of the trial, if there is any, until after you render your verdict. So don't read or listen to any news or internet reports about the case, if there are any. Just like Tweets and internet posts, things on the internet and in the media are often inaccurate or incomplete, and it is certainly not given under oath with all parties present, nor is it subject to cross-examination and close scrutiny, like the evidence you will hear in the courtroom.

During the trial, you will receive all evidence which may be properly considered in reaching your verdict. I know that you may be used to looking things up online, but doing any type of research is unfair to the parties, can lead to bad decisions, and it can cause major problems and require us to start all over.

Finally, do not form any opinion until all the evidence is in. The last witness is often just as important as the first witness. So keep an open mind until I instruct you to start deliberations at the end of the case.

These rules are necessary for a fair trial, and violation of these instructions does subject you to punishment as allowed by law for contempt.

I will repeat or summarize these instructions for you regularly throughout the trial, not because I think you aren't paying attention, but because in my experience jurors find some of these instructions difficult to follow.  I know of no other situation in our culture where we ask strangers to sit together, watching and listening to something, then go into a room together and not talk about the one thing they have in common, what they just watched together.

We are all wired into the digital world and used to looking stuff up online and talking or posting about our lives.  So please remember the reasons I gave you about why we have these rules in the context of this trial, and let me know if there are any problems with following the rules either on your own part or your fellow jurors'.

So your personal comfort is important to the Court.  If during the trial you have personal needs, you can raise your hand or otherwise notify the court security officer, who will always be close by to you.  So if there's anything we can do to accommodate you, please let me know.

The trial is now about to begin.  First the plaintiff will make an opening statement, which is simply an outline to help you understand the evidence as it comes in.

Next, the defendant will make an opening statement.  Opening statements are neither evidence nor arguments.

The plaintiff will then call its first witness and counsel for the defendant will then be allowed to cross-examine.  I allow a direct examination, a cross-examination, and a redirect for each witness.

Following the plaintiff's case, the defendant will present witnesses, and we'll follow the same structure with a direct examination, a cross-examination, and a redirect.

After all of the evidence is in, the attorneys will give their closing arguments to summarize and interpret the evidence for you.  I will instruct you on the law, and after that you will retire to deliberate on your own.

Remember, at the end of the trial, you must make your decision based on what you recall of the evidence.  You will not have a written transcript to consult.  So please pay close attention to the testimony as it's given.

I do allow jurors to take notes.  And at this time we're going to pass to you your folders.  Each of you will have a folder with a notepad, a couple of pens, perhaps a highlighter.  And there's some envelopes in your -- in your folders there.

So you can make your notes on the notepad.  And at the end of every day we'll put them back into your folder, leave them on your chair.  This room is secure and very safe

overnight, and no one will be -- have access to what you've written.

There are also some envelopes in there. And the envelopes are important, that if you need to communicate with me, it must be done by a written note. So you can write out your note, sign -- with your question or whatever you need to let me know, sign it, put it in an envelope, seal the envelope, and then you can give it to the court security officer, who will bring it to me.

So, with that, it's -- it's about 10:34. So we're going to take about a 20-minute break, and when we come back I'll call on the attorneys to make their opening statement. And after they finish that, we'll call the first witness.

So you can retire now to your jury room.

(Jury not present.)

THE COURT: All right. Anything from the plaintiff that we need to take up?

MR. MARTIN: No, Your Honor.

THE COURT: And remind me who your first three witnesses are again.

MR. MARTIN: It will be Jeremy Mattingly, Nicholas Keck, and Frank Canale -- I'm sorry -- not Frank Canale. Well, it will be Frank Canale if it's in the morning. He can't -- he's not -- he can't be here this afternoon.

THE COURT: Okay.

MR. MARTIN: But if not him, we'll have to call Barry Sulkin.

THE COURT: Okay. Anything from the defense we need to take up?

MR. CASHION: Not at this time.

THE COURT: All right. We'll be in recess.

(Recess.)

(Jury present.)

THE COURT: All right. Be seated.

So, ladies and gentlemen, we'll now hear opening statements, first from the plaintiff and then on behalf of the defendant.

Mr. Martin.

PLAINTIFF'S OPENING STATEMENT

MR. MARTIN: Hello, ladies and gentlemen. This is the only chance I'll have to speak to you until after all the evidence is in and we do closing arguments. So thank you for being here, and hopefully this will be a worthwhile experience for you.

We're here because Tennessee Riverkeeper has investigated Ricky Ray's landfill operation and found problems with his stormwater controls and storm control -- best management practices to prevent siltation and mud from leaving the site.

Mr. Ray, we contend, is running a landfill out

there. And you'll see photos. You'll see videos. And you can decide for yourself whether -- it is a landfill. It's pretty striking. It's a huge mound of dirt and rock that the neighbors call Dirt Mountain. And you'll see why with the photos.

A landfill receives and permanently disposes of solid waste. The judge will give you the definition later on, but an improperly regulated landfill is a threat. It's a threat to the environment. It's a threat to health of people.

There are different kinds of landfills. You may be familiar with a municipal solid waste landfill that takes your household garbage. That's not what this is. This is a construction and demolition waste landfill that accepts things like rock, stone, dirt, construction debris, (indiscernible) landfill normally does, things like old pieces of metal and old tires, some of them, things such as that.

And a landfill is required to obtain a permit to operate. Someone wants to start a landfill, they apply -- rightfully, they should apply for a permit. And there's something called the Jackson Law, which requires local approval for the permit to be sited, and there are reasons for that.

One of the reasons is that the landfill is -- by

its very nature is very intrusive upon the environment and the people who happen to live close to it. And, you know, these days people live close to anything. So they have laws that require the local government to look at a landfill and determine whether it should be sited and whether it can be sited in the location properly, and protect the environment.

Part of that is it gives the local people, local residents a chance to be heard on it. They can file comments. They can ask for a public hearing. They can come voice their opposition to the landfill. And people living next to Dirt Mountain were deprived of that. Mr. Ray did not apply for a landfill permit, so the thing just popped up out there. And it's an eyesore, and it's in their backyard, some of them.

If he had applied for a landfill permit, he also would have had to have a -- either a personal -- either an individual permit, NPDES permit from Tennessee Department of Environment and Conservation, TDEC, or a general multisector Tennessee permit for the operation of a landfill. That permit has certain requirements that are protective of the environment that includes -- they have -- the operator has to monitor total suspended solids in his waste stream, and he has to report the results of that monitoring annually to TDEC.

Now, total suspended solids are things that are

suspended in stormwaters, mud and siltation, things that just float around in it. So there's a test they can do for that and determine that.

Mr. Ray contends that he's not operating a landfill; he's operating a construction site. And he applied for and received a general stormwater construction permit. It doesn't have the protections that the -- that the landfill stormwater permit would have. He doesn't have to monitor total suspended solids, for instance. He doesn't have to report the results of his monitoring to TDEC. It's just an easier permit. It's a cheaper permit.

And, without having to apply for the landfill permit and the multisector stormwater permit, it's easier, it's cheaper, and he saves a lot of money. But he skips a step. And it -- if it's a landfill, then, you know, he should do it the right way, he should get a permit and he should get the multisector permit and the landfill permit.

The neighbors out there, they're people that live out there that are exposed to this. And they're very concerned about it. You know, one of the things -- they didn't have any say-so about it coming in. It just came in. He didn't apply for a permit, so the Jackson Law didn't apply, and they weren't notified, and it just popped up out there.

And it spews mud. It spews a lot of dirty, muddy

water.  We have photos that we will show you, and you'll see that mud comes from the landfill, goes through one of two unnamed tributaries that go to Sulphur Creek.  And it pollutes Sulphur Creek with mud and siltation.  You'll see that in the photos that we'll show you.

Mr. Nichols Keck lives there at Sulphur Creek at the confluence of one of these tributaries -- I'm sorry.  He doesn't live there.  He owns property there.  It was a site that he wanted to build a house at.  And he's, you know, concerned about now his beautiful creek and his side -- his side tributary that he's named after himself.  He calls it Keck Creek.  But it's no longer pretty.  It's no longer the pristine place that he wanted to build a house and raise his family.  And he's having second thoughts about doing that.

Mr. Frank Canale lives right next door to the landfill.  And we expect him to testify about the effect that this has had on his enjoyment of his property.  And also he has photographs of muddy water, you know, leaving the landfill.

The problem with muddy water is that it violates state water quality laws.  And the permit that Mr. Ray has requires him to not discharge water that would violate the laws.  So that's a problem.  Not only does he not have the correct stormwater permit, but he's not even complying with the stormwater permit regulations that he does have.

He's supposed to do site assessments, and we'll hopefully be able to explain to you what a site assessment is and why that's important.  He's supposed do one initially when he begins operations, and he's supposed to do one when there's a change in his operations.  For instance, he had two outfalls to begin with, and now he only has one.  That's a significant change.  Because the law requires him to do a site assessment at each outfall that drains 10 or more acres.  We believe we'll show you that his site is 38.5 acres -- might be .7 -- 38 acres, we'll say.  And he has two outfalls.  So at least one of them -- I should say he had two outfalls -- at least one of them drains more than 10 acres, and he should do site assessments there.  But we've been unable to locate any site assessments.

When he has a change in his operations, such as discontinuing one of the outfalls, then he should -- he's required to do a site assessment, and he's required to update his Stormwater Pollution Prevention Plan, which is one of the requirements of the permit, that he develop a stormwater pollution plan and keep it updated.

He's also required to do twice weekly inspections of his property.  And, if problems are found, such as stormwater controls or pollution prevention controls aren't properly being used or aren't properly being maintained, then he's supposed to correct that.  And if it requires a

correction to his Stormwater Pollution Prevention Plan, then he's supposed to correct the Stormwater Pollution Prevention Plan.

We contend he hasn't properly done site inspections and he has not updated his pollution prevention plan based on those site assessments -- those inspections, or on the site assessments.

Jeremy Mattingly is a commercial drone operator who went out and investigated the site and took drone video of the site. He has one video that's a complete fly-around of the site. And you can see how huge it is -- two years ago -- how huge it was then, and it's only gotten bigger. And you can see that, you know, the lack of stormwater controls that were present at that time.

We think that, you know, once you see the evidence we presented, then you will agree with us that Mr. Ray is operating a landfill and that he's not following the permit that he does have.

He'll have certain defenses that he will bring up.

The one he claims that he's running a construction site instead of a landfill. You know, we believe that you will agree that anything he's constructing out there doesn't require, you know, tons and tons of rock and dirt to be brought there.

And he'll say that he's stopped the problem, that

he has completed finally, after years of operation, his pond -- his stormwater retention pond, and that all those problems are done now.

But we'll show you photos and testimony that his discharges, the stormwater, muddy stormwater discharges that aren't in compliance with his permit are continuing and have continued until, you know, the -- well, it's continuing now -- but the last time we were there, a few weeks ago, and it was bad then.  If he hasn't stopped it, then they're not in the past.

We will begin with our evidence pretty soon, and we think that you'll see, you know, just what we're talking about.

Thank you very much.

THE COURT:  All right.  Mr. Cashion.

MR. CASHION:  Does the rule apply to this?

THE COURT:  Not this.  This is not evidence.  So anyone can listen.

DEFENDANTS' OPENING STATEMENT

MR. CASHION:  Thank you, Your Honor.

Good morning.  My name is Greg Cashion.  I represent Ricky Ray in this case.

And I think I want to just make one thing clear when -- from the start of what Mr. Martin was telling you. He wants to believe that this is a construction and

demolition landfill. It's not. And he wants you to look at this as a landfill case. And a construction and demolition, you put all kinds of materials out there. Anything -- you know, asbestos, drywall, all that, is a construction and demolition. They take everything.

That's not this case. In fact, the statute in Tennessee says there's an exception of materials to a construction and demolition landfill. The exception to that excludes natural rock, dirt, stumps, pavement, concrete, rebar, and brick rubble. Those materials are not a construction and demolition landfill. That's just fill.

Because in almost every job site out there, they're going to cut some material out, rock or dirt -- you know, used to say "blasting rock," but now in Davidson County, they just beat it, just hole-ram it out, so they don't blast it like they used to.

But they're going to take that rock out, take it -- take the dirt out. If they keep it separated, they'll put it somewhere else.

So that's really what is happening here, is Mr. Ray is taking rock and dirt. He's not taking junk. He's not taking any solid waste. He's not doing anything, just rock and dirt primarily, and making a hill.

So that's the one thing I wanted to correct. When they get on this construction and demolition landfill, we're

the exception to that. What you see here will be the exception.

Now, let me tell you about Mr. Ray. Mr. Ray bought this piece of property in 2019. And when he bought it, it was very rough. It sits -- he bought a ridge, basically, you know, 200-foot ridge, ridge that runs all the way down Ashland City Highway there. So he owns all this land on the back end of the ridge, which is pretty steep. And then this is not as steep coming down to Ashland City Highway. So we'll show you some maps.

But that's kind of -- he bought that, and that comes down. And the land was rough. He'll describe it to you, but it was very rough land. It had, you know, rises and falls and gullies and all this. And he wanted to basically have a hillside farm on it. So he wanted to level it up to make a hill that was the same height as the ridge, not -- just not have some mountain there.

You'll see it. It's next to the ridge that he wanted to pull out to get the best view you could in that area. So that's -- his vision was to have a hillside farm with a view. And that's what he started.

Now, Mr. Ray has worked construction for 50 years. Mr. Ray has always worked in excavation, in grading, in those fields. That's the type of work he's grown up and that's what he's excellent with. And in the last 18 years, he was a

superintendent and then later general superintendent for Summit Construction, who is a grading contractor.

So Mr. Ray had a unique skill set here. He knew how to make the land flat, smooth it out, and he knew how to make a mound or a big hill that you'll see, and that's what he was going to do. That's what he started. He's still working on it.

So we'll show you photographs of today -- you know, it's still not finished, but it starts to make -- let you understand, he's working on something that can be a hillside farm, and he can have his place, and he had the unique, I guess, contacts to make it happen, to bring the material in.

And he's very particular about bringing in only rock and dirt, primarily rock. And all the rock was coming off the construction sites that we see in Nashville, because they all have -- we're sitting on rock. So they always have to blast out. And he was -- accept the rock. And that's how he was going to construct his mound that comes out and is a part of the ridge.

So, what we go to then is when he had this vision, the first thing he did, he went to see an engineer. The engineer was a man named Randy Harper. And he told Mr. Harper his vision. This is what I want. I want the hill, I want this. And Mr. Harper, being a civil engineer,

went ahead and he -- after getting all the -- what he was -- wanted him to do, he drew it up. He drew it up showing how much grade was going to change.

So it's a topo-looking map, and it just shows you -- you know, places where it's very close, that means it's very steep coming up. And he also -- Mr. Harper put in a Stormwater Pollution Prevention Plan called a SWPPP. And he did that.

Metro came and they looked at it. They approved it. And Metro gave him a grading permit to start his work. This is going to be May 19th, 2020. So a little over five years ago he got his grading permit.

And then you also have to work with TDEC. TDEC is the Tennessee Department of Environmental and Conservation. And TDEC watches projects like this, where there's land being displaced, being added on. That's a TDEC. TDEC will be on that. And they're very diligent in protecting the lands and the waters.

So, he got together after he designed -- his engineer designed it, the engineer told him how to do it all, and then he hired a company called Mid-TN Erosion. They are the inspectors for this. They look at the land that he's working on. They inspect the site. And also they -- they inspect the site twice a week.

So you've got TDEC in there and then Mid-TN

Erosion, and they are inspectors who are certified by TDEC. So they're independent of TDEC but they're certified.

And that's how this works, and the reports are all labeled for TDEC. This is a TDEC operation, to keep TDEC apprised of someone who is doing a mass grading like this.

So, when he starts out, he starts out with Metro and Mid-TN. The woman from Metro was Katherine O'Hara. She joins the guy from Mid-TN, Billy Miles. Those two work with him to assess the site and make sure that it's all going in according to what everyone has designed, the engineers have looked at, and now everyone has approved.

And that's the system. And it's just really for migrating the stormwater runoff. That's what you're most interested in. You don't want out-of-control water. So it's all about the mitigation. And it's not simple. It takes time. It takes a while to get the stormwater runoff the way it's ultimately planned for.

Now -- so, once they got the blessing of both Metro and TDEC, they start. And they start with flattening it out, and then they go to hauling rock in and start building the structure. Which we have the plans set -- you'll see the plans, and you can see that this whole -- what they call the mountain, was given -- it was a known. It wasn't just like he surprised everybody and said, "Look, Metro approved it." They looked at it, they approved it, and

they said go.  Build it.  So there wasn't any surprise there.

And Metro inspects -- for the last five years, Metro has been inspecting.  They inspect once every month.  They come out and do photographs.  They write a report every month.  So Metro's inspected this probably 60 times -- five years, 12 months, 60 times, doing the once-a-month.  The inspectors for Metro through the years have been Katherine O'Hara, Chris Long, Linda Kelly, and it's now Thomas Biggerstaff.

So we have all those people coming out to this site looking at it and judging it, and then they have -- they sign off on it.  There's been no significant problems from Metro.  They're still working.

The other half of this is Mid-TN Erosion.  Their inspectors are reporting to TDEC twice a week, as I said a while ago.  Their inspectors were Billy Miles, Nasod Maylo, and now Andy Travis.  Those men came out twice a week.  And two times a week for five years -- now you're getting into the higher math -- is about 500.

So you have right now 500 inspections, give or take.  People are watching that.  Still have inspections as we're talking now.  And they're working with Mr. Ray to mitigate.  They're inspecting it.  They find something and they report it, and he goes out there, gets somebody, and corrects it.  They're working together.

This is not -- like I said, it's hard to get the whole thing right.  They work together day after day after day with these people reporting that.  So he's building this under a lot of supervision.  And there's been no significant problems.  And, as I said, they're still working.

Now, that's -- they started in 2020.  About three years later, the neighbors are not happy with the hill.  They call it the Dirt Mountain.  It looks bad.  They don't like it.

The Riverkeepers file a lawsuit on August 31, 2023.  Their claims -- has some administrative issues, but the real claim that you have before you get to the administrative issues is the water.  They're claiming the water is polluted that he's letting off that job site.  And so, when you start looking at it, the water's coming off the land.  And the water's being discharged.  And the complaint is about the water.

But the problem here is not the water.  It's that Riverkeepers do not have any proof what is -- what is the water.  They don't have samples.  They don't have scientists, they don't have engineers.  They don't have anybody that's going to say this muddy water exceeded the acceptable limits for that turbidity.  They don't have anybody.  They're not going to say this is a pollutant they're putting in.

So here we are in trial, and they're going to come

up and try to, you know, make us sound bad.  That's what they do.  Kick and roll, see what they can find out.  But it's about the water, and they don't have any proof of it.

So you're sitting here, waiting, knowing this is very scientific.  We don't -- I couldn't begin to tell you if I looked at a stream that looked muddy, "Well, that's too much mud."  You can't do it with your naked eye.  And you can't do it if you're not -- I mean, a scientist can't do it, is what the law says.  You've got to have proof.  You've got to have data.  You've got to have a sample -- one sample, they don't have.

So we're sitting here waiting for this to happen, and there's no gauge.  They're going to tell you about pollutants.  There's no turbidity they're going to talk about.  Nothing.

MR. MARTIN:  Your Honor --

THE COURT:  Mr. Cashion, you have one minute left.

MR. CASHION:  Thank you.

Dirt Mountain.  I wanted to put up one --

MR. MARTIN:  Your Honor, I hate to object during opening statement --

THE COURT:  Why don't you approach.

(Bench conference outside the hearing of the jury.)

MR. MARTIN:  That's not a correct statement of the

law.  I'm not required to have samples of turbidity in order to show violations of this permit because there are no turbidity standards in this permit.

THE COURT:  Well, opening statements are --

MR. MARTIN:  I understand.

THE COURT:  -- not law.  And I've told the jury that.

Since you're here, do you have a witness?

MR. MARTIN:  It will have to be Barry Sulkin if we're going to do witnesses before lunch.  I thought we were doing witnesses after lunch.

THE COURT:  No.  We're stopping at 2:30.  So I was going to work through lunch.

MR. MARTIN:  We can start with Barry Sulkin, if that's okay.

THE COURT:  When are your witnesses going to be here?

MR. MARTIN:  12:30.

THE COURT:  Okay.  All right.  Well, let's finish this up.  I may send them out -- I'll probably send the jury to lunch and we can talk about Mr. Sulkin.

MR. MARTIN:  Yes, sir.

(In open court.)

MR. CASHION:  Okay.  I just wanted to show you, when they show you these bad photographs of the rock and

dirt, two years ago, before the lawsuit was filed, I wanted to show you, when you look at it, what it looks like now.

And now he's putting in his topsoil. He's gotten green slopes on it. And he's completing the view that he wants of that area.

So, yes, if you stop looking -- if you start looking at construction midway, it's not going to look like it is finished. So it's not like a mud pit. It's not like a bunch of rocks. He's covered it in topsoil. And he's planted grass, and he's continuing to work. He's not through, but this is what he's working for. Not to have a mound of dirt and rock; to have a sloped hillside farm with a great vision -- with a great view.

Thank you.

THE COURT: All right. So, ladies and gentlemen, you've heard the opening statements. I'm going to change our schedule a little bit and let you all go ahead and get your lunch.

And plan to be back -- I've got it's 11: -- about -- a little bit after 11:30. I want to give you about 45 minutes to do that. And then return back up to the jury room. You should -- 45 minutes, and then come back up to the jury room and we'll continue the trial.

All right. Thank you. You can leave your folders in your chair.

(Jury not present.)

THE COURT:  All right.  So the record will reflect the jury has stepped out.

So let's go ahead and do our out-of-jury hearing for Mr. Sulkin.

Mr. Martin, if you want to present him.

MR. MARTIN:  Yes, sir.  Mr. Sulkin will --

THE COURT:  Well, I want to hear from him.  I want to be sure that you and he know and the defense know what's proper and what's not proper.

So let's bring him to the witness stand, and you can conduct your direct however you want to present it in front of the jury.

COURT DEPUTY:  Mr. Sulkin, if you'll stop here at the podium to be sworn in.

BARRY SULKIN,
called as a witness by Plaintiff, was duly sworn and testified as follows:

COURT DEPUTY:  Please state your full name for the record.

THE WITNESS:  Barry Lane Sulkin.

COURT DEPUTY:  You can have a seat at the witness stand.

THE COURT:  All right.  Go ahead.

DIRECT 701 EXAMINATION

BY MR. MARTIN:

Q.  Okay.  Mr. Sulkin, what is your profession?

A.  Environmental consultant.

Q.  And --

MR. CASHION:  I object, Your Honor.  I think it's irrelevant, it is what he's seen, and now an environmental consultant is going to address the jury.

THE COURT:  Mr. Martin?

MR. MARTIN:  Okay.  And have you been --

THE COURT:  So do you want to withdraw that question?

MR. MARTIN:  I'm sorry?

THE COURT:  Do you want to withdraw the question, given the objection?

MR. MARTIN:  I will withdraw it.

THE COURT:  Okay.  Go ahead.

BY MR. MARTIN:

Q.  Have you investigated the site called Dirt Mountain?

A.  Yes, I have.

MR. CASHION:  Your Honor, I object.  Any investigation -- he is not a consultant.  He can only say what he saw.

THE COURT:  Well, I'll let him do it.  The

investigation, I guess, is a prelude to what he saw.

So go ahead. Overruled.

BY MR. MARTIN:

Q. And in the course of that investigation, did you take a number of photographs?

A. Yes, I did.

Q. And what do these photographs tend to show?

A. It showed at times muddy water.

THE COURT: What exhibits is he referring to now? What photos? What photos do you intend to get into evidence through Mr. Sulkin?

BY MR. MARTIN:

Q. Okay. Mr. Sulkin, Exhibit 12 through 50, are those photographs that you took?

A. I don't have. . .

Q. Behind you, they're. . .

A. Oh. Yes, these are photographs I took.

MR. CASHION: Your Honor, I object. I think there has to be a location of where he's taking it, as well as a date.

THE COURT: All right.

MR. MARTIN: We're getting there.

Q. Okay. Exhibit 12 --

THE COURT: When did you take the photographs?

THE WITNESS: Over the last three years. They're

not all on one day.

THE COURT: What do you call three years?

THE WITNESS: I first went out to the site in the fall of 2022, a dry day. And I went there both wet and dry.

The first time I was there on a rain day, I believe it was January 3, 2023. And I've probably made 15, 20 visits since then, mostly on rain days, but some on dry.

THE COURT: All right. Thank you.

BY MR. MARTIN:

Q. Okay. Do you recognize that Exhibit 12?

A. I do.

Q. And can you tell us what that is and when that was taken?

A. Well, I've seen sites like this on more than one occasion. So I don't have the date on this photograph. But it is the eastern outfall stream that flows from the site under Ashland City Highway, and then a railroad track, and then it goes through some neighbors's yards.

And in the foreground here, you see Old Hydes Ferry Road, where the water flows along the edge of the road, has eaten under the road, and then goes through a pipe through some more neighbors' yards to Sulphur Creek.

Q. Was that photo taken January the 3rd, 2023?

A. I believe so. It's not dated on here, but that looks like what I saw on that day.

THE COURT: Are you looking at Plaintiff's Exhibit 12?

MR. MARTIN: Yes.

THE COURT: Okay.

MR. MARTIN: And, Judge, are you wanting me to go through each --

THE COURT: Whatever you want to present through him before the jury, I need to make sure we've got a clear understanding it's within the parameters of 701.

MR. MARTIN: This is going to take some time.

THE COURT: Okay.

BY MR. MARTIN:

Q. Exhibit 13, please, sir, can you identify that for us?

A. That is the southeastern corner of the property in question where flows come off onto Mr. Canale's property. It's the eastern outfall where a stream or channel is formed, and that's muddy water from the landfill going into the storm drain before it goes under Ashland City Highway.

THE COURT: Is that essentially what he's going to say for all of them, from Exhibit 12 through 50?

MR. MARTIN: Yes, sir.

THE COURT: It's muddy water that he believes is running water.

Anything else he's going to say?

MR. MARTIN: I'll ask him what the source was and

how he knows what the source was.  And I just want the jury to see all these photographs.

Also, he took a lot of photographs of the site. We did a site visit there.  I can cover some of that if you like.

THE COURT:  Whatever you want to present to the jury.

MR. MARTIN:  But I'm taking it you don't want me to go through each one of these photographs?

THE COURT:  You might be able to group them together if he's going to say the same thing about each photograph, his -- where he was -- where he took these pictures.

BY MR. MARTIN:

Q.   All these photographs, I'll say 12 through 28 were taken at that -- at the site, the --

A.   They were either taken at the site or downstream of the site and on different dates.

Q.   And downstream being before you get to Sulphur Creek, or at Sulphur Creek?

A.   Or at Sulphur Creek.

For example, Photograph Number 16, that is where that eastern stream or outfall flows through the Keck property and then enters Sulphur Creek.

So in the foreground you see Sulphur Creek and in

the background you see where the mud from the Ray facility is flowing through and into the Sulphur Creek. And I believe that was the first day I was able to catch it in that condition, which would have been June 29th of 2023.

Q. And when you were there at the site, did you find the appearance -- the appearance of the water coming from the Ray site to be objectionable?

A. Yes.

MR. CASHION: Your Honor, I object. He cannot go into that standard. He's got to show the turbidity.

THE COURT: That has a special meaning here, as you well know, Mr. Martin.

MR. MARTIN: The law doesn't say who it has to be objectionable to.

THE COURT: I'm sorry?

MR. MARTIN: It doesn't say who it has -- it says it cannot be objectionable.

THE COURT: Well, he cannot use his scientific, technical knowledge to answer that question because he's not an expert.

MR. MARTIN: I'm saying anybody that can look at it can --

THE COURT: Then you can make that argument to the jury.

MR. MARTIN: I'll ask them if they find it. . .

THE COURT: Yeah.

BY MR. MARTIN:

Q. Okay. 29 -- photographs 29 through 45, can you identify what those are?

A. So these are photographs up on the site. And they look to be from the date of a joint inspection we did in the fall of 2023.

Q. When you were there, what kind of debris did you see at the site?

A. Most of what I saw exposed was big pieces of concrete, like broken-up sidewalks and driveways and foundations, pavement, asphalt broken up, some concrete pipes, and then dirt and rock.

There wasn't a lot of dirt and rock visible like the other debris, because a lot of the dirt's either covered up with weeds growing on it or washed away in the rains, and big chunks of pavement and concrete were left behind.

Q. Did you see large areas of the site that was bare mud and rock?

A. Yes.

Q. Did you see areas of the site that did not have a grass cover?

MR. CASHION: Objection, Your Honor. Leading.

THE COURT: It's direct. So you can't lead.

THE WITNESS: Should I answer?

THE COURT: He'll rephrase the question.

MR. MARTIN: No.

Q. Okay. The photographs of -- well, let's say 46.

Can you describe that for us?

A. Yes. That is a culvert coming out under Old Hydes Ferry Road onto the Keck property showing muddy water.

Q. And did that muddy water come from the Ray site?

A. It did.

Q. Photograph 47, can you identify that for us?

A. That is where that same stream coming onto the Keck property flows through to the back of his property and flowing into Sulphur Creek.

And you see Sulphur Creek in the background flowing towards the camera clear, with the muddy water from the Ray site coming in from the left and blending with it.

Q. You say Photograph -- or Exhibit Number 48.

A. 48 is flow on the other stream, the eastern outfall, coming to the neighbor's property where it has eroded a ditch along the edge of Old Hydes Ferry Road and then flows into a pipe that goes under the road onto other neighbors' property and then on to Sulphur Creek.

Q. Exhibit Number 49, can you identify that for us?

A. I'm standing on Old Hydes Ferry Road looking south into the Keck property, and that is the flow coming from behind me at the Ray site onto Keck's property towards Sulphur Creek.

Q.    And Photograph Number 50.

A.    Another view of the same location on a different day, showing the same thing.

Q.    Can you look at Exhibit Number 52.

MR. CASHION:  I objected to him having anything to say about this permit.

THE COURT:  Well, let's hear the question.

MR. CASHION:  Okay.

THE COURT:  Let's see what the question -- what do you want him to say about Exhibit 52?

BY MR. MARTIN:

Q.    Can you tell us what that purports to be?

A.    It's an affidavit of the custodian of records.

MR. CASHION:  Your Honor, I'm going to object to any testimony about --

THE COURT:  Am I looking at the right thing?  What I have here is the stormwater pollution plan.  There is no affidavit.

MR. MARTIN:  You're not looking at the right thing.

THE COURT:  I'm looking at 52.  That's what you said.

MR. MARTIN:  52 is a collection of documents.  It begins with the affidavit, and it contains --

THE COURT:  So Riley Seth McCormick?  Is that the

affidavit you're referring to?

MR. MARTIN: Yes, sir.

MR. CASHION: Your Honor, I object. It's hearsay.

MR. MARTIN: Can we move for the admission into evidence of Exhibit 52, including the whole collection?

THE COURT: So for it to be the custodian of records, it would have to be the person who is in charge of the office where this is filed. But Mr. Riley Seth McCormick doesn't identify who he is. So under the rules -- and specifically 803-6 -- requires that a record of an act, event, condition, opinion or diagnosis, the record was made at or near the time, kept in the regular course of business, regular practice, and is shown by the testimony of the custodian or other qualified witness or by certification.

There's no certification here that he is the custodian. He just says it. Typically it will come and say, "I am the custodian of records for the Tennessee Department of Transportation, located in the Snodgrass Business [sic], all of the records of transportation come through me for verification. That's my job." This affidavit does not do that.

And, in fact, it suggests that the records were prepared by somebody else, not this person. So I don't know if it's admissible.

What rule of evidence allows this in?

MR. MARTIN: 902(4).

THE COURT: It looks like you have the same problem there. It has to be certified by the custodian or another person authorized to make the certification or a certificate that complies with 902-1, -2, or -3, a federal statute or a rule prescribed by the Supreme Court.

Again, Mr. McCormick doesn't put in his affidavit enough information for the Court to conclude really what office that this even comes from, or that he's the custodian of record from wherever this -- this -- this -- this document is filed. So I don't think 902(4) gets it into evidence.

Who is Riley Seth McCormick? Who is that?

MR. MARTIN: I've never met him. He's --

THE COURT: I guess that --

MR. MARTIN: -- custodian of records is all I know.

THE COURT: Of what office?

MR. MARTIN: Oh, let me -- let me get a copy of that.

He just says he's the duly authorized custodian of the records.

THE COURT: Yeah. I can't admit it based on that. It doesn't comply with the rule.

Any other exhibits to come in through Mr. Sulkin?

MR. MARTIN: Judge, there are other rules that

apply to that. 803(6) is a record of a regularly conducted activity --

THE COURT: But there you need -- 806(d), all of these conditions, (a), (b), and (c), are shown by the testimony of the custodian or another qualified person or by a certification that complies with 902(11) or (12). And, again, the affidavit of custodian in Plaintiff's Exhibit 52 doesn't satisfy that.

MR. MARTIN: Rule 901-7 authenticating by showing evidence the document was recorded or filed in a public office as authorized by law.

THE COURT: I'm sorry. What? 90-what?

MR. MARTIN: 901(7).

THE COURT: 901(b)(7)?

MR. MARTIN: Yes.

THE COURT: (b)(7).

MR. MARTIN: (b)(7).

THE COURT: Okay. But this affidavit doesn't comply with (b)(7). Again, typically, this -- it can be done this way, but the affidavit has to explain who they are and what office they hold to make the certification.

Mr. Martin, I don't know -- this may be all for naught. My law clerk just Googled it or whatever -- you know how you get on the internet. And, according to LinkedIn, McCormick is an intern for the Tennessee General Assembly.

That's not -- go ahead.

MR. HOLT:  Your Honor, if I may, on his LinkedIn, it's outdated, and it says he will be moving to Nashville to start his new chapter.  I'm looking at the TDEC chart of their officers, and Riley McCormick -- or Seth McCormick is listed as -- in the Permitting and Assessment Office.

THE COURT:  But he should have said that in his affidavit.

MR. HOLT:  Yes, Your Honor.

THE COURT:  Yeah.  You can't certify it for him.

What else do you want to get in through this witness?

BY MR. MARTIN:

Q.   Can you look at Exhibit Number 5, please, sir.

Can you identify Exhibit Number 5 for us?

A.   There's a 5 in the front and a 5 in the back.  Do you mean the one in the back?

Q.   I don't know what's in the back.

A.   My book has two number 5's, one in the front part, and then after 50 it starts over again -- after 52. . .  Yeah. After 52 they start over again at Number 1.

THE COURT:  We can't have two Number 5's. Remember I said at the pretrial conference, they need to be numbered sequentially.  Is that an attachment to Exhibit 52?

MR. MARTIN:  I believe so.

THE COURT: Okay.

BY MR. MARTIN:

Q. So the one in the front.

THE COURT: The one in the front.

BY MR. MARTIN:

Q. Can you identify it for us, the one in the front?

A. Number 5 is an aerial view of the Ray property.

THE COURT: Did you take this picture?

THE WITNESS: No. This is off the internet.

THE COURT: Did you get it off the internet?

THE WITNESS: I have a copy of this off the internet.

THE COURT: That's not my question. Did you do it?

THE WITNESS: I don't know if I took this exact one or not.

MR. MARTIN: It's a Google Earth photograph.

THE COURT: Yeah. He doesn't have any knowledge of it, so it can't come in through him.

What other exhibits do you want to get in through him?

MR. MARTIN: Well, if 52 is out, I believe that's -- well, there is one more.

Q. Would you look at Document 51.

MR. CASHION: Your Honor, I object to that.

THE COURT: What is 51? Let me catch up with you all. What is this?

MR. MARTIN: It is a financial document from Mr. Ray's RR Farms that was produced to us during discovery.

THE COURT: Is this relevant for liability or for any possible fines?

MR. MARTIN: Well, it's certainly relevant for a fine, but it also tends to show that he's operating a landfill and has been compensated for receiving waste there.

THE COURT: How does it show that?

MR. MARTIN: It shows what -- you know, it's -- it's the number of trucks that have come there and how much they paid to dump their waste there.

THE COURT: Yeah. But does this witness have any knowledge to testify about this document?

MR. MARTIN: He doesn't. But it. . .

That's all the exhibits, but I would ask him just some background questions.

Q. Where do you live?

THE COURT: Where does Mr. Sulkin live?

MR. MARTIN: Yes, sir.

THE COURT: Sure.

THE WITNESS: I live off of Pecan Valley Road, about a mile and a half or 2 miles north of the site.

BY MR. MARTIN:

Q. And are you concerned about the discharges from Mr. Ray's property?

A. I am.

Q. Why are you concerned?

MR. CASHION: Your Honor, I object. His concern is not --

THE COURT: Well, I'm going to hear what it is, and then we'll figure out if it's relevant or not.

THE WITNESS: I'm concerned about pollution and muddy water, particularly pollution in the area where I live and recreate, and I use the streams and the river in this area where the mud is going.

THE COURT: Anything else you want him to say?

MR. MARTIN: No, sir.

THE COURT: All right.

What is your objection about his perception that it's pollution?

MR. CASHION: He's drawing a conclusion.

THE COURT: Well --

MR. CASHION: He's trying to draw a conclusion when he uses the word "pollution" that it is actually there. He doesn't have any -- any -- documentation on pollution.

THE COURT: Well, he still can testify from his personal knowledge that what apparently he saw from his land.

That's --

MR. CASHION: From his land --

THE COURT: He's not going to be identified as an expert.

MR. CASHION: Right. But from his land -- he's across the ridge --

THE COURT: Oh.

MR. CASHION: -- he doesn't see anything. We didn't develop the Pecan Valley Road. We developed the other side, which is Ashland City Highway.

THE COURT: Oh.

MR. CASHION: He's on the other side of the ridge that never sees anything that's happening on this side, Ashland City side.

THE COURT: Is that correct, Mr. Martin?

MR. MARTIN: That's correct. He's expressed a general concern about pollution.

THE COURT: Right. But that general concern comes from the report that he made for you all, for the plaintiff, not as a neighbor next door affected by it, like some of your other witnesses.

I see Mr. Cashion's point, side door way of trying to get in his expert opinion. It's a different story if he walks outside on his front porch and sees, but that's not the case here. He's essentially talking about what he's seen

when he was doing his expert report.

MR. MARTIN:  Yes, sir.  I'll withdraw that question.

THE COURT:  All right.  Have we covered everything for Mr. Sulkin?  Basically, you're going to use him to get in Exhibits 12 through 50, that he made those pictures?

MR. MARTIN:  Yes, sir.

THE COURT:  Okay.  Any other testimony you want from him?  Well, I should -- that he has personal knowledge of that he can testify about?

MR. MARTIN:  Well, the plan was to go through the permit and to show the jury the sections of the permit that clearly, you know, he has -- clearly -- Mr. Ray has the permit.  And that sets the standards for --

THE COURT:  And maybe you can do that through another witness.  It just doesn't sound like -- well, first of all, you have to get the permit into evidence.  But -- before we can talk about it.

MR. MARTIN:  Yes, sir.

THE COURT:  All right.

MR. MARTIN:  That's all --

THE COURT:  All right.  Any objection to Mr. Sulkin getting in Exhibits 12 through 50?  He made those pictures.  They show what -- they show what they purport to show.

MR. CASHION: No objection to that. But I do want to ask the Court again to advise the jury that his expert report was dismissed and he is only here because -- I'm going to be the jack-in-the-box again.

THE COURT: Right. But we've heard everything that Mr. Sulkin's going to say. And typically I don't tell the jury I've excluded this, excluded that. It's not evidence; they can't consider it.

MR. CASHION: Right.

THE COURT: He's not going to be identified as an expert. All we need is his name and address, but there will be no reference at all that he has any special scientific, technical background here. He's talking about the pictures he made, when he made them, and what they purport to show. I don't see how that's objectionable. To the jury, he's just going to be another witness.

MR. CASHION: Okay.

THE COURT: Okay.

MR. CASHION: Thank you.

MR. MARTIN: I would just like to inform the Court that I will be attempting to add to my witness list, if I can subpoena the custodian of records at TDEC before, you know, I finish my case, I would like to put him on.

THE COURT: Well, we'll cover that -- I guess -- talk to Mr. Cashion, see if you have an agreement. The trial

has started.  You all have filed your witness lists, you revised your witness lists.  This can't be a surprise, but you've put me on notice.  I'll rule on it when it's properly before me.

All right.  Let us -- anything else, Mr. Martin?  On this witness?

MR. MARTIN:  No, sir.

THE COURT:  So are you going to call him or are you going to have another witness here?

MR. MARTIN:  After -- after lunch or --

THE COURT:  Yeah.  We're going to come back -- I'm going to cut you all's lunch down to 12:30.  I hope you can do that.  Now, we're going to go from 12:30 to 2:30.  So you need to have enough witnesses so you all can get to the funeral.

MR. MARTIN:  I intend to begin with Jeremy Mattingly.

THE COURT:  Okay.

MR. CASHION:  Could I just ask for 2:15?

THE COURT:  Sure.  Sure.  Because you've got to go to Christ Presbyterian.  Downtown or out in Brentwood?

MR. CASHION:  Brentwood.

THE COURT:  Oh, that's a long ways.

MR. CASHION:  Yeah.  Out on Old Hickory.

THE COURT:  So we're going to go from 12:30 to

2:15, with probably -- I may let them stand up and move their legs so we can get the case moving along.

All right.  Thank you.

(Whereupon a lunch break was observed.)

(Jury present.)

THE COURT:  All right.  Be seated.

All right.  Before we call the first witness, does either party invoke the rule?  From the plaintiff?

MR. MARTIN:  The plaintiff does not.

THE COURT:  From the defense?  Do you invoke the rule?

MR. CASHION:  Yes, Your Honor.

THE COURT:  All right.  So, if you're going to be a witness in this case, you need to step outside and wait until you're called to testify.

All right.  Plaintiff, call your first witness.

MR. MARTIN:  We call Jeremy Mattingly.

COURT DEPUTY:  Mr. Mattingly, if you'll come to the podium first to be sworn in.  Please raise your right hand.

JEREMY MATTINGLY, called as a witness by Plaintiff, was duly sworn and testified as follows:

COURT DEPUTY:  Please state your full name for the

record.

THE WITNESS:  Jeremy Mattingly.

COURT DEPUTY:  And spell your last name.

THE WITNESS:  M-a-t-t-i-n-g-l-y.

COURT DEPUTY:  Thank you.  You can have a seat at the witness stand.

THE COURT:  All right.  You can start.

DIRECT EXAMINATION

BY MR. MARTIN:

Q.    Okay.  Mr. Mattingly, were you retained by Tennessee Riverkeeper on February 2nd, 2023, to take some drone videos?

A.    Yes, sir.

Q.    Are you a commercial drone pilot?

A.    Yes, sir.

Q.    Are you certified by the Federal Aviation Administration?

A.    Yes, by Part 107.

Q.    Where were you asked to taken drone videos by Tennessee Riverkeeper?

A.    There was a person who was getting -- I believe the address -- there's a gentleman next to the property.  And his address is 5232 Ashland City Highway.

Q.    Would that be Mr. Frank Canale?

A.    Yes.

Q.    So what did you do that day?

A.   I -- I took the video on February 9th, 2023, which was a Thursday.  And I drove to the property, which is, I believe, adjoining the other property, and I got out of my vehicle, parked at his residence, and put the drone up in the air to see where water was coming onto his property.

Q.   Okay.  And did you actually take two videos that day?

A.   Yes, sir.

Q.   Okay.  Let's look at Exhibit Number 1.

THE COURT:  Plaintiff's Exhibit Number 1?

MR. MARTIN:  Yes, sir.

THE COURT:  All right.  Is there any objection to Plaintiff's Exhibit 1?

MR. FITTS:  No, Your Honor.

THE COURT:  All right.  Admitted.

(Whereupon Plaintiff Exhibit 1 was marked for identification and received in evidence.)

THE COURT:  Go ahead.  You can go ahead with the examination.  Oh, you're just going to show it.

MR. MARTIN:  Just wanted to let it play.

(Video played.)

BY MR. MARTIN:

Q.   Okay.  And just for the record, does that fairly and accurately depict the scene that you saw there that day?

A.   Yes.

MR. MARTIN:  Okay.  And we would like to also play

Plaintiff's Exhibit Number 2.

THE COURT:  Any objection to Number 2?

MR. FITTS:  No, Your Honor.

THE COURT:  All right.  Admitted.

(Whereupon Plaintiff Exhibit 2 was marked for identification and received in evidence.)

(Video played.)

BY MR. MARTIN:

Q.   Okay.  And also does that fairly and accurately depict the scene that you saw that day?

A.   Yes, sir.

Q.   What were you trying to show there in that second video?

A.   I was trying to show which ways water might be going from one property into an individual's property that was being affected.

MR. MARTIN:  Okay.  Thank you.  That's all the questions for this witness.

THE COURT:  All right.  Cross.

CROSS-EXAMINATION

BY MR. FITTS:

Q.   Mr. Mattingly, my name is Will Fitts.  I'm here on behalf of the defendant, Mr. Ricky Ray.  Just a couple questions for you.

A.   Yes, sir.

Q.   Am I correct that both of these videos were taken on

February 9th, 2023?

A.   Yes, sir.

Q.   And if my math is correct, is that roughly two years, three months ago?

A.   Yes, sir.

Q.   Okay.  And that was also -- I'll represent to you that the complaint that started this lawsuit was filed in August of 2023.

So this would be prior to August of 2023, correct?

A.   I believe so.

MR. FITTS:  That's all I have.

THE COURT:  All right.  Redirect.

MR. MARTIN:  We have nothing, Your Honor.

THE COURT:  All right.  You can step down.

(Witness excused.)

THE COURT:  All right.  Call your next witness.

MR. MARTIN:  We call Mr. Nicholas Keck.

THE COURT:  You may need to retrieve him in the witness room there, Mr. Martin.

COURT DEPUTY:  If you'll come up to the podium to be sworn in, please.  Please raise your right hand.

NICHOLAS KECK,
called as a witness by Plaintiff, was duly sworn and testified as follows:

COURT DEPUTY:  Please state your full name for the

record.

THE WITNESS:  Nicolas J. Keck.

COURT DEPUTY:  And spell your last name.

THE WITNESS:  K-e-c-k.

COURT DEPUTY:  You can have a seat at the witness stand.

DIRECT EXAMINATION

BY MR. MARTIN:

Q.    Mr. Keck, where do you reside?

A.    Currently my wife and I live in Ashland City, right on the edge of Nashville.

Q.    And do you own property at Sulphur Creek?

A.    Yes.  5167 Old Hydes Ferry Pike.

Q.    And tell us about that property.

A.    My wife and I purchased it in 2019, right as we were getting married, and we've owned it ever since.

Q.    Could you speak up just a little bit.

A.    Yeah.  Sorry.

My wife and I bought it in 2019.  We were married in November, and we bought it -- or closed on it in December. And we were planning on building a house there, and that will be our forever home.

Q.    What was it about the place that made you want to build your house there?

A.    It's a really great location.  Scottsboro, the

community, is kind of an agricultural, rural area, but it's really close to Nashville, so it only takes me, like, 15 minutes to get to town from there.  My office is downtown.

And it's got 3.4 acres, and I grew up on a farm as a kid with animals and stuff, so that was really appealing to me.  And it's got a creek at the back, which is beautiful, and then a little creek stream that runs along one other side of it as well.  So it had water features and land and proximity to Nashville.

Q.   Has that changed any?

A.   The creeks definitely aren't as appealing as they used to be.

Q.   How is it less appealing?

A.   Since all this stuff has been happening, it's -- they're often dirty.  And it's concerning because I don't really know what's in the water.  And it's -- it's -- every time it rains, it just gets really brown and a lot of sediment, and then that accumulates and it's frustrating.

Q.   And you said "since all this stuff has been happening."

What do you mean by that?

A.   Since the -- what we refer to as Dirt Mountain was constructed.  That property was purchased a few months before my wife and I closed on our property.  So, when we bought ours, that whole section of land was just trees and a hillside.  And then over the years it's torn down all the

trees and ripped up all the grass, and there's just a lot of dirt that's been accumulated with concrete and other debris.

Q. How far do you live from Dirt Mountain?

A. Five minutes. My wife and I purchased a townhome that was close because we wanted to be close to where our land was.

Q. And I'm sorry, I keep saying "live."

How far is your property on Sulphur Creek from --

A. Right across Highway 12.

Q. Right across the highway?

A. Yeah.

Q. What have you observed over at Dirt Mountain?

A. A lot of trucks. A lot of dump trucks with a lot of construction waste, is what it seems like. I mean, we've seen concrete. We've seen asphalt, a lot of dirt. It's just nonstop trucks for years. They keep building pathways up to the top, and then it just seems the pathway ends at the top, and all of it gets dumped down to the bottom.

Q. Have you taken some photographs of -- of mud in your creek?

A. Yeah. Many.

Q. I'm going to show -- there's a book behind you. It has exhibits in it.

A. The white one or the yellow one?

MR. MARTIN: I didn't hear what you said.

THE WITNESS: The white one or the yellow one?

MR. MARTIN: They're the same.

THE WITNESS: Plaintiff's.

MR. MARTIN: There we go. The plaintiff one. Yes.

BY MR. MARTIN:

Q. And look at Exhibit Number 6, please.

A. Yes, sir.

Q. Can you describe that photograph for us?

A. Yeah. That's a photograph I took last month, in April. It's right at the base of Dirt Mountain, and you can see all the dirt on the right-hand side in the water, and on the left-hand side is from the neighbor, who doesn't have a Dirt Mountain, and the water's clear, which is something we see pretty often, is the mixing of the dirty water with what should be clear water.

Q. Does that photograph fairly and accurately depict what you saw that day?

A. Yeah.

Q. Okay. Can you display the photo? Number -- what are we -- 6?

THE COURT: Do you want to move it into it exhibit first -- evidence? Do you want to move it into evidence?

MR. MARTIN: Yes, sir.

THE COURT: Okay. Without objection, it's

admitted.

(Whereupon, Plaintiff Exhibit 6 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.   Okay.  Can you tell us again what that picture is showing?

A.   That's the accumulation of water at the base of Dirt Mountain.  Everything on the right-hand side is coming off of all of that.  And then that goes into a drain that then feeds into my land across the highway.

Q.   How dirty did that appear to be when you were there?

A.   It's visibly muddy.  It's not the worst it's ever been, because this happens a lot, but it's definitely pretty normal.

Q.   And where were you standing when you took this?

A.   If you're standing on Highway 12, the drain is right there.  This is right where the neighbor's yard meets the property for the Dirt Mountain.

Q.   Okay.  Take a look at Plaintiff's Exhibit Number 7. Tell us what that -- without describing the photo, just tell us what it shows.

A.   More muddy water.

Q.   Okay.  And is that a photo that you took?

A.   Yes.

Q.   On April the 3rd also --

A.    Yes.

Q.    -- 2025?

And does it fairly and accurately depict the scene that you saw that day?

A.    Yeah.

MR. MARTIN:  We would move to offer it into evidence.

THE COURT:  Without objection, admitted.

(Whereupon, Plaintiff Exhibit 7 was marked for identification and received in evidence.)

MR. MARTIN:  We'll exhibit that -- display that now, please.

Q.    Okay.  Can you tell us where this photo was taken?

A.    This is right on my land.  The very entrance.  It's the northeast side, very corner of my property.

Q.    And what does it show?

A.    Muddy water that's come from Dirt Mountain and then feeds into the stream that runs along the entire east side of my property.

Q.    Do you find the color of that water to be objectionable?

A.    Yeah.

Q.    Let's look at Photograph -- take a look at Photograph Number 8, please, sir.

Was that also a photograph taken by you?

A.    Yes.

Q.    And also on April 3rd, 2025?

A.    Yes.

Q.    Without describing it, can you tell us what it depicts?

A.    It's the same location, just a larger view of the stream that you can see flowing down the right side of my property. It's very muddy.

Q.    And does it fairly and accurately depict the scene that you saw that day?

A.    Yes.

        MR. MARTIN:  We would offer Plaintiff's Exhibit Number 8 into evidence.

        THE COURT:  Without objection, admitted.

        (Whereupon, Plaintiff Exhibit 8 was marked for
        identification and received in evidence.)

BY MR. MARTIN:

Q.    Okay.  And where was this photograph taken?

A.    It's at the very entrance of my property on the northeast side of 5167 Old Hydes Ferry Pike.  That stream runs all the way down and then feeds into Sulphur Creek at the back of my property.

Q.    Can you describe what we're seeing?

A.    It's a lot of mud and accumulation of sediment.  It's very dirty water and spewing all over into my property.

Q.    Have you found the color of that water to be objectionable?

A.    Yeah.

Q.    And take a look at Plaintiff's Exhibit Number 9, please, sir.

Without describing it, can you tell us what that is?

A.    More muddy water.

Q.    And was it a photograph taken by you?

A.    Yes.

Q.    Also on April 3rd, 2025?

A.    Yep.

Q.    Did it fairly and -- does it fairly and accurately depict the scene that you saw that day?

A.    Yes.

MR. MARTIN:  We would offer Plaintiff's Exhibit Number 9 into evidence.

THE COURT:  Without objection, admitted.

(Whereupon, Plaintiff Exhibit 9 was marked for

identification and received in evidence.)

BY MR. MARTIN:

Q.    So where was this photograph taken?

A.    This is right across Old Hydes Ferry Pike.  I started following where the water was coming from from my property up this little continuation of the stream.

Q.    So did you follow it all the way from your property to Dirt Mountain?

A.   Yes.

Q.   And was there any other source of dirty water into this stream other than Dirt Mountain?

A.   No.  Not to my knowledge.

Q.   Do you find the color of this water to be objectionable?

A.   Yes.

Q.   Okay, sir, please take a look at Plaintiff's Exhibit Number 10.

Is this also a photograph taken by you on April 3rd, 2025?

A.   Yes.

Q.   Without describing it, can you tell us what it is?

A.   It's a bit farther up from the previous picture.  It's the same stream, getting closer to Highway 12.

Q.   And does it fairly and accurately depict the scene you saw that day?

A.   Yeah.

MR. MARTIN:  We would offer Plaintiff's Exhibit Number 10 into evidence.

THE COURT:  Without objection, admitted.

(Whereupon, Plaintiff Exhibit 10 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.   Can you describe what we're seeing here?

A.   This is the bend of the stream that we saw previously

that goes into my property. This is where I followed it up a little farther onto my diagonal neighbor's area. It flows right up to the railroad tracks and then Highway 12.

Q. And you found the color of this water to be objectionable?

A. Yes.

MR. MARTIN: Okay. Thank you, sir. That's all the questions I have.

THE COURT: All right. Cross.

CROSS-EXAMINATION

BY MR. FITTS:

Q. Mr. Keck, my name is William Fitts, and I represent the defendant, Mr. Ray. I'm just going to ask you a few questions.

A. Okay.

Q. Earlier in your testimony you were speaking about creeks, plural, that you were concerned about.

Which creeks, plural, are you talking about, were you referring to?

A. Honestly, all of them in the area at this point, but the ones that specifically are near my property is the one that runs on the east side that goes into Sulphur Creek and then Sulphur Creek at the south end of my property.

Q. Okay. So your testimony is that not only the stream that abuts your property but then also Sulphur Creek itself

is -- prior to that junction has been affected by muddy water?

A.    Yes.

Q.    Okay.  How often do you visit your property?

A.    As often as we can.  I'd say usually once a month, go check on it.  My neighbors next door, since we've bought it, we've had an agreement with them where they mow all the land for us, and we allow them to use it with their dogs.  And they have a deer stand that they watch stuff at the very back near the creek because animals always come up.  So somebody's out there every day.

Q.    When you go and check on your property monthly, what does that visit entail?

A.    We usually park on Old Hydes Ferry Pike because there's no driveway currently.  Most of the time the appeal is to go back to the creek.  There's a clearing at the very back of the south of the property that goes across Sulphur Creek at the very south end.  So we typically go back there and check on things.  There's a little covered area back there that we can sit at.

Q.    Okay.  Are there any other activities that you conduct, you know, on a regular basis on the property?

A.    We've had to bush hog a couple times, especially when we first bought it, because it had never been developed or anything.  I've gone out and put stakes where we were going

to build our house, and so there's a few things there for -- where we had worked with the architect. There's also a bonfire pit at the back.

Q. Okay. You testified regarding seeing dump trucks going to Mr. Ray's property. I guess I'll back up.

You also testified the -- to the proximity of your property to Mr. Ray's property.

Do you border Mr. Ray's property? Does your property border Mr. Ray's property?

A. Not directly, no.

Q. Does your property border Ashland City Highway?

A. It's right next to it.

Q. But does it border Ashland City Highway?

A. It's Old Hydes Ferry Pike, and then one house, and then Ashland City Highway.

Q. All right. So there is a property in between -- there is Mr. Ray's property -- correct me if I'm wrong.

There's Mr. Ray's property. South of that is Ashland City Highway. Then there's other property. And then there's Old Hydes Ferry Park [sic]. And then your property?

A. Yes. But there's no houses or anything in that stretch in there.

Q. So I guess my question is, if you are not on Ashland City Highway, how are you seeing these trucks coming into Mr. Ray's property if you don't have a view directly of his

property from your property?

A.   They've built up a mountain of dirt, like, 100 feet high.  Everybody can see it.

Q.   The trucks?

A.   Yes.

Q.   So you can -- you can see the dump trucks on top of the hills?  Is that what you're saying?

A.   Yes.  And pulling in constantly.

Q.   Okay.  And you noticed that on your monthly visits?

A.   We've noticed that for years, yeah.

Q.   Okay.

A.   I drive Highway 12 every day to go to work and stuff. So you can see when they're pulling in.

Q.   Did you ever stop to inspect what was inside those trucks?  You testified seeing multiple different items inside, so I didn't know exactly how you would know that from far away.

A.   You can see it from the road.

We've also had people in the neighborhood run over concrete that's fallen out of the trucks, stuff -- I mean, it's pretty evident.

Q.   Okay.  So your testimony is that you can see concrete in the trucks from the highway?

A.   You can see what's been dumped out of the trucks on the land.

Q. Sure. Okay. So -- okay. That sounds -- that's all I have.

THE COURT: All right. Redirect.

REDIRECT EXAMINATION

BY MR. MARTIN:

Q. Have you had any problems from the concrete dropping out of the trucks?

A. Me personally, no, but our neighbor has run over it with his lawnmower. We've had neighbors who have also --

MR. FITTS: Objection, Your Honor. Hearsay.

THE COURT: Sustained.

BY MR. MARTIN:

Q. You saw the trucks on the top of the mountain. Tell us how that works, how they come in off of the road and how do they get to the top of the mountain?

A. Initially there was already a road on that property. So I think in 2020 was when this really started. Like I said, we bought our property in 2019, and I believe the Rays also bought their property that same year, a few months before.

So when we were first going to our property regularly, there was no Dirt Mountain. And over the course of the last few years, it's been stripped and turned into that. There's now, I think, two entrances on both sides of the property. You can see the trucks pull in from Highway 12, drive to the top, dump stuff off the top and then drive

out.  And that's been happening for a while.

Q.   And you said you had plans to build your home there on your property?

A.   Yes, sir.

Q.   Have those plans changed?

MR. FITTS:  Objection, Your Honor.  Outside the scope of cross.

THE COURT:  Well, it did come up in cross.  I'll allow it.  Overruled.

THE WITNESS:  Yes.  We've definitely reconsidered if things don't change.

BY MR. MARTIN:

Q.   And what are the reasons for that?

A.   The main appeal of the property was it was rural and had creeks, and it was really relaxing.  And now there's just a lot of muddy water, and I don't really know what's going to happen.  So it's -- it's a lot of unknowns, and it's -- it's just frustrating.  Sorry.

MR. MARTIN:  Okay.  Thank you, sir.

THE COURT:  Again, as I explained earlier, I typically only -- why don't you all approach.

MR. FITTS:  It's just --

THE COURT:  Why don't you approach.  Mr. Martin.

(Bench conference outside the hearing of the jury.)

THE COURT: As I explained, I allow a direct, a cross and a re-. I don't go back to recross. So what's your question?

MR. FITTS: My question was -- he just testified about muddy water when it rains. So I wanted to clarify that he only sees it when it rains or if he sees it in the river.

THE COURT: Let's move on.

MR. FITTS: That's fine.

(In open court.)

THE COURT: All right. You can step down.

(Witness excused.)

THE COURT: All right. Call your next witness.

You can leave that there.

THE WITNESS: Okay.

MR. MARTIN: We call Ricky Ray.

COURT DEPUTY: If you'll stop here at the podium to be sworn in. Please raise your right hand.

RICKY RAY,

called as a witness by Plaintiff, was duly sworn and testified as follows:

COURT DEPUTY: Please state your full name for the record.

THE WITNESS: Ricky Eskind Ray.

COURT DEPUTY:  And spell your last name.

THE DEFENDANT:  R-a-y.

COURT DEPUTY:  You can have a seat at the witness stand.

DIRECT EXAMINATION

BY MR. MARTIN:

Q.   You have a book in front of you that's Plaintiff's exhibits.  Will you take a look, please, sir, at Plaintiff's Exhibit Number 51.

MR. FITTS:  Objection, Your Honor.  Relevance.

THE COURT:  Go ahead.  Do you want to respond to the objection?

MR. MARTIN:  We believe it's relevant, that it shows, number one, the amount and volume of waste that he's --

THE COURT:  Why don't you all approach.

(Bench conference outside the hearing of the jury.)

THE COURT:  What is this?

MR. MARTIN:  It's a document that is the financial records of RR Farms.

MR. FITTS:  I think it's an income statement.

MR. MARTIN:  Income statements for RR Farms for 2022 through 2024.

THE COURT:  Let him finish, then you'll have a

chance.

I see 2023.  Okay.  So how is this relevant? What's the purpose of it?

MR. MARTIN:  Well, one, it shows the volume of material that he's --

THE COURT:  How does it show that?

MR. MARTIN:  Each one of those -- one of those columns -- I can't -- I can't read it from --

THE COURT:  Do you want to get your copy of it?

MR. MARTIN:  Yes, sir.  Well, it doesn't show --

THE COURT:  I need you to talk louder so I can hear you.

MR. MARTIN:  I was mistaken.  It does not show the volume.  But it shows the amount --

THE COURT:  Amount of what?  Money.

MR. MARTIN:  No.  Truckloads.  Each one of these is a truckload of waste that was brought there and disposed of there.  And -- and I believe Mr. Ray said that --

THE COURT:  How does it show -- you said it shows -- how does it show truckloads?  Which column are you looking at?

MR. MARTIN:  Quantity column, the fourth column from the right.

THE COURT:  Uh-huh.

MR. MARTIN:  Quantity -- we may not be on the same

page.  Probably aren't.  I don't have the first page.  This one says "Quantity 14," "Quantity 22," "Quantity 4."

THE COURT:  And "quantity" stands for?

MR. MARTIN:  The number of truckloads.

THE COURT:  Number of truckloads.  Okay.  So you want to use it to show trucks --

MR. MARTIN:  To show how many truckloads have been deposited there.

THE COURT:  Okay.

MR. MARTIN:  And also -- there's two reasons.  That reason.  Also, shows how much he was paid for each one.

THE COURT:  Yeah.  How is that relevant?

MR. MARTIN:  Well, he's running a landfill, and he's being paid to receive this stuff.

THE COURT:  But if he's getting paid or not paid, does it make a difference for whether there's a violation?

MR. MARTIN:  It -- it shows that he's running a landfill.

THE COURT:  Right.  But the amount him getting paid is irrelevant.

MR. MARTIN:  No, it's not --

THE COURT:  I'm not going to ask the jury to turn to the amount he's making into a determination of law.

MR. MARTIN:  No.  It's just he's running a commercial landfill, and he's being paid for doing that, as

opposed to running a construction site where he would have to pay for his fill material.

THE COURT: Oh, okay.

MR. FITTS: That's not the case in construction at all. Any time you need fill, if you can find someone that's willing to give it to you, they'll give it to you. Because I think --

THE COURT: Yeah. Y'all -- y'all can't talk at one time.

MR. FITTS: Usually when you remove fill from a site that needs to be excavated, you have to pay to deposit it somewhere. So, if you can find somewhere that would take it, then you would not have to -- it's irrelevant.

THE COURT: Well, I guess -- how is this relevant to any of the claims that you're claiming?

MR. MARTIN: It's relevant to whether or not he's running a landfill.

THE COURT: But that's not going to be a question in the jury charge. I'm not going to ask them to make a determination, is he running a landfill. That's not an element to any violations you've asserted. The --

MR. MARTIN: It's an element of Count Two.

THE COURT: How so?

MR. MARTIN: We're saying he is a landfill --

THE COURT: Right.

MR. MARTIN: -- and does not have a permit.

THE COURT: But this doesn't show that one way or the other. You can ask him that.

All right. I'm -- based on what you've represented, I don't see how it's relevant, so let's move on.

(In open court.)

BY MR. MARTIN:

Q. Mr. Ray, you have a general construction stormwater permit for your operation, do you not?

A. Yes, I do.

Q. Will you take a look, please, sir, at Plaintiff's Exhibit Number 52-1.

Do you recognize that document, sir?

A. Yes.

Q. What is that, please, sir?

A. Do what?

Q. What is it?

A. What is it?

Q. Yes, sir.

A. It's from the Department -- Tennessee Department Of Environmental and Conservation.

Q. Okay. Is that your Notice of Intent that you filed for the operation of RR Farms?

A. Yes.

MR. MARTIN: We would offer Plaintiff's Exhibit

Number 52-1 into evidence.

THE COURT: Okay. It doesn't have an exhibit label on it.

MR. MARTIN: It's --

THE COURT: You need to put an exhibit label that says 52-1.

MR. MARTIN: Yes, sir.

THE COURT: Any objection?

MR. FITTS: No objection.

THE COURT: All right. 52-1 is admitted.

(Whereupon, Plaintiff Exhibit 52-1 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q. Now, will you take a look, please, at Plaintiff's Exhibit Number 52-2.

A. Okay.

Q. Can you identify that for us?

A. It's a SWPPP, S-W-P-P-P.

Q. Yes, sir.

Is that the Stormwater Pollution Prevention Plan that you filed for RR Farms?

A. Yes.

MR. MARTIN: We offer Plaintiff's Exhibit Number 52-1 into evidence.

THE COURT: 52-2?

MR. MARTIN:  52-2.

THE COURT:  Without objection, admitted.

(Whereupon, Plaintiff Exhibit 52-2 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.   Will you take a look, please --

A.   What am I looking at?

Q.   Plaintiff's Exhibit Number 52-3.

Can you identify that for us, please, sir?

A.   It's the State of Tennessee NPDES permit.

Q.   Is that the -- we may be looking at different documents.

Is that the notice of coverage for your stormwater pollution prevention --

A.   It's what you said, 52-3.

Q.   Excuse me.  The document you're looking at, does it say "Notice of Coverage Under the General NPDES Permit"?

A.   Yes.

Q.   Yes.  And is that a notice of coverage that you received from TDEC?

A.   Yes.

MR. MARTIN:  Okay.  We offer Exhibit 52-3.

THE COURT:  Without objection, admitted.

(Whereupon, Plaintiff Exhibit 52-3 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q. Will you turn to Plaintiff's Exhibit Number 52-4.

Do you recognize that, please, sir?

A. Yes.

Q. What is that, please, sir?

A. It says it's the Construction General Permit Tracking Number TNR244256.

Q. Is this a letter from TDEC addressed to Ms. Crystal Ray?

A. Yes.

Q. And dated June the 9th, 2020?

A. Yes.

MR. MARTIN: We offer Plaintiff's Exhibit 52-4.

THE COURT: Admitted without objection.

(Whereupon, Plaintiff Exhibit 52-4 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q. Will you turn, please, sir, to Plaintiff's Exhibit Number 52-5.

Do you recognize that document?

A. Yes.

Q. What is that, please, sir?

A. National Pollution Discharge Elimination System, NPDES. (Indiscernible).

Q. Will you read the line -- the two lines right below that?

A.    "General Permit for Discharges of Stormwater Associated With Construction Activities, Permit Number TNR100000."

Q.    Is this the permit that you have for construction stormwater activities?

A.    Should be.

MR. MARTIN:  We offer Plaintiff's Exhibit Number 52-5.

THE COURT:  Admitted without objection.

(Whereupon, Plaintiff Exhibit 52-5 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.    Will you turn, please, to Plaintiff's Exhibit Number 52-6.

Can you identify that for us, please, sir?

A.    "Notice of Coverage Under the General NPDES Permit for Stormwater Discharge Associated With Construction Activities."

Q.    Is this a notice of coverage that you received for RR Farms from TDEC for your general NPDES permit for stormwater?

A.    Yes.

MR. MARTIN:  We offer Plaintiff's Exhibit 52-6 into evidence.

THE COURT:  Admitted.

(Whereupon, Plaintiff Exhibit 52-6 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.   Now, will you turn, please, sir, to Plaintiff's Exhibit Number 52-7.

Do you recognize that document, please, sir?

A.   Yes.

Q.   What is that, please, sir?

A.   Huh?

Q.   Can you tell us what it is?

A.   "Compliance Inspection for General NPDES Permit for Stormwater Discharge From Construction Activities."

Q.   Is this a TDEC inspection of your site at RR Farms Mass Grading?

A.   It appears to be.

MR. MARTIN:  We offer Plaintiff's Exhibit 52-7.

MR. FITTS:  Objection, Your Honor.  Lack of foundation.  Mr. Ray just said that it appears to be.  I don't believe that he has ever seen this before, and it seems like he's just agreeing with -- with Mr. Martin's interpretation of what this document is.

MR. MARTIN:  He identified it.  He said it appears to be what he identified it as.

THE COURT:  All right.

MR. FITTS:  I believe I asked him to read the title, and then Mr. Martin asked him whether it was an inspection of the property, and Mr. Ray said, "It appears to

be."

THE COURT: Correct.

MR. FITTS: Yes.

THE COURT: All right. I don't know if that's a ground for it not to come into evidence.

MR. FITTS: If Mr. Ray's looking at a document that he's never seen before --

THE COURT: Well, he didn't say that.

Admitted.

(Whereupon, Plaintiff Exhibit 52-7 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q. Will you turn, please, sir, to Plaintiff's Exhibit Number 53.

Can you identify that for us?

A. Stormwater Pollution Prevention Plan, SWPPP, for RR Farms.

Q. Is this a SWPPP that was filed on behalf of RR Farms with TDEC?

A. I don't exactly understand it all.

Q. I'm sorry?

A. I don't exactly understand it all.

Q. I'm sorry. I didn't hear the last two words.

A. I don't exactly understand it all.

Q. Okay. What about it do you not understand, sir?

Well, let me ask you this while you're looking at that.

Did you file for a second stormwater permit?

A. We were -- we were in the process of doing the second phase when the lawsuit come about. So TDEC did approve the extension -- I mean, the -- Phase 2 of it, but it was in Metro, and we never -- we never finished it. We just started doing the original plan.

Q. And this was the original plan that --

A. Well, that's what I was concerned about. I can't -- I don't see -- I can't make out the date on it.

Q. The date?

A. Now, this -- this is not -- this is no good.

Q. Okay, sir.

A. This don't have anything to do with what we're building.

Q. Well, but is this the document that you filed with TDEC?

A. If Metro would have came with them and went to the second phase, yes. But, we didn't get to that part. So this is -- September 22nd is after I started the project. So this is -- TDEC did approve it.

But it's got to be approved by TDEC and then Metro. TDEC approved it, but Metro was in the process of approving it when we terminated -- we -- we're not doing this one.

Q. So you made a permit application and then you withdrew

it?

A.    Right.

Q.    And was this the Stormwater Pollution Prevention Plan that you filed with that application?

A.    This was for the next phase.  So it -- it don't -- shouldn't count.

Q.    You're saying it shouldn't count because you never got that permit?

A.    We got this -- TDEC approved it but Metro did not.

Q.    Okay.

A.    Both of them has to be approved.

Q.    Okay, sir.

But regardless of whether or not you received a permit, is this the document that you filed in order to get a permit?

A.    I -- yes, I guess it would be.  Yeah.

MR. MARTIN:  We offer Document 53 -- Plaintiff's Exhibit Number 53 into evidence.

MR. FITTS:  And, Your Honor, we would object for relevance.

THE COURT:  Why don't you approach.

(Bench conference outside the hearing of the jury.)

MR. FITTS:  Your Honor, Exhibit 2 -- 52-2 is the Stormwater Pollution Prevention Plan submitted October of

2019.

THE COURT: Right.

MR. FITTS: And then this is the pollution prevention plan September of '22.

THE COURT: Right.

MR. FITTS: As Mr. Ray stated, this is -- was for --

THE COURT: "This" being 53?

MR. FITTS: Yes. Yes. 57 -- 53. Yes.

THE COURT: 53.

MR. FITTS: Is a -- was filed in 2022 because they decided that they wanted to alter the plans of how exactly the slopes were going to be graded. So they filed this, then the lawsuit was filed.

So, in order for this permit and pollution --

THE COURT: 53?

MR. FITTS: Yes. And in order for a permit for a permit pollution prevention plan to be in effect, construction has to begin. Construction can't begin until Metro approves building permits.

Because Mr. Ray abandoned this new SWPPP without -- because he did not get the Metro plans in order to construct this, he never started construction on this plan; therefore, it's never been in effect, and we think it can severely lead to confusion for the jury, that they might try

to flip it back and forth.

I don't see how this is relevant at all when we're operating under the other permit, under the other SWPPP. This has never become in effect.

MR. MARTIN: This contains some admissions --

THE COURT: I need you to respond to his argument first.

MR. MARTIN: That it's -- it never went into effect, we don't dispute that. But it has some information in that is different from something that they --

THE COURT: So you want to use it for impeachment?

MR. MARTIN: I want to use it to show that the size of the site is large enough to require a site assessment, which they admit in this document.

MR. FITTS: But that is for a completely different plan that would have a different footprint. So it's going to again lead to confusion of the jury, where he's going to bring something in here --

THE COURT: If you admit it never went into effect, then I don't know, why does the jury need to see Exhibit Number 53 if it never went into effect?

MR. MARTIN: This -- it's just that they filed it, and they made the certification to TDEC that these are the facts, and those facts contradict some facts that are in the other SWPPP.

THE COURT:  Okay.  So you want to use it for impeachment?  If that's the purpose of it, that's. . .

MR. MARTIN:  No, sir.  I want to use it to show the truth as to whether a site assessment is required for that size site.  They had the same size site, 38 acres.  So he says there's more --

THE COURT:  (Indiscernible).

MR. MARTIN:  I'm sorry.  I'm. . .

THE COURT:  Okay.

MR. MARTIN:  It's Section -- I'm sorry.

THE COURT:  Go ahead.

MR. MARTIN:  -- 5-5 --

THE COURT:  What page?

MR. MARTIN:  It's 14 at the bottom.  I'm not sure how this thing's numbered, though.  We had it Bates stamped.  Let's see.  No.  These aren't Bates stamped.  52 is Bates stamped.

MR. FITTS:  That's right.  It's page 14.

MR. MARTIN:  It is 14.

MR. FITTS:  Yeah.

THE COURT:  Are we all looking at the same thing?

MR. MARTIN:  Your page is different from my 14.

MR. FITTS:  Oh, that's a different tabulated -- if you scoot up a little bit, it's -- there's two pieces to it, I guess.  It starts renumbering at a certain point.

THE COURT: There's another 14? Nope.

MR. FITTS: Keep going back. Or sorry. Forward. It should only be --

MR. MARTIN: Maybe it would be easier to go by the section numbers. It would be the first part there, I believe.

MR. FITTS: Yeah.

MR. MARTIN: Right in there.

MR. FITTS: There.

THE COURT: Okay. So what's on this page?

MR. MARTIN: 5.5.3.8 --

THE COURT: 5.5- -- okay. Go ahead.

MR. MARTIN: The last sentence, "The drainage area for Outfall 1 is approximately 22.3 acres."

Greater than 10 acres, and therefore site assessment is required by the permit.

THE COURT: Yeah. That's what I'm saying, you want to use that as impeachment.

MR. MARTIN: Yes, sir. They -- you know, they say in this -- yeah. I want to show that when they said before that a site assessment was not required that they were in error. So yes, sir.

THE COURT: You want to use it for impeachment.

MR. MARTIN: Yes, sir.

THE COURT: So you can use that for impeachment.

It doesn't require the whole document to come in.

MR. MARTIN: Yeah. Just -- but it's all one document.

THE COURT: No. You can present it to him and to the jury. Doesn't require the entire document. He can look at the document, and you can ask the perfect question, but it's not my job to tell you what questions to ask.

MR. MARTIN: Yes, sir. I understand.

THE COURT: I'll sustain the objection. You can use it for impeachment.

(In open court.)

BY MR. MARTIN:

Q. Mr. Ray, sir, can you flip over to Section 5.5.3.8 of that document, of Plaintiff's Exhibit Number 53.

THE COURT: Why don't you find it for him because the document is confusing.

BY MR. MARTIN:

Q. Do you see on that page Section 5.5.3.8?

A. Yes, sir.

Q. Can you read that section to us, please, sir?

A. This is also the wrong date. This is not the -- this is not the thing I'm building.

Q. Yes, sir. Can you read that to us, please, sir.

A. (As read):

Quality assurance of erosion prevention and

sediment controls shall be done by performing a site assessment covering the entire disturbed area for each outfall during 10 or more acres within 30 days of construction commencing at each portion of the site that drains the qualifying acreage of such portion of the site.  The drainage area for Outfall 1 is approximately 22.3 acres, greater than 10.  Therefore, a site assessment is required by the permit.

Q.    Okay.  Thank you, sir.

MR. MARTIN:  And that's all the questions I have for this witness.

THE WITNESS:  But can I say --

THE COURT:  Well, you have to wait until there's a question.  And they'll get to ask you questions.

You said you're done?

MR. MARTIN:  No, sir.

THE COURT:  Oh, go ahead.

MR. MARTIN:  I'm through with this witness, sir.

Oh, yes, sir.  We offer that section, Plaintiff's Exhibit Number --

THE COURT:  He's already read it.  So it's in evidence.  So you have -- why don't you all approach.

(Bench conference outside the hearing of the venire.)

THE COURT: I'm just being clear. You don't want to ask him any more questions?

MR. MARTIN: I don't have any -- yes, I'm sure I do. Of course. I was thinking of doing impeachment.

THE COURT: Oh, we don't do piecemeal. You called him. Ask all the questions you've got.

MR. MARTIN: Yes, sir.

(In open court.)

BY MR. MARTIN:

Q. Mr. Ray, are you running a landfill out there?

A. Absolutely not.

Q. Are you accepting waste out there?

A. No.

Q. Are you accepting rocks?

A. Yes.

Q. Are you accepting dirt?

A. Yes.

Q. And it's something that someone else wants to get rid of?

A. Apparently.

Q. Are you keeping it there permanently?

A. Yes.

Q. Are you paid to receive that waste?

A. Excuse me?

Q. Are you paid?

A.    No.

Q.    You're not paid?

A.    Oh, I thought you said am I paying?

Q.    No.

A.    Yeah.  What --

          MR. FITTS:  Objection, Your Honor.

          THE COURT:  Well, start over with a question.  And both of you need to speak into the microphones.  Both of you.

          So let's start with a question.

          MR. MARTIN:  I have this microphone not turned on.

          THE COURT:  No.  Speak into the one on the podium.

BY MR. MARTIN:

Q.    Who do you receive --

          THE COURT:  Closer.

BY MR. MARTIN:

Q.    Who do you receive waste from, please, sir?

          MR. FITTS:  Objection, Your Honor.  Relevance.

          THE COURT:  Overruled.

          Go ahead.  You can answer.

          THE WITNESS:  Different contractors in Nashville.

BY MR. MARTIN:

Q.    And do they pay you money for you accepting their waste?

          MR. FITTS:  Objection, Your Honor.  Relevance.

          THE COURT:  Overruled.

          Go ahead.

THE WITNESS:  Yes.

BY MR. MARTIN:

Q.   Tell us about your construction site, sir.

MR. FITTS:  Objection, Your Honor.  Leading.

THE COURT:  Well, no.  That was an open question.
Overruled.

THE WITNESS:  Tell you about it?

BY MR. MARTIN:

Q.   Your construction site.

A.   It's -- it's really a dream of mine.  I'm building a
farm.  I'm building it to the elevation that I wanted it to
be to so I can have a great view up there.  Not doing
anything wrong.

Q.   What do you plan on farming --

THE COURT:  Let him finish.

You can finish.  He cut you off.

THE WITNESS:  I know.

THE COURT:  So I'm letting you finish.

THE WITNESS:  It will be a beautiful place when
we're done.  It will be all green grass.  We can run cows on
it, horses.  It will all be in green grass.  All the back of
the property, which contains about over half of the property,
will be in woods in the back, and all the front will be green
in grass.

BY MR. MARTIN:

Q.   So have you built a farm like this before?

A.   Yes.

Q.   Where was that?

A.   In Nashville.

Q.   In Nashville.  Where in Nashville?

A.   Just off Briley Parkway.

Q.   Did you receive a stormwater general construction permit for that farm also?

A.   Yes.

Q.   And did you also receive a lot of construction debris for that one also?

A.   Rock and dirt.

Q.   Rock and dirt.  How much did you place there?

A.   Approximately 300,000 yards.

Q.   Was that also your dream farm?  As you were building it?

A.   Yes.

Q.   Yes?  And did you farm there?

A.   No.

Q.   Is anyone farming there now?

A.   Somebody lives there now.

Q.   Has anyone ever farmed there?

A.   I don't know.

Q.   Do you have plans to do this anywhere else?

A.   No.

Q. No?

A. This is -- this -- I'm retiring. I'm done.

Q. Have you ever done a site assessment on your property?

A. No.

Q. Never ever?

A. On this one, no.

Q. On RR Farms?

A. No. Well, I take that back. Metro come out and done a site inspection when we got all of our erosion and stuff in. And Mid-TN Erosion done inspection. And I was -- assumed that that's all that I had to do.

Q. You just assumed that?

A. That's what I thought the site assessment was at the time.

Q. But you, yourself, have never had a site assessment done on your property?

A. No.

Q. Now --

A. Except what I just said.

Q. Yes, sir.

How large is your property?

A. Total acreage is 38.

Q. 38 acres?

A. 38-plus -- a little over 38.

Q. And currently how many outfalls do you have?

A.    Two.

Q.    You have two.  The outfall on the southeast side, is that still an outfall?

A.    Yes.

Q.    Did you block it off?

A.    I don't understand.

Q.    Did you push dirt up, create a berm so that water can no longer go out that side?

A.    No.

Q.    No?  So water still comes out of the outfall on the southeast side?

A.    Still comes out the way it always did.  There is a -- there's a rock check before you get there, but it still goes out.

Q.    Okay.  So you have 38 acres, and you have two outfalls.
        Do they both drain --

A.    There's only 17 acres disturbed.  The other acreage is still in woods in the back side.  The water goes off to Pecan Valley.  So it's -- the whole 38 acres is not coming into those outfalls.

Q.    So how much comes into those outfalls?

A.    17 acres, both of them, for both of them.

Q.    Well, the -- the portion of Document 53 you just read said that they drain more than 10 acres, said the outfalls drain more than 10 acres so a site assessment is required.

Do you dispute that?

A.   It says -- the one that I was trying to say a while ago was September '22.  That's not the plan that I am making, that I'm building.

Q.   Yes, sir, I understand.

Have you conducted bi-weekly inspections on your property?

A.   We've done twice weekly inspections.

Q.   Twice weekly.

And have you updated your Stormwater Pollution Prevention Plan based on those inspections?

A.   We -- wait.  Say that again, now.

Q.   Have you updated your Stormwater Pollution Prevention Plan based on what was found in those inspections?

A.   We have added silt fence to one side to back up the old silt fence.  And we have added baffles in the pond, and that's pretty much it.

Q.   But you understand what the Stormwater Pollution Prevention Plan is?

A.   Yeah.

Q.   Has that been updated?

A.   It's all in there.

Q.   Sir, has it ever been updated?  Or are you still going with the one you filed to begin with?

A.   It's the one we filed to begin with.

Q.    Yes, sir.

      Are you familiar with the requirements of your permit?  Your -- your general construction stormwater permit.

A.    Yeah.  I'm supposed to put the silt fence in, the pond, and all that stuff, yeah.  And when I get something to grade, then we topsoil it, seed it, and matt it.

Q.    Sorry.  I couldn't hear you.

A.    When we're through with it, when we're through shaving it, we put topsoil down, seed it, and matt it.  And then we add silt fence up on that portion of it once we get to that point.

Q.    Will you take a look again, please, at Plaintiff's Exhibit Number 52-5.  And turn to page 6, please, sir.

      Let me get on the same page here.

      Have you found that, page 6?

A.    Yes.  Yes.

Q.    Will you read the last sentence of that page, the little -- last little paragraph there?

A.    (As read):

      SWPPP must be updated and added if site
      activities diverge significantly from those
      indicated in the initial SWPPP.  A copy of the
      most recent version of the SWPPP must be available
      at the site.

Q.    Tell us about your -- your stormwater retention pond,

please, sir.

A.    I built it.

Q.    You built it?

A.    Yeah.

Q.    When was it built?

A.    At -- at -- started in 2020.

Q.    When was it completed?

A.    Everything was in -- I don't know the exact date -- '23.

Q.    Okay.  And was it redesigned as you were building it?

A.    No.

Q.    It was not redesigned?

A.    No.

Q.    What about the baffles?  Were they intended for it?

A.    Excuse me?

Q.    The baffles --

A.    Yes.

Q.    When were they placed in?

A.    In '23.

Q.    Was that part of the original design?

A.    They had to be put in, yeah.

Q.    Had to be redesigned to put them in?

A.    No.  It's the same design.

Q.    Same design.

      But it took you how long to finish it?

A.    Started in '20, and we did -- we put those in in '23.

Q.    Okay.  Are you aware you were required to do that before you began operations?

A.    No.

Q.    In that same document, will you turn, please, to page 40.  And it would be -- it would be easier if you look at the number on the bottom right, it says RAY FARMS_000113.  That's what we call a Bates stamp.

          Are you able to locate that?

A.    Excuse me?

Q.    Do you have that?

A.    Yeah.  Yes.

Q.    Will you look, please, sir, at Section 6.3.1 that starts out with "Violation of Water Quality Standards."

A.    What was the number?

Q.    6.3.1.

A.    I'm not seeing it.

          MR. MARTIN:  May I approach?

          THE COURT:  Sure.

BY MR. MARTIN:

Q.    Do you see that section there, 6.3.1?

A.    Yes.

Q.    Will you read that first paragraph for us, please, sir?

A.    (As read):

          This permit does not authorize stormwater or

          other discharge that would cause or contribute to

a violation of state water quality standards, Tennessee State rules. Such discharge constitute a violation of this permit.

Q. "Such Discharges constitute a violation of this permit"?

A. Yeah.

Q. Yes, sir. Okay.

On that -- make sure I'm reading the same page here.

On that same page, down at the bottom paragraph, 6.3.2, it says "Discharge Quality."

Can you read that paragraph for us, please?

A. (As read):

The construction activity shall be carried out in such a manner that will prevent violation of stormwater -- I mean, of water quality criteria as stated in the Tennessee Rules Chapter. This includes, but is not limited to, the prevention of any discharge that causes a condition in which visible solids, bottom deposits or turbulent [sic] impair the usefulness of waters of the State for any of the uses designed [sic] for that water body by Tennessee Rules, Chapter. . . Construction activity carried out in the manner required by. . .

Q. And please turn over to the next page. And that was

paragraph A you read.

And do you see paragraphs B and C there at the top of that page?

A. Yeah.

Q. Can you read the rest of paragraph A up there at the top and read paragraph B and C, too, please, sir?

A. (As read):

This permit shall be considered a compliance with the Tennessee Rules Chapter. There shall be no distinctively [sic] visible solid, scum, foam, oil slick, or the formation of slimes, bottom deposits or sludge banks of such size or character as may be determined [sic] to fish and aquatic life.

The stormwater discharge must be -- contain totally suspended soils, turbidity or color in such amounts of [sic] character that will result in any objectable appearance compared to the turbulent [sic] or color of the receiving water, considering the nature and location of the water.

Q. Okay. Thank you, sir.

Now, will you turn back a few pages to 110 on that same document, Plaintiff's Exhibit 52-5.

Do you see in the middle of that page 5.5.3.5?

A. What number again?

Q.    5.5.3.9.

A.    Okay.

Q.    I believe I misspoke.

It says "Inspections"?

A.    Yeah.

Q.    Will you read that paragraph to us, please?

A.    (As read):

Operator shall ensure proper installation, maintenance and overall effectiveness of erosion prevention and sediment controls, EPSC, by performing twice-weekly site inspections. Inspections must verify and document the functionality and performance of the EPSC measures described in the SWPPP. Initial inspections shall also indicate if all EPSCs have been installed as designed in the submitted SWPPP and EPSC plan, and, if not, measures that need to be taken so those EPSCs meet the design specifications in the fill SWPPP and EPSC plans.

THE COURT:  So, ladies and gentlemen, we're going to end for the day. As I mentioned to you, certain counsel have to attend a funeral, so we're going to stop today, but we'll start back tomorrow at 9:00.

I'll give you a chance to put your notepads into your folder, and remind you at the same time, you can't do

any investigation about the case, go on the internet to look up any information.  You can't have any discussions with anybody, including your family, friends, about the case, and, of course, if anyone tries to talk to you about the case, you need to let me know.

So the best thing to do is to put the case out of your mind until tomorrow morning.

Now, if you're going to be running late -- and I appreciate traffic gets bad -- you should have a number you can call and let the jury administrator know that.  Because we can't start until everyone is here.  So, if you're running late, which I understand, just let us know, and we can adjust accordingly.

So I appreciate your time and work, but we'll start at 9:00 tomorrow with a continuation of the testimony.

Thank you.

(Jury not present.)

THE COURT:  All right.  Anything else from the plaintiff?  Anything else we need to take up before we adjourn?

MR. MARTIN:  No, sir.

THE COURT:  All right.  For the defense?

MR. FITTS:  No, sir.

THE COURT:  All right.  Thank you.  See you in the morning.

(Court adjourned.)

REPORTER'S CERTIFICATE

I, Lise S. Matthews, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on May 27, 2025, in the matter of TENNESSEE RIVERKEEPER, INC. v. RICKY RAY dba RR Farms a/k/a RR Farms Mass Grading, Case No. 3:23-cv-00878; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (pages 1 through 147) is a true and accurate record of said proceedings.

This the 27th day of August, 2025.


/s/ Lise S. Matthews
LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter