IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TENNESSEE RIVERKEEPER, INC., | ) ) |
| Plaintiff, | ) ) |
| | ) Case No. |
| v. | ) 3:23-cv-00878 |
| | ) |
| RICKY RAY dba RR Farms a/k/a RR Farms Mass Grading, | ) District Judge Crenshaw ) ) |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

JUDGE WAVERLY D. CRENSHAW, JR., DISTRICT CHIEF

JURY TRIAL DAY 2

May 28, 2025

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:

  For the Plaintiff: Mr. Mark E. Martin
          Mark E. Martin, LLC
          1706 Reid Road
          Oneonta, Alabama 35121

          Mr. Andrew Holt
          Neal & Harwell, PLC
          1201 Demonbreun Street
          Suite 1000
          Nashville, Tennessee 37203

  For the Defendant: Mr. Gregory Lee Cashion
          Mr. William Fitts
          Smith, Cashion & Orr
          One American Center
          3100 West End Avenue, Suite 800
          Nashville, Tennessee 37203

PREPARED BY:
      LISE S. MATTHEWS, RMR, CRR, CRC
       Official Court Reporter
      719 Church Street, Suite 2300
        Nashville, TN 37203
      lise_matthews@tnmd.uscourts.gov

I N D E X

Wednesday, May 28, 2025


INDEX OF WITNESSES


WITNESSES:                                                      PAGE

RICKY RAY
     DIRECT EXAMINATION (CONTINUED) BY MR. MARTIN          9

FRANK CANALE
     DIRECT EXAMINATION BY MR. MARTIN                     37

BARRY SULKIN
     DIRECT EXAMINATION BY MR. MARTIN                     73

I N D E X

Wednesday, May 28, 2025

EXHIBITS

| PLAINTIFF'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 3 | A video taken by Frank Canale at his property showing muddy water from the site entering the pipe under Ashland city Highway. (1 minute, 22 seconds) | 43 | 43 | |
| 4 | A video taken by Frank Canale at his property showing muddy water from the site entering the pipe under Ashland city Highway. (26 seconds) | 43 | 43 | |
| 12 | January 3, 2023, photograph taken by Barry Sulkin | 75 | 75 | |
| 13 | January 3, 2023, photograph taken by Barry Sulkin | 75 | 75 | |
| 14 | January 3, 2023, photograph taken by Barry Sulkin | 75 | 75 | |
| 15 | January 3, 2023, photograph taken by Barry Sulkin | 75 | 75 | |
| 16 | June 29, 2023, photograph taken by Barry Sulkin | 78 | 78 | |
| 17 | June 29, 2023, photograph taken by Barry Sulkin | 78 | 78 | |
| 18 | July 8, 2023, photograph taken by Barry Sulkin | 80 | 80 | |
| 19 | July 19, 2023, photograph taken by Barry Sulkin | 81 | 81 | |

I N D E X

Wednesday, May 28, 2025


EXHIBITS (CONTINUED)

| PLAINTIFF'S EXHIBIT | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|
| 20 August 3, 2023, photograph taken by Barry Sulkin | 83 | 83 | |
| 21 August 3, 2023, photograph taken by Barry Sulkin | 83 | 83 | |
| 22 August 3, 2023, photograph taken by Barry Sulkin | 83 | 83 | |
| 23 August 3, 2023, photograph taken by Barry Sulkin | 85 | 85 | |
| 24 August 3, 2023, photograph taken by Barry Sulkin | 85 | 85 | |
| 25 August 3, 2023, photograph taken by Barry Sulkin | 85 | 85 | |
| 26 August 13, 2023, photograph taken by Barry Sulkin | 85 | 85 | |
| 27 August 13, 2023, photograph taken by Barry Sulkin | 85 | 85 | |
| 28 August 13, 2023, photograph taken by Barry Sulkin | 85 | 85 | |
| 29 September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 30 September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 31 September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 32 September 21, 2023, photograph taken by Barry Sulkin. | 89 | 89 | |

I N D E X

Wednesday, May 28, 2025


EXHIBITS (CONTINUED)

| PLAINTIFF'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 33 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 34 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 35 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 36 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 37 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 38 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 39 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 40 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 41 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 42 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 43 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 44 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |
| 45 | September 21, 2023, photograph taken by Barry Sulkin | 89 | 89 | |

I N D E X

Wednesday, May 28, 2025

EXHIBITS (CONTINUED)

| PLAINTIFF'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 46 | February 9, 2024, photograph taken by Barry Sulkin | 94 | 94 | |
| 47 | February 28, 2024, photograph taken by Barry Sulkin | 96 | 96 | |
| 48 | April 11, 2024, photograph taken by Barry Sulkin | 97 | 97 | |
| 49 | May 8, 2024, photograph taken by Barry Sulkin | 98 | 98 | |
| 50 | May 9, 2024, photograph taken by Barry Sulkin | 99 | 99 | |
| 54 | Declaration of Ricky Ray | 25 | 25 | |
| 55 | May 20, 2025, photograph taken by Barry Sulkin | 101 | 101 | |
| 56 | May 20, 2025, photograph taken by Barry Sulkin | 101 | 101 | |
| 57 | May 20, 2025, photograph taken by Barry Sulkin | 101 | 101 | |
| 58 | May 20, 2025, photograph taken by Barry Sulkin | 101 | 101 | |

The above-styled cause came on to be heard on May 28, 2025, before the Honorable Waverly D. Crenshaw, Jr., District Judge, when the following proceedings were had, to-wit:

(Jury not present.)

THE COURT: All right. Be seated.

All right. Good morning. Any preliminary matters from the plaintiff?

MR. MARTIN: Yes. We would like to revisit Mr. Sulkin's ability to testify about Exhibit 52.

THE COURT: Okay. Maybe we'll take that up at lunch. But I'm not going to keep the jury waiting while we're chatting.

MR. MARTIN: Yes, sir.

THE COURT: Okay. Anything from the defense?

MR. CASHION: I have nothing.

THE COURT: Okay. I do need to remind everyone -- although it's primarily the plaintiff -- the defendant hasn't started yet -- so I try not to intervene in the questioning so it can flow for the jury. But I do need you to formally move to admit an exhibit so my record is clear.

So when I have to ask you do you move to admit, it makes the jury think I'm trying to help you. And I'm not trying to help the plaintiff. And I'm not trying to help the defendant. I'm not trying to help anybody.

So I need you to be more attentive to that so it doesn't appear -- doesn't appear that -- they get the wrong impression. I'm just trying to make a record that the Court of Appeals can -- can understand what we did, if it gets there.

Does -- so be sure you move to admit. And you all shouldn't show an exhibit on the overhead until it is admitted. Okay?

MR. MARTIN: Yes, sir.

THE COURT: Does that make sense, Mr. Martin?

MR. MARTIN: I figured that.

THE COURT: So be sure you talk into the microphones.

(Jury present.)

THE COURT: All right. Good morning. And thank you all for being here on time so we can start on time. I appreciate that. I'll give you a minute to get your notepads ready.

And, Mr. Ray, if you want to return to the witness stand. I think you can wait for a bit until they. . .

RICKY RAY,
called as a witness by Plaintiff, was previously sworn and testified as follows:
///

THE COURT: All right. And you remain under oath. All right.

Let's continue the examination.

DIRECT EXAMINATION (CONTINUED)

BY MR. MARTIN:

Q. Good morning, Mr. Ray.

A. Good morning.

Q. I believe we were on Plaintiff's Exhibit Number 52-1.

And, Your Honor, this exhibit is in evidence. We would like to display it on the screen.

THE COURT: All right.

THE WITNESS: This notebook?

MR. MARTIN: Is that Plaintiff's Exhibit?

Q. Okay, sir, you've identified this exhibit earlier as a Notice of Intent for your General NPDES Permit for Stormwater Discharges From Construction Activities.

Do you recall that?

A. I can't hear you.

Q. I said, you've identified this exhibit earlier as a Notice of Intent for General NPDES Permit for Stormwater Discharges From Construction Activities for your RR Farms Mass Grading.

Do you recall that?

A. Yeah.

Q. And I would like to call your attention to the block

over on the right side.  It says "Acres Disturbed."

Do you see that?  It says 18.6.

A.    Yes.

Q.    And it says "Total acres" of 18.6?

A.    Yes.

Q.    Is that correct, that you have 18.6 acres at this time?

A.    That's what it says.

Q.    That's what it said, but isn't your site 38 acres?

A.    Do what now?

Q.    Isn't your site 38 acres?

A.    That's the total acreage.

Q.    Yes, sir.

A.    All of the site is not disturbed.

Q.    But how much of it drains to the front of the property, sir?

A.    The plan said 17.1.  This says 18.6.

(Overlapping speech.)

Q.    I'm sorry.

A.    What's disturbed is what comes to the front.

Q.    But do you agree that your SWPPP requires you to do a site assessment for disturbed and undisturbed land?

A.    No.  It's just what comes into them basins.

Q.    It's what drains through the outfall -- it goes -- it's for 10 or more acres of disturbed or undisturbed land; do you agree with that?

A.    Yes.

Q.    Okay.  And how much undisturbed land drains to the front of the property?

A.    There may be an acre more.  It's just what's down in the flat that don't come into the pond, it goes behind it.  So it would be what this says, 18.6.

Q.    Are you aware that your -- your SWPPP, your Stormwater Pollution Prevention Plan, says 38 acres drains through those outfalls?

A.    If it says that, it's not possible.

Q.    Okay.  We'll get to that.

Okay.  If you'll flip to 52-2, Plaintiff's Exhibit 52-2, the Stormwater Pollution Prevention Plan.

And turn to the Bates stamp page number 7.

Do you see in the middle of that page where it says "Existing Site Conditions"?

A.    Yeah.  Yes.

Q.    And let -- let me back up just a second.

You identified this yesterday as your Stormwater Pollution Prevention Plan for RR Farms filed in October 2019?

A.    Yes.

Q.    Okay.  It says (as read):

Existing Site Conditions.  The area of the construction site for which NPDES coverage is applied for as part of this SWPPP is approximately

38.56 acres.

Do you agree that it says that?

A.   I agree it says that.

Q.   And the next paragraph, "Project Description," it says (as read):

The area of the construction site for which NPDES coverage is applied for as part of this SWPPP is approximately 38.56 acres.

Do you agree that it says that?

A.   Yes, it says that.

Q.   So, at the time this SWPPP was prepared and filed, did you tell your engineers that was incorrect?  That there was only 19 acres there?

A.   I did not.

Q.   Yes, sir.

And did you sign this SWPPP?

A.   Yes.

Q.   Yes, sir.  Okay.

Can you turn over to page 17 of that same document, Plaintiff's Exhibit 52-2.

And at the top it says "Site Assessment."

We lost the screen.

It says (as read):

Quality assurance of erosion prevention and sediment controls shall be done by performing a

site assessment of the construction site. The Tennessee General Permit requires a site assessment for each outfall totaling 10 or more acres of the Tennessee General Permit Number TNR1000 Stormwater Discharges From Construction Activities. The drainage area for each outfall is less than 10 acres, therefore site assessment is not required.

Do you agree that it says that?

A. Yes.

Q. Can you explain why, if it drains 38 acres and the drainage area needing a site assessment is 10 acres or more, how can two outfalls drain less than 10 acres apiece?

A. Well, I guess the only way I can answer that question is that hill is probably 150 foot tall, the back of my property, which is over half of it goes to a creek behind it. It does not come to these outfalls. That's just the way it is. It just don't -- it don't run into those outfalls.

Q. Well, did your engineers know that when they prepared this SWPPP?

A. Yes.

Q. Then why did they say it drains 38 acres?

MR. FITTS: Objection, Your Honor. Speculation.

THE COURT: Overruled.

THE WITNESS: I can't answer for them. I'm. . .

BY MR. MARTIN:

Q. Yes, sir. Well, you signed this SWPPP, as you said earlier, and you didn't disagree with them before you signed the SWPPP?

A. Maybe I misunderstood them. But it -- it don't drain 38 acres.

Q. Yes, sir.

Do you have another engineering report that says how much it drains?

A. It's on the plans.

Q. It's in the SWPPP? That's your -- what's your plan? The SWPPP?

A. Well, the SWPPP's in the plans.

Q. I'm sorry?

A. The SWPPP is in the plans. I mean, the documentation is all together in the box.

Q. Yes, sir. Can you turn to page 11 of that same document, Plaintiff's Exhibit 52-2. And I'll direct your attention to the bottom of that document, where it says "Outfall Locations."

It says (as read):

The site has two stormwater outfall locations. Outfall 1 is located in the general vicinity of the southwestern corner of the site. The outfall is located --

And it gives latitude and longitude coordinates that I won't read. (As read):

Outfall 1 drains several inlets on the southern portion of the subject site. Outfall 2 is located in the general vicinity of the southeastern portion of the subject site.

And it gives more coordinates. (As read):

Outfall 2 drains several inlets on the southern portion of the site.

Do you agree that that's what it says?

A. Where did it say that at? The bottom?

Q. Yes, sir, the bottom, the paragraph that's labeled "Outfall Locations."

A. Yes.

Q. So basically it says you have two outfalls, one's on the southeastern corner of the site and one is on the southwestern corner of the site?

A. Correct.

Q. And Outfall 1 being the one on the southwestern corner of the site, which, as you stand in the road and look at it, would be on the left side?

A. Yeah.

Q. Because you're looking north?

A. Yes, sir.

Q. And Outfall 2 is on the southeastern corner of the site?

A.    Correct.

Q.    Which would be on the right side as you look at it?

A.    Yes, sir.

Q.    By Mr. -- do you know Mr. Frank Canale?

A.    I just know he's a neighbor.  I don't know him personally, no.

Q.    You know he's a neighbor?

A.    Yeah.

Q.    And you know that's where his property is?

A.    Yes.

Q.    By that southeastern outfall?

A.    Yes.

Q.    Yes, sir.  If I could ask you to please flip over to Plaintiff's Exhibit Number 52-3.

A.    Okay.

Q.    Do you have it?  Do you see there in the -- well, first off, this is a Notice of Coverage under the General NPDES Permit for Stormwater Discharges Associated With Construction Activities.

         Do you agree with that?

A.    Yeah.

Q.    And it says "Name of the Construction Project:  RR Farms," and in parentheses it says "18.6 acres."

         So what does that 18.6 acres designate?

A.    That would be the disturbed area, I would suspect.

Q.    If I could get you, please, sir, to look at Plaintiff's Exhibit Number 52-4.

A.    Okay.

Q.    Okay.  And you've identified that earlier as a letter from TDEC, the Tennessee Department of Environment and Conservation, Division of Water Resources, from June the 9th, 2020.  And you've identified that earlier.  So you still agree that's what this is, I assume.

            And if you turn to page 2 of that document.  And it says Site Assessment --

A.    Page what?

Q.    It will be -- it's actually page 68, Bates numbered.

            Do you see down at the bottom?

            May I approach the witness?

A.    Where am I at to start with?

Q.    I'm sorry?

A.    Where am I at to start with?  Page 5?

Q.    This is Document 52-4.

A.    52-4.  Okay.  Okay.  67 at the bottom -- page 67?

Q.    Yeah.  Page 67.  And then the next page, page 68.

A.    All right.

Q.    And up at the top it says "Site Assessment."  (As read):

            Per Part 3.2.2 of the permit, a quality
            assurance of erosion prevention and sediment
            controls -- just call it "EPSC" -- a lot of

acronyms -- shall be done by performing site assessments. The site assessment must be conducted at each outfall draining 10 or more acres. Site assessments must cover the entire disturbed area and occur within 30 days. And at a minimum site assessments should be performed to verify the installation, functionality and performance of the EPSC measures described in the SWPPP.

And this was a letter from TDEC reminding you you needed to do site assessments; is that what you take that to be?

A.   Where does it say?  Where does it say that?

Q.   Up at the top of the page, where it says "Site Assessment."

Do you see that?

A.   Yeah.  Yeah.

Q.   And that's TDEC's reminder that you should do a site assessment; do you agree?

A.   Okay.

Q.   Was that yes?

A.   Yeah.

Q.   And you didn't -- you didn't do a site assessment; is that correct?

A.   Correct.

Q.    Okay.  I'll ask you to turn to Plaintiff's Exhibit 52-7.
Do you have that, please, sir?

A.    Yeah.

Q.    And you've identified this yesterday as a report of an inspection by TDEC on your property on June -- on June 28th, 2023?  Do you agree with that?

A.    I'm not seeing that date.

Q.    At the very bottom, to the right of Bill Murph's signature, it looks like?

A.    Okay.  Yeah.  June 28th, yeah.

Q.    Will you turn to the next page, which is 165.
And do you see the second bullet point on that page that says "Site Assessments"?

A.    Yes.

Q.    It says (as read):

           Section 5.5.3.8 of the 2021 General NPDES
           Permit for Discharges of Stormwater Associated
           With Construction Activities:  The Division has
           not received this assessment, nor was it found
           on-site.
           Do you disagree with Mr. Murph's statement there?

A.    No.

Q.    And it says (as read):

           Visual inspection of the sediment basin does
           not appear it has been designed according to the

size and elevation of the EPSC plan sheet specifications on C-5.3.

Do you disagree with Mr. Murph's statement there?

A.   I don't disagree with him saying it.  I disagree with the size is -- is per plan.  You can't tell by the visual eye if it's to plan or not.

Q.   You can't tell --

A.   Just by looking at it.  You can't tell if it's bigger or smaller.

Q.   Oh, if it's been designed by plan.  I see.

And I'll direct your attention to the third bullet point, which says "Inspections" --

A.   Where at?

Q.   At that same page.

A.   Okay.

Q.   165.

It says (as read):

Earliest on-site twice-weekly inspection report [sic] was dated March 24th, 2023.

And will you remind us when you began operations there?

A.   '20 -- May of '20.

Q.   May 2020?

A.   Yeah.

Q.   And Mr. Murph's saying he didn't find any inspection

reports before March 24th, 2023.

A.   Do what now?

Q.   Mr. Murph seems to be saying that he could not locate any inspection reports prior to March the 24th, 2023.

A.   Okay.

Q.   When did you begin doing inspection reports?

A.   We began on the first day we started, May of '20.

Q.   And do you have those inspection reports?

A.   Yes, sir.

Q.   Yes, sir.

It also says (as read):

Twice-weekly inspections have been conducted and signed by a Level 1 certified inspector but have not been signed and dated by the primary permittee.  This is inconsistent with section 8.7.2 of the 2021 General Permit for Discharges of Stormwater Associated With Construction Activities.

He appears to be saying that you have not signed your inspection reports.

A.   That would be correct.

Q.   That would be correct?

A.   (Nods.)

Q.   And you are the primary permittee?

A.   That would be correct as well.

Q.   Did you review each inspection report when you received it?

A.   Yes.

Q.   But you didn't sign it?

A.   Not as soon as I -- not as soon -- sometimes it's a few days before I see it.  But if there's ever a problem, I get a text from them, but it's always in the report.  And I do look at the reports.

Q.   But you didn't sign the inspection reports?

A.   No.

Q.   Are you aware that you were required to sign the inspection reports?

A.   Not -- not really, but I see it, yeah.

Q.   Did you make changes to your -- your stormwater pollution plan based on the inspection reports you received?

A.   Not quite following you.

Q.   I'm sorry?

A.   I'm not quite following what you're saying.

Q.   Do you agree that your permit required you to make changes based on the inspection reports if they showed problems with your site?

A.   Yes.

Q.   And did you make those changes?

A.   We added -- we added check dams and stuff, and rock ditches.

MR. MARTIN: Yes.

Your Honor, I would like to introduce a new exhibit for purposes of impeachment that hasn't been --

THE COURT: All right. What's the exhibit number?

MR. MARTIN: I'm not sure what number we're on for exhibits.

COURT DEPUTY: 54.

MR. MARTIN: 54 would be the next?

It would be Exhibit Number 54, Plaintiff's.

THE COURT: All right. For ID purposes only.

MR. MARTIN: I'm sorry?

THE COURT: ID purposes only.

MR. MARTIN: It's a declaration of -- oh, you're admitting it for ID purposes only.

THE COURT: Yeah.

MR. MARTIN: Yes, sir.

THE COURT: Do you have an extra copy?

MR. MARTIN: We have, I believe, six copies.

THE COURT: All right. Go ahead.

BY MR. MARTIN:

Q. Mr. Ray, please take a look --

THE COURT: You gave me three copies. I only need one.

MR. CASHION: We need one.

BY MR. MARTIN:

Q.   Okay.  Mr. Ray, you have in front of you a copy of Plaintiff's Exhibit Number 54 --

THE COURT:  You have not given it to him.

BY MR. MARTIN:

Q.   And it -- it says "Declaration of Ricky Ray."

Do you recognize this document?

A.   (Reviews document.)  Okay.

Q.   Do you recognize that document, sir?

A.   Yeah.

Q.   And is that your signature on the back?

A.   Yes.

Q.   Signed April the 20th, 2025?

A.   Yes.

MR. MARTIN:  At this time we offer Plaintiff's Exhibit Number 54.

THE COURT:  Why don't counsel approach.

(Bench conference outside the hearing of the jury.)

THE COURT:  So I guess I'm confused.  I thought you were going to impeach him with this?

MR. MARTIN:  Yes, sir.  There are statements in there that are inconsistent with statements that he's made.

THE COURT:  Okay.

MR. FITTS:  We would object.

THE COURT: Oh?

MR. FITTS: I just haven't seen it.

THE COURT: So you don't have this?

MR. FITTS: We have it.

THE COURT: You want to admit this affidavit as proof.

Do you object?

MR. FITTS: Actually, no. We're not going to object.

THE COURT: Admitted.

(In open court.)

THE COURT: So Exhibit 54 is admitted.

(Whereupon, Plaintiff Exhibit 54 was marked for identification and received in evidence.)

MR. MARTIN: I'm sorry?

THE COURT: I said Exhibit 54 is admitted.

MR. MARTIN: Yes, sir.

Q.   Paragraph 5 says (as read):

I operate and/or directly oversee all activities on the property and have done so since it was purchased by me and Crystal Ray -- your former wife.

In 2019 you're the one responsible for complying with your stormwater pollution prevention plan?

A.   Yes.

Q.   And I believe you said yesterday you don't fully understand the requirements of your pollution prevention plan.

Do you understand what you're supposed to do under that plan?

A.   Yeah.

Q.   You do?

A.   Well, I mean. . .

Q.   Sir, it took you a long time to build your sediment basin.

Did you understand that that was supposed to be done before you began work on your site, began accepting waste on your site?

A.   It -- it was all done except for the baffles.  The -- the -- the berm and all was built.  It was functioning.

Q.   Paragraph 12 -- over on the second page of that document, paragraph 12 says (as read):

I completed construction of the stormwater retention pond on the property and finalized its compliance with the design of such set forth in the plans in July of 2023.

So you completed the stormwater retention pond in July of 2023, correct?

A.   Yes.

Q.   And Number 14 says after these controls were completed

there's only one outfall for stormwater runoff from the property -- from the portion of the property under construction applicable to the permit, which is connected to the stormwater retention pond.

You said yesterday you have two outfalls still, even after --

A.   I -- I know I wrote this, but I don't know what I was thinking when I wrote this, but there is two.

Q.   There is two?

A.   Yes.

Q.   And this is incorrect?

A.   That -- yeah.

Q.   And you signed your name to it?

A.   Yeah.

Q.   Yes, sir.

Paragraph 16 says (as read):

I have inspected the property during every significant rain event after the initiation of this lawsuit and have confirmed that all stormwater discharges from the property during and after these events is low in turbidity and clear.

Did you take photographs of those discharges that you say were low in turbidity and clear?

A.   Yes.

Q.   At every significant rain event that you inspected on

your property?

A.   Yes.

Q.   And you have those photographs?

A.   Yes.

Q.   Did you do chemical analysis to see if they were low in turbidity and clear?

A.   No.

Q.   You did not?  You didn't think it was important to do chemical analysis of that?

A.   No.

Q.   So you agree you can determine turbidity without doing chemical analysis?

MR. FITTS:  Objection, Your Honor.

THE COURT:  Sustained.

BY MR. MARTIN:

Q.   You saw the photographs from Mr. Keck yesterday?  Did you?

A.   Yes, I did.

Q.   And you saw the muddy water in his photographs?

A.   Yes.

Q.   Would you agree that the water in his photographs were discolored and muddy?

A.   Yes, they were discolored.  Just like ditches everywhere, it's discolored when it rains.

Q.   Would you agree that there were -- there was high

turbidity?

A.  No.

Q.  What is your definition of "turbidity," sir?

A.  Like, flowing fast.

MR. FITTS:  Objection, Your Honor.

THE COURT:  He's already answered now.

Go ahead.

BY MR. MARTIN:

Q.  It flows fast?

A.  Uh-huh.

Q.  And that's what turbidity is to you?

A.  I'm -- I'm not that educated, so --

Q.  Yes, sir.

A.  -- that's what it means to me.

MR. MARTIN:  May I have a moment to confer with co-counsel?

THE COURT:  Sure.

(Respite.)

BY MR. MARTIN:

Q.  Sir, can you tell me if you know the test that's generally used for turbidity?

MR. FITTS:  Objection, Your Honor.

MR. MARTIN:  He has said he's in charge of his site, and he should know when it's turbid and when it's not.

THE COURT:  Overruled.

You can answer if you know.

THE WITNESS: I'm not sure.

BY MR. MARTIN:

Q. You don't know that?

A. No.

Q. And you -- I don't want to repeat, but I believe you said you've never done any testing at your site for turbidity.

Have you ever had anyone else do testing at your site for turbidity?

A. No.

Q. But you're satisfied that you can look at water and tell whether it's high turbidity or low turbidity?

MR. FITTS: Objection, Your Honor.

MR. MARTIN: He said that's how he did it.

THE COURT: I'll allow him to answer, but, ladies and gentlemen of the jury, when the case is submitted to you for deliberation, I'll give you definitions and you'll have to follow those definitions, whether you agree with them or not. Only what I tell you the definitions are matters, not what the lawyers or the witnesses may say.

Go ahead.

THE WITNESS: I don't know.

MR. MARTIN: Could I ask that the question be read back?

THE COURT: He answered it.

MR. MARTIN: I didn't --

THE WITNESS: I said I don't know.

MR. MARTIN: Okay.

Q. Mr. Ray, your previous site on -- on Cato Road -- is that where it was? I don't know if you ever confirmed that that was the location.

A. Yes.

Q. All right. I believe you said someone was -- had a house, was living on that site?

A. I know they were going to build a house. I don't know it was ever built.

Q. Do you know if they were able to get a septic tank permit on that site?

A. I don't know. I had it perked. There was a perk site on it.

Q. You had it perked?

A. Yes.

Q. And it was all fill material?

A. Not all of it, no.

Q. So some of the site was not fill material and some of it was?

A. Correct.

Q. And by that I mean, stones and rock --

THE COURT: I'm going to ask the lawyers to

approach.

(Bench conference outside the hearing of the jury.)

THE COURT: I guess this Cato Road -- is that the one near Briley Parkway that he discussed yesterday?

MR. MARTIN: Yes, sir.

THE COURT: That's not the RR Farms?

MR. MARTIN: No, sir.

THE COURT: So why are we talking about it?

MR. MARTIN: For impeachment.

THE COURT: Keep going -- impeachment?

MR. MARTIN: He said he wants to build on the current site and that someone was planning on building on the previous site.

THE COURT: Uh-huh.

MR. MARTIN: We have evidence that no one has built on the previous site.

THE COURT: Okay. How does that impeach him?

MR. MARTIN: It implies that it's incapable of being built upon.

THE COURT: Well, Cato Road, but we're not talking about Cato Road in this case.

MR. MARTIN: But he did the same thing he's done on this site.

THE COURT: How -- I don't follow what you're

saying. Because I think bringing up Cato is potentially confusing to the jury under 403.

MR. MARTIN: I understand.

THE COURT: And I may need to let them know this case is not about Cato Road. But I'll let you impeach him, but I don't understand how that impeaches him.

MR. MARTIN: I think I'll back off of that a little bit, sir.

THE COURT: Okay. Now -- we may need to revisit this Cato Road -- are you going to get back into that? We've only had two references to it, this one and then yesterday. Are you going -- let's do it this way. Before you get into any further questions about Cato Road, we need to have a discussion outside of the jury. Because I do think it's confusing.

MR. MARTIN: We do have a witness that we can put on about Cato Road, a neighbor that lives next door to it that can tell us about that property.

THE COURT: But how is that relevant to what happened at RR Farms?

MR. MARTIN: It shows his plan and pattern.

THE COURT: Okay. I'm -- plan and pattern to do what?

MR. MARTIN: To build a landfill and call it a construction site.

THE COURT: And he did that at Cato Road?

MR. MARTIN: Yes, sir.

THE COURT: Well, that's -- now it comes into being potentially 403(b) evidence of other bad acts.

MR. MARTIN: Yes, sir.

THE COURT: So we still need to discuss that.

MR. MARTIN: Yes, sir.

MR. FITTS: Yeah. I think we would object --

THE COURT: Now that you've won, you don't need to say anything.

MR. FITTS: Okay.

(In open court.)

MR. MARTIN: Can I have one more moment to confer?

THE COURT: Sure.

BY MR. MARTIN:

Q. Sir, your current site, RR Farms, do you plan on building anything there?

A. I'm not sure.

Q. You haven't made those plans yet?

A. No.

Q. You're -- the farm that you wanted to build there, do you have plans for the farm?

A. Do what now? Yeah, I have plans to put it all in grass. It will be pasture land.

Q. In grass?

A.    In grass.

Q.    Are you going to raise anything besides grass?

A.    No.

Q.    Okay.  So your farm is to farm grass?

A.    That's correct.

Q.    Can you -- you have said you -- several things that you haven't done on the property that were not in compliance with your permit and your SWPPP; is that correct?

A.    Say that again, sir.

Q.    You said that there are things that were required in your SWPPP that you needed to do.  For instance, your stormwater retention pond should have been completed when you began operations, and it was several years later.  And on inspection reports, you didn't upgrade the SWPPP based on the inspection reports?

MR. FITTS:  Objection, Your Honor.  Counsel seems to be testifying and doesn't have a question on the table.

THE COURT:  Yeah.  I'm going to sustain it.  You can rephrase the question.

MR. MARTIN:  Okay.

Q.    But you agree that you've admitted there's some things that you haven't done that were required by your permit?

MR. FITTS:  Objection.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Yes, I have said that.  But it's all

complete now.

BY MR. MARTIN:

Q.   Well, do you realize that those things are a violation of your permit?

MR. FITTS:  Objection, Your Honor.

THE COURT:  Sustained.

MR. MARTIN:  Okay.  That's all the questions I have for this. . .

THE COURT:  All right.  So we're in the plaintiff's case in chief.  If the defense wants to examine the defendant now, you can, or you can wait until your case in chief.  It's your --

MR. FITTS:  We're going to wait until our case in chief, Your Honor.

THE OCOURT:  All right.  You can step down.

(Witness dismissed.)

THE COURT:  All right.  Call your next witness.

MR. MARTIN:  Our next witness will be Frank Canale.

THE COURT:  All right.  You may need to retrieve him.

COURT DEPUTY:  If you'll come to the podium to be sworn in.

Please raise your right hand.

///

FRANK CANALE, called as a witness by Plaintiff, was duly sworn and testified as follows:

COURT DEPUTY:  Please state your full name for the record.

THE WITNESS:  It's Frank Canale.

COURT DEPUTY:  Spell your last name.

THE WITNESS:  C-a-n-a-l-e.

COURT DEPUTY:  You can have a seat at the witness stand.

DIRECT EXAMINATION

BY MR. MARTIN:

Q.   Mr. Canale, how are you today, sir?  Can you tell us where you reside, please, sir?

A.   I live at 5232 Ashland City Highway.

THE COURT:  I'm going to get you to bring that microphone closer to you.

THE WITNESS:  5232 Ashland City Highway.

BY MR. MARTIN:

Q.   How long have you lived there, sir?

A.   I bought the property in 1992.  So a little over 30 years.

Q.   And can you describe your property for us?

A.   It's roughly one acre.  It's got a house.  It's got a

detached shop.

Q. And did something happen next door that you're concerned about?

A. Well, I mean, years ago I came home and they were cutting -- had a brush cutter that was cutting a path along the property line. You know, at that point, you know, we were just curious what was going on. Obviously somebody had purchased the property. I mean, but at that point we didn't know what was going on.

Q. Did you find out what was going on?

A. Yes, sir. At first we went on the government website and it indicated there was a permit for a road to the cell tower. That's what was initially -- what we thought was going on.

Q. Okay. And what else did you observe there? What did you observe next?

A. After that, then they started clearing the trees. I mean, they just -- I mean, we're talking -- there's, you know, roughly 20 or 30 acres there, and all of a sudden they've got a bulldozer in there cutting and -- and tearing all the trees down. You know, at first we thought, you know, maybe they're doing some kind of development. You know, there's no way to know. Nobody's going to tell you anything.

Q. Did you receive any kind of notice that something was happening over there?

A.    No, sir, I've never received any kind -- any kind of communications, other than what I generated trying to get information from the city council, city councilmen.  At that point they directed me to stormwater.  And I got passed around through their departments, but nobody would give you any answers.

Q.    Did anyone tell you that you had a right to comment --

A.    No, sir.

Q.    -- to anyone about what was going on?

A.    No, sir.

Q.    Yes, sir.

A.    I mean, my emails to stormwater -- at that time it was Jonathan Hall directed me to contact stormwater, and I sent emails to them.  And they basically passed me around through their departments one after another, but nobody would answer your questions.

      And eventually they told me that, you know, any further communications had to be through their Legal Department, which basically was just a scare tactic.  Told me, you know, quit contacting them.

Q.    And this was who telling you that?

A.    That came from Mr. Honeysuckle.

Q.    And what's his position?

A.    He's one of the upper parts of stormwater.  He's not the head of stormwater, but he was the main contact.

Q.    And what -- what agency was this?

A.    Metro Stormwater.

Q.    Metro Stormwater.  So, what else happened at -- next door to you?

A.    After they got through clearing the trees, then they started, you know, bringing in dump trucks, loads of -- of rock and gravel and whatever.  I mean, it was just -- you lose count after a while of how many dump trucks actually came in that property.

Q.    Would you say -- well, never mind.

A.    Do you want me to give you an estimate?

Q.    Yes, sir.

A.    I would say tens of thousands.  It's unreal.  I mean, we're talking over a course of four years.  Maybe five years.  I've lost count at this point.  But, I mean, it's -- it is just unreal.

Q.    Did you find the dump trucks to be disturbing?

A.    Well, yeah.  Yeah.  I mean, you know, it's -- it goes on all day long.  I mean, it's -- recently, within the past year or so, it's slowed down.  And now they come as fast as they can come until they have to slow down to turn in.  They're on their Jake Brakes.  They turn in.  They lug their way up to the top of the hill.  They got their backup sirens that they back up.  You've got the bulldozer operators blowing their horns for them to stop.  They dump their load, and then the

tailgate slams.  And this goes on over and over and over.

Q.    Do you work, sir?

A.    Yes, sir.  I'm employed, which -- I work an early shift. So I'm home by 3:00.  So I'm here in the afternoon until they leave.

But my neighbors, most of them are retired, and they have to live with it day after day after day after day, all day long.

Q.    Have you had any damage to your property from something connected with the dump trucks?

A.    Well, I mean, other than just the nuisance of the gravel and rock that's in the yard when you go to cut the grass.  I mean, you have to, you know, watch for that sort of thing.

Q.    Okay, sir.  And have you had any problems with muddy discharge from the property?

A.    I have seen it, yes, sir.

Q.    Has your property had discharge on it?

A.    When it rains, my backyard stands with water in it.

Q.    Where does that water come from, sir?

A.    It comes from the property next door.  Like I say, I lived there for 30 years.  They built -- they built up a mound and diverted the water onto my property and into the neighbor behind me's property.  It used to not be like that. The water went the other direction.

Q.    Can you describe this water, how it looked?

A.    Well, I mean, it's -- it depends on, you know, how bad it rains.  I mean, most of the time it's, you know, muddy.  When it gets -- especially the -- the -- I won't call it a creek.  It's a little ditch.  That part, which goes down to a storm drain, that part's muddy.

You know, the part that's in my backyard, it's just standing there.  So you can't really see it.  It's not flowing.  It's just -- you know, it just stands there.  So you can't tell what it's like.

Q.    Have you taken any videos of muddy water?

A.    Yes, sir, I have.

Q.    When did you take those videos?

A.    The last one that I recall was January the 2nd of 2023.  It was about 6:00 in the afternoon.

Q.    Okay.  And we have two videos.  Were they both taken at the same time?

A.    They probably -- if -- I mean, they would have been probably within an hour of each other.

Q.    And can you describe what these videos show?

A.    One of them shows the storm drain at the -- you know, beside my driveway where the water runs down to.  And I have glasses that I've collected the water in and showed the muddy water in those glasses.  It's just a clear drinking glass.  But, I mean, that's what I had to use.

The other one just shows an area that is in the

property beside mine, and it just shows the muddy water running down towards the Ashland City Highway.

Q. Okay, sir. Do these videos fairly and accurately depict what you observed as you were taking them?

A. Oh, yes, sir.

MR. MARTIN: We offer Plaintiff's Exhibits 3 and 4 into evidence.

THE COURT: Admitted without objection.

MR. CASHION: No objection.

(Whereupon, Plaintiff Exhibit 3 and Plaintiff Exhibit 4 were marked for identification and received in evidence.)

MR. MARTIN: At this time, we would like to play Exhibit 3.

THE COURT: All right.

(Video played of Plaintiff's Exhibit 3.)

BY MR. MARTIN:

Q. Where was that video taken, please, sir?

A. It's taken at the storm drain at the -- beside the driveway and the curb of my property.

Q. Is it at the edge of the road, the drain?

A. Yes, sir. It's within approximately eight feet of the road.

Q. And would that be the southeast portion of the Rays' property?

A.  Yes, sir, it would.

Q.  And did this muddy water come from the Rays' property?

A.  Yes, sir, it did.

Q.  Would you say you found the color of that water to be objectionable?

A.  Well, I mean, it's not good.  I mean, when you see --

Q.  Go ahead, sir.

A.  Muddy water's got to go somewhere.  You know, it's not supposed to be going down the storm drain.

Q.  Do you know where that storm drain goes?

A.  I believe it goes -- it goes under Highway 12, and from there it goes towards -- I assume the Cumberland River.  I'm not sure exactly how it gets there.

Q.  Yes, sir.

        At this time we would like to play Plaintiff's Exhibit Number 4.

        THE COURT:  All right.

        (Video played of Plaintiff's Exhibit 3.)

BY MR. MARTIN:

Q.  When did you say that video was taken?

A.  January the 2nd of 2023, I believe.

Q.  And the first video, when was it taken?

A.  The same time.

Q.  The same day?

A.  Yes, sir, the same day.

MR. MARTIN: Okay. Thank you, sir. That's all the questions I have for you.

THE COURT: All right. Cross.

MR. CASHION: I have no questions for Mr. Canale.

THE COURT: You can step down.

THE WITNESS: Thank you, sir.

(Witness excused.)

MR. MARTIN: May I have a moment to confer?

THE COURT: Sure.

MR. MARTIN: May we approach?

THE COURT: Sure.

(Bench conference outside the hearing of the jury.)

MR. MARTIN: All I have left pertains to Cato Road or Mr. Sulkin.

THE COURT: Okay. Why don't we let them take a break and we can talk about both of those.

MR. MARTIN: Yes, sir.

THE COURT: Okay.

(In open court.)

THE COURT: So, ladies and gentlemen of the jury, I'm going to allow you to take your morning break a little bit earlier, and we -- I'll get back with you.

(Jury not present.)

THE COURT: All right. So, Mr. Martin, do you

want to take up those two items now?

MR. MARTIN: Yes, sir. Podium?

THE COURT: Sure.

MR. MARTIN: If I recall, the -- we left off with Mr. Sulkin as far as Document 52, that they were not in evidence.

THE COURT: Right.

MR. MARTIN: Now that they are in evidence, I would like to have him -- Your Honor, we covered them pretty good with Mr. Ray, but Mr. Ray yesterday did not cover them very well, is not very clear. And, you know, my fault. I did better today, I think, in presenting it. But I learn. I'm an old dog, but I learn a few things.

But I think it would be very helpful to the jury to get some clarity on what is contained -- the requirements in the stormwater pollution prevention plan and the permit.

THE COURT: So how is that different from what was in Mr. Sulkin's expert witness report?

MR. MARTIN: He will just be reading the provisions and not giving an opinion about them.

THE COURT: Oh. You -- you -- I think they can read. And you can read. So they can read it for themselves. I don't see how that's going to be helpful to the jury.

MR. MARTIN: Okay.

THE COURT: Because he can't testify as an expert.

I know that's --

MR. MARTIN: I understand.

THE COURT: -- what you ultimately wanted, but that would be -- I mean, help me. What other -- now, you still can get in through him Exhibits 12 -- I think 12 through 50. You've gotten --

MR. MARTIN: And we will do that. We intend to put those in too.

THE COURT: Unless there's no objection, they can just come in.

MR. FITTS: We object.

THE COURT: Okay.

MR. FITTS: Wait. I'm sorry, Your Honor. Could you --

THE COURT: Well, you don't have to answer. That was more rhetorical.

MR. FITTS: Okay.

THE COURT: What else is it that you want to call Mr. Sulkin to do? Because I don't think he can provide his expert knowledge to interpret the permits. That comes too close to being expert witness testimony.

MR. MARTIN: And there was some -- yesterday we -- he wanted to testify about the muddy water as a -- as a lay witness. And there was some question about whether he lived on the water -- on the creek or not. And he doesn't. But he

does use the water; he uses Cumberland River, which is very close to that. And it does affect him and -- just as it would anyone else.

THE COURT: So you want to put him on the witness stand to say?

MR. MARTIN: To say that -- to express his concern about muddy water in Cumberland River and how the discharges from Ray's property affect --

THE COURT: Cause the muddy water.

MR. MARTIN: Cause the muddy water.

THE COURT: Okay. And how is that going to be helpful to the jury? Because I don't have a definition of "muddy water" in the jury charge. That's not what we're going to ask them to do.

MR. MARTIN: Turbidity.

THE COURT: Right.

MR. MARTIN: Well, he can say, as any lay witness would, that he finds it objectionable, which is the standard in the permit.

THE COURT: But not the definition I'm going to give them in the charge. You know, "The term 'turbidity' means the quality of being cloudy or hazy with individual particles or suspended solids that are generally invisible to the naked eye, similar to smoke in the air."

So that's the definition I think we should

charge -- we haven't had the charge conference yet, but that's what we're finding is being supported by the law.

And -- I don't know that Mr. Sulkin's testimony about what he believes is coming out of RR Farms into the Cumberland River to his house is going to be really helpful to the jury to make its decisions here.

MR. MARTIN:  Not to his house.  To his -- through the river that he recreates on.

THE COURT:  Okay.  On the Cumberland River.

MR. MARTIN:  The next matter is --

THE COURT:  Cato Road.

MR. MARTIN:  -- Cato Road.  We have an impeachment witness who is a neighbor there.

THE COURT:  And what are we impeaching?

MR. MARTIN:  Mr. Ray said that it's buildable property and someone was trying to build a house there.

THE COURT:  Right.  He said he had perked it for a septic tank.  But how is that relevant to RR Farms?  I mean, he could make the decision to build on Cato -- not build on Cato and to build on RR Farms or vice versa.  What difference does it make if he builds on it or not?

MR. MARTIN:  We say under Rule 404-2 --

THE COURT:  Okay.

MR. MARTIN:  -- it's admissible for proving motive, opportunity, intent --

THE COURT: Okay.

MR. MARTIN: -- plan, knowledge, absent of mistake, lack of accident.

THE COURT: Well, not -- not -- you're saying 402 --

MR. MARTIN: 404-2.

THE COURT: 404. You're talking about 404(b) or (c) or (a)?

MR. MARTIN: I'm sorry, (b)(2).

THE COURT: Okay. You're talking about 404(b), "other crimes, wrongs or acts," correct?

MR. MARTIN: Yes, sir.

THE COURT: All right. You can use that evidence -- "may be admissible for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

So which one of those are you -- are you wanting to invoke here?

MR. MARTIN: Motive, plan, knowledge, lack of accident.

THE COURT: Okay. And what's the -- what's the -- I guess what's the bad act or -- it's not a crime. I guess what's the wrong or bad act you want to present to the jury?

MR. MARTIN: The act is evading the requirement to

register as a landfill by claiming that he's running a construction site.

THE COURT: So how does Cato Road advance that --

MR. MARTIN: Because he did the same thing there.

THE COURT: You're going to have to explain. I'm not following you. I'm trying to follow you, but what do you mean, he did the same thing there?

MR. MARTIN: He got a construction general permit on Cato Road and brought in a lot of rock and dirt and other construction debris and piled it up all up there and left a big ugly site that drained and continues to drain muddy water into the neighbor's property. Actually, I believe filled up his pond on his property.

THE COURT: So you really want to use that to show because he did it at Cato Road he's doing it at RR Farms?

MR. MARTIN: He knew what he was doing and intentionally did it at RR Farm.

THE COURT: All right. Let me hear from the defendant.

MR. FITTS: First, Your Honor, I think we would object due to the fact that the Clean Water Act and Resource Conservation Act, which are the two acts that we are alleged to have violated, are strict liability statutes. So I don't see how a motive, opportunity, intent is relevant whatsoever to the turbidation violations of those acts.

And then, second, we would object due to surprise. According to the local rules, if the -- if a party wants to bring in a witness they did not disclose on the witness list and they did not give prior notice to counsel, I believe it's exigent circumstances, that the Court may allow such a witness to testify.

I don't think we've even heard of Cato Road before today. I hadn't heard of Cato Road before today. So we believe it would be severely prejudicial and unfair to bring a whole new witness and bring a whole new property into this trial that we didn't -- haven't discussed prior to trial.

And I guess in addition we would -- we would object to -- just to all of this testimony due to relevance. It -- there is -- I still don't -- Mr. Martin still fails to link this to this case and the actual counts before us. How is his landfill claim going to be proven up by Mr. Ray's actions on a completely different property? If he violated the law on that property, that has nothing to do with violating the law on this property.

And, in addition, it's the same with the Clean Water Act. There are strict liability statutes. I just do not see how this would yield any evidence -- oh, and, in addition, it's going to confuse the jury. So surprise, relevance, confusion of the jury. I think all three of those are. . .

THE COURT: All right. I'm going to give Mr. Martin the last word on this.

MR. MARTIN: They claim surprise, but it's offered for impeachment. And there's no requirement for us to notify them in advance of impeachment material. It shows Mr. Ray was not telling the truth about someone building a house on that property.

THE COURT: So there is no house on Cato Road?

MR. MARTIN: There is no house. And that's what our witness is prepared to testify about.

THE COURT: Let me go back to my notes, but I do remember Mr. Ray saying it had been perked for a septic. You typically use a septic if you're going to build a house. So that's some proof that there was at one point in time, maybe, a plan to build a house. That they didn't continue to build it, I don't -- help me -- help me understand how it's impeaching.

MR. MARTIN: I don't know that it has been perked. He said it was. Our witness would know, but I -- I didn't know that he was going to claim that. So I haven't discussed that with the witness yet.

THE COURT: Okay. So you can't give me a proffer whether it's a house on the -- on the Cato Road.

MR. MARTIN: No. I know there's no house that's been built there. I've been told that -- I haven't discussed

with him whether it was perked for septic.  I thought it had not been.  But I haven't discussed that with this witness.

THE COURT:  Okay.  All right.

What do you say to the defendant's other arguments, I guess?

MR. MARTIN:  I'm not sure I followed their other argument.  I believe it was as to relevancy?

THE COURT:  And relevancy, yeah.

MR. MARTIN:  Well, the same thing.  It shows he perjured himself --

THE COURT:  He perjured himself when he said he --

MR. MARTIN:  He said the other site had been built upon.

THE COURT:  I don't know if he said it had actually been built upon.  He said at close he might have had some plans to build upon it.  But even if he said it, couldn't the plans have changed?

All right.  Go ahead.

MR. MARTIN:  I think it would be pretty clear that the site isn't suitable for building.  I've seen photos.

THE COURT:  Okay.  I -- I'm doing the best I can to -- I think he wants to talk to you.

MR. HOLT:  Your Honor, could I --

THE COURT:  No.  You're not talking to me.  You can talk to him.

(Respite.)

MR. MARTIN: This is -- I'm looking at the transcript from yesterday.

Mr. Ray was asked, "Is anyone farming there now?"

And his answer was, "Someone lives there now."

"Has anyone ever farmed there?"

"I don't know."

May I show you this?

THE COURT: And you're saying no one lives there?

MR. MARTIN: I'm saying no one lives there. There's nothing there for anyone to live in or on.

THE COURT: Okay. And what if someone lives there or not, how is that relevant to your allegations here?

MR. MARTIN: Your Honor, he's saying it's just fine that all of that is there because it's -- can be built upon. It's not a landfill; it's a construction site and they can build a house there --

THE COURT: Now you're talking about Cato Road.

MR. MARTIN: Yes, sir.

THE COURT: Now, we don't have any proof before the jury about any of that happening at Cato Road. His testimony was what was happening at RR Farms, and then we've had this reference to Cato Road near Briley Parkway.

So you want to impeach him by bringing on a witness saying they live there?

MR. MARTIN: By saying he -- they live next door and nobody lives there.

THE COURT: Oh, I'm sorry. So they don't live on Mr. Ray's property on Cato Road?

MR. MARTIN: No. No, sir. No one does.

THE COURT: They just live next door and they know, I guess, by being neighbors no one is living there.

MR. MARTIN: By being neighbors curious what is going on at this construction -- you know, this dump next door.

THE COURT: Any -- is that the essence of what you want to impeach Mr. Ray on?

MR. MARTIN: Yes, sir.

THE COURT: You said no one lives there, and they're going to say, "We're neighbors, we think somebody lives there"?

MR. MARTIN: No, sir. It's the other way around. Mr. Ray says that someone lives there.

THE COURT: Right.

MR. MARTIN: And the neighbor said no one lives there.

THE COURT: Right. Because we're neighbors; so we know what's going on next door.

MR. MARTIN: We know what's going on.

THE COURT: Well, is the witness here?

MR. MARTIN: Not at the moment. I don't -- I don't believe. I think he was coming today. I'm not sure if he's here.

THE COURT: Yeah, I guess I'm still -- I've got a lot of problems with it.

The first problem with it is really, under 403, even if it's relevant, you're really enticing the jury to make a decision on something that's not at issue here, on reasons -- and that's why 403 allows me to exclude it even if it's relevant. Because of the danger of prejudice by this coming in. They're not going to be asked to -- they shouldn't be focusing on Cato Road. They need to focus on RR Farms. That's what you brought the lawsuit on.

Okay. Even assuming that he misspoke, I don't see how -- why someone lives there is relevant to the underlying claims that you've brought.

MR. MARTIN: No one can live there because it's a dump. It's a collection of rock and stone and dirt and asphalt and other things.

THE COURT: Okay. But he testified here he wants RR Farms to be essentially a greenery, with green grass. No one's going to be living there. He hasn't made any decisions to do it. So I'm not sure it's really impeaching now.

MR. MARTIN: He did pretty much say that he doesn't plan to live there.

THE COURT: Right.

MR. MARTIN: But --

THE COURT: So no one's -- he doesn't plan to live on RR Farms. No one is living on Cato. Even if your witnesses is correct. How does that help the jury?

MR. MARTIN: But he -- I still think you may have it backwards.

THE COURT: Okay.

MR. MARTIN: No one -- he said someone lives on Cato, and no one lives on Cato.

THE COURT: Okay. And no one lives on RR Farms.

MR. MARTIN: Correct.

THE COURT: All right. But because he said someone actually lives there, that impeaches --

MR. MARTIN: It -- sorry.

THE COURT: -- his testimony?

MR. MARTIN: It shows that he's lying. And if he's lying about that, then he's lying about everything else.

THE COURT: What does the defense say?

MR. FITTS: Well, Your Honor, if that's the case, it almost seems like he's trying to bring this in as a character witness, which would also require disclosure. Plus local rules do -- Mr. Martin is wrong is on his interpretation of local rules. Local Rule 39.01(c), states that (as read):

At the beginning of trial, counsel must deliver to the courtroom deputy clerk a list in triplicate of all witnesses expected to testify in the case. The list must --

I'll move on down to F.  Under 39.01(f) (as read):

Subpoena of trial witnesses.  Should a attorney deliver subpoenas for witnesses in civil cases to other individuals, such subpoenas must be delivered along with advance -- at least 14 days prior to the trial date.  If this requirement has not been met, a motion for continuance grounded upon failure of a witness to be served or appear will not be granted except upon a showing of extenuating circumstances.

He wasn't on the witness list.  That's. . .

And we agree with all of your other considerations with confusion of the jury.  We don't see how this is relevant at all to the actual underlying claims.  It seems like this is just an -- he found one small statement by Mr. Ray that he believed people may be living at a property that he has not been to in a long time, and is going to now try to bring this whole other site that apparently has all of this rock and dirt and all these bad, bad things and is just going to throw this in here in the middle of trial without advance notice, and we're expected to defend Mr. Ray's

character on a site we've never seen, we've never heard about before yesterday.

THE COURT:  All right.

(Respite.)

THE COURT:  All right.  We're back on the record and the Court looked over what the court reporter has.  And Mr. Ray did say, quote, Somebody lives there now, referencing Briley Parkway, which is also on Cato Road.

But here's my concern, Mr. Martin.  I think that's too far afield.  What you're actually -- this whole discussion about Briley Parkway and Cato Road is inviting the jury to say that because he didn't do something on Cato Road, he's guilty of what he's doing here now.  And that's the very kind of evidence that I think 403 requires be excluded because you're asking the jury to essentially make a decision on what happened at RR Farms based on what he did or did not do at -- on Cato Road.  And that -- that is -- that's why 403 says, even if it's relevant, it should be excluded.

Now, I'll let you argue if you want.  I'll let each side argue that the -- the balancing, but I think it is substantially outweighed by the threat or possibility of confusing the issues.

The one concern I have is he says somebody lived there now, but you don't have your witness here.  When is your witness arriving?

MR. MARTIN: May I check?

THE COURT: Sure. But I guess even if the witness says that, seems like 403, I need to tell the jury, you need to make a decision here on what happened at RR Farms, and to the extent you've heard testimony about another farm on Briley Parkway or Cato Road, that is not at issue here. Because you're asking him to conclude he's violated the Clean Water Act and the other act over on Cato Road. Since he's doing it there, he's doing it here. And 403 doesn't allow that. I don't think.

Is your witness here?

MR. HOLT: A backpack is here but I'm not sure if it belongs to the witness. So we're going to call and see if he's here.

THE COURT: So I'm not sure if it makes any difference. But that's my current -- I'll let you respond to that. Tell me where I'm wrong.

MR. MARTIN: You know, just the arguments we already made.

THE COURT: Okay.

MR. MARTIN: That's it's. It shows his plan, purpose, intent --

THE COURT: Right. Plan, purpose, to evade the law on Cato Road. So he evaded it there; he's evading it here. We need to make a decision based on the law and the

facts of this case, not what happened or didn't happen at Cato Road.

MR. MARTIN: But our argument and proof on Cato Road isn't showing that he violated his permit there. That's not the intent of that. We could show that, but I agree that would be far afield.

THE COURT: I think even getting into it was -- when you went to Briley Parkway, I immediately wanted to know, why are we doing this. And then when you did it again today, I'm still trying to wonder why we're talking about Cato Road.

But I cut you off. Go ahead.

MR. MARTIN: I lost my train of thought.

THE COURT: I'm sorry. That happens to me, too.

MR. MARTIN: Too many things to think about. No.

He just said -- he said he was building farms for people to live on, and he's not -- our -- our testimony at Cato Road, the neighbor would just be saying he's seen the property, he saw the mess when it was going up, and -- and you know, what happened there, and there's nobody living there, and he has muddy water going into his house.

But there's no -- there's no -- and he does have a permit there, and -- but we aren't intending to introduce that permit and to talk about how he's violated that permit.

THE COURT: I'm not intending to admit it either.

MR. MARTIN:  I understand.

THE COURT:  Let's do this case.  You can bring Cato Road, only if you want to.

All right.  Anything else?

MR. MARTIN:  Not on Cato Road.

THE COURT:  Okay.  So I'm -- I'm going to find that under 403 the reference to Cato Road and Briley Parkway and what farm and what activity -- and what activity and what construction may have occurred there in the past and comparing that to what the allegations here does implicate 403.  It creates a danger that the jury's going to make a decision not on the evidence and the facts of this case, but on what he -- Mr. Ray did or didn't do on Cato Road.  And that's -- that specifically is confusing the issues and misleading the jury and just unnecessary for this particular case.

Since I -- I'll leave it to you all.  I guess I'll hear you both.  I don't know if we need to tell the jury, you know, "To the extent you've heard evidence about Cato Road and Briley Parkway -- Briley Parkway, you should not consider that."

But because I think that that evidence is excludable under 403, even if the witness you have is going to come in and say, "Well, he's wrong, nobody lives there," that would not be relevant to the issues before the Court.

So. . . That's my ruling.

MR. MARTIN: Yes, sir.

THE COURT: Now, you all -- when we do the jury charge, you can -- you can see -- and I think we'll have a provision there, "You may have heard evidence about something that's not relevant." We can bring it up there. I'm going to let you all make that judgment call. Sometimes by bringing it to the jury's attention you actually give it more emphasis than it needs to. So I'll be interested what you all think, if we really need to do that.

All right. So that takes care of Cato Road/Briley Parkway. That takes care of your witness.

And now that's -- what do you want to do with Mr. Sulkin?

MR. MARTIN: Mr. Sulkin and those photographs.

THE COURT: Okay. All right. So let's -- let's see here.

MR. CASHION: Your Honor --

THE COURT: Oh, go ahead. Say again.

MR. CASHION: Are you through? He's still standing there. Yes. Let me. . .

THE COURT: Yes, let me hear from the defense.

MR. CASHION: I still I think I'm going to be the Jack-in-the-box. I think if he says anything like yesterday of saying, "Well, did you perform an investigation?"

He goes, "Well, yes."

I think if he says anything like that, I should be entitled to say, "Isn't it true that you wrote a report as an expert and the Court is not allowing you to testify?" I think I can ask him that if he starts down that road.

Because when I -- I objected to "investigation," he said -- he said, "Well, he can say that." And "investigation" trips the whole thing.

THE COURT: Right. So maybe the right question to Mr. Sulkin is "Did you take pictures?"

MR. CASHION: Right.

THE COURT: And he would answer "Yes." He can identify Exhibits -- what is it -- 12 through 50. "Is this -- do these pictures fairly depict what you did?"

We need to get the date the pictures were made.

And he can go through the pictures to show what they show. They show muddy water.

MR. CASHION: And I think as long as he sticks with "muddy water" as a generic. Otherwise, if he starts saying something about the turbidity -- when he starts saying another -- he cannot testify as to any other scientific or anything. So I'm concerned --

THE COURT: Yeah. And I --

MR. CASHION: -- cut him off when he's trying to embellish, "Oh, this is really, really muddy." You know,

"This is" -- I just hear him in my mind trying to make a bigger deal.

THE COURT: Yeah.

Mr. Martin, what's your plan? What do you -- because I understand -- I see the defense's point, and I actually saw it before they mentioned it. Because if you ask him a question, "What is turbidity," because he's an expert with all of this scientific knowledge, he's going to pour into that answer what he knows. He has to. He has personal knowledge of all of that. So he's right back to giving an expert opinion, which he cannot do.

So as long as you ask him, "Did you make any -- what -- on these dates?"

"Yes."

"Do they fairly depict what you were looking at?"

"Yes, they do." Then you can go through each.

"And what does it show?"

"It shows the water."

Talk about the color of the water. But he can't get into his scientific terms or anything that's going to invite his -- his expert opinion.

MR. MARTIN: Where did the water come from, where is the water going, just his observation.

THE COURT: Right.

MR. CASHION: So we're still not going to talk

about --

THE COURT: He's not going to use the word "investigation," if that's your concern.

MR. CASHION: Okay. That was what got me going.

THE COURT: And I guess I need to tell Mr. Martin -- or I can tell Mr. Sulkin myself -- and I thought maybe I already had -- he cannot testify about anything in his report for the reasons the Court has stated.

MR. MARTIN: I'm sorry?

THE COURT: He cannot testify about anything in his report for the reasons I've already stated.

MR. MARTIN: Yes, sir.

THE COURT: He can testify of his personal knowledge. "I went out there; I took pictures; these pictures fairly depict it; I did it on this date; the water was going left to right." And other things that a -- as the cases put it, a lay person or -- of ordinary experience in life can do.

So a lay person would be able to say, "Yeah, I saw the water; it was coming through; it was brown; it was going left to right" -- or right to left or whatever it is. Where he was when he did it. What day he did it. Those are all things within his personal knowledge.

Are we good on that? Anything else you want to get into with him that we've not discussed?

MR. MARTIN: He can say it looked muddy.

THE COURT: He can say it looks muddy. You can't ask him, "What does 'muddy' mean?" Because then that's going to use -- what? His scientific knowledge. "Well, as an expert from TDEC for 25, 30 years, muddy water". . . He can't testify as an expert.

MR. MARTIN: Can he say that the color concerned him? He found it concerning?

MR. CASHION: No. I would object to that. Because now you're asking for an opinion on the water. It's just --

THE COURT: Because the next question has to be why? And his why answer is using his scientific knowledge. He's -- he's a lay person and an expert. And, you know, the cases -- and the leading case in Sixth Circuit says it's -- the Court has to be careful to make sure he is testifying only based upon his personal knowledge. He can make conclusions and inferences to the extent that a person of ordinary sensibilities, a lay person walking down the street could do so. But he can't use his scientific knowledge.

MR. MARTIN: I asked the other lay witnesses if they found the color objectionable --

THE COURT: Uh-huh.

MR. MARTIN: -- without objection from the defendant.

THE COURT: Right. But they weren't experts. So they were -- that -- that classic man on the -- or woman on the street, saying, "Yeah, it was brown, like chocolate milk" or whatever, they can -- that's what a lay person. . . But Mr. Sulkin is not that. He looks at things differently. When he says "muddy waters," things start coming in his head about what that means from an expert environment/consultant's standpoint, and you can't invite him to make those opinions.

MR. CASHION: And he -- that was my next word, was objectionable, because he goes --

THE COURT: I can't hear you. What's objectionable?

MR. CASHION: I'm sorry. Yes, Your Honor --

THE COURT: Oh, did he find it objectionable?

MR. CASHION: Not using the word "objectionable" because --

THE COURT: The problem with that is because, if Mr. Cashion examines him on "objectionable," there you go, all that now is getting ready to come in.

MR. MARTIN: Yes, sir. I understand.

MR. CASHION: So this is going to stick to "muddy." That's the most he can say.

THE COURT: No. Most people have said "muddy." He is an expert who is also a lay person. He can testify with his lay person hat. But he can't testify from his

expert witness hat.

MR. MARTIN: The jury's not going to know that he's an expert.

THE COURT: Right. He's just going to be Joe Smith, just like everybody else.

MR. MARTIN: So he should --

THE COURT: But you know, I know, and the parties know. We've got to be careful that he testifies strictly under 701 and not -- not open the door to 702. I think we can get it done. I think I've -- I think I've built a fence around Mr. Sulkin.

Let's go ahead and -- go ahead. I'm sorry.

MR. CASHION: Well, if he crosses the line -- because he can't help himself for some reason -- can we then direct the jury that he was an expert and he -- you have found him not to be able to testify or competent to testify, and that's --

THE COURT: Well, first of all, I don't think Mr. Martin's going to break the line.

MR. CASHION: Okay.

THE COURT: Number two --

MR. CASHION: I want to --

THE COURT: And you need to advise the witness -- and maybe I need to have the witness in here before we start so I can tell him.

MR. CASHION: Okay.

THE COURT: But if the witness breaches the line, then, yeah, some kind of curative instruction -- that's a pretty strong one you're asking for. And I think I can come up with words. But I don't think that's going to happen. Mr. Martin is an accomplished lawyer. You are. The witness -- it's not his first rodeo. We know what the rules and regulations are. Let's follow the rules.

All right. Let's take our break for 15 minutes.

MR. CASHION: Thank you.

(Recess.)

THE COURT: All right. Be seated. Are we ready for the jury to come in, Mr. Martin?

MR. MARTIN: Yes, sir.

THE COURT: Same for the defense? Ready for the jury?

MR. CASHION: Yes, Your Honor.

THE COURT: All right.

MR. CASHION: Did you want to talk to Mr. . . . first?

(Jury present.)

THE COURT: All right. Call your next witness.

MR. MARTIN: That will be Barry Sulkin.

THE COURT: All right. And if counsel can approach.

All right. Mr. Sulkin, if you'll stop there, we'll swear you in.

COURT DEPUTY: Please raise your right hand.

BARRY SULKIN,

called as a witness by Plaintiff, was duly sworn and testified as follows:

COURT DEPUTY: Please state your full name for the record.

THE WITNESS: Barry Wayne Sulkin.

COURT DEPUTY: Please spell your last name.

THE WITNESS: S-u-l-k-i-n.

COURT DEPUTY: You can have a seat at the witness stand. And watch the ramp.

THE COURT: All right. If the lawyers can approach.

(Bench conference outside the hearing of the jury.)

THE COURT: Did you get to talk to him during the break?

MR. MARTIN: Yes, sir. He understands.

THE COURT: He understands?

MR. MARTIN: Yes, sir.

THE COURT: What are you going to cover in terms

of his background?

MR. MARTIN: I'm going on ask him where he lives, is he familiar with the area.

THE COURT: Right. Have you been to the area?

MR. MARTIN: Have you been to the area.

THE COURT: And then launch into his pictures.

MR. MARTIN: Nothing about his work or his job or what he does.

THE COURT: He's a lay person.

MR. MARTIN: Yeah.

THE COURT: Okay. All right.

(In open court.)

DIRECT EXAMINATION

BY MR. MARTIN:

Q. Would you state your name for us, please, sir?

A. Barry Sulkin.

Q. Where do you live, please, sir?

A. 4443 Pecan Valley Road in Nashville.

Q. And how far is that from Mr. Ray's property?

A. About two miles.

Q. Are you familiar with that area?

A. Very.

Q. Have you been to that area?

A. Yes, I've lived there since 1978.

Q. And are you familiar with Sulphur Creek there?

A.   Yes, I've been from one end to the other of Sulphur Creek.

Q.   And are you familiar with Cumberland River there?

A.   Yes.

Q.   Can you tell us the proximity of Cumberland River to Sulphur Creek?

A.   Well, Sulphur Creek is a tributary of the Cumberland River.  So it enters the river near the end of Pecan Valley Road, near where I live.

Q.   Have you taken photographs of water in the creeks in that area?

A.   Yes.

Q.   Did you take photographs on August 12th, 2023?

A.   Can you point me to that page that has the index of the photographs?

            MR. MARTIN:  Get Plaintiff's Exhibit book 1 there.

            THE COURT:  If you want to show him, go ahead.

            THE WITNESS:  I took a lot of photographs on different dates.

            MR. MARTIN:  I'll withdraw my last question.

Q.   So did you take photographs January the 3rd, 2023?

A.   I did.

Q.   And are those photographs Plaintiff's Exhibit 12 through 15?

A.   I recognize those, yes.

Q.   And do those photographs fairly and accurately depict the scene that you saw when you took them?

A.   Yes.

MR. MARTIN:  We would move to introduce Plaintiff's Exhibit 12 through 15.

THE COURT:  Without objection, admitted.

MR. CASHION:  No objection.

(Whereupon, Plaintiff Exhibit 12, Plaintiff Exhibit 13, Plaintiff Exhibit 14, and Plaintiff Exhibit 15 were marked for identification and received in evidence.)

BY MR. MARTIN:

Q.   Okay.  We're showing you Plaintiff's Exhibit Number 12.

Can you tell us where that photograph was taken?

A.   I was standing on the Old Hydes Ferry Road looking north towards the Ray property with the railroad track in the background, in the trees that separates where I'm standing from Ashland City Highway.

Q.   Does that show muddy water?

A.   It shows muddy water.

Q.   Where does that water come from?

A.   It comes through a tunnel under the railroad track, and on the other side of that tunnel there is a wooded stretch, and then it goes through another tunnel under Ashland City Highway, over to the corner of Mr. Canale's property, where

there is a storm drain at the corner -- southeast corner of the Ray property.

Q.    So this came off of the southeast corner of the Ray property?

A.    Yes.

Q.    And where does -- where does this water go?

A.    It goes along the road for about 50 feet, and then through a pipe, across to the other side of the road, across the Whittenmeyer property, and into Sulphur Creek.

Q.    Okay.  And we're going to show you --

THE COURT:  Talk into the microphone.

BY MR. MARTIN:

Q.    We're showing you now Plaintiff's Exhibit Number 13.

Where was this photograph taken?

A.    I'm standing on the edge of Frank Canale's driveway, looking west into the Ray fill site where the water's coming from and flowing into the storm drain on Canale's property adjacent to Ashland City Highway.

Q.    Okay.  And what is the source of this water?

A.    The material being disposed on the Ray property.

Q.    And where does this water go?

A.    It goes under the highway, through the two tunnels I just described, into where you see it in the previous picture and on to Sulphur Creek and the Cumberland River.

Q.    And would you call that muddy water?

A.    Yes, that's muddy water.

Q.    Okay.  We're showing you now Plaintiff's Exhibit Number 14.

Where was this photograph taken?

A.    Approximately the same spot as the previous photo.  I just stepped a little bit closer to the property line so I could see how the water was getting around that silt fence, which you can see in the upper right part of the photograph with the muddy water coming around the left edge of it.

Q.    And which side of Mr. Ray's property?  Was this the east or west side?

A.    This is the eastern side, next to Canale.

Q.    And where was this water going?

A.    Into that drain and on to Sulphur Creek and the Cumberland River.

Q.    Okay.  And please take a look at Plaintiff's Exhibit Number 15.

Where was this photograph taken?

A.    That same general area.  That is just a close-up of the drain on the edge of Canale's property, on the eastern side of the Ray fill area.

Q.    And was the source of this water the Ray property?

A.    Yes, it was.

Q.    And where did the water go?

A.    Sulphur Creek and the Cumberland River.

Q.   And would you call this water muddy?

A.   Yes.

Q.   Okay, sir, did you also take photographs on June the 29th, 2023?

A.   Yes.

Q.   And take a look at Exhibits 16 and 17 and tell us if those are the photos you took that day.

A.   Yes, they are.

Q.   Now, do these photos fairly and accurately depict what you saw there that day?

A.   Yes.

MR. MARTIN:  We would move to admit Plaintiff's Exhibit 16 and 17.

THE COURT:  Admitted.

(Whereupon, Plaintiff Exhibit 16 and Plaintiff Exhibit 17 were marked for identification and received in evidence.)

BY MR. MARTIN:

Q.   And we're showing you on the screen Plaintiff's Exhibit 16.

Where was this photograph taken?

A.   That is the mouth of the stream flowing through the Keck property where it enters Sulphur Creek and flows to the left in the photograph downstream towards the Cumberland River.

Q.   Okay.  The water on the left there came from Mr. Ray's

property?

A.    Yes, it did.

Q.    And the water on the right there, what is that?

A.    That's Sulphur Creek coming from upstream of the Ray property at that point.

Q.    Would you say the water on the left is muddy?

A.    Yes.

Q.    Would you say the water on the right is not muddy?

A.    Yes.

Q.    Please take a look at Photograph Number 17.

Can you tell us where you were when you took that photograph?

A.    Same general location, but I had stepped into the mouth of Mr. Keck's stream, looking downstream in the direction of flow, where you see Sulphur Creek in the background and Mr. Keck's creek flowing to the right, where it blends in to Sulphur Creek on the way to the Cumberland River.

Q.    And the water on the right came from the Rays' property?

A.    Yes.

Q.    Would you say the water on the right is muddy?

A.    Yes.

Q.    Would you say the water on the left is not muddy?

A.    I would, yes.

Q.    Did you take a photograph on July the 8th, 2023?

A.    Let me check the index.

Yes.

Q.    Would you take a look at Plaintiff's Exhibit Number 18, please.

A.    I'm going to pull the index out so I can get back and forth quicker.

Q.    Number 18.

A.    Number 18.  Okay.

Q.    Does that photo fairly and accurately depict what you saw there that day?

A.    Yes.

MR. MARTIN:  We would move to admit Plaintiff's Exhibit Number 18.

THE COURT:  Admitted.

(Whereupon, Plaintiff Exhibit 18 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.    Okay.  We're showing you Plaintiff's Exhibit 18 on the screen.

Can you tell us where you were when you took that photograph?

A.    I'm standing on Old Hydes Ferry Road looking east, back towards Nashville.  To the left, which is north, is that stream coming off the eastern side of the Ray property under the railroad.  It comes down, follows the road a short distance, and then under the road through a pipe on to the

Whittenmeyer property and Sulphur Creek, then the Cumberland River.

Q.   Would you say that water is muddy?

A.   Yes.

Q.   Did you take a photograph on July the 19th, 2023?

A.   Yes.

Q.   Would you take a look, please, at Plaintiff's Exhibit Number 19.

Is this a photo that you took on July the 19th, 2023?

A.   It is.

Q.   Does the photo fairly and accurately depict the scene that you saw that day?

A.   Yes.

MR. MARTIN:  We would move to admit Plaintiff's Exhibit Number 19.

THE COURT:  Admitted.

(Whereupon, Plaintiff Exhibit 19 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.   We're showing you Exhibit Number 19 on the screen.

Can you tell us where you were when you took that photograph.

A.   I was on Mr. Keck's property a short distance up from where it joins Sulphur Creek, looking upstream on his

property.

Q.   Did this water come from Mr. Ray's property?

A.   Yes, it did.

Q.   And did it go to Sulphur Creek?

A.   Yes.

Q.   Would you say that this water is muddy?

A.   Yes.

Q.   Did you take photographs on August the 3rd, 2023?

A.   I did.

Q.   Would you look at Plaintiff's Exhibit 20 through 21, please, sir.

Are these the photographs that you took on August 3rd, 2023?

A.   Yes.

Q.   And do these photographs fairly and accurately depict the scene that you saw that day?

A.   Yes.

MR. MARTIN:  We would move to admit Plaintiff's Exhibit 20, 21, and 22.

THE COURT:  You didn't ask him to look at 22.

BY MR. MARTIN:

Q.   Would you take a look at Number 22.

A.   Yes.

Q.   Does this photograph -- I'm sorry.

Is that a photograph that you took on August 3rd,

2023?

A.   It is.

Q.   Does it fairly and accurately depict the scene that you saw that day?

A.   Yes.

            THE COURT:  All right.  Admitted.

            (Whereupon, Plaintiff Exhibit 20, Plaintiff
            Exhibit 21, and Plaintiff Exhibit 22 were marked
            for identification and received in evidence.)

BY MR. MARTIN:

Q.   Okay.  And we're showing you on the screen Plaintiff's Exhibit Number 20.

            Where was this photograph taken?

A.   That is on Mr. Keck's property where his stream enters Sulphur Creek.  I'm looking upstream from the photograph, with Sulphur Creek in the background and Keck's property on the left, with his creek coming through.

Q.   Okay.  And the property -- the water in Keck's creek on the left, did it come from Mr. Ray's property that day?

A.   Yes, it did.

Q.   And this is Sulphur Creek?

A.   This is Sulphur Creek.

Q.   Would you say the water on the left is muddy?

A.   Yes.

Q.   Would you say the water on the right is not muddy?

A.   The water on the right is a little muddy, but just upstream at the back end of this photo is where the other stream from the eastern corner also flows in.

So on some days, if you catch it after both are impacting Sulphur Creek, then you don't have the clarity of Sulphur Creek by comparison.

Q.   We're going to show you now on the screen Plaintiff's Exhibit Number 21.

Where were you when you took this photograph?

A.   Same as earlier photographs, on the same location on Old Hydes Ferry Road.  This is the eastern discharge from the Ray property that then goes along the road and through a pipe over to Reba Whittenmeyer's land and then into Sulphur Creek upstream of the previous photo on Keck's property.

Q.   And would you say this water is muddy?

A.   Yes, it is.

Q.   Did you take photographs on August the 12th, 2023?

A.   I did.

Q.   And would you take a look at Plaintiff's Exhibits Number 23, 24, 25, 26, 27, and 28.

Are those the photographs that you took on August the 12th, 2023?

A.   Yes.

Q.   And do these -- do these photographs as a group fairly and accurately depict the scene that you saw that day?

A.    Yes.

MR. MARTIN:  We would move to admit Plaintiffs' Exhibits 23, 24, 25, 26, 27, and 28.

THE COURT:  Admitted.

(Whereupon, Plaintiff Exhibit 23, Plaintiff Exhibit 24, Plaintiff Exhibit 25, Plaintiff Exhibit 26, Plaintiff Exhibit 27, and Plaintiff Exhibit 28 were marked for identification and received in evidence.)

MR. MARTIN:  I got a little ahead of myself.

Q.    Would you take a look at Plaintiff's Exhibit Number 22.

A.    Okay.

Q.    Where were you when you took this photograph?

A.    I was standing on the end of -- at the end of Frank Canale's driveway on Ashland City Highway, looking west towards Ashland City with the Ray property on the right.

Q.    And the water that we're seeing, did that come off of Ray's property?

A.    Yes.  You can see water coming out of that fresh gravel where they had added a new road there and raised the roadway, but it was sending water out into the street and then back towards Canale's direction, where it entered a street drain.

Q.    And where did this water go?

A.    Into that same drainage under the highway and railroad track to Sulphur Creek.

Q.   And when you say -- would you say this water is muddy?

A.   Yes, it is.

          MR. MARTIN:  And I believe -- I believe number 22 is in evidence?

          THE COURT:  It is.

BY MR. MARTIN:

Q.   And would you look at Plaintiff's Exhibit Number 23, please.

          Where were you when you took this photograph?

A.   I was on Mr. Keck's property, looking and standing in his creek.

Q.   And this is water from Mr. Ray's property?

A.   Yes.

Q.   And this water flows to Sulphur Creek?

A.   It does.

Q.   Would you say this water is muddy?

A.   Yes.

Q.   Okay.  Please take a look at Plaintiff's Exhibit Number 24 we're showing you on the screen.

          Where were you when you took this photograph?

A.   Where was I?

Q.   Yes, sir.

A.   The same location as the last photograph, Mr. Keck's creek.  I'm turned around looking downstream where it flows into Sulphur Creek, which is flowing from left to right in

the background.

Q. Would you say this water is muddy?

A. Yes.

Q. Okay. Would you take a look at Plaintiff's Exhibit Number 25.

And where were you when you took this photograph?

A. I was standing on Old Hydes Ferry Road looking east. This was near the eastern discharge from the southeast corner of the Ray property.

Q. And this water came from the Ray property?

A. Yes. And you can see the diminished flow there. It's less than the previous photographs. It's at the end of a rain.

Q. And this water went to Sulphur Creek?

A. Yes.

Q. Would you say this water is muddy?

A. Yes.

Q. Okay. We're showing you now Plaintiff's Exhibit Number 26.

Where were you when you took this photograph?

A. This is the mouth of Mr. Keck's creek at Sulphur Creek, looking upstream.

Q. The water on the left came from Mr. Keck's creek?

A. Yes.

Q. And would you say that it's muddy?

A.   Yes.

Q.   Okay.  Please take a look at Plaintiff's Exhibit Number 27 that we're displaying.

Where was -- where was this photograph taken?

A.   A short distance up in Mr. Keck's creek, looking upstream.

Q.   Would you say this is muddy water?

A.   Yes.

Q.   Okay.  Now, please take a look at Plaintiff's Exhibit Number 28 that we're showing.

Where was this photograph taken?

A.   The same location as the previous photograph along Old Hydes Ferry Pike -- or Road.  This time I'm looking to the west, with north on the right side.

Q.   Did this water come from Mr. Ray's property?

A.   It did.

Q.   And does it go to Sulphur Creek?

A.   Yes.

Q.   Would you say that it is muddy?

A.   Yes.

Q.   Would you take a look -- well, let me ask you first, did you take photographs on September the 21st, 2023?

A.   Yes.

Q.   And are these photographs that are marked as Plaintiff's Exhibit 29 through 45?

A.   Yes.

Q.   And do these photographs as a group fairly and accurately depict the scene that you saw when you took them?

A.   Yes.

          MR. MARTIN:  We move -- Plaintiffs move to admit Plaintiff's Exhibits Number 29 through 45.

          THE COURT:  Admitted.

          (Whereupon, Plaintiff Exhibit 29, Plaintiff
          Exhibit 30, Plaintiff Exhibit 31, Plaintiff
          Exhibit 32, Plaintiff Exhibit 33, Plaintiff
          Exhibit 34, Plaintiff Exhibit 35, Plaintiff
          Exhibit 36, Plaintiff Exhibit 37, Plaintiff
          Exhibit 38, Plaintiff Exhibit 39, Plaintiff
          Exhibit 40, Plaintiff Exhibit 41, Plaintiff
          Exhibit 42, Plaintiff Exhibit 43, Plaintiff
          Exhibit 44, and Plaintiff Exhibit 45 were marked
          for identification and received in evidence.)

BY MR. MARTIN:

Q.   Okay.  Please take a look at Exhibit Number -- Plaintiff's Exhibit Number 29 that we're showing on the screen.

          Can you tell us where this photograph was taken?

A.   That was taken on Mr. Ray's property.  It looks to be the stormwater basin at the front portion of his property next -- near Ashland City Highway.

Q.   Okay.   We're showing you now Plaintiff's Exhibit Number 30.

          And let me just ask -- all these photographs, 31 through 45, were they all taken on Ray's property?

A.   Yes.

Q.   Do you know where on Ray's property Number 30 was taken?

A.   Partway up the slope.   You can see the cell tower in the background.   So we hiked up to the top and around the property.   So this is partway up.

Q.   Okay.   We're showing you now Plaintiff's Exhibit 31.

          Can you tell us where that photograph was taken?

A.   This is along one of the roads built on either side of the disposal area on the way up to the cell tower.

Q.   Okay.   Please take a look at Number -- Plaintiff's Exhibit Number 32.

          Can you tell where that was taken?

A.   Partway up to the top of the mound, along the side of one of the humps.   I can't tell if it's left or right from the picture.

Q.   Please take a look at Plaintiff's Exhibit Number 33.

          Can you tell us where this one was taken -- I'm sorry.

          Can you tell us where this photograph was taken?

A.   About halfway up to the top of the mound -- one of the mounds.

Q.    Is that -- does that show concrete?

A.    Yes, it shows chunks of concrete, what appears to be part of a curb or sidewalk, along with other materials.

Q.    Please take a look at Plaintiff's Exhibit Number 34.

Can you tell us where this photograph was taken, please, sir?

A.    Along my walk up to the top just past that previous photograph.

Q.    And can you identify what is shown in that photograph?

A.    Pieces of waste concrete and a part of a pipe.

Q.    Can you please take a look at Plaintiff's Exhibit Number 35.

Where was this photograph taken?

A.    That was up near the top, along that same walk.

Q.    Can you tell us what this photograph shows?

A.    Large pieces of asphalt and smaller broken pieces of asphalt, a large slab of concrete, as well as smaller chunks of concrete.

Q.    Okay.  Please take a look at Plaintiff's Exhibit Number 36.

Where was this photograph taken, please, sir?

A.    In the same general area as the last photograph, walking up towards the top of the mound.

Q.    And what's this photograph show?

A.    A piece of a metal pipe and chunks of concrete.

Q. Please take a look at Plaintiff's Exhibit Number 37.

Where was this photograph taken?

A. This is near the top or at the top looking at the side slope of the mound.

Q. Can you identify that debris there?

A. It's rock and gravel and pieces of concrete.

Q. Please take a look at Plaintiff's Exhibit Number 38.

Where was this photograph taken?

A. This is up at the top looking back down towards Ashland City Highway, approximately in between the two mounds.

Q. Please take a look at Plaintiff's Exhibit Number 39.

And where was this photograph taken?

A. Same general area. And you can see the previous road that ran between the two mounds in the far -- far end of the photograph that's being now covered up.

Q. Can you identify that waste there?

A. Broken-up concrete.

Q. Okay. Please take a look at Plaintiff's Exhibit Number 40.

Where was this photograph taken?

A. In that same general area further down the slope a bit.

Q. And is that an automobile tire?

A. Well, it may be a truck tire, but it's an old tire mixed in with chunks of concrete.

Q. Please take a look at Plaintiff's Exhibit Number 41.

Where was this photograph taken?

A.   Further down the slope.  I don't remember exactly which part of the slope -- we walked all over the place -- but a little further down from the top.

Q.   Okay.  And will you please look at Plaintiff's Exhibit Number 42.

And where was this photograph taken?

A.   That was taken near the top of the two mounds.  You can see the cell tower in the background with the road going in front of it, and a person standing in the gap between the two mounds.

Q.   Can you identify the debris there?

A.   Large pieces of broken concrete and looks like some pavement as well.

Q.   Please take a look at Plaintiff's Exhibit Number 43.

Where was this photograph taken?

A.   In that same general area near the top of the mound.

Q.   And does that show cracks in the ground?

A.   It's either cracks or water has washed away the loose material, leaving gullies.

Q.   Can you please take a look at Plaintiff's Exhibit Number 44.

Where was this photograph taken?

A.   That was near the top of the mound looking back down towards the highway on the right side of the two mounds

looking towards the highway.

Q.   Can you identify that debris?

A.   It's a pile of broken-up asphalt, pavement, and concrete behind it.

Q.   And please take a look at Plaintiff's Exhibit Number 45.

And where was this photograph taken?

A.   Partway back down the western of the two mounds, on the side.

Q.   And what is that debris there?

A.   Broken-up waste concrete debris.

There's some rebar in it.

Q.   Okay.  Did you take a photograph on February the 9th, 2024?

A.   I did.

Q.   Will you please look at Plaintiff's Exhibit Number 46 and tell us if that's the photograph that you took on February the 9th, 2024?

A.   It is.

Q.   And does that photograph fairly and accurately depict the scene that you saw that day?

A.   Yes.

MR. MARTIN:  We would move to admit Plaintiff's Exhibit 46.

THE COURT:  Admitted.

(Whereupon, Plaintiff Exhibit 46 was marked for

identification and received in evidence.)

BY MR. MARTIN:

Q.   Okay.  We're showing you Plaintiff's Exhibit Number 46 on the screen.

Can you tell us where you are when you took that photograph?

A.   I'm on Mr. Keck's property looking upstream at the pipe coming out from under Old Hydes Ferry Road.

Q.   And did this water come from Mr. Ray's property?

A.   Yes.

Q.   Are there any other sources of muddy water between Mr. Keck's property and Mr. Ray's property?

A.   No.

Q.   Would you call this water muddy?

A.   Yes.

Q.   And does it go down to Sulphur Creek?

A.   It does.

Q.   Did you take a photograph on February the 28th, 2024?

A.   Yes.

Q.   And is that photograph Plaintiff's Exhibit Number 47?

A.   Yes.

Q.   Does this photograph fairly and accurately depict the scene that you saw that day?

A.   It does.

MR. MARTIN:  We move to admit Plaintiff's Exhibit

Number 47.

THE COURT:  Admitted.

(Whereupon, Plaintiff Exhibit 47 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.   Okay.  We're showing you Plaintiff's Exhibit Number 47 on the screen.

Can you tell us where you were when you took this photograph?

A.   I was standing on the back edge of Mr. Keck's property where his stream flows into Sulphur Creek.  Same place as the earlier photographs we looked at.

Q.   And the water on the left comes from Mr. Keck's creek?

A.   It's Mr. Keck's creek, and it comes from the western corner of the Ray property.

Q.   And would you say that that water is muddy?

A.   Yes.

Q.   And would you say the water in Sulphur Creek is not muddy?

A.   That's right.

Q.   Did you take a photograph on April 11th, 2024?

A.   Yes.

Q.   And is that photograph Plaintiff's Exhibit Number 48?

A.   Yes.

Q.   And does that -- does Plaintiff's Exhibit Number 48

fairly and accurately depict the scene that you saw that day?

A.   It does.

MR. MARTIN:  Okay.  We are showing you Plaintiff's Exhibit Number 48 on the screen.  We move --

THE COURT:  48 is admitted.

MR. MARTIN:  Is admitted.  Thank you.

(Whereupon, Plaintiff Exhibit 48 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.   Where were you when you took Plaintiff's Exhibit Number 48?

A.   I was standing on Old Hydes Ferry Road looking to the west, near the eastern discharge from the Ray property with the Whittenmeyer property on the left.  You can see the edge of her driveway in the upper left corner of the picture.

Q.   And did this water come from Mr. Ray's property?

A.   Yes.

Q.   And did it go to Sulphur Creek?

A.   Yes.  It goes under the road to Sulphur Creek.

Q.   And would you say that it is muddy?

A.   Yes, it is.

Q.   Did you take a photograph on May the 8th, 2024?

A.   Yes.

Q.   And is that photograph Plaintiff's Exhibit Number 49?

A.   Yes.

Q.   Does that photograph fairly and accurately depict the scene that you saw that day?

A.   It does.

MR. MARTIN:  We move to admit Plaintiff's Exhibit Number 49.

THE COURT:  Admitted.

(Whereupon, Plaintiff Exhibit 49 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.   Can you tell us where this photograph was taken?

A.   Standing on Old Hydes Ferry Road, looking south into Mr. Keck's property, where the stream flows from under the road.

Q.   And did this water come from the Ray's property?

A.   Yes.

Q.   And does it go to Sulphur Creek?

A.   Yes.

Q.   And would you say that it is muddy?

A.   It is.

Q.   Did you take a photograph on May the 9th, 2024?

A.   I did.

Q.   And is that photograph Plaintiff's Exhibit Number 50?

A.   Yes.

Q.   Would you say that that photograph fairly and accurately depicts the scene that you saw that day?  Does it?

A.    It does.

MR. MARTIN:  We move to admit Plaintiff's Exhibit Number 50.

THE COURT:  Admitted.

(Whereupon, Plaintiff Exhibit 50 was marked for identification and received in evidence.)

BY MR. MARTIN:

Q.    Okay.  We're showing you on the screen Plaintiff's Exhibit Number 50.

Can you tell us where you were when that photograph was taken?

A.    Same as the last photograph, standing on the edge of Old Hydes Ferry Road looking into Mr. Keck's property.

Q.    And did that water come from Mr. Ray's property?

A.    Yes.

Q.    And did it go to Sulphur Creek?

A.    It did.

Q.    Would you say that it is muddy?

A.    Yes.

MR. MARTIN:  We have an additional four photographs that I believe the defendants have agreed that we can admit.  I believe we've already presented these to the Court, Exhibits 54 through 55.

THE COURT:  All right.

BY MR. MARTIN:

Q.   Do you have Plaintiff's Exhibit 54 through -- I said 55, but through 57 in your book?

THE COURT:  Hold on a second.  So you're talking about Plaintiff's Exhibit 54?

MR. MARTIN:  54, 55, 56, and 57.

THE COURT:  I think -- I think there's some confusion.  Why don't you all approach.

(Bench conference outside the hearing of the jury.)

THE COURT:  So we already have a 54.  You marked this one 54.

MR. MARTIN:  Okay.  We messed that up.

MR. CASHION:  Because that was your last number.

MR. MARTIN:  I thought that was -- we have -- is it possible to change that one?

THE COURT:  No.  Not once they're in.

MR. MARTIN:  We need to mark these.

MR. CASHION:  Just flip it one.  Make that 54 the end of it.

MR. MARTIN:  54 through 58.

THE COURT:  55 to 58.

MR. MARTIN:  Yes.  We have these already marked 55, 56, and 57.

THE COURT:  Okay.

MR. MARTIN: So if we make 54 58.

THE COURT: 58. You can do that. You will have 55 to 58.

MR. CASHION: Just bring it to the tail.

THE COURT: So you have a copy for the courtroom deputy and one for me.

MR. MARTIN: Here's a copy.

THE COURT: Okay.

MR. CASHION: Got to edit now.

THE COURT: Yeah.

MR. CASHION: All right.

THE COURT: 54 is now --

MR. MARTIN: These don't have stickers.

THE COURT: Oh. I don't have anything under -- oh, there it is. 58. Okay.

MR. MARTIN: So 54 becomes 58.

MR. CASHION: Your Honor, we have a stipulation.

THE COURT: 55 through 58 will be admitted. Okay.

(In open court.)

THE COURT: All right. 55 through 58 are admitted.

(Whereupon, Plaintiff Exhibit 55, Plaintiff Exhibit 56, Plaintiff Exhibit 57, and Plaintiff Exhibit 58 were marked for identification and received in evidence.)

BY MR. MARTIN:

Q. Okay. Mr. Sulkin, did you take photographs on May 20th, 2025?

A. Yes, if that's last Tuesday. I don't have my calendar in front of me, but I did take pictures last Tuesday.

Q. Okay. And are those photographs Plaintiff's Exhibit 55 through 58?

A. Yes.

Q. We're showing you on the screen Plaintiff's Exhibit Number 55.

Can you tell us where this photograph was taken?

A. That is Mr. Keck's property. I'm standing on Old Hydes Ferry Road, same as the previous photographs, looking downstream. It looks a little different because the utility company had come along and cleared the trees under the power line. So it's more open there. But it's the same location I had been photographing for a while.

Q. Did this water come from Mr. Ray's property?

A. Yes.

Q. And did it go to Sulphur Creek?

A. Yes.

Q. And would you say that it's muddy?

A. Yes.

Q. If you'll please take a look at -- well, I'm sorry. We're showing you on the screen Plaintiff's Exhibit Number

56.

Where was this photograph taken?

A. That's the same location. I just moved a little to the left to get the telephone pole in to give a point of reference.

Q. Okay. We're showing you on the screen Plaintiff's Exhibit Number 57.

Where was this photograph taken?

A. That was the same stream to the north on the other side of Ashland City Highway, standing on the edge of Ashland City Highway looking down into Mr. Ray's property where the stream flows from his site into the pipe under the road.

Q. And this is the same day that this water continues to still flow from Mr. Ray's property?

A. Yes. Same day, few minutes later.

Q. And it goes to Sulphur Creek?

A. Yes, it does.

Q. And would you say that it is muddy?

A. Yes.

Q. Okay. We're showing you on the screen now Plaintiff's Exhibit 58.

And can you tell us where this was taken?

A. Same location as the last photo, just a closer up view to get inside the vegetation a bit.

Q. And this water also comes from Mr. Ray's property?

A.   This is on Mr. Ray's property where I zoomed in.

Q.   And it goes to Sulphur Creek?

A.   Yes, it flows --

Q.   Wold you say --

A.   It flows towards the camera under the highway to Sulphur Creek.

Q.   And would you say that it is muddy?

A.   Yes.

MR. MARTIN:  That's all for this witness, Your Honor.

THE COURT:  All right.  Cross.

MR. CASHION:  Your Honor, I have no questions for this witness.

THE COURT:  All right.  You can step down.

(Witness excused.)

THE COURT:  Can the lawyers approach.

(Bench conference outside the hearing of the jury.)

THE COURT:  So are you ready to close your case in chief?

MR. MARTIN:  Can I confer with my -- with co-counsel?

THE COURT:  Sure.

MR. MARTIN:  I believe so.  I just want to double-check.

THE COURT: So, if you are, I would propose we let them go to lunch and then let you all go to lunch, and then we come back at 1:00 or so to talk about -- I anticipate you have a motion?

MR. CASHION: Yes.

THE COURT: Okay.

MR. CASHION: I'll have a motion.

THE COURT: I thought you might have a motion.

Okay. So I'll let you formally close in front of the jury.

MR. MARTIN: Okay. And at some point we would like to address Count Two, if we may. Count Two.

THE COURT: I assume that will be part of his motion to dismiss.

MR. MARTIN: Okay.

THE COURT: But if you -- I mean, you have an announcement on Count Two?

MR. MARTIN: No, sir. I would like to argue it some more.

MR. CASHION: You'll have an opportunity.

MR. MARTIN: Thank you.

(In open court.)

THE COURT: All right. Call your next witness.

MR. MARTIN: I believe we have no other witnesses. We would like to confer before we rest.

THE COURT: Okay. Do you want to approach the bench, you mean? I'm not sure I understand what you mean by "confer." With someone else or with the Court?

MR. MARTIN: With co-counsel.

THE COURT: Okay. Oh, sure. Go ahead.

MR. MARTIN: I thought -- I thought we were going to do that after lunch. Are you --

THE COURT: Why don't you all approach.

(Bench conference outside the hearing of the jury.)

THE COURT: Well, I guess here is another way. We've heard from Mr. Keck, correct?

MR. MARTIN: Yes, sir.

THE COURT: And we've heard from Mattingly. We've heard from Sulkin. We've heard from Canale. You've called Ray.

Do you want to call Whiteside?

MR. MARTIN: We do not. We've called all our witnesses.

THE COURT: So I think you're ready to rest?

MR. MARTIN: Okay. We would like to make a motion before we rest.

THE COURT: Make a motion?

MR. MARTIN: For judgment as a matter of law.

THE COURT: All right. You can do that at the --

we can do that once you rest. We'll take up your motion and the defense motion.

MR. MARTIN: Yes, sir.

THE COURT: Okay.

MR. MARTIN: Thank you.

(In open court.)

MR. MARTIN: Your Honor, at this time, the plaintiff will rest.

THE COURT: All right. So, ladies and gentlemen of the jury, you've heard now the plaintiff's evidence in its case in chief. This is a good opportunity for us to stop and take lunch, and I'm going to give you a few more minutes today to do that while the Court takes care of some other business. So why don't you all plan to be ready, say, around 1:30 or so.

Remember, no discussion, even though you've heard all the plaintiff's case, it would be inappropriate for you to have any discussion about the case. First of all, you don't know the law that you're going to apply, and you would need that.

So, again, don't discuss the case, don't investigate the case, don't talk to anyone about the case. And if anyone tries to talk to you about the case, do let me know as soon as possible.

So have a safe lunch. Thanks.

(Jury not present.)

THE COURT: All right. Why don't you all come back, say, about 1:00 or so. Say 1:00.

Is that enough time for you all to get lunch?

MR. CASHION: Hope so.

THE COURT: Say again.

MR. CASHION: Yes, we'll try to.

THE COURT: Okay. And then I'll hear any motions.

MR. CASHION: Yeah.

(Whereupon, a lunch break was observed.)

(Jury not present.)

THE COURT: All right. Be seated. Okay. So we're in an out-of-jury hearing. I know the defense has a motion. I'm not real sure I understand the plaintiff's motion.

MR. MARTIN: At this time we're not making a motion, Your Honor.

THE COURT: Okay. Good. That makes -- I think that makes sense.

So that takes us to the defense motion.

MR. FITTS: Yes. Your Honor, I think we have two separate motions. Would you like me to approach the --

THE COURT: Yeah.

MR. FITTS: So first, Your Honor, we have a motion on Count Two of the Plaintiff's Amended Complaint. I don't

know if you want me to walk you through everything that was said in your order dated May 23rd, 2025, at ECF 112. But here we have a motion to dismiss or, in the alternative, a motion for judgment on the pleadings to dismiss Count Two of the Plaintiff's -- as the Court has stated previously, Count Two for violation of the Resource Conservation and Recovery Act.

Under Count Two Plaintiff is burdened with proving its claim as set forth in the pretrial order, but, however, it cannot prevail on any theory of liability that's not also sufficiently pled in the Amended Complaint. And the Amended Complaint says the defendant violated the RCRA by failing to obtain an NPDES permit for the operation of a C&D landfill; whereas, the pretrial order says that Count Two alleges that defendant violated the RCRA by operating a C&D landfill without obtaining a solid waste disposal permit.

In your order you found that NPDES and solid waste disposal permits are not the same thing. You noted that a solid waste disposal permit does not appear in Count Two of the Amended Complaint. You noted that Plaintiff had changed its theory of liability on Count Two from the Amended Complaint and found that the Court is inclined to rule that if Plaintiff -- abandonment -- or ruled that, one, Plaintiff abandoned its initial theory on Count Two, and, two, has raised a brand new theory of liability in the pretrial order

without giving sufficient notice or time to prepare a defense, and asked the Plaintiff to explain why you should not order that way -- I believe you've even stated that you're not satisfied with their explanation. We can't make heads or tails of their explanation, and so we would move on those grounds to dismiss Claim 2.

Would you like for us to present Claim 1 now or wait for the plaintiff's response?

THE COURT: Well, we can -- we can do Count Two now.

In all honesty, I've read it and reread it and I'm beginning to have an understanding of it that I just didn't share with you all. But I guess we need to hear from the plaintiff.

What does the plaintiff say Count Two is about?

MR. HOLT: Your Honor, would it be all right if I replied to this?

THE COURT: Sure. Come on.

MR. HOLT: Would it be all right if I brought my laptop up?

THE COURT: No, it doesn't bother me. I don't understand why you -- people do it, but that's because I don't know how to work a laptop.

MR. HOLT: My legal (indiscernible) said never to do that. So I apologize for my first federal trial.

THE COURT:  No, no.  You can use it.  It's just something I -- I use a yellow --

MR. HOLT:  Gotcha.

THE COURT:  It works as good as a laptop.  Better, I think.

MR. HOLT:  Well, let me get my pad.

Your Honor, we apologize that in our Amended Complaint we didn't mention that to operate a landfill you actually need two permits, and we didn't mention those two permits in the Amended Complaint.  We did not change our theory but we accidentally pleaded one of the -- one of the permits that's required to operate a landfill and not the other one, and then we brought it up in the -- I believe motion for summary judgment.

So, just to clear that issue, it's not that we're flip-flopping on the permits.  It's that we allege that Mr. Ray is operating a landfill, masquerading as a masquerading [sic] site.  And it's really, you know, a question of law, a question of fact of what a landfill is.

Under RCRA, a landfill is a place that receives solid waste and disposes of it there permanently by applying it on the land.  And so I -- I -- failing to attain a permit while disposing of solid waste material is a violation of RCRA.  It amounts to open dumping, which is the heart of Count Two.

THE COURT: But -- but as I -- and part of my understanding after -- excuse me -- is during the opening statements -- I listened very closely, and I began to rethink what I was thinking.

As I understand it, the defendant says it's a Class 4 construction and demolition landfill. And if -- if the -- if the jury finds that -- I'm sorry -- the defendant says it is not a -- a construction/demolition landfill.

If the jury says no to that, that's -- that's the end of the case, I think.

If the jury says yes, then we go to determine if the RR Farms falls within the exception, to which I am inclined to let the jury -- if it gets to the jury -- answer that question yes or no.

MR. HOLT: Yes, Your Honor, we agree.

THE COURT: You agree with what I just said?

MR. HOLT: The question for the jury -- well, we initially thought the question of whether it's a --

THE COURT: No. No. You agree that that's the analysis that --

MR. HOLT: Let me summarize what I heard to make sure that we're on the same page.

THE COURT: Okay.

MR. HOLT: Just because it's my first time and I don't want to make any mistakes.

We agree that the question for the jury should be whether or not that this is a landfill. In operating a landfill -- whether it's construction/demolition or any type of --

THE COURT: And if they say no --

MR. HOLT: We would ask that the question to the jury is whether it's a landfill, not specifically construction and demolition.

THE COURT: That's a detail. We can figure that out. But if the jury says no --

MR. HOLT: Then that resolves Count Two.

THE COURT: Wow. And if they say yes?

MR. HOLT: Well, it resolves Count Two unless one of my bosses decides to appeal and say that landfill is a matter of law.

But for the jury's purposes -- let me double-check.

That's correct, right?

MR. MARTIN: That's right.

MR. HOLT: That is correct.

THE COURT: And if they say yes, we go to the exception.

MR. HOLT: If they say yes, we go to the exception. And we think the exception didn't apply.

THE COURT: Sure. That's why we have a lawsuit.

MR. HOLT:  Exactly.

THE COURT:  What does the defendant -- does defense agree with this analytical structure?

MR. FITTS:  I don't believe so because I think we're still kind of --

THE COURT:  Well, that's what your co-counsel said in opening.  First thing he said in opening is this is not a construction/demolition landfill.

MR. FITTS:  That's correct.

THE COURT:  This is not.

MR. FITTS:  Correct.

THE COURT:  And if the jury says, "We agree it is not," case over.

MR. FITTS:  Correct.  But --

THE COURT:  Okay.

MR. FITTS:  -- at the same time we would say that we still have the issue that I think we brought up in the motion for -- right before trial we brought up that we still don't believe that there -- we still don't understand what section of the code they've -- we're alleged to have violated.

But, even in addition to that, under the RCRA they have to give us proper notice -- there's a notice requirement via a letter --

THE COURT:  The pre-suit.

MR. FITTS:  Yes, the pre-suit notice.

THE COURT:  Yeah.  That's something we've been wondering about because nobody's gone back to make sure this was in the pre-suit required notice.

MR. FITTS:  Correct.

THE COURT:  Have you looked at that?

MR. FITTS:  Yes.  And I believe it states the exact same language as the original complaint in this action. It's actually attached to the original complaint, I believe. And it states -- it's the exact same language --

THE COURT:  So what's your position?  Have they gone beyond --

MR. FITTS:  Correct.

THE COURT:  Or are they within the --

MR. FITTS:  Correct.  And not only that, but also they did not provide that in trial.

So I don't know.  It's not an exhibit here for us today.  But at the same time, yes, they did not provide, according to the -- according to the law, "notice regarding alleged violation of a permit standard, regulation, condition, requirement, or order which has become effective under this Act" --

THE COURT:  Yeah.  I know -- I understand what it says.

But what does their notice say?  Are you saying

that -- let's look at it.

MR. HOLT:  I'm looking at page 11, Your Honor, of "Notice of Intent to Sue."

THE COURT:  Is that it?

MR. HOLT:  Which is Exhibit 1 to our Amended Complaint.

THE COURT:  Right.  Yeah.  It's in there.

So I think we're all looking on page 11.

Is that what we're looking at?

MR. HOLT:  I'm looking at page 11 of the Notice of Intent, yes, Your Honor.

THE COURT:  Okay.  So looks like the notice does include both the open dump language, as well as the solid waste disposal.

So that is properly part of the pre-notice -- the pre-litigation notice.  Starting at the bottom of page 11.

MR. FITTS:  Could you point me to the solid waste?

THE COURT:  At the bottom of Document 1.1, page 11 of 14, start at that paragraph and continue to the next page.

MR. FITTS:  The paragraph that starts "RCRA"?

THE COURT:  Sure.  And then the next page (as read):

        Open Dump.  RCRA defines the term
        "construction/demolition landfill" as a solid
        waste disposal facility.

And gives the definitions of "solid waste disposal."

All right. Well, that answers that.

MR. FITTS: Sorry, Your Honor, I missed that.

THE COURT: No. I think they did include it in their pre-suit notice.

MR. FITTS: Okay. I guess -- my response would be that this paragraph that we're looking at is about an open dump, and at the very end it says (as read):

These regulations prohibit a facility from discharging pollutants into the waters of the United States that is in violation of the requirements from the NPDES system.

The -- above, where they mention failure to obtain an NPDES permit for operation of construction and demolition landfill, we still don't see the solid waste permit -- if -- assuming that -- I guess the purpose of the Notice of Intent is to provide a possible defendant an opportunity --

THE COURT: Page 12 of 14. It talks about the solid waste disposal. Of Document 1-1, page 12 of 14, the third paragraph.

MR. FITTS: That's -- it defines a C&D landfill.

THE COURT: As a solid waste disposal facility subject to the requirements of subpart A.

MR. FITTS: Correct.

THE COURT: You don't think that's enough?

MR. FITTS: No. And here's the reason why. So the purpose of this pre-suit notice is to give a possible defendant a chance to obtain -- to fix -- to remedy the issues that the potential plaintiff has. And that if they could remedy their issues within the 60-day period, where -- I know they were sending off letters to the EPA and TDEC to see if they want to enforce -- that if they could remedy it before a suit is brought, then they're not subject to liability. The whole point of this is to give a site a notice so that they can cure any deficiencies beforehand.

The notice says that we are in violation of -- because we did not obtain an NPDES permit for the operation of a construction and demolition landfill. As we've talked about, that doesn't exist.

So I don't know how when we received this letter we were supposed to know that, oh, what we should do is go get a solid waste disposal permit from the Tennessee Environment -- Department of Environment and Conservation.

I don't see how that's -- I understand that it mentions solid waste in the definition of a C&D landfill, but you cannot get a permit from -- the entity that defines a C&D landfill is the federal government. You get a permit for a landfill from the state government. So a federal definition of a C&D landfill is completely different from what the state

definition is.

And we could have -- I don't see how alleging that us operating an open dump due to our -- an alleged C&D landfill is notice that you should get a permit under Tennessee state law for a solid waste facility.

I don't understand how that -- I feel like it needs to be more explicit, and the standard is much higher that they should -- that a proper notice would say, "You failed to get a permit for a solid waste disposal facility under Tennessee law, which is then a violation because that's enacted under the RCRA; that's a violation of federal law."

That's not given.

THE COURT: Okay. Well, let's move back to Count Two.

MR. HOLT: Can I respond to that?

THE COURT: You don't need to.

MR. HOLT: Okay. Great.

Well, that being said, Your Honor, we believe that the jury's been provided sufficient information from which they can conclude that Mr. Ray is operating a landfill. You know, we think that the pictures of -- and the testimony of him receiving waste for various purposes -- his dream house, his horse house, his grass farm -- is enough for the jury to decide that that's a pretextual answer for why he's receiving such an enormous quantity of waste on his property.

And knowing that, you know, we think his property is functionally indistinguishable from a landfill, and it's up to the jury to decide whether or not that's something that they -- they can change the nature of by Mr. Ray's intent.

But, as counsel had said earlier, Clean Water Act and RCRA are strict liability standards. So we don't think his intent should matter all that much to the jury. We think it is just the nature of this property is collecting waste, polluting Sulphur Creek and the Cumberland River. It meets all the classical definitions of a landfill.

And we don't think the permit applies because we think "fill material" has a specific legal meaning under the Clean Water Act and RCRA, which is limited to filling in bodies of water.

THE COURT: So I'm going to give them -- we can find no definition of that, as well.

So then, according to normal rules of statutory construction, they should use the plain and ordinary meaning of those words. That's what I intend to charge them.

MR. HOLT: I apologize if I don't know this, Your Honor. I'm not as entirely familiar with the case as I wish I was. But we do have a CFR definition of "fill material" that was promulgated under the Clean Water Act.

THE COURT: Right. But the exception they're relying upon is a State. I'll look at it -- and I think we

did -- but if you read the definition of it, it -- it doesn't fit this case.

Read that definition in the CFR.

MR. HOLT:  Do you mind?

THE COURT:  Out loud.

MR. HOLT:  Okay.  Great.  Thank you.

(As read):

The term "fill material" means material placed in waters of the United States where the material has the effect of --

THE COURT:  Stop right there.

MR. HOLT:  Gotcha.

THE COURT:  Doesn't apply here.

MR. HOLT:  But would this not be probative to the jury for understanding that when --

THE COURT:  If the State of Tennessee wanted to adopt that, it knows how to do so.  And this -- and it didn't.  So I think we have to lean on it.

So what I was going to charge the jury is, Question:  Did Tennessee Riverkeeper prove by preponderance of the evidence that RR Farms is a Class 4 construction and demolition landfill?  Yes or no?

And what's your objection to that?

MR. HOLT:  I would say that in our Amended Complaint we alleged specifically that -- we say that it's a

construction/demolition landfill, but we do say that the violation that Mr. Ray's committed is that he's operating a landfill that constitutes as an open dump.

And so there are a lot of ways to get to open dumping. Construction and demolition has one set of standards.

THE COURT: What does the defendant say to that question: Did Tennessee Riverkeeper prove by a preponderance of the evidence that RR Farms is a Class 4 construction/demolition landfill? Yes or no?

MR. FITTS: That's our understanding, correct, that that would be --

THE COURT: And then the second question is did -- well, then I give them the instruction: If you answered yes to Question 9, then proceed to Question 10. If you answered no to Question 9, then do not answer Question 10.

Question 10: Did Ricky Ray prove by preponderance of the evidence that he was not required to obtain a landfill permit because RR Farms engages in the use of solely natural rock, dirt, stumps, pavement, concrete, and rebar and/or brick rubble as fill material? Yes or no.

What does the defendant say to that?

MR. FITTS: We would agree with that.

THE COURT: So what does the plaintiff say to that?

MR. HOLT:  I don't think we have an objection to that, Your Honor.

THE COURT:  Okay.  All right.

So then the remaining question, is there proof before the Court on the defendant's motion to dismiss from which the jury can make a decision?

And I think there is.  That's a jury question. Let the jury determine it.

MR. HOLT:  I would agree, Your Honor.

THE COURT:  Now, I don't know that -- and we can talk about this later.  Remember, the parameters of your closing arguments is limited to the -- to the proof before the jury.  So, if -- you know, if -- if this were a car accident case and the allegation was that a Mercedes hit my car, you can't argue to the jury it was an 18-wheeler because there's no proof that an 18-wheeler hit the car.  So your argument has to be within the confines.

MR. HOLT:  Yes, Your Honor.

THE COURT:  Okay.  All right.

So should we move to Count One?

MR. FITTS:  Yes.

THE COURT:  All right.  Count One and Two -- I mean, Count One.

So we've got four alleged violations, right?

MR. FITTS:  Correct.

THE COURT: Okay.

MR. FITTS: Specifically, with regard to the four violations of the permit, we would like to move for a -- move for a judgment as a matter of law under Rule 50(a)(1).

Under -- with regard to the specific violations, Number 4, that begins with failure to comply with duty to perform twice-weekly inspections.

We would ask the Court to resolve that issue and deny that and grant -- grant our motion for a judgment as a matter of law on that claim because there has been no evidence provided that we have failed to comply with our duty to perform twice-weekly inspections. Plaintiff entered into evidence the declaration of Ricky Ray, which shows that -- which states that he did comply with his duty to perform twice-weekly inspections, and revise properly.

And according to his testimony as well -- I believe Mr. Martin asked him if he completed all these bi-weekly inspections. He said he did. And he asked him if he had copies of those, and he said he did.

I don't think I've heard any other testimony regarding Mr. Ray --

THE COURT: Yeah. You've got Exhibit 52-7, which supports -- where it says twice weekly inspections have been done. That's in Exhibit 52-7.

MR. FITTS: Have been done.

THE COURT:  Have been done.

MR. FITTS:  Correct.

THE COURT:  And Mr. Ray did testify that.

So let's hear from the plaintiff.  What evidence is it from which the jury could find in Plaintiff's favor on 5.5.3.9?

MR. HOLT:  Your Honor --

THE COURT:  You can come to the podium.

MR. HOLT:  Okay.  Your Honor, we argue that the evidence we've seen so far demonstrates that the erosion, sediment, and prevention controls just aren't working.  The muddy water --

THE COURT:  That's not what 5- -- I'm not cutting you off, but let's stick to the issue you all brought, and that's 5.5.3.9.  So let's look at that.  Because that's where I need to conclude that there is evidence that this jury can find.

Do you have the permit there?

MR. HOLT:  Let me get the permit.  Sorry, Your Honor.  If you could direct us to the --

THE COURT:  Oh, look on page 37 of Exhibit 57.- -- 57-5.  52-5.  Yes.

MR. HOLT:  Your Honor, at the beginning of that page it says that "At a minimum, site assessment should be performed to verify the installation, functionality and

performance of the EPSC measures" --

THE COURT: But that's 5.5.3.8. You all are proceeding under 5.5.3.9.

MR. HOLT: 5.5.3.?

THE COURT: 9, "Inspections."

MR. HOLT: 9, "Inspections." (As read):

Inspections must verify and document the functionality and performance of the EPS measures described in SWPPP.

And our argument would be that all the evidence we've seen of muddy water is evidence that these EPSC's aren't functioning.

THE COURT: But the only evidence before me is that they have in fact done twice-weekly inspections. It's in his testimony and it's in Exhibit 52-7.

MR. HOLT: We know that there is evidence that he is performing these --

THE COURT: Twice weekly.

MR. HOLT: -- performing these weekly inspections, twice weekly, or at least saying he is. But we're arguing the evidence creates an issue for the jury of whether or not these inspections are actually happening.

THE COURT: But that's not what -- I don't know the jury gets to -- has the -- you know, can they evaluate? The jury's going to be told that you're alleging a violation

of 5.5.3.9; this is what it says. And I need -- I don't see that there's evidence here from which the jury could conclude that RR Farms did not comply.

MR. HOLT: We would argue that at least --

THE COURT: Whether it's effective or not is -- you know, maybe you need to go to the legislature on that or go to TDEC. All TDEC says, "by performing twice weekly inspections." (As read):

Inspections must verify and document the functionality and performance of the EPSC measures described in the SWPPP, and initial inspections shall also indicate if all have been installed and designed and shall also indicate -- the rest of it what's stated there.

But if we admit the only evidence before the jury is that twice-weekly inspections were -- were performed -- and that's in Mr. Ray's testimony and in Exhibit 52-7 -- how can a jury come up -- how can a jury say defendant violated without evidence?

MR. HOLT: We would argue that the fact that these inspections are not up to the standards established here because they do not verify the functionality --

THE COURT: Then you need to go to TDEC and tell them their inspection protocol is messed up.

MR. HOLT: Yes, also that, Your Honor, but we

would argue that that's a violation of the permit.

THE COURT: Where do you find that in these language?

MR. HOLT: "Inspections must verify and document the functionality and performance of the EPS measures."

If they are performing these inspections twice weekly, then it raises a contradiction of why so much mud is discharging off this property.

So we would say that, even though they have said this, the evidence of discharges are so overwhelming that it would rebut that these inspections are verifying and documenting the functionality and performance of these controls. And we think the jury would be prepared to see that, no, the controls just aren't working. And if the controls --

THE COURT: What controls?

MR. HOLT: Exactly, Your Honor. The erosion prevention and sediment controls that are allowing mud to --

THE COURT: I would go with you if there was any language to support anything that you're saying, but it's just not -- I can't just make this up.

MR. HOLT: Your Honor, I apologize. I'm repeating myself. But I guess I'm just confused on how, if this -- inspections must verify and document the functionality of the controls and we have evidence before the jury that the

controls aren't working, we have mud discharging into Sulphur Creek, then that those -- that these inspections are not as thorough as the language in the permit requires.

THE COURT: Well, perhaps you need to look at the way they word the rule. But as I look at your Amended Complaint, as well as the pretrial order -- and in quite frankly your briefing -- the issue here has always been did they perform twice weekly. And I don't see that inspections must verify and document the functionality -- yeah.

They -- you asked Mr. Ray, "Did you document it?"

And he said yes.

Then he asked, "Do you have that documentation?"

He said yes.

I thought the next question was going to be produce it. And that would be a discovery issue, not a trial issue.

So, again, the only evidence here is that he did do twice weekly; he did document it, and he's in compliance with that.

MR. HOLT: We would argue that the evidence also includes that he did document it and he did do these inspections, but the inspections did not indicate that all ESPC's have been installed as designed in the submitted SWPPP.

And we know it's an inference, and we know that

it's -- it's almost a double inference, but we're saying that these reports are in themselves -- these inspections and the reports are in themselves deficient. Because, if he's performing twice-weekly assessments, we wouldn't be having these issues. If these inspections were correct, then the evidence before the jury just wouldn't exist.

THE COURT: But I guess -- you agree that the only evidence before this jury is that twice-weekly inspections were performed. He testified to that effect, we have a document, 52-7, to that effect. And he said, "Yes, I have documentation."

MR. HOLT: I also believe that there was some evidence -- I believe there's other evidence. And I believe that Mr. Ray's testimony was that he did not sign some of these inspection reports.

THE COURT: And 52-7 says that. 52-7 says that. But it also says the inspections were done.

MR. HOLT: Well, so I guess just for one -- if you would permit me, the language says, "Operator shall ensure proper installation, maintenance, and overall effectiveness of erosion prevention and sediment controls by performing twice-weekly site inspections."

THE COURT: Right.

MR. HOLT: And we would say that they have not ensured the installation, maintenance or effectiveness of

this, and that their twice-weekly site inspections have been completely insufficient in complying with the language of this permit.

THE COURT:  And --

MR. MARTIN:  May I confer with co-counsel?

THE COURT:  Oh, sure.  Sure.

MR. HOLT:  Your Honor, we would also submit that Mr. Ray's testimony, that it was that he did not sign that -- these inspection reports.  And we think, you know, it's a procedural violation, but it's a violation of the permit nonetheless.

THE COURT:  So, even if all that's true, where is the evidence of an ongoing violation?

MR. HOLT:  I believe that Mr. Sulkin's photos show that these --

THE COURT:  5.5.3.9.  Where is the evidence that, after the lawsuit was brought in August -- August of 2023, that he is not performing twice weekly?  I don't see that there is any evidence.  Tell me if there is.  Because, without that, I think I have to grant it.  I have to dismiss it.

MR. HOLT:  Your Honor, I, myself, am convinced that "The operator shall ensure proper installation, maintenance or overall effectiveness of erosion prevention and sediment controls" is the standard that he violated, and

Mr. Sulkin's evidence -- photos --

THE COURT:  With all due respect -- and we'll get to that -- all Mr. Sulkin said is "We have pictures of water that's muddy."

MR. HOLT:  Yes, Your Honor.  And that's evidence of erosion prevention and sediment controls that aren't functioning.

THE COURT:  But I don't have any evidence -- I have you saying that.  I don't have anybody from the witness stand saying that.

MR. HOLT:  Well, the permit says this language.

THE COURT:  Right.  But I can't look at the picture and come to that conclusion, that the picture shows erosion, damage, et cetera.

MR. HOLT:  I believe --

THE COURT:  The jury needs testimony.

MR. HOLT:  I believe any amount of muddy water coming from the property -- and we saw a lot of evidence of muddy water -- is a failure of an erosion prevention and sediment controls.

THE COURT:  It could be.  But it's no evidence one way or the other.  It's no evidence that it is.  It's no evidence that it's not.  It's just no evidence.

MR. HOLT:  Sorry, Your Honor.  Just --

THE COURT:  So let -- this will get to it.  Tell

me what witness you're relying on.

MR. HOLT: We're relying on Mr. Ray's testimony of reading the permit and saying that he did not sign these inspection reports, and we're relying on Mr. Sulkin's testimony that erosion is not being prevented.

THE COURT: He did not testify about erosion. The word "erosion" never came out of his mouth.

MR. HOLT: Perhaps I'm being too quick to jump from muddy water to erosion and sediment. But it's Riverkeeper's contention that the amount of muddy water is directly the cause of erosion not being prevented and sediment flowing.

THE COURT: And I understand your argument. But having an argument and having proof to support it are two different things, and there's just no proof here. And that's not a fair inference that all muddy water contains erosion, et cetera, as you're saying.

MR. HOLT: Not --

THE COURT: You can't make that inference.

MR. HOLT: Not all muddy water, Your Honor, but in the case of --

THE COURT: Okay.

MR. HOLT: -- in the case of our case, where we are suing on behalf of failure to perform, these -- these are interlocked claims. And so the insufficiency of the controls

goes to show the insufficiency of the inspections.

THE COURT: All right. Well, let's go on to another one. I just -- I don't think we're going to meet --

MR. HOLT: Thank you, Your Honor.

THE COURT: Let's start from the top.

Violation Number 1, what I'm calling Violation Number 1, 5.5.3.8.

MR. FITTS: Well, Your Honor, I don't want to throw you a curve ball here, but I'm going to go a little bit more generally than that. I have --

THE COURT: So you're not moving to dismiss --

MR. FITTS: We are. We're moving to dismiss Claim 1. So bear with me here. I believe there is a -- there is a -- the waters have been muddied here that -- regarding a Clean Water Act violation.

According to the pretrial order, Count One alleges that the defendant violated the Clean Water Act by operating the site in a manner that discharges pollutants to the waters of the United States and waters of the state in violation of the permit. That's what -- that's all that's stated under Claim 1 under the pretrial order.

In fact, this Court has also said in *Tennessee Riverkeeper v. City of Lawrenceburg*, Number 1:20-cv-00052, 2023, U.S. District, Lexus 123416 at 22, quote (as read):

To establish a violation of the Clean Water Act

for unauthorized discharge of pollutants, a plaintiff must establish that a pollutant was added to navigable waters from a point source.

And I bring that -- also, actually, before I say that, also, according to the United -- the Sixth Circuit, *United States v. Cundiff*, 555 F.3d, 200, page 213, Sixth Circuit, 2009, the elements -- these are the -- the following elements: That a plaintiff, quote (as read):

Must prove to establish liability under the Clean Water Act are as follows: A -- (1), a person; (2), discharged a pollutant; (3), from a point source; (4), into waters of the United States; (5), without a permit.

I bring this before you to say, it appears that there is some confusion as to violations of a permit versus violations of the Clean Water Act.

A violation of the Clean Water Act requires these elements. If you plead for violation of the Clean Water Act, you have to follow these elements. A violation of a permit can be brought underneath the Clean Water Act's citizen suits. But that in itself is not a quote/unquote violation of the Clean Water Act for these purposes, approving that a plaintiff -- or that a pollutant was added to navigable waters from a point source.

The point of that is you can bring a lawsuit on

behalf of citizens to enforce a permit condition, but that is different than an action against a defendant for violating the Clean Water Act for unauthorized discharge. Those are two different things that can be combined together or they can be separate.

Either way, I -- based on all of my review of Sixth Circuit case law, I've not found any cases where a court has said you're not allowed to -- you're not allowed to -- or that these are two separate entities. But I think a court out of Texas does a really good job explaining it. Hold on a second.

And this is the *Ragsdale* case that was cited in our jury instructions, 737 F.Supp.3d 449. I believe this is page 462. (As read):

> *Ragsdale* argues that he need not show that JLM discharged stormwater into waters of the United States to prove that a violation -- to prove a violation of the Clean Water Act because he must show only that JLM violated the terms of its stormwater permit. *Ragsdale* is correct that, quote, private citizens may commence civil actions against any person, quote, alleged to be in violation of the conditions of either a federal or state NPDES permit, end quote. But to prevail under the Clean Water Act a plaintiff must show

that the alleged violations involved discharges of pollutants into waters of the United States.

I have found other cases similar to this in the Sixth Circuit where people have come and enforced Clean Water Act -- or enforced permit conditions under the Clean Water Act citizen suit provision, but that doesn't -- those two are two separate things. You can -- just because a permit is violated doesn't mean that that is a Clean Water Act violation.

I think the Sixth Circuit and this Court have made it very clear that, if you're going to go after a Clean Water Act violation, you must have -- you must prove that a pollutant was added to navigable waters from a point source.

All that to say -- I guess to -- where we take issue -- or having established that, the five factors, where we take issue is the second factor of a person discharged a pollutant. We take issue with any evidentiary proof that is sufficient to lead a jury on the word "pollutant."

Under Rule 702, expert proof is allowable if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue. We believe that a failure to provide any expert proof regarding a pollutant, and that actual discharge, what exactly constitutes a pollutant is -- completely fails -- the jury would not be able to -- to reach

a proper verdict without it.

And our basis for that claim is actually from another Riverkeeper case in this Court.  Judge Trauger ruled in *Riverkeeper v. Tweeden*, Number 3:24-cv-00886, 2025, U.S. District, Lexus 40463 at 22.

She ruled, quote (as read):

Absent a claim that Riverkeeper's scientist is able to perceive with the naked eye the presence of the pollutants at issue, the Court cannot credit the statement that Riverkeeper scientists observed pollutant discharge as anything other than speculative.

In that case there was a different type of pollutant that was at issue.  It was a -- PFOAs, if I'm not mistaken, which is different than just, you know, dirty water.

In that case, Riverkeeper had brought a scientist in -- I believe an expert report, but at least had provided at this stage a report from a scientist that showed that there were PFOAs in water discharged from the defendant's property prior to the suit.

Then also the report stated that after the suit that scientist had gone back to the site, observed the water with his eyes, and noted that the discoloration of the water was the same as it was originally when he had visited the

site, and, therefore, summarized that those pollutants were still in the discharge.

Judge Trauger still found that to be insufficient, that -- that sight alone does not -- does not equal -- or does not prove that a pollutant was discharged. That she basically noted that they needed testing afterwards to satisfy the exact same standard that we're under here. They were under the exact same standard that -- that the permit stated that (as read):

Discharge must not contain total suspended solids, turbidity, or color in such amounts or character that will result in any objectionable appearance compared to the turbidity or color of the receiving water.

The exact same standard. Even though we're dealing with PFOAs, which are going to be a different thing -- we're dealing with dirt here. It's the exact same standard.

She ruled that proving a pollutant, it is not enough with the naked eye to prove that that pollutant or even color in such an amount -- I believe that was an important part of it -- in such amounts, because there's no given amounts of turbidity that we're dealing with here, or amounts of color, that that standard was not met by even a scientist who had previously tested the site and noted that

the color of the water was the same as before, that that was not enough to meet the standard of proving discharge of a pollutant into waters of the United States.

In addition, we would also argue that the failure to provide any expert proof or testing -- any expert proof or testing, either/or -- or I guess an expert to explain testing, an expert that does have testing, that there's a failure -- that -- that scientific, technical, or specialized knowledge is required here to show a causational effect and that -- that Mr. Ray failed to meet the standards, the scientific, technical, and specialized standards, set forth by his permit. And there yet has been no expert proof presented to opine on those standards.

Under these theories, we move to dismiss Count One as a whole.

THE COURT: All right.

MR. FITTS: Unless -- unless the plaintiffs wanted to proceed under a violation of Clean -- or a violation of permit action, which would only lead to injunctive relief because -- you have to prove a violation of the Clean Water Act itself in order to receive Clean Water Act violation damages. That's the whole purpose of the citizen suit.

There's some literature on that where it's -- it's there as a secondary action, so that if a neighbor is getting flooded by a bunch of things, they can go into court and

immediately try to get an injunction against that defendant for violating the permit.  That's under the Clean Water Act citizen suit.  It is not a violation of the Clean Water Act itself.

And I'll state again, the Sixth Circuit states you must prove these five elements to establish liability under the Clean Water Act.

Defendant's [sic] pretrial order says that they're going after us for a violation of the Clean Water Act for discharging pollutants.

THE COURT:  All right.  Let's hear from the plaintiff.

MR. MARTIN:  The Clean Water Act makes it illegal and prohibited to discharge pollutants to waters of the United States without the authorization of a permit.  Any violation of the permit is a violation of the Clean Water Act if it results in a discharge of pollutants to waters of the United States.

THE COURT:  So are you agreeing that you -- that -- I was with you until the last thing you just said, if it involves pollutants.

So you agree that that's a requirement for them -- for you to succeed on 5.5.3.8?

MR. MARTIN:  Which one was .8?

THE COURT:  That's your first violation.  The site

assessment.  The site assessment.

MR. MARTIN:  Yes.

THE COURT:  So Plaintiff -- I'm sorry -- Defendant's also right, that's going to apply to all four of your violations?

MR. MARTIN:  I'm sorry?

THE COURT:  That's going to apply to all four of the alleged violations of the permit, if there's a requirement to have pollutants on 3. -- I'm sorry -- 5.5.3.8, 6.3.2(c), 6.3.1, and as well as 5.5.3.9.  Each one of those requires proof of a pollutant.

MR. MARTIN:  Well, I -- I -- I misspoke, Judge. The water quality sections of our permit -- of our complaint require discharge of a pollutant, because that's what the permit says.

THE COURT:  In order to establish a violation of the permit?

MR. MARTIN:  Of those sections of the permit, the -- the permit that requires they shall not discharge water that creates a violation of state water quality.  Now, of course that requires discharge of a pollutant that violates that standard.  And the -- the other permit section that says they shall not discharge water that creates an objectionable appearance.  Of course, that requires a discharge of a pollutant of muddy water.  And the rest are

violations of the permit.

THE COURT: I think -- I think -- excuse me. I think the defense has a point then. There's no evidence for this jury to conclude that there are pollutants.

MR. MARTIN: No, sir. It's the standard that's set in the permit that we -- that has to be met by the defendant. If he's violating that standard, then he's violating the permit.

THE COURT: And you don't have to prove that there was a pollutant?

MR. MARTIN: Yeah, we have to prove there's a pollutant.

THE COURT: That's my point. There is no proof here.

MR. MARTIN: No. The definition of a pollutant, sir, is the addition of -- the definition of a pollutant is -- let me read it.

THE COURT: Okay. I'm looking for. . . Well, I guess -- well, go ahead.

MR. MARTIN: "The term 'pollutant' means" --

THE COURT: Where -- I just want to write down your citation so I can...

MR. MARTIN: Yes, sir. This is Clean Water Act Section 502, "General Definitions."

THE COURT: Okay.

MR. MARTIN: (As read):

The term pollutant means dredge, spoil, solid waste, incinerator residues, sewage (garbage), sewage (sludge), munitions, chemical waste, biological materials, radioactive materials, heat --

THE COURT: Slower.

MR. MARTIN: (As read):

-- rock, sand, and agriculture waste.

That includes -- you know, muddy water has rock, sand. Mud fits the definition of a pollutant.

THE COURT: So your position is just because the water is muddy the jury can assume there's pollutants?

MR. MARTIN: I'm saying as -- as -- yes, just because it's muddy, there is a pollutant.

And then the question is, is that a violation of the permit? Do they have --

THE COURT: What type of pollutant are they to assume is in the muddy water?

MR. MARTIN: Mud, dirt, silt.

THE COURT: Well, I'll need to look at the definition to see if that's included.

MR. MARTIN: "The term 'pollutant' means" --

THE COURT: I guess even if it is included, there's no proof before the jury what the muddy water is made

up of. Nobody's gotten on the stand to testify, "Yeah, this is muddy water, and muddy water -- and the kind of substance that makes it muddy is blank and blank and blank." There's -- the jury would have to make that inference simply on color. And we know that's -- that's not enough.

MR. MARTIN: Mud is a solid waste.

THE COURT: Depends on what the mud is. I can make mud out of sand. I can make mud out of dirt.

MR. MARTIN: It's still a solid waste.

THE COURT: But we're dealing with whether it's a pollutant.

MR. MARTIN: A pollutant -- the definition -- "A pollutant means dredge, spoil, solid waste" --

THE COURT: Right.

MR. MARTIN: And other things.

THE COURT: But I don't have any proof for this jury to conclude it's any of those things.

MR. MARTIN: It's -- it fits a definition of a solid waste. How can mud and water not be a solid waste?

THE COURT: Because we're focusing on the definition of "pollutant."

MR. MARTIN: That's part of the definition of "pollutant." A pollutant is solid waste, and solid waste is --

THE COURT: No witness has taken the stand, taken

the oath, and said this muddy water in this picture is made up of solid waste.

MR. MARTIN:  I think --

THE COURT:  I don't even plan on charging them what a solid waste is, if we get that far.  But what witness can I -- can you point to that will get you over the hurdle?

MR. MARTIN:  It's a matter of law.  Solid waste -- the definition of solid waste --

THE COURT:  No.  No.  Pollutant.

MR. MARTIN:  Pollutant is a solid waste.

THE COURT:  But what evidence, what witness are they to rely upon?  There's just not a witness.

MR. MARTIN:  There's mud.  The witness is Mr. Sulkin saying the water is muddy.

THE COURT:  Right.

MR. MARTIN:  If it has mud in the water, it has solid waste in the water.  Solid waste is -

THE COURT:  -- didn't say it was mud in the water. Nobody said it was mud in the water.  Just said it looks muddy.  No one said why that water is muddy.

MR. MARTIN:  Well, certainly the jury can use their common sense and say if it looks muddy --

THE COURT:  Based on the evidence --

MR. MARTIN:  -- there's mud in the water.

THE COURT:  Based on evidence, they can make an

inference.

MR. MARTIN: I'm sorry, Judge, I can't agree with that.

THE COURT: Oh, well, that's a normal charge. So I'll go with what I just said.

They cannot make unreasonable inferences. They can't infer, you know, he robbed a bank and he took $1 million when the bank says, no, only 100 was taken. You know, you -- you -- they can make an inference there.

MR. MARTIN: I just think it's inconceivable --

THE COURT: Okay.

MR. MARTIN: -- to say that water that looks muddy doesn't have mud in it.

THE COURT: Well, I'm going to do this. First of all, I'm going to bring the jury -- unless the defense objects, I guess. I want to bring the jury in and excuse them for the day. And then I'm inclined -- this is a critical issue, and I want to make sure that I've heard the parties out, give you all an opportunity to do your research and give me some cases, file that, and then we come back and revisit this.

MR. MARTIN: When would you like our briefs in?

THE COURT: Let's get the jury in first.

So you've heard the Court is going to want some supplemental briefs. We've got a jury. So this is -- can't

be a long period of time.  How much time do you all want before I tell you what time we're going to do it?

MR. MARTIN:  9:00 in the morning.

MR. FITTS:  I mean, we could get it in before then, but I don't know what the Court would --

THE COURT:  9:00 was my number.  We're of one accord.

All right.  Bring them in.

(Jury present.)

THE COURT:  All right.  So, ladies and gentlemen of the jury, I'm going excuse you all for the rest of the day.  I would ask, though, that you plan to be back tomorrow at noon.  Noon tomorrow.  Please be back here at the courthouse.

Same rules apply.  No investigation, no Google searches or what have you.  Don't talk among yourselves. Don't talk to anyone else.  If there is anything about this case in the media, don't listen to it.  Don't read it.  And if anyone tries to contact you to talk about the case, tell them no, and let me know who tried to contact you.

So have a safe evening, drive safe, and see you tomorrow.

(Jury not present.)

THE COURT:  All right.  Any questions from the plaintiff?  You understand what I want?

MR. MARTIN:  Can you rephrase what you want?

THE COURT:  Well, it's basically the argument that the defense have put forth.  Must there be proof of a pollutant for the plaintiff to succeed on Count One or Two?

All right.  Any questions from the defense?

MR. FITTS:  We're here at 9:00 as well?

THE COURT:  No.  I want you to file your briefs.  Then you need to give me a chance to read them.  I'll read them as soon as they come in.  Why don't you all plan to be here at 10:00.  And, obviously, if you want to file it earlier, that's just fine.

All right.  Thank you.

(Court adjourned.)

REPORTER'S CERTIFICATE

I, Lise S. Matthews, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on May 28, 2025, in the matter of TENNESSEE RIVERKEEPER, INC. v. RICKY RAY dba RR Farms a/k/a RR Farms Mass Grading, Case No. 3:23-cv-00878; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (pages 1 through 149) is a true and accurate record of said proceedings.

This the 27th day of August, 2025.

/s/ Lise S. Matthews
LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter