IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TENNESSEE RIVERKEEPER, )
INC., )
          Plaintiff, )
                     ) Case No.
                     ) 3:23-cv-00878
    v. )
                     ) District Judge Crenshaw
RICKY RAY dba RR Farms )
a/k/a RR Farms Mass )
Grading, )
          Defendant. )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

WAVERLY D. CRENSHAW, JR., DISTRICT JUDGE

JURY TRIAL DAY 3

May 29, 2025

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:

        For the Plaintiff:  Mr. Mark E. Martin
                           Mark E. Martin, LLC
                           1706 Reid Road
                           Oneonta, Alabama 35121

                           Mr. Andrew Holt
                           Neal & Harwell, PLC
                           1201 Demonbreun Street
                           Suite 1000
                           Nashville, Tennessee 37203

        For the Defendant:  Mr. Gregory Lee Cashion
                           Mr. William Fitts
                           Smith, Cashion & Orr
                           One American Center
                           3100 West End Avenue, Suite 800
                           Nashville, Tennessee 37203

PREPARED BY:
                LISE S. MATTHEWS, RMR, CRR, CRC
                  Official Court Reporter
               719 Church Street, Suite 2300
                    Nashville, TN 37203
             lise_matthews@tnmd.uscourts.gov

I N D E X

Thursday, May 29, 2025

INDEX OF PROCEEDINGS

                                                         PAGE

PLAINTIFF'S CLOSING STATEMENT                              89

DEFENDANT'S CLOSING STATEMENT                              96

PLAINTIFF'S REBUTTAL CLOSING STATEMENT                    103

INDEX OF WITNESSES

WITNESSES:                                               PAGE

RICKY RAY
    DIRECT EXAMINATION BY MR. FITTS                        21
    CROSS-EXAMINATION BY MR. MARTIN                        49

I N D E X

Thursday, May 29, 2025


EXHIBITS


| DEFENDANT'S EXHIBIT | | MARKED FOR I.D. | RECEIVED IN EVD. | WITH-DRAWN |
|---|---|---|---|---|
| 1 | Demonstrative Approximate property location indicated on USGS Survey | 22 | 22 | |
| 34 | May 21, 2025 photograph of property | 40 | 40 | |
| 36 | May 21, 2025 photograph of property | 41 | 41 | |
| 37 | May 21, 2025 photograph of property | 44 | 44 | |
| 38 | May 21, 2025 photograph of property | 46 | 46 | |

The above-styled cause came on to be heard on May 29, 2025, before the Honorable Waverly D. Crenshaw, Jr., District Judge, when the following proceedings were had, to-wit:

(Jury not present.)

THE COURT: All right. Be seated.

All right. Sorry for the delay, but you all filed, as I requested, the briefs on Count One that I've been going over and looking at some of your citations.

And then I got the plaintiff's motion -- which I assume the defense has seen -- Plaintiff's motion to reopen the proof, Document Number 118, motion to reopen Plaintiff's case and to reconsider the exclusion of Barry Sulkin as Plaintiff's expert. I did not expect that, but I took time to read it, digest it, and consider it.

What I haven't heard from is the defendant's response. Obviously, you're not going to get a chance to file it in writing. So I want to give you an opportunity now to share with the Court your position on Document 118, the motion to reopen the plaintiff's case in chief and reconsider the exclusion of Barry Sulkin.

MR. CASHION: To no surprise, this should be dismissed, not granted. To try to say after they've closed their proof they want to a reconsideration, I've never seen this before. They closed their proof.

And I would also say, I don't know -- the reconsideration -- there's a horrible flaw in Barry Sulkin's in the first place.  He never did any testing of the water, which is absolutely critical, as all the briefing here on our side has shown.

So, even if you reconsider, you cannot get over the hump that he didn't do what he was supposed to do.  He didn't get water data.  He didn't test water.  He didn't do chemical tests.  He didn't do anything.

And so it doesn't matter if he wants to rewrite his -- his expert report and all that.  It's too late.  It's just simply too late.

You know, the Court got it right the first time, and there's nothing to reconsider here.

THE COURT:  So, as I mentioned, I did a little bit more research once we got the motion so it can be properly considered, and one of the things we found is -- as I consider their motion, one of the most important considerations is whether the opposing party, the defendant, would be prejudiced if the Court permitted the plaintiff to reopen its -- do you want to speak to that?

MR. CASHION:  Yes, Your Honor.  I think we would be horribly prejudiced, to go this far in the trial and then have to go back and start the trial over.  I don't know how else to do it.  I don't know how -- how you would even

comprehend granting that motion. I guess -- I don't know if we -- the jury -- I don't know how we can get prepared to do another expert with a jury trial, and we would need more time if you were really going to do that.

And then do you dismiss the jury. Do we all come back? Is this grounds for you to -- to continue the case and redo the case again? I think it's almost unfathomable that someone could file a motion for reconsideration after they do their whole case, they told you, "We Rest." And that "we rest" has to stand. They can't pull something like this to try to restart. Because I don't see how you could do anything but restart the whole trial later to give us a chance to, you know, understand what they're saying. We may even want to hire an expert if he actually says something.

But it's too late. It's just too late. And it's too prejudicial, since we've spent the resources to get this far, to have a start-over with a jury -- we can't hold the jury. And it's all a waste of all the -- the judicial work and court work and clients that are paying for our work to do, and it would -- the prejudice would be unbelievable.

THE COURT: Okay.

MR. CASHION: Okay.

THE COURT: All right.

I'm going to let the -- the plaintiff has the last word on your motion to reopen.

MR. HOLT: Good morning, Your Honor.

THE COURT: Good morning.

MR. HOLT: Is my laptop still allowed?

THE COURT: Sure.

MR. HOLT: Okay, great.

Your Honor, we understand that this is an extraordinary request. It is not unprecedented. It -- it is rare, but it happens in certain occasions.

As we mentioned in our memoranda, there are certain factors that allow a district court in its discretion to say that this is something that can be available to a plaintiff when there is grounds for it. And we think there are grounds for it in this situation.

We think Mr. Sulkin's expert testimony, once removed of all its legal conclusions, are not surprising, are not controversial, and are strictly a description of the facts that are -- I don't want to say all already in evidence, but substantially in evidence, that these permit violations have occurred, is something that we think we have met our burden on, but we are concerned that the jury -- it is not entirely clear on what these permit violations mean or how they operate.

And we understand Mr. Sulkin's original opinion was full of legal opinions. That was our error. Well, we contend that each of these violations are Clean Water Act

violations, and we provided precedent to the Court that stated as much.

We're more than happy to remove those, as you can see in the redline report. We will just stick to exactly what we've already shown, that the permit requires Mr. Ray to do certain things, and Mr. Sulkin has gone on to the site and seen in his experience and his expertise that these things are not being done.

One other thing I would like to point out is we find no case law to support the position that expert testing, water testing, or scientific data is required to sustain a citizen suit under the Clean Water Act. We think the entire provision of the citizen suit is to allow citizens to -- when they see clear and obvious violations to be able to bring the violators into court, and when we have obvious cases like we contend this one is, we don't think scientific testing is necessary for the jury or for the Court.

And one last thing I will add is that one of the reasons we decided to file this motion is that yesterday we realized that the Court was surprised that we were willing to contend that the landfill was the main issue at play for Count Two. And -- and we think that there has been miscommunication between opposing counsel, ourselves, and the Court as to what these claims mean and what our theory of the case is.

And -- and I will admit that that is partly due to misorganization on our part. But we think that the law rules in our favor here that these violations are Clean Water Act violations, and we're willing to concede to removing those to allow this. And we don't think it would prejudice the plaintiff.

And one -- we understand that it is somewhat of a surprise, but they've had access to this report since December, and they never filed for an expert of their own. They could have done that if they were worried about Mr. Sulkin's report -- not -- since December, excuse me, Your Honor. And we would be willing to make equitable concessions on our side if opposing counsel would stipulate to allowing Mr. Sulkin to just read his amended report into the record.

And then they would be able to cross-examine him, but just -- just for Mr. Sulkin to be able to clearly articulate what the permits say, what they mean, and what the water -- and what the water quality standards require.

And -- and, you know, we discussed even conceding that they're using materials, fill material.

And if that is something that the Court would be willing to, in its discretion, entertain or discuss further, we would be more than happy to answer any other questions.

THE COURT: All right.

MR. HOLT: Thank you.

THE COURT: So I think procedurally, I need to go ahead and address the motion, Document Number 118, the motion to reopen Plaintiff's case and to reconsider the exclusion of Barry Sulkin as Plaintiff's expert.

So the Court's looked at the cases cited, and from my reading of them and trying to distill them, this is what the Court believes it's guided to do.

The Court does have considerable latitude and discretion in deciding whether to allow parties to submit new evidence, even after they've closed their case in chief. See *United States v. McCoy*, 1994 Westlaw 652765 at Star, Sixth Circuit, November 18, 1994, citing *United States v. Walker*, 772 F.2d 1172 at 1177, Sixth Circuit, 1985.

In exercising this discretion, the Court must consider, one, the timeliness of the motion; two, the character of the testimony or new evidence, and, three, the effect of granting the motion.

See *United States v. Blankenship*, 775 F.2d 735 at 740, Sixth Circuit, 1985.

The most important consideration is whether the opposing party would be prejudiced if the Court permitted the moving party to reopen its case in chief.

See *United States v. Blankenship*. See also *United States v. Adams*, 665 Fed.App 312 at 321, Sixth Circuit, 2016.

In addition to these considerations, the moving

party, one, should provide a reasonable explanation for failure to present the evidence in its case in chief; two, the evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury.

See *Blankenship v.* 775 F.2d at 741.

The Sixth Circuit has also advised trial courts, district courts, to be extremely reluctant to grant reopening.

See *United States v. Billingsley*, 474 F.2d 63 at 67, Sixth Circuit, 1973.

So, using these factors and that standard in this particular case, I turn first to the timeliness of the motion to reopen. No argument has really been proffered by the plaintiff, but the Court has looked at it independently, and I cannot find that this motion is at all timely. The fact of the matter is I ruled on the motion to exclude Mr. Sulkin back on May the 19th, ten days ago, and this motion is being filed now after you close your proof. You've known for ten days that Mr. Sulkin -- was not going to be allowed to testify as an expert witness. Apparently now you agree with me that his testimony, as presented in his expert witness report, I think Document 58, is just bereft of legal conclusions and totally inappropriate under the law for him to testify.

So I can't find that this motion is all -- timely.

The character of the testimony, I looked at your -- it's -- it's a revision, maybe, of his prior report, but it's totally new opinions. He's deleted his opinion about something being a violation of the Clean Water Act, now to make observations and present his opinion about what occurred on the RR Farms.

So it's not a minor change that he's making; it's a wholly new opinion being presented by Mr. Sulkin.

I think that -- and I looked -- I've looked at it quickly. But, remember, when I excluded it, yes, it was for legal conclusions, but I went on to explain that he did not satisfy other requirements of 702; specifically, 702(b) and 702(c). And that is what principles, what -- what methods, what standards is he applying, and has he applied those standards and principles reliably. And, again, I don't see that that's set forth in it.

So, when I look at the fact of the character of this testimony that you want to present, that does not justify reopening the case and proof.

And then, finally, the effect of granting the motion. Yeah, the plaintiff has presented its case in chief. You called all the witnesses on your witness list. We've got a number of exhibits here. You even called Mr. Ray adversely in this case. And the defense has responded to that.

I still remember the practice of law, both from

the plaintiff's side and the defense side.  And any time parties and lawyers are going to trial, you're coming up with what your theory of the case is.  And your theory of the case here is quite helpful to the Court in deciding the motion, because when I go to the pretrial order that supplants the pleadings, the plaintiff's theory -- I'm reading the plaintiff's theory -- this is what you said in the second paragraph of Document 92, quote (as read):

Count One alleges the Rays violated the CWA by operating the site in a manner that discharges pollutants to the waters of the United States and waters of the state in violation of the permit, period.

That's your description of Count One.

You knew back when you gave me the pretrial order on May the 14th you were going to need to prove pollutants of the water.  You even said it in your theory.

So now to come forth at this hour, not only do you have the prejudice to the defendant in its theory of the case, but I think the defense is right, this is essentially a motion for a new trial because -- to start all over.

The Court has expended resources here, the parties have expended resources here.  But this is not a new issue.  This is not a surprise.  Because the plaintiff recognized it at least when it submitted the pretrial order, if not before

that.

So the effect of granting the motion is going to cause prejudice to the defense. I don't think they're overstating the prejudice here, because that's something that has attached, especially when you get to this point in the trial. There's no reasonable explanation for the late filing of this motion. There's no good cause or anything close to good cause or new information that would support it.

So the motion to reopen the proof -- the plaintiff's case in chief and present new and different evidence from Sulkin, I'm going to deny that motion for the reasons stated.

Now, with that done, that takes us to the pending motion by the defense to -- to dismiss Count One.

So I've read your briefs. I'm going to have more to say on this, but I do want to start moving things along. I'm going to dismiss Count One. There's simply -- and I'll have more to say about this that I'll put in the record, and I'll probably go ahead and issue a memorandum of opinion. So this is a summary. This is a summary of what the Court's reasoning is. And, quite frankly, it's based on the fact that the plaintiffs presented in its case in chief persons who had made observations of water coming from what they thought was the RR Farms and that -- and pictures of that water. I think in one -- maybe it was the video -- it was

actually raining.  In the other photos, it was water presumably after it rained.  But in each and every case, those witnesses described the water as muddy.  And that's all they said.  The water is muddy, but nothing was offered to explain why the water is muddy.

And that's required here I think.  The Clean Water Act requires that you prove pollutants.  Your pretrial order said you were going to prove pollutants.  And the word "pollutant" did not come out of the mouth of any of the plaintiffs.  The word "sediment" didn't -- wasn't used by any witness or any other terms that are used to talk about what pollution is.

And the Court's looked at your case citations, and I don't find any cases that say that all muddy water contains pollutants.  And, logically, that -- that would not be the case anyway.

So I'm going to grant that and dismiss Count One.

You can be seated.

And that takes us to Count Two, which I am -- I believe should go to the jury.

Now, along those lines, we have worked on the jury charge and verdict.  So let's -- let's get that.

While he's getting the charge, let me ask the defense, how many witnesses do you all plan on calling?

MR. FITTS:  Just one, Your Honor.

THE COURT: All right. And that one would be?

MR. FITTS: That one would be Mr. Ricky Ray.

THE COURT: Okay.

All right. How long do you anticipate that direct?

MR. FITTS: We'll try to --

THE COURT: I'm -- I'm trying to plan the day because the jury's here, ready to go.

MR. FITTS: Less than an hour, absolutely, I would think.

THE COURT: All right.

MR. FITTS: And it could be 30 minutes, 15 minutes, but less than an hour, absolutely.

THE COURT: Okay. All right.

So let me give you all a copy of the jury charge on Count Two.

I shared with you the verdict form, and unless you want to change your mind, I think each side found that acceptable.

Now, when you read through the jury charge, please read everything, but the Court will be very hesitant to change anything here without some real good reasons and law, prior to page 28. From page 1 to page 27, those are the normal charges that I'm required to give in every jury trial. Tells them about evidence, what it is, what is evidence, what

is not evidence, the burden of proof. Please read it. May be some things in there you want to tweak, but that's been tested by me and -- for ten years, and I've not changed a word.

Then, when you get to pages -- page 33 to the end, that's the standard, normal closing instructions that I give. Read it. I'll give you a chance to object to it, make changes. But at least -- not quite ten years -- for at least nine and a half years, nobody has persuaded me to change anything from page 33 to the end or up to page 28.

So, if I were you all, I would read carefully pages 28 through 32. That's what you really need to focus on here. And we're going to get started here in a bit. And if you all have some changes, then together you can present those to Mr. Langley or -- and then we'll finally have a charge conference.

You may want to look at pages 26 and 27, which are the parties' theories. But, again, it's not an argument. You don't repeat your argument here. It's just to let them know. So you may want to look at pages 26 through 32.

All right.

MR. HOLT: Your Honor, just as an initial matter, we would like to be heard on the issue of whether the Tennessee state law exemption applies to federal law. If you would like us to do that after the jury -- reading the jury

charges?

THE COURT: You can raise that as part of your -- when we have the charge conference.

MR. HOLT: Yes, sir.

THE COURT: All right. So at this point, it's five minutes after 12:00. The jury's here. Are you all ready -- is the defense ready to proceed?

MR. CASHION: I would like a little time because we have our questions for Mr. Ray for everything, and I think we can shorten the process --

THE COURT: Okay.

MR. CASHION: -- if we're just going to be talking about this, which is the Count Two.

THE COURT: Sure.

MR. CASHION: I think we need to kind of converse and bring it back to you.

THE COURT: All right. So what I guess I should do -- I'll apologize to the jury for the delay. I'll tell them that's my fault, not you all. And I'll send them to lunch and say we'll get started in the defendant's evidence at 1:00.

Does that work for the plaintiff?

MR. MARTIN: Yes.

THE COURT: All right. Does that work for the defense?

MR. CASHION: Yes, sir.

THE COURT: All right. Bring the jury in.

(Jury present.)

THE COURT: All right. Let the record reflect that the jury has returned to the courtroom.

And the Court will start by apologizing to you all for the delay. I'm glad I told you to come later, not at 9:00, and all I can tell you is the delay was due to me and not the parties. So if you want to be upset with anyone, let that be me.

Let me especially apologize to Juror Number 4, Mr. Gregory, who went out of his way to change things that he needed to do to be here, and the Court appreciates you all's collective diligence and his in particular.

So now that the plaintiff, recall, has completed their case in chief, which means the plaintiff has presented to you all of its evidence, it turns to the defendant to present their case.

Don't get your pads out yet. I know you're ready to go. I'm actually going to let you now go and get your lunch and be back at 1:00. I can only wish that the Court could pay for your lunch, but hopefully -- I cannot do that until you start deliberating.

So at this point, go ahead and do your lunch and -- but do be back -- we'll be ready to go with the

defendant's first witness at 1:00.

All right.  Thank you.

(Whereupon, a lunch break was observed.)

(Jury not present.)

THE COURT:  All right.  Be seated.  Are we -- is the plaintiff ready for the jury to come in?

MR. MARTIN:  We are, Your Honor.

THE COURT:  All right.  Defense?

MR. CASHION:  Yes, Your Honor.

THE COURT:  All right.  Bring in the jury.

(Jury present.)

THE COURT:  All right.  I'll give you all a moment to get your notebooks ready and ask the defense to call its first witness.

MR. FITTS:  Your Honor, we would like to call Mr. Ricky Ray as our first witness.

THE COURT:  All right.  I'm going to remind you, you're still under oath.

COURT DEPUTY:  If you'll just have a seat at the witness stand.

RICKY RAY,

called as a witness by Defendant, was previously sworn and testified as follows:

///

THE COURT:  All right.  You can start.

DIRECT EXAMINATION

BY MR. FITTS:

Q.    Mr. Ray, would you state your full name for the record, please?

A.    Ricky Ray.

Q.    Perfect.  And, Mr. Ray, would you please describe your employment background.

A.    Well, I've been in construction for approximately 50 years.  My last employer was Summit Constructors.  I was the superintendent there for 18 years.  I've been doing the grading, site work, for 50 years.

Q.    Could you describe for the jury what grading and site work is, what it entails?

A.    It's taking a raw piece of land and building pads for buildings, roads, parking lots, waterways, just any kind of -- any kind of dirt work.

Q.    Would that involve excavating material?

A.    Excuse me?

Q.    Would that involve excavating material, for example?

A.    Absolutely, yes.

Q.    And would it involve also the placement of material?

A.    Yes, sir.  Yes.

Q.    I would like you to pull up Exhibit 1 -- Plaintiff -- or Defendant's Exhibit 1, which is a demonstrative exhibit that

was agreed between counsel.

Your Honor, will we need to move to admit this if it was. . .

THE COURT:  No objection from the plaintiff?

MR. MARTIN:  No objection.

THE COURT:  All right.  Admitted.

(Whereupon Defendant's Exhibit 1 was marked for identification and received in evidence.)

BY MR. FITTS:

Q.   We're going to wait a second for it to pull up.

Mr. Ray, this is Defendant's Exhibit 1.

Can you describe what this document is?

A.   The orange box is my property.  It shows a topography of the property.

Q.   So would you say this is a map --

A.   It's a map of my property, yes.

Q.   And including the surrounding areas as well?

A.   Yes.

Q.   And is this -- and you said this was a topographical map?

A.   Yes.

Q.   And a topographical map, could you -- what exactly does that show?

A.   If -- the little circle, oblong circle at the very center, pretty much the brightest one that makes an oval

shape, that's showing the top of the ridge.  And the ones -- the squiggly ones that go off to the back and off to the front, that shows that it's on a hill.  It shows that the back of the property is a little steeper than the front of the property was.

And we're filling -- we built the road up on the right-hand side, and we're filling the front.  It will sort of match the back when it's done, except not hardly as steep.

So each -- I think on this one, each one of those lines is about 10 feet, I would think, in elevation difference.  So it's -- that's pretty much it.  It's. . .

Q.   And when did you purchase this parcel of property?

A.   2019.

Q.   And why did you purchase it?

A.   Well, I liked this location and I wanted to build a -- it's got a cell tower on top of it.  And I drove up there, and it had a beautiful view of the hills across the way, all the way around.  So I thought that would be good to build me a place and have a beautiful view with about a 3- or 4-acre flat spot on top, and everything with pretty green grass on a hillside.  So it was a vision I had.

Q.   And I think you testified earlier that -- when Mr. Martin was questioning you about this -- the purpose of this was also a farm.

And so could you describe exactly what that

would -- what the purpose of that farm would be?

A.   You can run cattle or horses, any kind of livestock on it.  It will have green grass all over it.

Q.   And the purpose, I guess, of the grass is for the cows and horses to --

A.   To eat.  Yeah.

Q.   So they would graze -- this is basically a grazing farm for cattle?

A.   Yes.  Yeah.

Q.   And was the property suitable for a grazing farm at the time you purchased it?

A.   No.  No.

Q.   And so the -- was your purpose in regrading this site to bring the site to where it could be used as a grazing farm for cattle and horses?

A.   That's -- that's correct.  Keeping in mind that -- the view on top.  That was my main goal.

Q.   Were there any structures on the property when you built it?

A.   There was one old house.

Q.   An old house?

A.   Yep.

Q.   And is that house still on the property?

A.   No, it is not.

Q.   What happened to it?

A.   We got dumpsters from waste management and demoed it. We took it down with an excavator, put it in the dumpsters, and hauled it to the landfill.

Q.   When you demolished that house, would the -- the remnants of it -- would that be -- would you consider that construction waste?

A.   Yes.

Q.   And you didn't place that on the property --

A.   We did not.  We put it in dumpsters and hauled it to the landfill.

Q.   And before you began construction on this property, did you apply for any permits?

A.   Yes.

Q.   What permit did you apply for?

A.   Grading permit from Metro.

Q.   And did you have to submit building plans for this permit?

A.   Yes.

Q.   And were those --

A.   It's grading plans.

Q.   Grading plans?

A.   Yes.

Q.   And were those grading plans approved by Metro?

A.   Yes.

Q.   I believe when Mr. Martin was questioning you earlier,

you spoke about dump trucks that would enter the property.

So -- actually, I guess I'll back up.

How -- how -- what does the process look like in taking the property that you testified was not suitable for a grazing farm, and how do you take that and build the -- the final product set forth in your plans?  What exactly is the process there?

A.   Well, I mean, you -- you level it where you can get a truck on it, and then you start dumping the loads, and then you -- you flatten it off as you go.

Q.   So you would need multiple dump trucks full of material to come and place the material on the property?

A.   That is correct.

Q.   Did -- when the dump trucks would come in to your property, did you -- did you let every dump truck through to place fill on your property?

A.   No.

Q.   Did you reject any truckloads?

A.   Yes.

Q.   Multiple truckloads?

A.   Quite a few.

Q.   And why would you reject these loads?

A.   If -- if they had anything except what I was allowed to take, which was rock and dirt and asphalt, concrete, brick.

Q.   And who -- these dump trucks obviously didn't

materialize out of nowhere. Somehow they -- did they get -- did companies get in contact with you in order to place fill on the property?

A. Yes. And we only -- we only took material from permitted sites. We didn't let just anybody dump there.

Q. What do you mean by a permitted site?

A. They had to be permitted through Metro.

Q. And did you reject any of these companies that wanted to place material on your property?

A. Sometimes they would -- they would bring something, like house debris or something, and we didn't accept that.

Q. But when they contacted you regarding placing, was there any -- did you reject any of them at that stage before they even came with material? Was it just -- it was just at. . .

A. It was just -- it was just the people that we selected to dump.

Q. Okay.

A. Yep.

Q. Were you -- you were present when Mr. Sulkin testified about his visit to your property on September 21, 2023; is that correct?

A. I was there, yes.

Q. We would like to -- Mr. Ray, I would like for you to look at Plaintiff's Exhibit 29. And I guess -- I'll represent that Plaintiff's Exhibit 29 to 45 were introduced

by Mr. Sulkin as pictures that he took on the property, I believe all on September 21st.

A.   I don't think this is one of them.

Q.   Is that your understanding?

A.   Hmm?

Q.   I believe Exhibits 29 -- Plaintiff's Exhibit 29 through 45 were introduced by Mr. Sulkin as photographs of the site taken on September 21, 2023.

Were you present when -- when he testified to these --

A.   That's not what's on my screen.

Q.   It's -- Exhibit 29 is on your screen.

A.   Which book?

THE COURT:  You can show him.

THE WITNESS:  I'm sorry.  What was the question?

BY MR. FITTS:

Q.   You were present when Mr. Sulkin introduced Exhibits 29 through 45 as photographs he took on your site on September 21st, 2023?

A.   Yeah.

Q.   Could you -- referring to Plaintiff's Exhibit 29, could you tell us what we're looking at here?

A.   That's the retention pond.

Q.   And I don't know if I clarified.

You were on site on September 21 when Mr. Sulkin

was taking these pictures?

A.   Yes.

Q.   And so can you describe -- strike that.

We'll move on to Exhibit 30, if you'll just flip over.

Can you tell us exactly where on the property this picture was taken?

A.   It looks like it's on the western slope.

Q.   And what do you see in this picture?

A.   I see grass, weeds, rock.  Looks like one piece of concrete.

Q.   And this fairly -- fairly accurately depicts what you also noticed on the site on September 21st?

A.   Yes.

Q.   Could you flip to Exhibit 31.

Can you tell us what we're looking at here?

A.   Excuse me?

Q.   Could you tell us what we're looking at here?

A.   This is the old road to the cell tower that run -- it ran right up the middle of the property.  You'll see gravel on the old road.  You'll see the grass and weeds on the right-hand side.

Q.   So this was the original -- is it correct that this is the original access road to the cell tower at the top of the property?

A.    Yes, it was.  Or, yes, it is.

Q.    And could you -- it appears -- would you say that it's correct that it appears there's two different mounds on either side of that road?

A.    Yes.

Q.    And could you tell us why exactly there were two mounds on the side of that road?

A.    Well, if you noticed, there's power lines that ran up right up beside this old road that goes up to the cell tower. So the -- that's why there was two mounds, because I couldn't -- I couldn't fill this up until the power lines were moved to the cell tower.  And we had to build a new road to get that done.

Q.    So once -- once the power lines were moved, the plan was -- what was the plan after that?

A.    To fill the middle up and pull the sides in and put it all together, make it one -- one fill.

Q.    And then, after that, eventually the plan would be for the material to match the elevations in the plans; is that correct?

A.    That is correct.

Q.    Could you flip with me to Exhibit 32.

        Could you describe what you see in this picture for us?

A.    Do what now?

Q.   Could you describe what you see in this picture for us?

A.   It's -- it's one of the slopes that is -- got a little bit of rock, dirt, and a lot of grass and weeds.

Q.   I guess more on the process here of how the grading process went.

First material would be placed; is that correct?

A.   Yes.

Q.   And then material needed to be stabilized at a certain point, whether temporary or permanent?

A.   Yeah.

Q.   How would that work, how would you stabilize --

A.   You just put a contractor's mix -- seed on it and it comes up and looks like that.

Q.   So a seed mix of grass and weeds?

A.   Yeah.  And some of it is natural stuff that comes up.

Q.   And how does that grass and plant life -- I guess, how does that help stabilize the slope?

A.   The root system from the grass, weeds, goes in the ground and ties it all together.

Q.   Could you flip with me to Exhibit 33.

A.   What's that number?

Q.   33.  Just the next one.

A.   I don't -- it looks like a lot of rock, a little bit of dirt, and I see one piece of concrete on it.

Q.   Could you flip with us to Exhibit 34.

And could you tell us what you see here?

A.   About the same: rock, a little bit of dirt, weeds, a little bit of grass, a piece of a concrete pipe.

Q.   You said a concrete pipe?

A.   That's a concrete pipe.

Q.   Could you flip with us to Exhibit 35.

And could you tell us what -- describe what you see here?

A.   Rock, a little bit of dirt, some weeds and grass, looks like I see a piece of -- that flat looping piece up on top looks like a piece of asphalt/pavement.

Q.   In -- in your experience, is asphalt and pavement roughly -- do those words roughly mean the same thing?

A.   Yes, same thing.

Q.   Could you flip with us to Exhibit 36.

And could you tell us what we're looking at here?

A.   Same.  It looks like rock -- a little bit of weeds, little bit of gravel, one piece of a pipe right there that shouldn't be there.  It's laying on top.  So we would have got it at some point out of it and -- because we don't -- we don't put that kind of stuff in our fill.

Q.   So you would -- you would testify today that -- that this metal pipe was picked out after --

A.   Yes.

Q.   And did you have anyone other than yourself inspecting

the property on a regular basis to pick out anything like this that may not be what type of material you wanted?

A.    Yes.

Q.    And who would that have been?

A.    That -- Brandi and James Ray.

Q.    And who are those people?

A.    They're my kids.

Q.    Your son and daughter?

A.    They work there.  Yeah.

Q.    Uh-huh.  And so it was consistent that at least all three of you all would -- would inspect after -- after fill had been placed, you know, for multiple reasons, but one of the reasons would be to pick out anything that shouldn't be there?

A.    That is correct.

Q.    Because -- now, when you would receive a dump truck, and if you had, like you said, you know, accepted that dump truck full of material, it would be -- it would be difficult to know -- or how big were the dump trucks?

A.    Twelve yards each.  The beds on them are about 7 foot wide and about 16 foot long, 4 foot tall.

Q.    So 12 yards, that would be cubic yards --

A.    Yes.

Q.    -- of material?

A.    Uh-huh.

Q. And there's -- you wouldn't be able to tell just basically looking on a dump truck whether a little pipe like this could be in the middle of the --

A. That is correct.

Q. And so that's why you would verify after?

A. Yeah.

Q. Could you flip with me to 38. I'm going to skip 37.
And could you describe --

A. Did you say 38?

Q. 38.
And could you describe what you are looking at here?

A. Looks like grass, weeds, rock, a little bit of dirt.

Q. And where -- where on the property was this taken?

A. It looks like it's on the west -- the west mound in the middle, be the east side of the west mound.

Q. Would that be -- approximately how close in elevation do you think would this be to your -- I guess the top where you envisioned your view?

A. I would say it's probably -- I'm just guessing -- 10 foot from the top.

Q. And in the background there, you can see -- would you -- is that the view that you were talking about?

A. Yes.

Q. And could you flip with me to 39.

And then tell us what you see here.

A. There again, weeds and grass -- it's kind of hard to tell if that's rock. It possibly could be concrete broken up. Yeah, it's probably broke-up concrete.

Q. And can you grow vegetation in your experience on just purely concrete or rock?

A. No, you cannot.

Q. You would need a little bit of soil; is that correct?

A. Yes.

Q. Would you flip with me to Exhibit 40.

A. Okay.

Q. And can you tell us what we're looking at here?

A. Looking at some grass, a little bit of rock, and a car tire -- a car tire. I'm sorry.

Q. And does it appear that the tire is on top of that grass or underneath that grass?

A. Yeah, it -- it's definitely on the grass.

Q. Yeah.

A. The grass has grown up around it.

Q. So, if there's grass underneath it, then, based on your earlier testimony about how the process worked, placing fill --

A. Yeah.

Q. -- and then stabilizing slopes with vegetation, would you -- would you say that this was placed on top of a

stabilized slope -- an already stabilized slope?

A. Yes.

Q. That it wasn't -- would you agree that it was not placed into your property as fill material?

A. No. No.

Q. You would agree about that statement?

A. We would have -- we would have got that out.

Q. Okay. So do you know -- do you know what happened to the tire?

A. Yeah. We hauled it off.

Q. You pulled it out?

A. Any tires we found, we haul them off.

Q. Would you flip with me to Exhibit 41.

And can you tell us what we're looking at here?

A. Looks like -- looks like a pile of concrete, and then there's rock and dirt behind it.

Q. And this is one of the -- on one of the slopes on your property?

A. Yeah. It's kind of hard -- it's so close in, I can't really tell where it's at. I don't see any background to it.

Q. Could you flip with me to Exhibit 42.

A. Okay.

Q. And could you describe for us what you see here?

A. There -- it's quite a bit of rock, the grass and weeds and stuff and the concrete, maybe just a little bit of

asphalt right there.

Q. Could you flip with us to Exhibit 43.

And tell us what you see there.

A. Yes.

Q. Could you tell us what you see there?

A. Do what?

Q. Could you tell us what you see there.

A. It's on the edge of -- edge of a fill where, when it rains, it will settle down just a little bit and causes a crack.

Q. And what material do you see there?

A. Looks like that one is mostly dirt with a little bit of rock.

Q. Would you flip with me to Exhibit 44.

And could you tell us what you see there?

A. Grass, weeds, some asphalt --

Q. Could you flip -- could you flip with us to Exhibit 45.

And tell us what you see there.

A. Grass and weeds, rock, a little bit of dirt, a piece of concrete with a piece of rebar in it.

MR. FITTS: Your Honor, one moment just to confer with counsel?

THE COURT: Sure.

BY MR. FITTS:

Q. Could you flip back with me to Exhibit 37. I skipped

it.

A.    37?

Q.    Yes.  I shouldn't have.

      And can you tell us what you see there?

A.    Excuse me?

Q.    Could you tell us what you see there?

A.    Looks like a bunch of rock and vegetation on the side.

Q.    Earlier we spoke about how all these photographs were taken on September 21st, 2023, by Mr. Sulkin during his site visit, and we also -- you also testified that you were there that day.

      Did you witness Mr. Sulkin taking pictures, taking these pictures?

A.    No.  We let them walk theirself -- we -- I may have saw them -- some of them, but most not.

Q.    Did Mr. Sulkin walk your property?

A.    Pretty much the entire site.

Q.    Did he walk on top of both hills?

A.    Yeah.

Q.    And took a bunch of pictures, I presume?

A.    Yes.

Q.    And these are the only pictures that you've ever seen from that day that -- from Mr. Sulkin?

A.    Yes.

Q.    And for about how long did Mr. Sulkin walk the property?

A.    I would -- I would guess about an hour, give or take a little bit.

Q.    Mr. Ray, could you grab the other binder of Defendant's exhibits and flip to Defendant's Exhibit 34.

A.    What was the page?  I'm sorry.

Q.    Exhibit 34.

A.    I don't see a 34.

Q.    Similarly to yesterday with Mr. Sulkin, we had extra exhibits that were --

            THE COURT:  And I don't have --

            MR. FITTS:  You don't have them either.  I'll get your copies.

Q.    Did you happen to visit your property on May 21st, 2025?

A.    Yes.

Q.    And did you take pictures that day?

A.    Yes, I did.

Q.    Can you tell us what Exhibit 34 is?

A.    It's a picture of the pond with a little bit of water in it.

Q.    Did you take this picture?

A.    I took this picture.  The pond -- I mean, the water in this -- it was after the big rain.  And the water in this picture is clear.

Q.    Did you -- does this picture fairly and accurately depict what you saw on May 21st, 2025, when you took this

picture?

A.	Yes.

MR. FITTS:  Your Honor, we would like to move for Exhibit 34 to be admitted into evidence.

THE COURT:  Without objection, admitted.

(Whereupon Defendant's Exhibit 34 was marked for identification and received in evidence.)

BY MR. FITTS:

Q.	So this picture was only from a few days ago?

A.	Yes.

Q.	Eight days ago?

A.	Yeah.

Q.	And so this is what the retention pond on your property looks like today?

A.	Yes.  And the rock coming into the upper -- which would be the lower part of this picture -- is the -- is the riprap paper, where the water comes into the pond.

Q.	Can you say that one more time?  I'm sorry.  We were pulling up the exhibit.  I want the jury to understand what you're talking about.

A.	The rock at the bottom of the picture, the riprap rock, is where the water comes into the pond.  So this -- it goes through this rock to filter it and goes on out to the pond, where it's -- all the vegetation in the bottom of the pond.

Q.	Could you flip with me to Exhibit 36.

A.    I got my stuff all wrong here.

Q.    36?

A.    Is it the one on the screen?

Q.    Not yet.

A.    I've got it all messed up.

Q.    It should have the sticker, 36, at the bottom right.  36.

A.    (Indicating.)

Q.    Does it have 36 at the bottom?

A.    Got 37 right there.  But they're all loose.

          THE COURT:  If you want to help him, go ahead.

          THE WITNESS:  I don't know what order they are.
They're loose.

BY MR. FITTS:

Q.    Okay.  So we're looking at 36?

A.    36, yeah.

Q.    Is this also a picture you took on May 21st, 2025?

A.    Yes, it is.

Q.    And does this picture accurately depict what you saw on
the site that day?

A.    Yes.

          MR. FITTS:  Your Honor, we would like to move for
Exhibit 36 to be admitted into evidence.

          THE COURT:  Admitted without objection.

          (Whereupon Defendant's Exhibit 36 was marked for
          identification and received in evidence.)

BY MR. FITTS:

Q. Can you tell us what -- what -- where on the property we are here?

A. It's on the -- it's on the east side of the property, be the northeast side.

Q. And there's a pretty stark difference here between the -- it looks like two different colors, brown and green.

Can you tell us what we're looking at there?

A. Yeah. This is the -- all the green is a finished product. That's what it looks like from now on.

The brown part, which is the -- the fill that's been placed there, it's ready for topsoil. We've just been waiting for the rain to quit raining every other day or two so we can put the topsoil on it. Then we'll put seed and matting. Straw matting goes on it to stabilize it. And then let nature take its course. It will turn green just like the rest of it.

Q. And --

A. The rock at the bottom is to catch any silt or anything that's coming off of that until it's stabilized. And it goes -- it keeps it from running out in the road.

Q. So, when water comes off of the slope, you just testified that it goes into these rocks on the left-hand side, and then where does it go?

A. It goes down in the bottom a little further and settles

out right there. And it goes through a big rock check dam and eventually goes onto the pond.

Q. So this eventually ends up in the retention pond?

A. Yes. And that's the cell tower road in the middle of the two green things. That's the main, forever road, that goes up to the cell tower.

Q. So that's a new road that you built for --

A. Yes. And that's the new power lines that you see in there that goes up to the cell tower now.

Q. So now that the power lines have been moved you're moving on with your final plan for the property?

A. Yes.

Q. And not the two mounds?

A. That's exactly right.

Q. Would you flip with me to the next one, Exhibit 37.

A. Okay.

Q. And is this another picture that you took on May 21st, 2025?

A. Yes, it is.

Q. And does it fairly and accurately depict what you saw that day?

A. Yes.

MR. FITTS: Your Honor, we would like to move for Exhibit 37 to be entered into evidence.

THE COURT: Admitted.

(Whereupon Defendant's Exhibit 37 was marked for identification and received in evidence.)

BY MR. FITTS:

Q.   And can you describe for us where we are here, especially in relation to the last picture we looked at?

A.   Yeah.   The last -- the last picture was -- I was looking north, up the hill, and this one I'm looking south, looking down the hill.   And it's also on the east side of the project.

And there again, the green is -- is the forever look.   The slope in the bottom is all stabilizing green grass.   This is -- shows what it's going to look like, and that's the cell tower road in the middle.

Q.   And I think you testified regarding the brown spot that we talked about earlier, that that was ready for topsoil --

A.   Topsoil.

Q.   -- to be placed on it?

A.   Yeah.

Q.   And then, after you placed topsoil, you would place --

A.   Seeding and matting.

Q.   And the reason that this seeding and matting wasn't immediately put on for this was because of rain, you said?

A.   Because of the rain, yes.

Q.   Have you experienced a good amount of rain this month --

A.   We've -- it actually set a record.   It hasn't rained as

much in May since the 2010 flood.

Q.   Yeah, I can commiserate with that.

Could you flip with me to Exhibit 38.

A.   Yes.

Q.   And can you tell us what we're looking at here?

A.   This is -- the cell tower is behind me.  So I'm standing in the north -- the north, middle part of the project.

Here, the green in the middle is a pile of topsoil that's going on the slopes.

Where the track hoe is sitting down there, that's where we're placing fill right now.  It's between what used to be the two mounds.  This is what we're doing, filling it up in the middle so it ties the two mounds together and makes one big fill.

Over to the left you'll see -- you'll see a gravel road that kind of wraps around this -- the green grass in the middle.

There is another green on the other side, kind of hard to see on this with the grainy pictures, but that's another pile of topsoil that goes also on the slopes.

Q.   Oh, oh, sorry.  Before we get into describing all this... Does this fairly and accurately describe --

A.   It --

Q.   -- what you saw that day?

A.   I'm sorry.  Yes, it does.

MR. FITTS: And, Your Honor, we would like to move for Exhibit 38 to be admitted into evidence.

THE COURT: Admitted.

(Whereupon Defendant's Exhibit 38 was marked for identification and received in evidence.)

BY MR. FITTS:

Q. So, now that the jury's looking at it, before we get into -- this road that you were just speaking about on the left side, is that the same road we were looking at earlier? Is that the access road?

A. This is the road that goes up to the tower, yes.

Q. And I believe you said -- are we at the top of the property, basically, here?

A. Right.

Q. And is -- does this also depict the view that you were talking about?

A. Yes. This -- this shows the -- the good view.

Q. And -- I guess describe for us what else you see in the picture, as you were doing earlier for the jury now that they can --

(Overlapping speech.)

Q. -- look at it with us.

So the green is -- is all being finally stabilized with vegetation?

A. These two green piles here, they're just -- they're just

temporary stabilization for topsoil. That's not the final. It will -- when it's -- everything is up to grade, then topsoil will be placed on it, just like on the slopes, and then it will have this final grass on it. But we -- this is just to protect it while it's in the pile.

Q. So that's a pile of topsoil that you're protecting from erosion --

A. From erosion, yes.

Q. And so we only see one mound here.

A. Well, the one on the left -- the very left side of the picture, that's topsoil, too. It looks kind of like a hill, too, but it's actually a pile of topsoil.

Q. Yes. But either way, when we -- multiple previous pictures we looked at had the two big hills. Now we're only looking at one.

A. Yes.

Q. So how did that happen? What happened there to change it?

A. Well, we're filling in the middle, and a lot of the stuff in the front got pushed over sideways into the middle.

Q. So a lot of stuff on the top got pushed over to the middle?

A. Pushed over. We couldn't do that until the power lines got moved. So that's why the middle is running behind the rest of it.

Q.   And this is all in furtherance of eventually matching the contours of the plan that Metro approved?

A.   Exactly.  Yeah.

Q.   And so, once you get enough fill material to match those plans, could you accept any more fill material and be in compliance with that permit?

A.   Once I get up to the grade, that's it.

Q.   Mr. Ray, did you engage in the use of solely natural rock, dirt, stumps, pavement, concrete, and rebar and/or brick rubble as fill material on this property?

A.   That's all.  Mostly rock and dirt.

THE COURT:  I can't hear you.

MR. MARTIN:  Object.  It asked him his opinion of a legal definition.

THE COURT:  Do you want to rephrase the question?

BY MR. FITTS:

Q.   Mr. Ray, did you -- did you place anything other than natural rock, dirt, stumps, pavement, concrete, rebar, or brick rubble on the property that was not immediately removed, as we talked about with the tire and pipe?

A.   That -- that would be correct.

Q.   So you did not place anything other than that?

A.   I did not place anything but that.  But the. . .

Q.   And we talked about as fill material, in your experience in construction for 30 years in excavation and -- and

ground -- site work, could you tell us what fill material typically means?

A. Just that. Rock, dirt, asphalt, concrete, brick.

Q. And fill material would have -- would fill material -- would have -- would it have topsoil on it eventually?

A. Yes. Well, unless a building is going on it, a road, but yeah. But lawn layers would have topsoil on it.

Q. So it would be there with a building, a road, or topsoil with eventual vegetation on top of that?

A. Yeah.

MR. FITTS: Your Honor, one moment to confer with counsel.

THE COURT: All right.

MR. FITTS: Your Honor, we have no further questions for Mr. Ray.

THE COURT: All right. Cross.

CROSS-EXAMINATION

BY MR. MARTIN:

Q. Hello, Mr. Ray.

A. Hello.

Q. I believe you said you've been doing grading and site work for 50 years?

A. That's correct.

Q. And can you tell us more about what grading and site work is that you do?

A.   We build pads -- pads for -- to build warehouses on.  We do roads, lot grading for subdivisions.  We do grading for apartment buildings, roadways.

Q.   And if I heard you right, you said you buy properties and do grading and site work on the properties?

A.   This --

MR. FITTS:  Objection, Your Honor.  Facts not in evidence.

THE COURT:  Overruled.

BY MR. MARTIN:

Q.   You may answer.

A.   Yeah -- this property, yeah.  I don't -- I mean, I grade -- I work for somebody else.  I didn't buy all the properties that I've worked on.

Q.   Cato Road, did you buy that property?

MR. FITTS:  Objection, Your Honor, relevance.

THE COURT:  Counsel, approach the bench.

(Bench conference outside the hearing of the jury.)

MR. MARTIN:  He's a professional.  He does this professionally.

THE COURT:  Okay.

MR. MARTIN:  And this is part of his plan and practice, scheme.

THE COURT:  Keep going.  Because I'm trying to

connect it to this case.

MR. MARTIN:  So this case is a professional endeavor.  It's a landfill.

THE COURT:  Uh-huh.

MR. MARTIN:  He makes money doing it.  And he's done it 50 years.

THE COURT:  Okay.  So how does that -- why is that relevant here?

MR. MARTIN:  It shows that he's running a professional operation.

THE COURT:  I think he's testified he's been doing this as a business for 50 years.

MR. MARTIN:  Yes, sir.

THE COURT:  Okay.

MR. MARTIN:  That's about all I can get out of that.

THE COURT:  Okay.  So you just want to say he -- Cato Road is one of the -- I guess sites that he worked on?

MR. MARTIN:  Yeah.

THE COURT:  Is that it?

MR. MARTIN:  And ask if there's any others.  Any others.

THE COURT:  Okay.  All right.  And that's all?

MR. MARTIN:  Yes, sir.

THE COURT:  Okay.

(In open court.)

BY MR. MARTIN:

Q.   So Cato Road is one of the sites that you've worked on?

A.   Yes.

Q.   Are there others that you have bought the property and developed like Cato Road and Dirt Mountain?

A.   No.

Q.   And you're paid to receive material there at Dirt Mountain?

A.   Yes.

Q.   These -- these contractors, you said they -- they bring in the material, and they -- they pay you to dump there?

A.   Yes.

Q.   How much have you been paid for them to dump there?

MR. FITTS:  Objection, Your Honor.

THE COURT:  You want to approach?

(Bench conference outside the hearing of the jury.)

THE COURT:  I thought -- I thought that was as far as you were going.  Go ahead.

MR. MARTIN:  Well, that was the other ones.

THE COURT:  Hmm?

MR. MARTIN:  That was the others, as far as I was doing the other ones.  But on this one --

THE COURT:  Why is it important for the jury to

hear how much he's been paid?

MR. MARTIN: He's been paid $1.4 million.

THE COURT: Okay.

MR. MARTIN: He's not -- he's not building a horse farm. He's making a lot of money doing this. It goes to show that it's a landfill.

THE COURT: Goes to show it's a landfill. Keep going.

MR. MARTIN: He's a professional operation. He's paid to bring in the dirt and permanently store it there. That's the definition of a landfill, and it's not just incidentally he's running a landfill on the side. It's his business. That's what he's doing.

THE COURT: And what's the jury supposed to take from that?

MR. MARTIN: Just that. Just that it's a landfill. That it's a professional operation. He makes a ton of money doing it.

MR. FITTS: I don't believe those are any factors --

THE COURT: Say again.

MR. FITTS: I don't believe that's involved in any of the factors he's got to prove this is a C&D landfill. I don't think being a professional operation is one of the factors. I don't think accepting money is any factor for

this.  I don't see how that fits in the jury charge and the jury instructions, in any of the law.  It doesn't matter if he got it for free, if he got money for it, or what.  I mean, it could be a landfill regardless.

THE COURT:  He's been doing it for 50 years.  I think the jury will surmise he's not doing it for free.

But I guess I'm wondering if you're -- if this -- you want the jury to find against him because he's made a lot of money.  That would be improper.

MR. FITTS:  That's where we would say the probative value is severely outweighed by the unfair prejudice.

THE COURT:  I'm just not sure how it's relevant to it proving it's a landfill when he's testified I've been doing this for 50 years.  Don't you have enough there to argue that to the jury, if that's really what your -- common sense.  I mean, you know, the jury instruction says you didn't leave your common sense at the door.

MR. MARTIN:  Yes, sir.

THE COURT:  All right.

MR. MARTIN:  All right.

(In open court.)

BY MR. MARTIN:

Q.  And you -- you looked at Defendant's Exhibit number 1. And -- I don't have it to display.

THE COURT: You can show it. It's part of the Court record now, so it's free to be used by either party.

MR. MARTIN: But we don't have it on our laptop on our desk to show.

THE COURT: You can call up Number 1. You can ask them to show it.

UNIDENTIFIED SPEAKER: Oh, you want me to?

BY MR. MARTIN:

Q. Okay. You testified about this topo map. And you said that there's a ridge running along the -- the back of the property.

A. It's actually the top of the property.

Q. The top of the property.

But didn't you say yesterday that there was a ridge running in the middle of the property that cuts the property in half?

A. Well, I call it the middle, but you can see it right there. It's the oval shape on top.

Q. Okay. You said you thought it was what?

A. Excuse me?

Q. I may have misunderstood. Did you say that it was cut -- that it cut it in half?

A. I don't think so.

Q. You don't think you said that?

A. No.

Q.   Okay.  What's the slope of those -- what's the degree of slope of those slopes on your property?

A.   The one in the back's probably 26, 28 percent.  Just guessing.

Q.   And what kind of grass are you planting there?

A.   None.

Q.   You're not planting any grass?

A.   No.  None in the back.

Q.   No.  On the --

A.   On the front where I'm working?

Q.   Yes, sir.

A.   33 percent, 31 slope.

Q.   I'm sorry?

A.   33 percent slope.

Q.   On the front --

A.   One the front.

Q.   -- you had 33 percent.

A.   The disturbed part, at the top.

Q.   Okay.  I'm sorry if I confused you there.

A.   When you get down toward the bottom, it's less than that.

Q.   And what kind of grass are you planting on the front part?

A.   Fescue.

Q.   Fescue?

A.    Yes.

Q.    Have you ever raised horses?

A.    Excuse me?

Q.    Have you ever raised horses?

A.    I've had horses, yes.

Q.    You've had horses.

Have you ever raised cows?

A.    Yes.

Q.    Do they like steep slopes?

A.    They graze on them, yes, they do.

Q.    They do?

A.    Horses not as much as -- yes, they absolutely do.

Q.    Learn something new every day.

How do you keep them from falling down the slope?

A.    I don't.  They just don't fall down the slope.

Q.    Now, you saw the photos that showed a tire on your property?

A.    I did.

Q.    And a piece of metal pipe.

And I believe you said your daughter and your son walk the property and pick out these things?

A.    They -- they're the one that puts the fill in.  So they see -- if there's anything there, they take it out.

Q.    What kind of things have they taken out?

A.    Do what?

Q.   What kind of things have they taken out?

A.   Just what -- stuff like that, a tire, mostly.

Q.   And what else?

A.   Maybe a piece of pipe, maybe a piece of tin or something, occasionally, just. . .  It's not a lot, but it's a little.

Q.   And what else?

A.   That's pretty much it.

Q.   So the practice is to dump it on the property and then have your daughter and your son scour the property looking for these things --

A.   They -- they usually do it when -- I'm sorry.  I didn't mean to interrupt.

Q.   That's all right.  Go ahead.

THE COURT:  No, finish your question.

BY MR. MARTIN:

Q.   They scour the property and they find these things and they pull them out?

A.   Yes.

Q.   And I believe you said the dump trucks are 12 cubic yards; is that right?

A.   Yes.  Yeah.

Q.   About the size of this little area here where these ladies are sitting?

A.   Pretty much.

Q.   And so they pull it up and they dump it; it forms a
pile?

A.   Uh-huh.

Q.   And then someone else comes up and dumps another pile
beside it, and beside it, and beside it, and on top of it; is
that kind of how it works?

A.   Not exactly.

Q.   How does it work?

A.   They dump a pile.  We take a dozer and push it off, and
we push it -- it takes about anywhere from four to six
pushes.  And we push it out, and that way that separates the
pile.

Q.   And it just gradually builds up?

A.   Do what now?

Q.   It just gradually builds higher and higher?

A.   Yeah.

Q.   And covers what was dumped the first time, and you dump
something on top of it, and it just keeps going?

A.   Whatever you dump, we run a lift.  And when you push it
off, whatever's in that pile goes off this lift, and you can
see everything that's in that pile.

Q.   And it gets buried by the next pile?

A.   No, it does not.

Q.   It does not?

A.   If there's anything in it, it don't.

Q. I'm sorry?

A. If there's anything that's not supposed to be there, it don't get -- it don't get covered up. But yes, if it's nothing in it, it gets covered.

Q. So who's there to make that determination?

A. They are. They are the one running the dozers.

Q. Who is "they"? Your daughter and your son?

A. That's right.

Q. They run the dozers?

A. Yes.

Q. Family operation, right?

A. Yeah.

Q. So you're saying there's absolutely no way that tires, metal, pieces of metal pipe, rods, or other things get covered up by the next load that comes in?

A. I don't believe so.

Q. You don't believe it happened?

A. No.

Q. You pay your daughter and your son?

A. I do.

Q. Is that a full-time job, running the dozers?

A. It is.

        MR. MARTIN: Thank you, sir.

        May I ask one more question?

        THE COURT: I thought you might.

BY MR. MARTIN:

Q.    How much do you pay your daughter and your son?

MR. FITTS:  Your Honor, objection.

THE COURT:  I'll -- you can answer, if you know.

THE WITNESS:  Do I answer or no?

THE COURT:  Answer if you know.

THE WITNESS:  $1,400 a week.

MR. MARTIN:  Okay.  Thank you.

THE COURT:  All right.  Redirect.

Oh, you can step down.

MR. FITTS:  No redirect, Your Honor.

THE COURT:  All right.  Call your next witness.

MR. CASHION:  Your Honor, that completes our case.

THE COURT:  All right.  Does the plaintiff have any rebuttal proof?

MR. MARTIN:  No, Your Honor.

THE COURT:  Okay.  So, ladies and gentlemen of the jury, you've now heard all of the evidence in this case.  The next step will be for the lawyers to give you their closing arguments, which is not evidence, but their summation, their interpretation of what the evidence shows.  Of course, you're the judges of the facts.  It will be your final decision.

So we're going to take a brief break now for about 15 minutes, and when we come back, we'll have closing arguments from the plaintiff and then from the defense, and

then I'll give you the law that you have to apply to this case, the jury instructions. You'll get -- each get your own copy of that, and you can make marks on it, highlight it, you can do with it whatever you want as I read it to you. And after that, you'll retire to the jury room to begin your deliberations.

So let's take our midafternoon break.

(Jury not present.)

THE COURT: All right. The jury has left the courtroom.

Anything from the plaintiff we need to take up? Anything from the plaintiff?

MR. MARTIN: You'll have a charge conference later on?

THE COURT: As soon as I know there's nothing else, we're going to do it right now.

MR. MARTIN: Nothing until then.

THE COURT: Okay. Anything from the defense?

MR. CASHION: No, Your Honor.

THE COURT: All right. So you've had a chance to look at the charge.

Plaintiff, any objections to the proposed charge?

MR. MARTIN: Yes, Your Honor.

THE COURT: Okay. You want to share those with me?

MR. HOLT:  Yes, Your Honor.  We -- should --

THE COURT:  Come on, so I can hear you.

MR. HOLT:  Your Honor, yesterday we discussed the definition of "fill material."  And we -- I ran into a roadblock where I was using the federal definition of what fill material is.

But I suppose our position -- well, I know that our position is that this exception under Tennessee law provides a standard that is below what RCRA provides.  And we are -- there is case law that says Tennessee law can provide heightened standards for what waste -- solid waste disposal is and what landfills are, but RCRA provides the federal floor.  And we're suing here in federal court based off of RCRA's regulations.

And there is case law that says just because the EPA has authorized Tennessee to promulgate its own standards, the federal minimum criteria are still valid and still what we're suing under.

THE COURT:  So what do you propose is the definition of "fill material"?

MR. HOLT:  We propose --

THE COURT:  I need a citation so I can -- I can follow you.

MR. HOLT:  We propose that the exception isn't relevant at all.

THE COURT: Okay. Now, we're -- let's go back to the -- do you have a definition of "fill material" you want me to use?

MR. HOLT: Well, we propose that the Clean Water Act and RCRA, which incorporates these regulations, provide the definition for "fill material."

THE COURT: And what is that definition? That's what I want to know. What is the language you want me to put in here?

MR. HOLT: I apologize, Your Honor. I had it ready to go. While I pull this up --

THE COURT: Let's do one issue at a time.

MR. HOLT: Yes. Yes, Your Honor.

THE COURT: Do you have -- you're looking for your citation?

MR. HOLT: Yes, Your Honor.

THE COURT: All right.

MR. HOLT: Your Honor, I apologize. I had this ready to go but I lost it.

THE COURT: That's why I always use a yellow pad.

MR. HOLT: Yes, Your Honor.

THE COURT: All right. Take your time.

MR. HOLT: Your Honor, respectfully, we turn the Court's direction to Title 33, Part 323 of --

THE COURT: Slower. I'm trying to write it down.

MR. HOLT:  Title 33, Part 323, of the CFR.  And under that, Section (e).

THE COURT:  So you're telling me to look at 323 CFR (e)?

MR. HOLT:  Yes, Your Honor.

THE COURT:  Do you have a copy perchance?

MR. HOLT:  I apologize, Your Honor, I do not.

THE COURT:  Okay.  Well, I guess we need to take a recess so I can see what that says.

MR. HOLT:  Yes, Your Honor.  Initially, if I could --

THE COURT:  That's the definition of "fill material" you want me to use?

MR. HOLT:  Your Honor, we -- we object to the use of the exception in the jury charge whatsoever because that's state law.

THE COURT:  Do you have -- do you want me to look at 323 CFR Section (e) for a definition of "fill material"?

MR. HOLT:  If I may take one more moment just to ensure that this is the exact definition.  I apologize.

THE COURT:  Sure.

MR. FITTS:  Your Honor, is this the same regulation that we were looking at yesterday with "deposit into the waters of the United States," like we were --

THE COURT:  I do not know.  I just want to look at

it so I can follow his argument.

Okay. Maybe while he's doing that, does the defense have any objections to the charge?

MR. FITTS: Well, we do, and it's kind of an objection that's been raised a couple times.

THE COURT: What page of the charge do you want me to change?

MR. FITTS: The. . . I guess it would be on page 29, where the charge states "to find Mr. Ray liable under the RCRA, you must find that Tennessee Riverkeeper has proven by preponderance of the evidence" --

THE COURT: Hold on. Hold on. Hold on. Page 29?

MR. FITTS: Yes.

THE COURT: All right. I found it. Go ahead.

Now, what do you want to change?

MR. FITTS: Well, I guess we are confused where the -- the law behind Mr. Ray being liable under the RCRA for operating a Class IV construction and demolition landfill.

I know the statute that defines it. I know the statute that says that if you are operating a Class IV facility and you violate the Clean Water Act by discharging pollutants into the waters of the United States, that there is therefore a violation of the RCRA.

I don't know what provision of the RCRA --

THE COURT: Yeah. I take that from your opening

statement.

MR. FITTS: Yes.

THE COURT: That's where that comes from. Your opening statement.

Read the part on 29, and then you probably need to continue and read the part on 30. Tells the jury, "If you find it is not," and "If" -- then tells the jury, "If you find that it is." It's up to them.

MR. FITTS: I guess the other objection is just that it seems like --

THE COURT: And this is going -- right now I'm just focused on the language in this charge. And if you want me to change some language, that's what I want to -- that's what I want to hear. I will ask you why I'm going to change it, but I need to first know what are you trying to change.

MR. FITTS: We'll withdraw our objection, Your Honor.

THE COURT: So you have no objections to the charge?

MR. FITTS: No.

THE COURT: Go ahead.

MR. CASHION: My page 31 was blank.

THE COURT: Oh, well --

MR. CASHION: I wasn't sure --

THE COURT: You can't object to that then.

MR. CASHION:  That's a reasonable objection.

THE COURT:  It's -- I think it carries on -- so it's just misnumbered.

MR. CASHION:  Do what now?

THE COURT:  It's misnumbered, I guess.  There's nothing on 31.

MR. CASHION:  I've got 31.

THE COURT:  Right.  It's a misnumbering --

MR. FITTS:  I guess our thing is, I think when you read it --

THE COURT:  We'll delete that part out.

Go ahead.

MR. FITTS:  "Accordingly, it will be up to you to decide whether Mr. Ray has proven by a preponderance of the evidence that RR Farms engages in the use of solely" --

Sorry.  Where it states, "Accordingly, it will be up to you whether Mr. Ray has proven by a preponderance of the evidence that RR Farms engages in the use of solely natural rock, dirt, stumps, pavement concrete, and rebar, and/or brick rubble as fill material."

We thought that that might be a paragraph after that that says, "If you do find that" --

THE COURT:  Read the paragraph before that.  "If you determine."

MR. FITTS:  I guess it -- nowhere -- I guess

what -- I still don't see language where it says, "If you do find that he found," then that is not -- then he falls under the exception.

THE COURT: Okay.

MR. FITTS: I don't know.

THE COURT: We can do that. Then you go to the verdict form to Question 2 --

MR. FITTS: Yes, Your Honor.

THE COURT: -- and they're going to check yes or no.

MR. FITTS: Sure.

THE COURT: And if they check yes, then he has the exemption. If they say no, he does not have the exemption.

But we can add that sentence. I do -- I'll add a sentence.

MR. CASHION: We thought 31 had that type of sentence.

THE COURT: Okay.

MR. FITTS: Yeah.

MR. CASHION: That's all we're saying.

MR. FITTS: We thought there might be a paragraph that was missing that explained that.

THE COURT: Anything else?

MR. CASHION: No, Your Honor.

THE COURT: All right. Now, what objections to

the charge does the plaintiff. . .  And if you can tell me what page of the charge you want me to change.

MR. HOLT:  Yes, Your Honor.  And first I'll just confirm that 33 CFR Section 323.2(e) --

THE COURT:  Point --

MR. HOLT:  .2(e) is the definition we respectfully would ask the Court to --

THE COURT:  Hold on.  Let me find that.

Are you referring to .2(e)(1)?

MR. HOLT:  Yes, Your Honor.

THE COURT:  Okay.  Yeah.  I guess I don't -- I think that would -- it confuses me.  I think it confuses the jury how that definition fits within the State of Tennessee's regulation.  It would make no sense.  It's not just apples and oranges; it's not -- it doesn't seem to fit with that exception.

MR. HOLT:  We agree, Your Honor.

THE COURT:  Oh.  Then why would I add it?

MR. HOLT:  Because we believe that federal law controls and federal law sets the minimum for what Tennessee law can exempt.

THE COURT:  Okay.

MR. HOLT:  And -- and under -- you know, we could amend -- we have some suggestions for the jury charge, such as "The operation of a landfill that does not comply with

RCRA or its regulations is defined as an open dump."

THE COURT: And what case cites that language?

MR. HOLT: Of the minimum standards.

THE COURT: Of what you want me to put in the jury charge.

MR. HOLT: That is from the definition, the regulations of RCRA. And that is from the definitions in RCRA, Section 4.

THE COURT: So why don't we do this. We'll take a break, and you write out -- or type out, preferably, what it is you want me to change and what page you want me to change.

But I don't see how this definition fits the exemption. (As read):

The term fill material means material placed in waters of the United States where the material has the effect of. . .

That -- looking at the -- looking at the regulation, that -- that just -- that would -- it just doesn't make any logical sense of how that would apply here.

MR. HOLT: If I may, Your Honor, our -- our theory of Count Two is that the placement of fill material on the site and not incorporating the necessary erosion and control measures as required by his permit has caused fill material, as defined in this section, to be placed in the waters of the United States.

THE COURT: And there's absolutely no evidence to support that in this case. All we have in this case is muddy water, and there's no proof from anybody who has taken the witness stand why it's muddy.

MR. HOLT: Your Honor, we have testimony from Nicholas Keck that said when he was down there he saw silt and sediment involved in the water. Silt and sediment are parts of these definition of pollutants.

And I'm not trying -- I'm not trying to claw back the Clean Water Act count at this moment.

What I'm really trying to argue is, under RCRA regulations, an open dump is constituted by a landfill that is not in compliance with its permit.

THE COURT: Okay. So what parts of the jury instruction do you want me to change?

MR. HOLT: Your Honor, on page 28 --

THE COURT: No. You're going to take a break.

MR. HOLT: That's right.

THE COURT: You're going to type it out. You're going to give me the case citation that supports adding this to the jury instruction. Your argument is good, but reference to the law is required, helps me even more.

MR. HOLT: If I may be heard just to clarify --

THE COURT: It's not helpful until I know what you're talking about. And I'll know better what language you

want and why you think it's appropriate if I can get your submission. That's why I asked you all give me your proposed jury instructions --

MR. HOLT: Yes, Your Honor.

THE COURT: -- before the pretrial conference.

MR. HOLT: Yes, Your Honor.

THE COURT: So we don't do -- we've got the jury waiting and we're here doing things that could have been done and should have been done before this case ever started.

So let's -- let's -- let's do it the right way. Okay?

MR. HOLT: Yes, Your Honor. If I just may ask a clarifying question.

THE COURT: Oh, sure.

MR. HOLT: For these jury instructions, if I were to find a case that established that federal minimums -- RCRA establishes federal minimums and that the regulations provide that these are open dumps, you would want me to include these on the jury charge?

THE COURT: I don't know.

MR. HOLT: Okay.

THE COURT: Because I don't understand what you're talking about.

MR. HOLT: Okay, Your Honor.

THE COURT: I don't know how that fits into the

jury instructions.

MR. HOLT:  Okay, Your Honor.

THE COURT:  All right.

MR. HOLT:  Thank you.

THE COURT:  How much time do you need?

MR. HOLT:  Fifteen minutes.

THE COURT:  Okay.

MR. HOLT:  Ten minutes.

THE COURT:  Now, one prerequisite is you've got to share it with the defense, because as soon as you tell me what you want, I'm going turn to them and ask them what they think.

So let's go ahead and do that now.

MR. HOLT:  Yes, Your Honor.

THE COURT:  Okay.

(Recess.)

(Jury not present.)

THE COURT:  All right.  Be seated.

All right.  Can the plaintiff tell me what you propose?

MR. HOLT:  Sorry, Your Honor?

THE COURT:  Can you tell me what you propose to the jury instructions?

MR. HOLT:  Yes, Your Honor.  Would you like me to read it?

THE COURT:  You can come to the podium.

MR. FITTS:  Your Honor, we haven't received a copy of it.

THE COURT:  Let's listen together.  We'll do the best we can.

MR. HOLT:  I apologize, Your Honor.  I just finished it.  I can send it to the Court right now if you would like me to do so.

THE COURT:  I would like you to read it.

MR. HOLT:  Okay.

THE COURT:  Slowly.

MR. HOLT:  Yes, Your Honor.  So, starting on page 28, "Alleged violation of the Resource Conservation and Recovery Act" --

THE COURT:  Slowly.  You're going to read it slowly.

MR. HOLT:  "The RCRA is a federal statute that governs the generation, transportation, treatment, and disposal" --

THE COURT:  Slower.  Slower.

MR. HOLT:  -- "of hazardous and solid wastes.  The purpose of RCRA is to reduce the generation of wastes and to ensure that any waste that is generated is properly treated, stored, and disposed of.  RCRA permits citizens to sue against any person who, quote, is alleged to be in violation

of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter (42 USCA Section 6972).

"RCRA requires states to create solid waste management plans that ensure solid waste will be disposed of in an environmentally sound manner.  The operation of a landfill that does not comply with RCRA's regulations is deemed to be an open dump in violation of RCRA.

"Tennessee has received approval to administer and enforce its own solid waste management program under RCRA.  Pursuant to that program, Tennessee generally requires that any person who constructs or operates a solid waste disposal facility must obtain a landfill permit, subject to an exception that I will explain later.  However, even for states who have received approval to administer and enforce their own solid waste programs, federal law provides the minimum criteria that states must follow in operationalizing their program.  (See *Ashoff v. City of Ukiah*, 140 F.3d 409, 412, Note 3, Ninth Circuit, 1997.)

"In other words, federal law provides the regulatory floor and states may require more restrictive limits but they cannot provide exemptions to federal law. Violations of federal minimum criteria are, therefore, violations of the law no matter what.

"RCRA regulations provide that a facility shall

not cause a discharge of dredge or fill material to waters of the United States that is in violation of the requirements under Section 404 of the Clean Water Act as amended. (40 CFR Section 257.3-3(b).)

"Federal law defines "fill material" as material placed in waters of the United States where the material has the effect of replacing any portion of a water of the United States with dry land or changing the bottom elevation of any portion of the water of the United States. Examples of such fill material include but are not limited to rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation materials and materials used to create any structure or infrastructure in the waters of the United States.

"In this case Tennessee Riverkeeper alleges that Mr. Ray is operating a Class IV construction and demolition landfill without complying with RCRA regulations. Riverkeeper contends that Mr. Ray operates a landfill that has caused fill material to discharge into waters of the United States and is therefore an open dump under RCRA regulations and therefore in violation of RCRA.

"A Class IV construction and demolition landfill is a facility that receives and permanently disposes of construction/demolition waste. The term "construction/ demolition waste" means waste resulting from construction,

remodeling, repair, and demolition of structures and from road building.  Such waste includes but is not limited to bricks, concrete, and other masonry materials, soil, rock, and lumber, road spoils, rebar, and paving material.

"To find Mr. Ray liable under RCRA, you must find that Tennessee Riverkeepers has proven by preponderance of the evidence that RR Farms is operating a landfill.  In deciding this issue, you may consider what kind of waste, if any, that RR Farms receives and permanently disposes of at the site.

"If you find that Tennessee Riverkeeper has not proven by preponderance of the evidence that Mr. Ray is operating a construction/demolition landfill, then Mr. Ray is not liable on Count Two."

THE COURT:  Is that it?

MR. HOLT:  That is it, Your Honor.

THE COURT:  Okay.

(Respite.)

THE COURT:  All right.  What does the -- what does the defense -- defendant say?  You can come to the podium if you want.

MR. FITTS:  Could I sit here?  It might be easier with all the stuff I've got.

THE COURT:  Sure.

MR. FITTS:  I've got two screens and a book.

First, Your Honor, we would object simply because the pretrial order states Count Two alleges the Rays violated the RCRA by operating a construction and demolition landfill without first obtaining a solid waste disposal permit.

That's the count that we're under right now. It's only one sentence.

Count Three that was dismissed talks about operating an open dump. It appears that they're trying to alter their theory of the case yet again into -- to allege that we somehow violated RCRA standards. We don't even know what standards they're saying that we violated. So I'm not sure if we have to open up evidence and have a retrial and all of that.

But, first of all, generally we would -- we would object purely because this is all outside the scope of Count Two, according to the pretrial order.

Second, running through the alterations, I believe they entered in paragraph 2 of their instructions -- we agree with what is stated. It just provides that, you know, citizens can sue under the RCRA. I don't see how it helps the jury, but that would be our only objection. It's just -- it's adding more language that we don't think is necessary.

THE COURT: So I originally had a sentence in there to that effect. I'll add that sentence back.

MR. FITTS: That's fine.

THE COURT: In that place in that paragraph. It originally was there. But I'll add it back.

MR. FITTS: And then, second, we would -- I guess the next paragraph starts to talk about states creating solid waste management plans and specifically says the operation of a landfill that does not comply with RCRA's regulations is deemed to be an open dump. They dismissed their open dump claim on Count Three. Count Three was all about an open dump; they dismissed it.

That's not what Count Two is about at all. It's about operating a construction/demolition landfill without obtaining a solid waste disposal permit. Therefore we think all that is irrelevant and should be stricken, that entire paragraph.

THE COURT: Not entire --

MR. FITTS: Sorry, the entire insertion into that paragraph.

THE COURT: It's just that one sentence.

Go ahead.

MR. FITTS: And then the third -- fourth paragraph, "However," the case they cite to -- I'll read you the first sentence from it. (As read):

This appeal is narrowly focused on the question of whether the Resource Conservation and Recovery Act authorizes citizen suits in federal courts

claiming only violations of state standards that exceed the federal criteria.

And, furthermore (as read):

Gilbert Ashoff and others sued for an injunction against the City of Ukiah, alleging that its solid waste disposal site violated the RCRA and Clean Water Act and state law.

So this issue was narrowly whether the RCRA authorizes citizens to sue for violations of state standards that are in excess of the federal criteria.

It seems that they're taking it to mean the exact opposite. I think the Court, when they said "narrowly focused," were trying to indicate something there, that this wasn't supposed to be taken and applied to a wholly different issue.

I don't -- I don't think that you could find the Court here stated that -- anything about whether -- about state standards that are below RCRA standards. Especially the summarization afterwards, which it appears the Ninth Circuit did not want anyone to pull from their decision.

Next paragraph (as read):

RCRA regulations provide that a facility shall not cause discharge of dredge material to the waters of the United States that is in violation of the requirements under Section 404 of the Clean

Water Act.

It's my understanding that the Clean Water Act claim was dismissed. This also is not -- doesn't have anything to do with the C&D landfill or solid waste disposal permit. So it's irrelevant.

The next one -- the next paragraph (as read):

Federal law defines "fill material" as material placed in the waters of the United States.

I think we've looked at that a few times now. There's no proof that there were material placed into waters of the United States. It's a regulation that seems to be dealing with wetlands and not the case here. Also, that has nothing to do with what Count Two says in the pretrial order.

The next paragraph is just an expansion of that, I guess, which we would object to for the same reason.

And then we would object to the insertion of the final paragraph, especially because it removes our -- our exception. And I guess generally our -- our understanding of -- our original understanding of what Plaintiffs were trying to bring this case on was that if the Clean Water Act was violated by a C&D landfill under the RCRA that that would be a violation also of the RCRA. But it seems like they've -- especially in the pretrial order they kind of altered that to mean that -- or altered that to allege that we violated the RCRA by operating a C&D landfill without

first obtaining a solid waste disposal permit, which means that they're basically -- their theory is that Tennessee law -- the Tennessee Solid Waste Disposal Permit Program was authorized under the RCRA.

Therefore -- I assume this is their theory -- therefore a violation of Tennessee standards would be a violation of the RCRA. And if that's the case, then -- they seem to be abandoning any violation of Tennessee law, and so for all those reasons we would object to --

THE COURT: All right. I'll give the plaintiff the last word on this.

MR. HOLT: Your Honor, in the pretrial order our count is for the operation of construction and demolition landfill without a permit. As a matter of law, that is open dumping, and that is what the violation of RCRA entails. It's being engaged in open dumping.

So I understand that the pretrial order supersedes the amended complaint. But in the amended complaint our count was focused on -- Count Two was focused on the RCRA regulations that were violated that amounted to a violation -- prohibited open dumping.

And I -- I would say -- if I was really clever, I would have quoted the supremacy clause in the jury instructions. I didn't have time to do so. But, nonetheless, the case does provide that proposition and does

show that it's well established in RCRA that they're providing the federal floor. I apologize for not finding the best case, but that is federal law. And -- and states that try to exempt RCRA or provide regulations that -- that impermissibly provide exemptions to RCRA are prohibited.

And, lastly, you know, we are not claiming a violation of the Clean Water Act per se. We're claiming a violation of the NPDES system, a violation of the permit that he has.

Section -- the RCRA section that I had cited says that the discharge of fill material not in compliance with Section 404 automatically defines a landfill operation as an open dump.

So earlier we made a lot about how violations of NPDES cannot automatically be called violations of the Clean Water Act. We're not claiming Clean Water Act is violated under this count; we're claiming that the RCRA regulations that -- that govern construction and demolition landfills, one of which is the impermissible discharge of fill material without a 404 permit, automatically turns a landfill into an open dump, and that they're dumping without a permit.

THE COURT: All right. Well, thanks for the argument.

MR. HOLT: Thank you.

THE COURT: I am going to make one change, and

that's that sentence to the first paragraph that allowed -- that makes reference to permitting a citizen lawsuit.  We'll add that sentence back.

I'm going to overrule all the other objections.  One, and primarily, it's simply beyond what you all proposed in your pretrial order.

Count Three was dismissed at the request of the plaintiff, and it seems you're also trying to revive some of those claims.

But primarily what you're proposing that I charge the jury, it's simply not supported by your theory as stated in the pretrial order, which supplants the pleadings here.

So, with that, we're going to finish the jury instructions.

Previously you've seen -- you've seen the verdict form.  And we talked about that.  So that's -- you've had a chance to reflect on that.  So there will be no changes there.

So, the plan -- I'm going bring the jury back in.  The plaintiff has 15 minutes.  Defense has 15 minutes.  Do you all -- does the plaintiff want to reserve some of its 15 minutes so you can reply?

MR. MARTIN:  Yes, sir.

THE COURT:  Okay.  How much time do you want to reserve?

MR. MARTIN:  Two minutes.

THE COURT:  All right.  Then I'll let you know when you've reached that goal.  Do you all want to take a break before we start closing argument?

MR. MARTIN:  Yes, sir.

MR. CASHION:  I have one question.

THE COURT:  Sure.

MR. CASHION:  When addressing the jury in my opening statement, I talked a lot about the water, and now we don't have water.  And I want to know if you were going to tell the jury that's gone, because I need to.  Because they're going to wonder what I was talking about and what planet I was on.  Because now my opening statement will not match the closing statement.  I need to tell them water's gone, that's been dismissed so they understand why this whole thing was truncated.

But I think it's better if you tell them.  That's my request, Your Honor.  "It's all about water," is what I said.

THE COURT:  All right.  What does the plaintiff say?

MR. MARTIN:  I think it makes sense to let them know why we went all of that and we're not doing it now.

THE COURT:  Okay.  So I'm looking at your joint statement of the case.  That's the one I used during jury

selection. And your first paragraph, I went with you all's, although I had written one I wished I had used now. But -- because I say in mine, "There are two claims here." But you all do that, too. And we -- and I read this just as you submitted it.

The first sentence says, "This is a lawsuit brought by the Tennessee Riverkeepers, Inc., who operates -- against Ricky Ray, who operates a grading business known as RR Mass Farms Grading for alleged violations of two federal laws."

So what I would propose to do is tell the jury -- I guess you want me to do it before your closing arguments -- allege -- "I told you in the beginning, this was about alleged violations of two federal laws, the Clean Water Act and the Resource Conservation and Recovery Act. I now want to instruct you that the only law now before you for decision are alleged violations of the Resource Conservation and Recovery Act and not the Clean Water Act."

So I'll tell them that before I launch into the -- to the charge.

What do we say on the page where we describe the parties' theories? Did we say anything there about the Clean Water Act? Okay. We've taken that out of your -- the statement of the parties' position. So I'll just tell them that when -- you know, I think it will be easier to do it --

I'll just intertwine that -- I'll do it -- I'll do that before we start the closing arguments.  Okay.

Now, do you all want a break, or are you ready to go?  What does the plaintiff say?

MR. MARTIN:  We would request a break.

THE COURT:  We'll take a ten-minute break and then we're going to get started.  All right.

(Recess.)

(Jury not present.)

THE COURT:  Okay.  Before the jury has gone in, I understand you've had an opportunity to look at the exhibits, and they're in order?

MR. MARTIN:  Yes.

THE COURT:  Correct?

MR. FITTS:  That's correct, Your Honor.

THE COURT:  All right.  Bring in the jury.  All right.

(Jury present.)

THE COURT:  So, ladies and gentlemen, as I mentioned to you, we're now going to have closing arguments.

I do want to share with you, when we started the case and we were doing jury selection, you may remember me saying this case is about two alleged violations of two statutes, one of those statutes being the Clean Water Act. The closing arguments will only refer -- will not refer to

the Clean Water Act.  That's no longer before you for any decision.

All right.  So, with that, we'll start with the plaintiff.

PLAINTIFF'S CLOSING STATEMENT

MR. MARTIN:  Well, ladies and gentlemen of the jury, good afternoon.  It's been a long few days.  I appreciate your attention.  We -- both parties, I'm sure, have noticed you guys pay attention.  You take notes.  And we both appreciate it, I'm sure.

This case is about RCRA.  RCRA is the Resource Conservation and Recovery Act, and the judge will tell you more about it when he charges you.  But it is designed to take care of open dumping, which was a huge problem back before they began sanitary landfills.  RCRA regulates disposal of solid waste, whether it's a landfill or however.  And usually a landfill.

When it was passed, Congress noted that RCRA was intended to eliminate the last remaining loophole in environmental laws, that of unregulated land disposal of discarded waste.  It's important -- it's important in this case.  And you may wonder, you know, what difference does it make if he's permitted as a landfill or not?  Makes a lot of difference in the fact that it protects the environment. There are protections in the landfill permit for the

environment, and he's required -- one is required, if they have a landfill permit, to get a Sector L stormwater permit, which has more protections for the environment than the construction stormwater permit that Mr. Ray has.

And we've seen muddy water. And, if he's properly regulated, he would -- should be able to control muddy water with those regulations.

And you say, well, what harm does muddy water do? Kills fish, kills plants, and it's unsightly. It's a pollutant, and the intention of both the Clean Water Act and RCRA is to protect the environment and to eliminate pollutants to the extent possible.

So we've -- we've seen witnesses testify, and the question for you will be whether or not this is a permit and whether the exception that they allege applies to keep them from having to get a permit if they are a landfill.

We saw Mr. Mattingly's drone shot, the circle that he made around the property, and you saw from that just the vast amount of rock and dirt and other stuff that's been dumped there and just laid bare for years. He's saying he's finally getting some grass cover on it, but it took him a while. It took a long time to get that -- that together. And it's -- you know, the environment, the streams, the rivers have paid for it there.

We heard from Frank Canale, who lives next door,

30 years he's enjoyed his one acre there with his house and his detached workshop.  One day he notices construction going on next door, people cutting down trees, and then, next thing you know is they're pulling in rocks.

He has to listen to the dump trucks as they go tearing up the hills, their backup beeping signals, the -- he said the bulldozers blow their horns to tell the -- the dump trucks when to stop.  And they use Jack braking going downhill.

And I don't know if you know what Jack braking is. It's when trucks put their truck into a low gear as they go downhill, and you hear a wha-wha-wha-wha sound.  It's so annoying, a lot of cities, you may have seen signs that say "No Jack braking," and that's because it makes such a noise doing it.

And so Mr. Canale has been affected, and his -- all the muddy water runoff ran onto his property and was a big problem for him.

And we heard from Mr. Keck, who lives down by Sulphur Creek.  You know, his land has been impacted.  He's had sediment pile up in his creek.  The muddy water affects his enjoyment of his land, and he has a right to complain about this unpermitted landfill sending muddy water to his land.

And we heard from Mr. Sulkin, who went on the land

by permission, took photographs of the steep slopes, the debris that's there. And you saw a tire. And you saw a pipe. It's a big area. We don't know what else is there.

Mr. Ray says that his son and his daughter drive bulldozers and pick out the -- the unallowed debris as it comes in. Obviously they miss stuff. They missed this tire. They missed the metal pipe. And even though he denies that some of it gets buried in the process, you know, the judge will tell you, you can use your common sense.

The exception that they're claiming is -- and pardon me for putting on my glasses for this -- use of solely natural rock, dirt, stumps, pavement, concrete, and rebar, and/or brick rubble as fill materials.

That exception is ambiguous. It's hard to figure out just what it means. And there aren't a lot of definitions of the terms there. And it's another situation where you're going to be called on to use your common sense.

For instance, what do they mean by the word "solely"? It doesn't say "substantially." It says "solely." There's nothing but these materials may go there.

And what is meant by the word "natural rock"? That's not a phrase I'm familiar with. Rock seems to be mostly natural as it is. And that terms not defined by the statute. But I would suggest that maybe it means rock that comes from the area, naturally comes from the area where it's

being used.

But we contend that exception shouldn't apply to this case anyway.

It -- the word use of "solely natural rock," the word use, it's not defined either. Does it mean permanently disposing of this material, dumping it into a landfill? Doesn't seem that that would apply.

We contend this -- this section, this exception was intended to keep somebody who's filling potholes in their driveway from having to get a landfill permit. Now, that would be ridiculous, and we think the legislature said that people have small projects like that, maybe they're bringing their building site, their house, maybe they're making it level, filling in a little depression on it, maybe somebody's, you know, repairing a road.

That's what this is intended for, use, and that's -- that's a movement that a lot of states have. They call it beneficial fill. They find a way of using material beneficially so they don't have to put it in landfill, where it's expensive and there's limited landfill space. So you see things like using tires for paving roads, ground up tires and stuff. That's all the beneficial use.

We contend that it's not intended to allow someone to amass, you know, huge quantities of rock and actually run a landfill and not have to get a permit. It just doesn't

make sense that the legislature would want somebody to do that.

Once again, use your common sense and see what you think, if that's a reasonable thing for the legislature to do, is to allow somebody to get out of the requirements of permitting.

We talked about a Class IV construction and demolition landfill. It's a facility that receives and permanently disposes of construction and demolition waste.

Now, which is clearly what we have here. He is a professional. He's been working in grading and -- 50 years. He's done this before at Cato Road. And he's accepting fill material. He's accepting rock, dirt, whatever, from these builders, contractors, whoever, and they pay him so they can dispose of the property there.

I suppose they would have to pay more if they went to a real, you know, permitted landfill. He has this operation where he brings them in on the side and he gets paid. And he doesn't -- you know, we're not saying he's a bad guy for doing that. He's just found a loophole where he thinks he can get away with not having to get a permit and not having to go through that expense and the trouble that it takes to, you know, to keep up compliance with your permit. He found an easier way to do it.

But it's not a legal way to do it. You know, it's

not a way that he should be allowed to do. You know, he should be held to the same standards as everybody else, to apply, to comply with the laws that require people running a commercial operation such as this to get a permit. And it's really that simple.

You'll recall yesterday when we were talking about site assessment -- you know, probably way too much. We talked about site assessment. And he was saying that he didn't -- you know, his property didn't drain 38 acres, so he didn't have to have a site assessment.

But he said that there was a ridge on his property that cut his property in half, and therefore he didn't drain that much.

You saw the topo map that he presented today. It's Defendant's Exhibit Number 1. And you'll have it with you in the jury room. The ridge doesn't cut his property in half. It's way up on the top of his property. It doesn't divide his 38 acres into -- into half.

So why does that matter at this point? You have to decide if he intentionally lied about that in order to avoid, you know, being accused of not doing site assessments. And if he intentionally lied about that, then you have to decide if he's credible to believe on anything else. That's something up to you to decide.

So one thing that protects people in the

community --

THE COURT: Mr. Martin, you've used your initial time. I just wanted to --

MR. MARTIN: Uh-huh. Thank you.

THE COURT: I'm just giving you a warning.

MR. MARTIN: Are you saying I'm into my rebuttal time now?

THE COURT: Well, it depends on if you go further or not.

MR. MARTIN: Well, let me think about this.

THE COURT: All right. You still have two minutes left that you reserved.

MR. MARTIN: I'll save the rest for rebuttal.

THE COURT: Okay. We'll hear from the --

MR. MARTIN: Thank you.

Thank you, ladies and gentlemen.

DEFENDANT'S CLOSING STATEMENT

MR. CASHION: Good afternoon, jury. I, likewise, want to thank you for your service, for your attention, and also for your patience in this one.

So I know we've been out a lot, but we've made progress, just like -- you won't hear me talking about it's all about the water. The Clean Water -- the Clean Water Act claim is dismissed. So that's done.

So now you're talking about simply the exception

to a -- the landfill that's in the statute.  Tennessee has a statute.

And I want to focus on that a little bit because when you go back -- first thing that's going to happen after I get through -- and any exception -- Mr. Martin may come back up.  I'm not sure.  But anyway, the next thing is the judge is going to read you the charge.  And he's going to tell you all about how to deliberate as a jury.

And when he gets down to the issue we're at -- so we've condensed this to just one issue.  And your jury charge is for one issue.  And that is, what is in the fill on the property?  That's it.

The verdict form will ask you, did Tennessee Riverkeeper prove by a preponderance of the evidence that RR Farms is a Class IV construction and demolition landfill?

And the answer is yes, because we come under this statute.  So we are.

But the important point is there's an exception to the statute.  So that's landfill of all types of construction uses.  And that would be, like I talked about in opening, you could have, you know, drywall, shingles, all this other stuff that doesn't belong in a fill, does not belong, because the purpose is to protect from harmful chemicals.  And so stuff that could be harmful is part of it, but the statute gives you an exception, tells the person, okay, you do

construction, but there's an exception to this, and the statute describes the exception.

And you'll be asked, did Ricky Ray prove by preponderance of evidence that he was not required to obtain a landfill permit because RR Farms engages in the use solely of natural rock, dirt, stumps, pavement, concrete, rebar, and/or brick rubble as fill material.  This is what fill material is.

And it says yes or no.  And we say it's obviously yes, that's what we put in there.

There's no other proof.  You can't say they put in drywall.  They didn't test -- they didn't do a drill hole to find out if there was something in there somewhere else.

The questions -- the two questions you have is, yes, we're part of it because we moved land, and that's part of it, and it will be -- dirt and rock will be in the first part.

But when you pull it out in the second part, as do you need a land permit for that, then he is not required to obtain the land permit because he engages solely for rock, dirt, stumps, pavement, concrete, rebar, and brick rubble as fill material.

So your job when you go back there is to say, you know, forget about clean water, forget about all that stuff. It's just one thing:  What's in the big pile?

And we've shown -- that's why we came back after -- this morning and showed you again the same photographs that Mr. Sulkin had -- had taken to show you that's all that's in there.

And we can -- you know, sometimes they put something aside, like the steel pipe or the tire. That's not what's in there. And the proof is that's the only thing that's in there.

Nobody has, you know, testified, oh, they were dumping shingles in there; they were dumping drywall in there; they were dumping, you know, asbestos in there. They were -- you know, doing all -- none of that. None of it.

What you have before you is did -- what you see from the photographs we've showed you, did it engage the use of -- solely natural rock, dirt, stumps, pavement/asphalt, concrete, rebar, brick and rubble? That's it.

And if you saw something else, then I don't know where it's coming in from the proof, you know. If you saw -- but you didn't.

And so I think this -- this is not a far reach here. It's just simply checking yes, yes, on them, and saying yeah, that's all we saw.

You're sitting here listening to our proof. We're telling you proof. He tells you his proof. I tell you mine. The witnesses tell you. And Mr. Ray told you just flat out,

no, that's all I used. Mostly rock and dirt. Mostly rock.

And so that's why in this case he doesn't need to obtain a landfill permit. Because he's using materials that are nonhazardous that you don't have to worry about. That's what the statute wanted.

And it's -- it's obvious that in construction they're always moving dirt. They're always blasting -- they don't blast rock anymore. I keep wanting to say that. They're always chipping rock off and moving rock, but they don't go around taking out a landfill permit because they move it from one area and move it to the next area. That's the way you do a fill.

This was a permitted set of drawings that had defined elevations on how to build this that Metro approved. Metro approved what they were doing, said, yes, you're going to put all this material you can find, however you want to find it, and make it. Metro said that's good.

They didn't say, this is a landfill. You're going to put dump in there and bad stuff. They proved this is what we're making our fill with.

And when you talk about, well, what -- do you feel comfortable -- well, remember what we talked about with the inspections. I mean, he had 500 TDEC inspections. They're still inspecting out there. He had 60 Metro, one per month, two per week for TDEC, one per month -- everybody's looking

at this. They have all kinds of inspections, and they're looking -- the TDEC people are looking mainly to make sure that our controls are correct for stormwater runoff. That's what they're doing.

But that's not the issue of this lawsuit. Metro is looking at the whole site.

My point is nobody wrote anything in over 500 reports that there was -- they were putting in something that they shouldn't be in that fill.

In fact, as Mr. Ray testified this morning, he wouldn't let them. Trucks would come up. If they had something they weren't supposed to, he would turn them away. And when the truck dumped, they spread it out so they could see if there's anything in there. If there's anything there, they pick it out and they just move along.

So there's no proof that there was anything else in here.

And that's where your duty stops and ends. What was in here? And there's certainly no proof of -- I'm not sure what this -- Metro -- no. I don't think it makes -- it makes any sense that we would be trying to construct a fill by putting stuff we knew was bad. In his 50 years, he knew what was -- to put in there and what wasn't.

And that's why I think it was important, when he was telling you that, when he started this project, he

knocked down the house.

Now, if he was going to be sketchy on it, why didn't he just cover it up?  Just knock it down and cover it up?  Nope.  That's not Ricky Ray.  He took it all out, loaded it in five different dumpsters -- Dempster dumpsters or waste management dumpsters, whatever you call it, and shipped it off to a landfill that takes that stuff.

So he didn't even start his -- when he started his construction, he knew what was -- he could take and what he couldn't.  He made sure he didn't have anything when he started.  He took the house down and shipped it off.

And then he kept watching trucks to make sure anybody that brought something was going to stay, and primarily the dirt and rock.  Got some asphalt, got some concrete, but it was primarily dirt and rock.

And so that's why this case boils down to not about water, not about, you know, what he did.  He said he missed the -- what did he say?  The time -- the acreage?  It's 38 acres, and he said it's about half.  No, no, no.  They just want something to complain about.

The forms said it was 18.6 of disturbed area.  And if I mapped and I have 38, I've got about 20 acres of undisturbed; I've got 18 of disturbed.  That's why he said it was half.  It was half because the disturbed area was what we were talking about.

And that's what I mean. You can't go with these little picks that just keep coming out every time.

And so what we just humbly ask you is to say yes, he was -- number one, say yes, he's in that category; number 2, say yes, he proved he's in the exception to that. That's where we want to be, in the exception. We do not have to get a landfill permit.

And it's crazy they waited three years before they even moved on this if they even thought we did. But this is just what we're fighting.

And so we -- again, I want to thank you for your time and attention and just ask that you deliberate and do whatever you know is best and fair for you, that you're comfortable with.

So thank you very much.

THE COURT: I'm going to interrupt. Get the doors closed. Okay. I didn't want anyone to be interrupted or a diversion.

Now you can start.

PLAINTIFF'S REBUTTAL CLOSING STATEMENT

MR. MARTIN: They say they have inspections where 500 people have looked at this property. But have you seen them? I haven't seen them. But now you're looking at it. You can decide for yourself. You don't need 500 people to tell you what's there in front of your eyes. This is a

landfill. It's a dirty landfill. It's belching muddy water onto the neighbors. Trucks are making a lot of noise and disturbing people, dropping chunks of concrete on the road and busting up people's tires.

Mr. Ray found a loophole. Would you want your neighbor to use this loophole? Do you think the Tennessee legislature intended that anyone could use this loophole to build a landfill anywhere they wanted? No local approval, no Jackson Law, no notice to the neighbors and give them an opportunity to come in and complain about it? Is that what the legislature -- the legislature intended?

So on this exception, this clean fill exception, we can call it, I guess, they have the burden of proof on that. We don't have to prove that they don't apply to this exception. They have to prove to you that they apply. And that means they have to prove that this is the only type of material that they have accepted there. Nothing else. Just solely. You know, everything has to be of that type.

And, you know, we've seen -- you know, Mr. Sulkin did a limited inspection there. Mr. Ray said he was there for an hour, and that sounds about right. It's a large site. It takes longer than that to inspect everything there and see what all is there. But within the time he was there, he found two items that should not have been there.

And that tire, you saw all the grass growing

around it.  It had been there for a while.  You know, the kids didn't find it and pull it out right away as it was coming off the truck.  It rolled down the bottom of the hill and stayed there.

You know, they -- maybe they've got it since then or maybe it got covered up and maybe there's other stuff covered up there that, you know, they just don't see.  They haven't been that careful to make sure that they comply strictly with this exception, if the exception applies at all.

It's up to them to prove that.  And you have to decide if they've done that.

Thank you very much.

THE COURT:  So, ladies and gentlemen, you've now heard the closing arguments from both sides.  I'm going to pass out to you now a copy of the charge that you can follow along.  That's your copy.  You can mark on it, highlight it, whatever you please.

Members of the jury:

Now that you've heard the evidence and the arguments during trial, it is time for me to instruct you about the law that you must follow in deciding this case.

I will start by explaining your duties and the general rules that apply in every civil case.  I will also explain some rules that you must use in evaluating particular

testimony and evidence.  Next, I will explain the elements, or parts, of the claim at issue in this case.  And last, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts you may return.

Please listen very carefully to everything I say.

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in the courtroom.  Deciding what the facts are is your job, not mine, and nothing I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if Tennessee Riverkeeper has met its burden of proof.

It is my job to instruct you about the law, and you are bound by your oath that you took at the beginning of the trial to follow the instructions that I give you, even if you disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All of the instructions are important, and you should consider them together as a whole.

The lawyers may have referred to some of the governing rules of law in their arguments and witnesses may have shared their opinion of the law.  There may also be

references to the law in exhibits admitted into evidence. But if what they say is different from what I say, you must follow what I say. What I say about the law controls.

Perform these duties fairly. Do not let any bias, sympathy, or prejudice that you feel -- that you may feel toward one side or the other influence your decision in any way.

In this case, Tennessee Riverkeeper is a corporate entity. All parties are equal before the law. A corporate entity is entitled to the same fair consideration that you would give any individual person.

Remember, you must make your decision based only on the evidence that you saw and heard here in the courtroom. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath and the exhibits that I allowed into evidence and any stipulations that the parties agreed to.

Nothing else is evidence. The lawyers' statements and arguments, including their opening and closing arguments, are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. And my comments and questions are not evidence.

During the trial I did not let you hear the answers to some of the questions that the parties asked, and I also ruled that you could not see some of the exhibits that the parties wanted you to see.  And sometimes I ordered you to disregard things that you saw or heard, or I struck things from the record.  You must completely ignore all of these things.  Do not even think about them.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

Make your decision based only on the evidence as I have defined it here, and nothing else.

You heard the lawyers object to some of the things that were said or done during the trial.  Do not hold that against either side.  The lawyers have a duty to object when they think that something is not permitted by the rules of evidence.  Those rules are designed to make sure that both sides receive a fair trial.

But evidence does not include any objections raised by the attorneys.  You must not speculate why I sustained or overruled any objection, nor are you permitted to guess what the answer might have been to any question I did not allow.  You may not draw any inference or speculate on the truth of any suggestion included in the question that

was not answered.

And do not interpret my rulings on their objections as any indication of how I think the case should be decided. My rulings were based on the rules of evidence, not on how I feel about the case. Remember that your decision must be based only on the evidence you saw and heard here in court.

Now, some of you have heard the terms "direct evidence" and "circumstantial evidence."

Direct evidence is simply evidence, like the testimony of an eyewitness, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight you should give to either one or says that one is any better evidence than the other. But you should consider all of the evidence, both direct and

circumstantial, and give it whatever weight you believe it deserves.

Again, you are to consider only the evidence in the case. You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

In our lives, we often look at one fact and conclude from it that another fact exists. In law we call this an inference. A jury is allowed to make reasonable inferences, unless otherwise instructed. Any inferences you make must be reasonable and must be based on the evidence in the case.

The existence of an inference does not change or shift the burden of proof from one party to another.

In reaching your verdict, you are to consider only the evidence in this case. However, you are not required to set aside your common sense, and you have the right to weigh the evidence in the light of your own observations and experiences.

Do not decide the case based on implicit biases, which are hidden thoughts that can impact what we see and hear, how we remember what we see and hear, and how we make

important decisions.

As we discussed in jury selection, everyone, including me, has feelings, assumptions, perceptions, fears, and stereotypes, that is, implicit biases, that we may not be aware of. No matter how unbiased we think we are, our brains are hardwired to make unconscious decisions. We look at others and filter what they say through the lens of our own personal experience and background.

Because we all do this, we often see life -- and evaluate evidence -- in a way that tends to favor people who are like ourselves or who have had life experiences like our own. We can also have biases about people like ourselves. One common example is the automatic association of male with career and female with family. Bias can affect our thoughts, how we remember what we see and hear, whom we believe or disbelieve, and how we make important decisions.

Because you are making very important decisions in this case, I strongly encourage you to evaluate the evidence carefully and resist jumping to conclusions based on personal likes or dislikes, generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases.

Take the time you need to reflect carefully and thoughtfully about the evidence. Think about why you're making the decision you're making. Reconsider your first impressions of the people and the evidence in this case. If

the people involved in this case were from different background, for example, richer or poorer, more or less educated, older or younger, or of a different gender, gender identity, race, religion, or sexual orientation, would you still view them, and the evidence, in the same way?

Listen to one another. You must carefully evaluate the evidence and resist and help each other to resist any urge to reach a verdict influenced by bias for or against any party or witness. Each of you have different backgrounds and will be viewing this case in light of your own insights, assumptions, and biases. Listening to different perspectives may help you to better identify the possible effects these hidden biases may have on decision-making.

The law demands that you return a just verdict based solely on the evidence, your individual evaluation of that evidence, your reason and common sense, and these instructions. Our system of justice is counting on you to render a fair decision based on the evidence, not on biases.

Certain charts, lists, timelines, and summaries have been shown to you in order to help explain facts disclosed by other records or documents. However, these demonstrative exhibits are not evidence or proof of any facts. They are used only as a matter of convenience. Therefore, if you find the demonstrative exhibits do not

correctly reflect facts or figures shown by the evidence in the case, you should disregard them.

Another part of your job as jurors is to decide how credible or believable each witness was. This is your job, not mine. It is up to you to decide if a witness's testimony was believable and how much weight you think it deserves. You are free to believe everything that a witness said, or only part of it, or none of it at all. But you should act reasonably and carefully in making these decisions.

Let me suggest some things that you should consider in evaluating each witness's testimony.

Ask yourself if the witness was able to clearly see or hear the events. Sometimes even an honest witness may not have been able to see or hear what was happening and may make a mistake.

Ask yourself how good the witness's memory seemed to be. Did the witness seem able to accurately remember what happened?

Ask yourself if there was anything else that might have interfered with the witness's ability to perceive or remember the events.

Ask yourself how the witness acted while testifying. Did the witness appear honest? Or did the witness appear to be lying?

Ask yourself if the witness had any relationship to Tennessee Riverkeeper or Mr. Ray, or anything to gain or lose from the case that might influence the witness's testimony. Ask yourself if the witness had any bias, or prejudice, or reason for testifying that might cause the witness to lie or to slant the testimony in favor of one side or the other.

Ask yourself if the witness testified inconsistently while on the witness stand, or if the witness said or did something, or failed to say or do something at any other time that is inconsistent with what the witness said while testifying.

If you believe that the witness was inconsistent, ask yourself if this makes the witness's testimony less believable. Sometimes it may; other times it may not.

Consider whether the inconsistency was about something important, or about some unimportant detail. Ask yourself if it seemed like an innocent mistake or if it seemed deliberate.

And ask yourself how believable the witness's testimony was in light of all the other evidence. Was the witness's testimony supported or contradicted by other evidence that you found believable? If you believe that a witness's testimony was contradicted by other evidence, remember that people sometimes forget things, and that even

two honest people who witness the same event may not describe it exactly the same way.

These are only some of the things you may consider in deciding how believable each witness was.  You may also consider other things that you think shed some light on the witness's believability.  Use your common sense and your everyday experience in dealing with other people, and then decide what testimony you believe and how much weight you think it deserves.

As judges of the facts, it is your responsibility to resolve discrepancies in the testimony of the witnesses as well as to determine what a particular document does or does not say.

With respect to a witness's testimony, discrepancies in a witness's testimony or between his or her testimony and that of others do not necessarily mean the witness should be discredited.  Failure of recollection is a common experience, and innocent mistakes recalling certain facts are not uncommon.  Two persons witnessing the same incident or transaction often will see or hear it differently.

With respect to documents admitted into evidence, you determine whether a particular document in fact reads or states what the parties have argued.  In other words, what a document says or does not say is for you to decide.  And if

you find a discrepancy between what you find a document states and other evidence, you must determine the weight to give to each piece of evidence.  Whether a discrepancy pertains to a fact of importance or only a trivial detail should be considered in weighing its significance.

A witness may be discredited or impeached by contradictory evidence, or by evidence that at some other time the witness has said or done something or has failed to say or do something that is inconsistent with the witness's testimony in court.

If you believe any witness has been impeached and thus discredited, you may give that witness's testimony as much credibility as you think it deserves.

If a witness has shown knowingly, voluntarily, or intentionally to have testified falsely concerning any material matter, you have a right to distrust that witness's testimony about other matters, and you may reject all of the testimony of that witness or give it such credibility as you may think it deserves.

Sometimes jurors wonder if the number of witnesses who testified is important.  It is not.  Do not make any decisions based only on the number of witnesses who testified.  What is more important is how believable the witnesses were and how much weight you think their testimony deserves.  Concentrate on that, not on numbers.

Tennessee Riverkeeper has the burden of proving its claim in this case by preponderance of the evidence, unless I specifically instruct you otherwise. If you conclude that Tennessee Riverkeeper has failed to establish its claim by preponderance of the evidence, then you must decide against it on the issue you are considering.

What does a preponderance of the evidence mean? To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true. In determining whether a claim has been proved by a preponderance of the evidence, you may consider the relevant testimony of all of the witnesses, regardless of who may have called them, and all of the relevant exhibits received in evidence, regardless of who may have produced them.

If you find that the credible evidence on a given issue is evenly divided between the parties -- that is, it is equally probable that one side is right as it is that the other side is right -- then you must decide that issue against the party having the burden of proof. That is, because the party bearing the burden must prove more than simply equality of evidence.

On the other hand, the party with the burden of proof need prove no more than a preponderance. So long as you find that the scales tip, however slightly, in favor of the party with this burden of proof, then that element will

have been proved by a preponderance of the evidence.

Some of you may have heard of proof beyond a reasonable doubt, which is the proper standard of proof in a criminal trial. That requirement does not apply to a civil case such as this case, and you should put it out of your mind.

I will now give you the parties' theories, which is a summary of what each party believes this case is about. These are simply the parties' theories; they are not evidence. You must render your verdict based upon these instructions and the evidence introduced at trial, not the parties' theories.

As I mentioned at the beginning of the case, this is a citizen enforcement lawsuit brought by Plaintiff Tennessee Riverkeeper, Inc., against the defendant, Ricky Ray.

Mr. Ray operates a grading business located at 5250 Ashland City Highway, Davidson County, Tennessee, known as RR Farms. Tennessee Riverkeeper alleges that Mr. Ray violated the Resource Conservation and Recovery Act at RR Farms.

Specifically, Tennessee Riverkeeper alleges that Mr. Ray violated the RCRA because he is operating a construction and demolition landfill without a landfill permit.

Mr. Ray contends that he is not operating a construction and demolition landfill, and, even if he was operating a construction and demolition landfill, Tennessee law exempts RR Farms from any landfill permit requirement.

I'm now going to turn to the substantive law in this case. This is the law that you will apply to the facts, as you determine them, to decide whether Tennessee Riverkeeper has proven its claim against Mr. Ray.

As you listen to these instructions, please keep in mind that many of the terms I will use, and that you will need to apply, have special meaning under the law. So please remember to consider the specific definitions I give you, rather than using your own opinion of what these terms mean.

The RCRA is a federal statute that governs generation, transportation, storage, treatment, and disposal of hazardous and solid waste. The purpose of the RCRA is to reduce the generation of waste, and to ensure that any waste that is generated is properly treated, stored, and disposed of.

The RCRA permits citizens, including Tennessee Riverkeeper, to sue against any person who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to the RCRA.

The RCRA requires states to create solid waste

management plans that ensure solid waste will be disposed of in an environmentally sound manner.  Tennessee has received approval to administer and enforce its own solid waste management program under the RCRA.

Pursuant to that program, Tennessee generally requires that any person who constructs or operates a solid waste disposal facility must obtain a landfill permit, subject to an exception that I will explain later.

In this case, Tennessee Riverkeeper alleges that Mr. Ray is operating a Class IV construction and demolition landfill at RR Farms without a permit.  A Class IV construction and demolition landfill is a facility that receives and permanently disposes of construction/demolition waste.

The term "construction/demolition waste" means waste resulting from construction, remodeling, repair, and demolition of structures and from road building.  Such waste includes but is not limited to bricks, concrete, and other masonry materials, soil, rock, and lumber, road spoils, rebar, and paving material.

To find Mr. Ray liable under the RCRA, you must first find that Tennessee Riverkeeper has proven by a preponderance of the evidence that RR Farms is a Class IV construction and demolition landfill.  In deciding this issue, you may consider what kind of waste, if any, that RR

Farms receives and permanently disposes of at the site.

If you find that Tennessee Riverkeeper has not proven by a preponderance of the evidence that Mr. Ray is operating a construction and demolition landfill, then Mr. Ray is not liable for violating the RCRA.

If you determine that RR Farms is a Class IV construction and demolition landfill, then you must determine if Mr. Ray is exempted from the landfill permit requirement.

Tennessee regulations provide that the use of solely natural rock, dirt, stumps, pavement, concrete, and rebar, and/or brick rubble as fill material does not subject a Class IV construction and demolition landfill to the requirement to have a permit.

You should apply the common, ordinary meaning of the term "fill material," which is defined in the dictionary as "any material placed on the surface of the ground, especially wet ground, in order to raise it."

Accordingly, it will be up to you to decide whether Mr. Ray has proven by a preponderance of the evidence that RR Farms engages in the use of solely natural rock, dirt, stumps, pavement, concrete, and rebar, and/or brick rubble as fill material.

If you find that Mr. Ray has met his burden on this issue, then you should note that on the verdict form, which I will instruct you on -- with you later.

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish about explaining some of the things about your deliberations in the jury room and your possible verdicts.

Upon retiring to the jury room, you will select one of your number to act as your foreperson. That person, foreperson, will preside over deliberations, and will be your spokesperson here in court. Your foreperson should guide your deliberations and ensure that they proceed with proper decorum.

In other words, the foreperson has the authority and the responsibility to make sure that all jurors are heard during your deliberations, and to ensure that all jurors conduct themselves in a professional and respectful manner.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, the foreperson must write them down on a piece of paper, sign that piece of paper, put that piece of paper in an envelope, and give it to the jury officer, who will give it to me.

The jury -- I will respond as soon as I can, but I may need to talk to the lawyers about what you have asked. So it may take me some time to get back to you.

Also, when you have reached a verdict, your

foreperson should send a note to the Court that you have reached a decision. All correspondence to the Court shall be placed in an envelope provided to you and should be sealed before being given to the jury officer.

One more thing about messages. Do not ever write down or tell anyone, including me, how you stand on your votes. For example, do not write down or tell anyone that you're split 4-4 or 6-2, or whatever your vote happens to be. That should stay secret until you are finished.

Remember that you must make your decision based only on the evidence that you saw and heard here in court.

During your deliberations, you must not communicate or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cellphone, smartphone, iPhone, Blackberry, or computer, the internet, any internet service, or any text or instant messaging service, any internet chat room, blog, or website, such as Facebook, Instagram, LinkedIn, Snapchat, YouTube, TikTok, or X, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during

deliberations. And I expect you to inform me as soon as you become aware of another juror's violation of these instructions.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide the case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have.

In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom. Otherwise, your decision may be based on information known only by you and not your fellow jurors or the parties in the case. This would unfairly and adversely impact the judicial process.

A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result, which would require the entire trial process to start over.

The verdict you must -- the verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree. Your verdict must be unanimous.

Now that all the evidence in and the arguments are completed, you're free to talk about the case in the jury room. In fact, it's your duty to talk with each other about the evidence and make every reasonable effort you can to reach unanimous agreement.

Listen to what your fellow jurors have to say. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences.

Do not hesitate to the change your mind if you are convinced that other jurors are right and that your original position was wrong, but do not ever change your mind just because other jurors see things differently or just to get the case over with. In the end, your vote must be exactly that - your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your mind.

Listen carefully to what the other jurors have to say, and then decide for yourself if Tennessee Riverkeeper has proved its case by a preponderance of the evidence.

The attitude and conduct of jurors at the

beginning of their deliberations is very important. It is rarely productive or good for a juror, upon entering the jury room, to make an emphatic expression of his or her opinion on the case or to announce a determination to stand for a certain verdict. When a juror does this, his or her sense of pride may be aroused, and he or she may be -- may hesitate to recede from an announced position if shown that it is wrong. Remember, you are not partisans or advocates in this matter, but judges.

Remember, if you elected to take notes during the trial, your notes should be used only as memory aids. You should not give your notes greater weight than your own independent recollection of the evidence. You should rely upon your own independent recollection of the evidence or lack of evidence, and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any more weight than the memory or impression of each juror.

Whether you took notes or not, each of you must form and express your own opinion as to the facts of the case.

Let me finish up by repeating something I've said to you earlier. Nothing I have said or done during this trial was meant to influence your decision in any way. You decide for yourselves if Tennessee Riverkeeper has proved its case by a preponderance of the evidence.

I'm now going to show on the overhead a proposed verdict. You'll get one copy of the verdict form to accompany you to the jury room.

The verdict form reads (as read):

We, the jury, unanimously answer the questions submitted by the Court as follows:

1. Did Tennessee Riverkeeper prove by a preponderance of the evidence that RR Farms is a Class IV construction and demolition landfill?

And there's a space for yes and a space for no. You'll check one. (As read):

If you answered yes to Question 1, then proceed to Question 2.

If you answered no to Question 1, then do not answer Question 2.

2. Did Ricky Ray prove, by preponderance of the evidence, that he was not required to obtain a landfill permit because RR Farms engages in the use of solely natural rock, dirt, stumps, pavement, concrete, and rebar, and/or brick rubble as fill material?

And there is a line there for yes and one for no.

After you have completed your verdict form, sign -- have the foreperson sign it, date it, and then send me a note in an envelope, give it to the Court -- the jury

officer, and he'll bring it to me, and we'll gather here in the courtroom to publish your verdict.

So I'll give you a moment to get your papers and your notebook, which -- your file folders. And we have prepared the exhibits. You'll have the actual copy of the exhibits as they came into evidence that you can read and do with as you please.

I'm also going to give you the exhibits on a thumb drive. And that's because jurors -- other juries have told me that they like to have the exhibits on a thumb drive so you can show it on the TV and you all can read it together and look at it together and deliberate as you look at that.

There will also be an index of the exhibits so -- a description so you know what is Exhibit 1 through whatever it is for your ease and convenience.

So, with that, I'm going to ask the jury officer to take you to the jury room. Give us just a minute for the courtroom deputy to follow behind you to bring you the exhibits before you get started.

Thank you.

(Jury retires at 4:40 p.m.)

THE COURT: All right. Does the plaintiff have any objections to the charge as given?

MR. HOLT: We do not, Your Honor.

THE COURT: Does the defendant have any objections

to the charge as given?

MR. CASHION:  Your Honor, I would only say that I think this was written before the verdict form because --

THE COURT:  What -- are you talking about the verdict form?

MR. CASHION:  Yeah, the verdict.

THE COURT:  What about it?

MR. CASHION:  Because this refers to "if Riverkeeper is able to prove that burden."  It doesn't say anything about us.  And you -- we kind of thought we shouldn't have the burden of proof.  They should -- the other way.

THE COURT:  But you have the burden of proof on the exception.

MR. CASHION:  I know.

THE COURT:  Okay.

MR. CASHION:  But this verdict form just leaves us off for -- we have a burden of proof, is what I'm saying.

THE COURT:  I'm not following you.

MR. CASHION:  Okay.  Let me. . .

On page 42, last sentence, "You decide for yourselves if Tennessee Riverkeepers have proven its case by a preponderance of the evidence."  You don't include us.

THE COURT:  I'm sorry.  You said page 42?

MR. CASHION:  42.  Last sentence.

THE COURT: 42?

MR. CASHION: I've got an earlier version. I apologize. 43. Pardon me. It used to be 42.

THE COURT: No. I don't think it's 43.

MR. CASHION: Sir?

THE COURT: 43 says the Court has no opinion.

MR. CASHION: Right. And there you say, "You decide for yourselves if Tennessee Riverkeeper has proved his burden by a preponderance of the evidence."

You don't mention our --

THE COURT: True. But it's clear on the verdict form.

MR. CASHION: It's clear on the verdict form. I'm good.

THE COURT: Thank you.

MR. HOLT: Your Honor --

THE COURT: I need you all to step out because I have --

MR. HOLT: Your Honor --

THE COURT: Oh.

MR. HOLT: Excuse me. We would like to enter an objection to the jury instructions.

THE COURT: I think you've waived it. I've already asked you. But go ahead.

MR. HOLT: We would just like --

THE COURT: You don't get do overs here. When I ask you these questions, they have meaning.

But go ahead and make your objection.

MR. HOLT: Thank you, Your Honor. We would just object for the reasons stated earlier --

THE COURT: So noted.

MR. HOLT: Thank you.

THE COURT: So I need you to either step to the side -- oh, I need to you all to step back and the other parties come forward.

So you need to move away from the table, and they'll bring in the next party.

(Recess.)

(Jury present at 5:30 p.m.)

THE COURT: All right. So let the record reflect the jury has returned to the courtroom.

I received your note: "We, the jury, have reached a verdict."

Signed by ////////////////, foreperson.

So, ///////////, do you have the verdict form?

JUROR: Yes, I do.

THE COURT: Can you pass that to the court officer.

All right. So, ////////////, I'm going to return the verdict to you so you can publish it, read it onto the

record.

JUROR:  We, the jury, unanimously answer the questions submitted by the Court as follows.

Number 1.  Did Tennessee Riverkeeper prove by a preponderance of evidence that RR Farms is a Class IV construction and demolition landfill?  Yes.

Number 2.  Did Ricky Ray prove by a preponderance of evidence that he was not required to obtain a landfill permit because RR Farms engages in the use of solely natural rock, dirt, stumps, pavement, concrete, and rebar and/or brick rubble as fill material?  Yes.

THE COURT:  All right.  Can you return the verdict form to the court officer.

So, ///////////////, is that your verdict?

JUROR:  Yes.

THE COURT:  //////////////, is that your verdict?

JUROR:  Yes.

THE COURT:  //////////////, is that your verdict?

JUROR:  Yes.

THE COURT:  //////////////, is that your verdict?

JUROR:  Yes.

THE COURT:  //////////////, is that your verdict?

JUROR:  Yes.

THE COURT:  //////////////, is that your verdict?

JUROR:  Yes.

THE COURT:  ////////////, is that your verdict?

JUROR:  Yes.

THE COURT:  And, ////////////, is that your verdict?

JUROR:  Yes.

THE COURT:  Well, the Court thanks you for your service.  You're hereby discharged.

If you all could give me just a minute, I would like to come to the jury room and personally thank you for your service to the Court.  It's much appreciated.

All right.  Thank you.  I'll be right around.

(Jury excused.)

THE COURT:  All right.  Anything else from the plaintiff?

MR. MARTIN:  No, Your Honor.

THE COURT:  All right.  From the defense?

MR. CASHION:  No, Your Honor.

THE COURT:  Okay.  We're adjourned.

(Court adjourned.)

REPORTER'S CERTIFICATE

I, Lise S. Matthews, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on May 29, 2025, in the matter of TENNESSEE RIVERKEEPER, INC. v. RICKY RAY dba RR Farms a/k/a RR Farms Mass Grading, Case No. 3:23-cv-00878; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (pages 1 through 133) is a true and accurate record of said proceedings.

This the 27th day of August, 2025.

/s/ Lise S. Matthews
LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter